26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

OCT 0 9 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| VS. | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commissioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, | § | |
| (Previous Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

## DEFENDANTS' MOTION TO DISMISS AND
## MOTION FOR SUMMARY JUDGEMENT

Respectfully submitted,
WILLETTE & GUERRA, L.L.P.
International Plaza, Ste. 460
Brownsville, Texas 78521
Telephone    : (956) 541-1846
Facsimile    : (956) 541-1893

BY: _____
Ryan Henry
State Bar No. 24007347
Federal I.D. No. 22968

ATTORNEY FOR DEFENDANTS

# TABLE OF CONTENTS

Page

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

Statement of the Nature and Stage of the Proceedings . . . . . . . . . . . . . . . . . . . . . . . .   7

Summary Judgement Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

Summary of Issues to be ruled upon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

Defendants' Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

Motion to Dismiss Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

No Response to Defendants' Motion for a Federal Rule of Civil Procedure
7(a) Reply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

The Individual Defendants, in their Individual Capacities are Entitled
to Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

Standard for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

Plaintiff's Claims are Barred by the Statute of Limitations . . . . . . . . . . . . . . . . . . . . .   15

Plaintiff's Speech did not Involve a Matter of Public Concern and thus There
was no Constitutional Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

Content . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

Context . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

Page

Defendants' Interest in Efficiency Outweighs Plaintiff's Interest in Speaking . . . . .      23

Plaintiff Cannot Succeed Under 42 U.S.C. §1983 Because
he has Shown no Policy Custom or Practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      24

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      25

Prayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      26

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      27

Certificate of Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      27

CtmPDF - www.fesino.com

# TABLE OF AUTHORITIES

Page

**CASES**

*Anderson v. Unisys Corp.*, 47 F.3d 302, (8th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . .   16

*Board of County Commissioners of Bryan County, Oklahoma v.
Brown*, 117 S.Ct. 1382 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

*Bradshaw v. Pittsburg Ind. School Dist.*, 207 F.3d 814, (C.A.5 (Tex.) 2000). . . . . .   19,20,21,22

*Brawner v. Richardson*, 855 F.2d 187, 192 (5th Cir.1988). . . . . . . . . . . . . . . . . . . . .   23

*Brossette, v. City of Baton Rouge*, 29 F.3d 623 (5th Cir. 1994)
cert. denied, 513 U.S. 971, 115 S.Ct. 443, 130 L.Ed.2d 353 (1994). . . . . . . . . . . . . .   17

*Burns v. Harris County Bail Bond Bd.*, 139 F.3d 513, (C.A.5 (Tex.) 1998). . . . . . . . .   15,16,17

*Burrell v. Newsome*, 883 F.2d 416, (5th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . .   16

*Clark v. Amoco Prod. Co.*, 794 F.2d 967, (5th Cir. 1986). . . . . . . . . . . . . . . . . . . . . .   12

*Conley v. Gibson*, 355 U.S. 41, (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

*Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). . . . . . . . . .   19,20,21

*Dodds v. Childers*, 933 F.2d 271, (5th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . .   19,20

*Eugene v. Alief Ind. School Dist.*, 65 F.3d 1299, (C.A.5 (Tex.) 1995). . . . . . . . . . . . .   24

*Fee v. Herndon*, 900 F.2d 804 (5th Cir.1990) cert. denied,
498 U.S. 908, 111 S. Ct 279 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

*Flores v. Cameron County, Tex.*, 92 F.3d 258, (5th Cir. 1996). . . . . . . . . . . . . . . . .   16

*Gibson v. Rich*, 44 F.3d 274, (C.A.5 (Tex.) 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

*Goodson v. Corpus Christi*, 202 F.3d 730, (5th Cir.2000). . . . . . . . . . . . . . . . . . . . . .   14

*Hale v. Townley.*45 F.3d 914, (C.A.5 (La.) 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

|  | Page |
|---|---|
| *Kennedy v. Tangipahoa Parish Library Bd. Of Control* 224 F.3d 359, (C.A.5 (La.) 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19,23 |
| *Little v. Liquid Air Corp.,* 37 F.3d 1069, (5th Cir. 1994) (en banc) . . . . . . . . . . . . . . | 15 |
| *Mahone v. Addicks Utility Dist. of Harris County,* 836 F.2d 921, (5th Cir. 1988) . . . | 12 |
| *McIntosh v. Antonino,* 71 F.3d 29, (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| *Moore v. Mississippi Valley State Univ.,* 871 F.2d 545, (5th Cir. 1989) . . . . . . . . . . . | 22 |
| *Monell v. Department of Social Services,* 436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . | 24,25 |
| *Piotrowski v. City of Houston,* 237 F.3d 567, (C.A.5 (Tex.) 2001) . . . . . . . . . . . . . . | 11,16 |
| *Russell v. Bd. Of Trustees,* 968 F.2d 489, (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . | 16 |
| *Scheuer v. Rhodes,* 416 U.S. 232, (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 |
| *Schultea v. Wood,* 47 F.3d 1427 (5th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13,14 |
| *Teague v. City of Flower Mound, Tex.,* 179 F.3d 377, (C.A.5 (Tex.) 1999) . . . . . . . | 18,19,21,22 |
| *Thompson v Steel,* 709 F.2d 381 (5th Cir. 1983), *cert. denied,* 464 U.S. 897 (1983) . . | 14 |
| *Wicks v. Mississippi State Employment Services* 41 F.3d 991, (C.A.5 (Miss.) 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 |

**STATUTES**

| 42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7,11,12,15,16,24,25,26 |
|---|---|
| TEX. CIV. PRAC. & REM. CODE ANN. §16.003(a) (Vernon 1999) . . . . . . . . . . . . | 16 |

**RULES**

| FED. R. CIV. P. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
|---|---|
| FED. R. CIV. P. 7(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 |
| FED. R. CIV. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,12 |
| FED. R. CIV. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,15 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| VS. | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commissioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, | § | |
| (Previous Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

## DEFENDANTS' MOTION TO DISMISS AND
## MOTION FOR SUMMARY JUDGEMENT

TO THE HONORABLE U.S. DISTRICT COURT:

COME NOW DEFENDANTS CITY OF BROWNSVILLE, BLANCA VELA, CARLTON

RICHARDS, ERNIE HERNANDEZ, HARRY MCNAIR JR., JOHN WOOD, IVAN WELKER,

EFREN FERNANDEZ, HENRY GONZALEZ, AND CARLOS RUBINSTEIN, in their individual

and official capacities, and file this, their Motion for Summary Judgement under Federal Rule of

Civil Procedure 56(c). Additionally, DEFENDANTS BLANCA VELA, CARLTON RICHARDS,

ERNIE HERNANDEZ, HARRY MCNAIR JR., JOHN WOOD, IVAN WELKER, EFREN

FERNANDEZ, HENRY GONZALEZ, AND CARLOS RUBINSTEIN, in their individual capacities,

file this, their Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) and would

respectfully submit unto the court the following:

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

1.     Plaintiff has sued a unit of government, the City of Brownsville, and several City elected officials and employees. Plaintiff is suing Defendants for damages allegedly sustained when Plaintiff was terminated from his employment with the City of Brownsville. Plaintiff alleges violations of his First and Fourteenth Amendment rights and brings suit under 42 U.S.C. §1983.

2.     Plaintiff filed his Original Petition on November 27, 2000. Defendants were served on March 2, 2001 and timely answered. On April 16, 2001, Defendants filed a Motion to Compel a Rule 7(a) Reply on claims made against the individual Defendants in their individual capacities. In response, Plaintiff filed a Motion to Strike. On May 29, 2001, the Court granted Defendants' Motion to Compel a Rule 7(a) Reply, denied the Plaintiff's Motion to Strike, and ordered the Plaintiff to submit a Rule 7(a) Reply on claims made against the individual Defendants in their individual capacities. The Court ordered deadline of July 16, 2001, for Plaintiff to submit his Rule 7(a) Reply has passed, and to date, no amended complaint has been filed. Defendants now file this, their Motion for Summary Judgement and Motion to Dismiss.

## SUMMARY JUDGEMENT EVIDENCE

3.     The following exhibits are submitted in support of this motion and are incorporated by reference herein:

|            |                                                                      |
|------------|----------------------------------------------------------------------|
| Exhibit A: | Plaintiff's Original Petition                                        |
| Exhibit B: | Affidavit of Ivan Welker                                             |
| Exhibit C: | Excerpt from the Meeting of the City Commission of the City of Brownsville, dated October 20, 1998. |
| Exhibit D: | Affidavit of Lanny Lambert                                           |

Exhibit E:      Affidavit of Carlos Rubinstein

Exhibit F:      Affidavit of Maria L. Gonzales

Exhibit G:      Deposition of Plaintiff, Juan Pequeno

## STATEMENT OF FACTS

4.      Plaintiff is the former director of the Management Information Systems (MIS) Department of the City of Brownsville.  The MIS Department was responsible for overseeing almost all of the data processing functions of the City of Brownsville, including hardware, software, and computer programming.  (Ex. G, page 10, lines 7-13).  On October 20, 1998, at a City Commission meeting, Plaintiff voiced his objections to the City of Brownsville's  proposed purchase of the "Sweetsoft Ambulance 2000" software to be used for the City's Emergency Medical Service billing.  (Ex. B, C, E, & G page 32, lines 3-23).  The "Sweetsoft Ambulance 2000" software is a comprehensive accounting program.  It is designed specifically for use by county and city Emergency Medical Service divisions to help them keep track of billing, accounts receivable, etc..., and should lead to an increase in money recouped for services.

5.      Shortly after the October 20, 1998 City Commission meeting, the City Manager asked Plaintiff to meet with the Emergency Medical Services (EMS) Director and to prepare a proposal that outlined the specific needs of EMS and detailed how the City's Management Information Services staff could meet those needs as well as or better than the "Sweetsoft 2000" package.  (Ex. B, E, & F).  In response, Plaintiff submitted a "proposal" dated October 29, 2000, defending MIS and the job they had done in the past.  (Ex. B, E, F, & G page 37, lines 1-15, and deposition exhibit 1).  After this first insufficient "proposal", the City Manager sent Plaintiff a memo detailing exactly what was expected of him.  (Ex. B, E, & F).  Plaintiff then wrote another proposal defending MIS.

Neither of the "proposals" fulfilled the requests by the City Manager. (Ex. B, E, & G page 36, lines 16-21, and deposition exhibit 2). The City Manager requested specific information from the Plaintiff, which was not provided in either proposal. Instead, the proposals focused on how beneficial Plaintiff felt MIS was to the City. Additionally, Plaintiff failed to meet with the EMS Director to assess the needs of the EMS Department, as directed. (Ex. B & E).

6.      The Assistant City Manager viewed Plaintiff's refusal to meet with EMS to assess its billing needs, his failure to respond properly to the City Manager's request, and his attempt to scuttle the potential purchase as insubordination, actions tending to destroy friendly relations between the City and its employees, refusal or failure to cooperate with fellow workers, and conduct reflecting unfavorably towards the City. (Ex. B & E). After being placed on administrative leave, and being afforded due process hearings, which he did not attend, Plaintiff's employment with the City of Brownsville was terminated. (Ex. B, E, & F). This termination took effect at 5:00 p.m. on November 24, 1998. (Ex. B, E, & F). Written notice of this termination was delivered to Plaintiff shortly after the decision was made on November 24, 1998. (Ex. B, E, F, & G page 44, lines 6-15). November 24, 1998, was the last date for which Plaintiff was paid. (Ex. F, & G, page 63, lines 14-17). On December 3, 1998, Plaintiff appealed his November 24, 1998 termination to the City Manager's office and an appeal hearing was set. (Ex. E, F, & G deposition exhibit 3). The appeal hearing was rescheduled three times at Plaintiff's request. (Ex. E, F, & G deposition exhibits 4-6). Despite this, Mr. Pequeno never appeared and failed to deliver any documentary evidence in connection with his appeal to the City Manager's office. (Ex. E & F). On December 14, 1998, Plaintiff's termination of November 24, 1998, was affirmed by the City Manager. (Ex. E & F).

## SUMMARY OF ISSUES TO BE RULED UPON

7.    ISSUE 1:    Whether or not Plaintiff has pled facts which overcome the defense of qualified immunity which the individual defendants are entitled to.

ISSUE 2:    Whether or not Plaintiff's claims are barred by the statute of limitations.

ISSUE 3:    Whether or not the speech Plaintiff alleges he was terminated for was a matter of "public concern."

ISSUE 4:    Whether Defendants' interest in the efficient operation of the City outweighed Plaintiff's interest in speaking.

ISSUE 5:    Whether or not Plaintiff has shown that a policy, custom, or practice on the part of the City of Brownsville caused his alleged constitutional violation.

## SUMMARY OF THE ARGUMENT

### A.  Issue 1

8.    First, the individual defendants are entitled to qualified immunity.  This Court ordered Plaintiff to show how qualified immunity could be overcome and Plaintiff has not obeyed that order. Further, Plaintiff has set forth no facts, either in his complaint, responses to discovery, or deposition, which would overcome the individual defendants' rights to qualified immunity.  Thus, the individual defendants should be dismissed.

### B.  Issue 2

9.    Second, the Plaintiff's claims are barred by the statute of limitations.  The Plaintiff has a two year statute of limitations in this case.  The competent summary judgement evidence shows that Plaintiff was terminated on November 24, 1998 by the Assistant City Manager.  Plaintiff received

notification that his termination was effective on that date, and that was the last date for which he was paid. Plaintiff filed his Original Petition with this Court on November 27, 2000. (Ex. A). Thus, he missed the deadline by three days, and his claim is barred. Additionally, under federal law, the limitations period for a §1983 claim begins to run "the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured. " *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (C.A.5 (Tex.) 2001). Even if this Court finds that Plaintiff was not terminated on November 24, 1998, the competent summary judgement evidence shows that Plaintiff knew or should have known that he was going to be terminated prior to that date.

### C. Issue 3

10.     Next, Plaintiff cannot succeed on his First Amendment claim because he did not speak out on a matter of public concern and thus there was no constitutional violation. Based on the content, form, and context of the speech at issue, the competent summary judgement evidence establishes that Plaintiff did not speak on a matter of public concern. Rather, he spoke on a matter of private concern, specifically, his belief that the in-house software, developed by his department, Management Information Systems (MIS), was superior to the commercial version the City of Brownsville was contemplating purchasing. As a result, Plaintiff cannot succeed on his First Amendment claim.

### D. Issue 4

11.     Even if the Court finds that Plaintiff spoke on a matter of public concern, Defendants still cannot be held liable because the Defendants' interest in efficiency at the office outweighed Plaintiff's interest in speaking. The competent summary judgement evidence shows the speech at

issue was likely to generate controversy and disruption, it impeded the department's general performance and operation, and it affected working relationships necessary to the department's proper functioning. Thus, Defendants were entitled to terminate Plaintiff even if he spoke about a matter of public concern.

### E. Issue 5

12.     Finally, Defendants cannot be held liable under 42 U.S.C. §1983 because Plaintiff has not established that a policy, custom, or practice on the part of Defendants caused his alleged injury. Plaintiff has not met this burden, nor will he be able to. As a result, Defendants are entitled to summary judgement.

### ARGUMENTS AND AUTHORITIES

### I.  MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

### A.     MOTION TO DISMISS STANDARD

13.     Plaintiff has failed to state a claim for which relief can be granted. Accordingly, his lawsuit is ripe for dismissal under Federal Rule of Civil Procedure 12(b)(6). Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint should be dismissed for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Under this standard, a court may dismiss a complaint if the plaintiff cannot possibly prevail on his claims. *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1973). Although the Rule 12(b)(6) standard is stringent, "the mere fact that a standard is stringent does not suggest that it can never be met." *Mahone v. Addicks Utility Dist. of Harris County*, 836 F.2d 921, 927 (5th Cir. 1988).

**B.      NO RESPONSE TO DEFENDANTS MOTION FOR A FEDERAL RULE OF**

**CIVIL PROCEDURE 7(a) REPLY**

14.      Defendants would point out, on April 16, 2001, Defendants filed a Motion to Compel a Rule

7(a) Reply on claims made against the individual Defendants in their individual capacities.  On May

29, 2001, the Court granted Defendants' Motion to Compel a Rule 7(a) Reply and ordered the

Plaintiff to replead claims made against the individual Defendants in their individual capacities.  The

Court ordered deadline of July 16, 2001, for Plaintiff to submit his Rule 7(a) Reply has passed, and

to date, no amended petition satisfying the Court's order has been filed.

**C.      THE INDIVIDUAL DEFENDANTS, IN THEIR INDIVIDUAL CAPACITIES,**

**ARE ENTITLED TO QUALIFIED IMMUNITY**

15.      Defendants Vela, Richards, Hernandez, McNair, Wood, Welker, Fernandez, Gonzalez, and

Rubinstein (hereinafter "Individual Defendants") are entitled to qualified immunity under Federal

Law.  *See Schultea v. Wood*, 47 F.3d 1427 (5th Cir.1995).  Qualified immunity protects government

officials who perform discretionary functions from liability "unless their conduct violates clearly

established statutory or constitutional rights of which a reasonable person would have known."

*Gibson v. Rich*, 44 F.3d 274, 276 (C.A.5 (Tex.) 1995).   The qualified immunity analysis is a

two-step process.  First, a court must determine whether the Plaintiff has alleged the violation of a

constitutional right.  *Hale v. Townley*.45 F.3d 914,917, (C.A.5 (La.) 1995).  Second, if the Plaintiff

has alleged a constitutional violation, the court must decide if the conduct was objectively reasonable

in light of clearly established law at the time that the challenged conduct occurred.  *Id* at 917.  "The

touchstone of this inquiry is whether a reasonable person would have believed that his conduct

CHAPDF - www.fenrir.com

conformed to the constitutional standard in light of the information available to him and the clearly established law." *Goodson v. Corpus Christi,* 202 F.3d 730, 736 (5th Cir.2000).

16.     An individual who claims qualified immunity is entitled to move the Court to require the plaintiff to file a response pursuant to Federal Rule of Civil Procedure 7(a) setting forth specific facts which show how the qualified immunity defense may be overcome. *Schultea v. Wood*, 47 F.3d 1427, 1434 (5th Cir.1995). The United States Court of Appeals for the Fifth Circuit has made clear that broad or conclusory allegations made against an individual defendant are not sufficient to overcome qualified immunity. Rather, a plaintiff must set forth with factual detail and particularity the basis for the claim which necessarily includes why the defendant official, cannot successfully maintain the defense of immunity. *Wicks v. Mississippi State Employment Services*, 41 F.3d 991,996 , (C.A.5 (Miss.) 1995). If the plaintiff is unable to meet these pleading requirements, the complaint should be dismissed immediately, as to do otherwise would abrogate the qualified immunity defense itself. *Wicks* at 996. This Court has ordered the Plaintiff to submit a Rule 7(a) Reply on claims made against the individual Defendants. The deadline has passed and Plaintiff has not obeyed the order.

17.     Plaintiff has alleged no facts that would overcome the Individual Defendants' qualified immunity. The Plaintiff is attempting to hold the individual Defendants personally liable for the Plaintiff's alleged damages simply because of their position as with the City of Brownsville. The Fifth Circuit has held that "personal involvement is an essential element in a civil rights cause of action." *Thompson v Steel*, 709 F.2d 381 (5th Cir. 1983), *cert. denied*, 464 U.S. 897 (1983). A Plaintiff bringing a civil rights cause action must state particular facts specifying the personal involvement of each defendant if the Plaintiff expects his complaint to be sustained. *Fee v. Herndon*, 900 F.2d 804 (5th Cir.1990) *cert. denied*, 498 U.S. 908, 111 S. Ct 279 (1990). Plaintiff has alleged

no personal involvement on the part of any other individual defendant, so they should be dismissed on qualified immunity grounds. Since Plaintiff has failed to file a Rule 7(a) response despite this Court's order, and since Plaintiff's Petition does not meet the specificity requirements, the Individual Defendants, in their individual capacities should be dismissed. Therefore, the Individual Defendants ask that this 12(b)(6) motion be granted.

## II. MOTION FOR SUMMARY JUDGEMENT

### A. STANDARD FOR SUMMARY JUDGEMENT

18.    Summary judgement is proper when the pleadings and evidence illustrate that no genuine issue exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Burns v. Harris County Bail Bond Bd.*, 139 F.3d 513, 517 (C.A.5 (Tex.) 1998). When both parties have submitted evidence of contradictory facts, the factual controversies will be resolved in favor of the nonmovant. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). However, the Court will not assume that the nonmovant could or would prove the necessary facts in the absence of proof. *Id.* at 1075. A movant must properly support his motion with competent evidence and demonstrate the absence of a genuine issue of material fact and then the burden will shift to the nonmovant to show that the entry of summary judgment is inappropriate. *Burns*, 139 F.3d at 518.

### B. PLAINTIFF'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

19.    There is no federal statute of limitations for actions under 42 U.S.C. §1983 and therefore, federal courts look to the general statute of limitations governing personal injuries in the forum state.

*Flores v. Cameron County, Tex.*, 92 F.3d 258, 271 (5ᵗʰ Cir. 1996). Texas has a two year statute of limitations for personal injury claims. TEX. CIV. PRAC. & REM. CODE ANN. §16.003(a) (Vernon 1999).

20.     Texas law governs the limitations period, but federal law governs when a cause of action accrues. *Burns*, 139 F.3d at 518. Under federal law, the limitations period for a §1983 claim begins to run "the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured. " *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (C.A.5 (Tex.) 2001)(quoting *Russell v. Bd. Of Trustees*, 968 F.2d 489, 493 (5ᵗʰ Cir. 1992)); *See also Burns v. Harris County Bail Bond Bd.*, 139 F.3d 513, 517 (C.A.5 (Tex.) 1998)("Under federal law, a cause of action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action."); *See also Burrell v. Newsome*, 883 F.2d 416, 418 (5ᵗʰ Cir. 1989). A plaintiff only needs to know the facts that would ultimately support a claim; she need not know that she has a claim. *Piotrowski*, 237 F.3d at 576.

21.     The Federal Rules of Civil Procedure makes it clear that a cause of action commences when the complaint is filed. FED. R. CIV. P. 3; *See also Anderson v. Unisys Corp.*, 47 F.3d 302, 309 (8ᵗʰ Cir. 1995). Further, merely placing a complaint in the mail does not constitute filing and will not commence a cause of action in a federal court. *McIntosh v. Antonino*, 71 F.3d 29, 36 (1ˢᵗ Cir. 1995). Plaintiff filed his Original Petition with this Court on November 27, 2000. (Ex. A). Plaintiff was terminated from his employment effective November 24, 1998. (Ex. B, E, & F). Plaintiff was terminated on that date by the Assistant City Manager, who had the power and authority to terminate the Plaintiff. (Ex. D). November 24, 1998 was the termination date that Plaintiff appealed and

.

November 24, 1998 was the last day of work for which Plaintiff was paid. (Ex. F, & G, page 63, lines 14-17). The City considered November 24, 1998, to be Plaintiff's termination date. It is clear that Plaintiff commenced his cause of action outside the statute of limitations period. Therefore, his claim is barred and summary judgement should be rendered in favor of the Defendants.

22.    Plaintiff claims that he was not officially terminated until his appeal to the City Manager was denied on December 14, 1998. Plaintiff admits his only evidence for this contention is a single letter from the City Manager. (Ex. G page 45, lines 5-17). However, this letter clearly states that the Assistant City Manager's decision to terminate Plaintiff, effective November 24, 1998, is justified and that the decision will be upheld. (Ex. F).

23.    Even if it was true, which Defendants deny, that Plaintiff was not terminated until December 14, 1998, summary judgement should still be granted in favor of Defendants because Plaintiff knew or had reason to know of the injury which is the basis of the action. "Under federal law, a cause of action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Burns v. Harris County Bail Bond Bd.*, 139 F.3d 513, 517 (C.A.5 (Tex.) 1998. In *Burns,* the Fifth Circuit held that the plaintiff's cause of action accrued on March 10, 1993, when she was put on notice that her liquor license would not be renewed, rather than on March 21, 1993, when her license expired. *Burns,* 139 F.3d at 519.   In another analogous case, *Brossette v. City of Baton Rouge*, the Fifth Circuit held that a plaintiffs §1983 cause of action accrued on the day he received notice of the suspension of his liquor license, not the day the suspension took effect, which came later. *Brossette, v. City of Baton Rouge*, 29 F.3d 623 (5th Cir. 1994), *cert. denied,* 513 U.S. 971, 115 S.Ct. 443, 130 L.Ed.2d 353 (1994).

24.     Similar circumstances are presented here.  Plaintiff should not be able to salvage his time-barred claims by contending that they did not accrue until his termination was affirmed on December 14, 1998, rather than on the day his termination commenced.  Without doubt, Plaintiff knew or had reason to know that he would be terminated from his employment on November 24, 1998.  (Ex. B, E, & F).  As a matter of fact, Plaintiff states that he knew as early as November 19, 1998, when he was placed on administrative leave, that he was going to be terminated.  (Ex. G, page 41, lines 13-18).  Therefore, Plaintiff's claims are still barred by way of the statute of limitations and Defendants are entitled to summary judgement.

C.     **PLAINTIFF CANNOT SUCCEED ON HIS FIRST AMENDMENT CLAIMS BECAUSE HIS SPEECH DID NOT INVOLVE A MATTER OF PUBLIC CONCERN AND THUS, THERE WAS NO CONSTITUTIONAL VIOLATION**

25.     In the event this Court should deny Defendants' Motion to Dismiss, and should the Court find the Plaintiff's claims are not barred by the statute of limitations, Defendants are still entitled to summary judgement because Plaintiff's speech did not involve a matter of public concern.  As a result, there is no constitutional violation.  There are four elements to an employee's First Amendment retaliation claim against his employer: (1) the plaintiff must suffer an adverse employment decision, (2) the speech must involve a matter of public concern, (3) the plaintiff's interest in speaking must outweigh the defendant's interest in promoting efficiency, and (4) the plaintiff's speech must have motivated the adverse employment decision.  *See Teague v. City of Flower Mound, Tex.*, 179 F.3d 377, 380 (C.A.5 (Tex.) 1999).

26.     As the competent summary judgement evidence establishes, Plaintiff did not speak on a matter of public concern.  Rather, he spoke on a matter of private concern, an employment dispute. Specifically, his speech focused on his belief that the in-house software, developed by his department, was superior to the commercial version the City of Brownsville was contemplating purchasing.  His speech was based entirely on a dispute he was having with his employer.

27.     Whether or not Plaintiff spoke out on a matter of public concern is a legal question.  *Kennedy v. Tangipahoa Parish Library Bd. Of Control*, 224 F.3d 359, 366 (C.A.5 (La.) 2000).  "If the speech does not concern a matter of public concern, a court will not scrutinize the reasons motivating a discharge that was allegedly in retaliation for that speech."  *Bradshaw v. Pittsburg Ind. School Dist.*, 207 F.3d 814, 816 (C.A.5 (Tex.) 2000)(quoting *Dodds v. Childers*, 933 F.2d 271, 273 (5th Cir. 1991)).  The courts have used two tests, the content-form-context test and the citizen-employee test to determine whether speech relates to a public concern.  *Id.* at 366.  The citizen-employee test can yield indeterminate results because the existence of an element of personal interest on the part of an employee in the speech does not prevent finding that the speech as a whole raises issues of public concern.  *Teague*, 179 F.3d at 382.  Thus, the Fifth Circuit has held that in a mixed speech case, the courts are bound to use the *Connick* factors of content, context, and form to determine whether the speech is public or private.  *Id.*

28.     The content-form-context test states that "whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement as revealed by the whole court record."  *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).  The Supreme Court went on to elaborate by saying:

"when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."

*Id.* at 147.

29.     The Fifth Circuit has made similar statements. In *Dodds*, the Court held that "... an employee cannot transform a personal conflict into an issue of public concern simply by arguing that individual concerns might have been of interest to the public under different circumstances." *Dodds*, 933 F.2d at 273.  In speaking particularly about government employees, the Fifth Circuit has stated that "to presume that all matters which transpire within a government office are of public concern would mean that virtually every remark--and certainly every criticism directed at a public official--would plant the seed of a constitutional case." *Bradshaw*, 207 F.3d at 816 (quoting *Connick*, 461 U.S. at 149).

30.     This is a case where Plaintiff has attempted to transform a personal conflict into an issue of public concern simply by arguing that his individual concerns *might* have been of interest to the public.  He is mistaken.  When the content-form-context factors are applied, it is obvious that Plaintiff's speech did not involve a matter of public concern.

### (i)     CONTENT

31.     Taken as a whole, as required by *Connick*, the content of the speech at issue can be summed up as Plaintiff's defense of the in-house software developed by his MIS staff.  (Ex. G, page 33, lines 4-15, & G deposition exhibits 1 and 2).  Public concerns are not present.  Plaintiff's concerns were

that responsibility for billing and oversight would be taken away from his MIS staff and turned over to Emergency Medical Services (EMS) if the new software was purchased. (Ex. C, F, & G page 29, lines 14-20). Such a scenario would not only lead to a decrease in the responsibility given to Plaintiff's department (MIS), but would almost certainly lead to a decrease in the prestige of that department since it was an MIS developed software that would be scrapped in favor of Sweetsoft. Plaintiff was also concerned about the changing role of the MIS department should the Sweetsoft software be purchased. (Ex. G page 31, lines 4-21).

32.     Plaintiff claims that because the new software would involve the expenditure of public funds, this makes it a matter of public concern. (Ex. G page 70, lines 14-22). However, Plaintiff admits that he had no basis for his belief that the Sweetsoft software would not collect as much revenue as his MIS developed software. (Ex. G page 27, lines 2-15). Further, Plaintiff is not entitled to insert a few references to the expenditure of public funds and claim that his speech was primarily that of a citizen rather than a disgruntled employee. *See Bradshaw*, 207 F.3d at 817; *See also Teague*, 179 F.3d at 382 ("The mere insertion of a scintilla of speech regarding a matter of public concern would make a federal case out of a wholly private matter fueled by private, non-public matters."). Taken as a whole, as required by *Connick*, the competent summary judgement evidence establishes that the content of the speech at issue was private, and that Plaintiff was primarily concerned with defending his MIS department and the job they were doing.

## (ii)    FORM

33.     In addition to Plaintiff's speaking at a City Commission meeting, the Plaintiff provided two proposals to his immediate supervisor. All of the speech in this case concerned Plaintiff's desire to

keep the in-house software program developed by his MIS staff rather than buy the new "Sweetsoft Ambulance 2000" software for the City of Brownsville's EMS. (Ex. B, E, F, & G deposition exhibits 1 & 2). The bulk of the speech at issue took the form of an internal grievance. (Ex. C, F, & G deposition exhibits 1 & 2). This fact is not dispositive, but it does weigh in favor of finding that Plaintiff's speech was private in nature. *See Bradshaw*, 207 F.3d at 817; *Teague*, 179 F.3d at 383; *Moore v. Mississippi Valley State Univ.*, 871 F.2d 545, 551 (5th Cir. 1989). At the City Commission meeting, Plaintiff spoke as the MIS Director for the City of Brownsville. (Ex. C). Further, Plaintiff wrote the two proposals as the MIS Director for the City of Brownsville. (Ex. G deposition exhibits 1 &2). These two proposals arose out of a private employer/employee dispute, not out of a public debate. (Ex. G page 36, lines 12-25).

### (iii)   CONTEXT

34.     In terms of context, Plaintiff's grievance is more appropriately characterized as private. In all of his speaking and writing, Plaintiff was acting as Juan Pequeno, MIS Director for the City of Brownsville, not Juan Pequeno, citizen. (Ex. B, E, F, & G deposition exhibits 1& 2). The two proposals at issue were signed by Plaintiff as MIS Director for the City of Brownsville. (Ex. F & G deposition exhibit 1 &2). Additionally, the concerns expressed in the two proposals were made in response to an employer-employee dispute. (Ex. B, E, F, & G page 36, lines 12-25). This is similar to the facts in *Bradshaw*, where the speech at issue was three memoranda signed by Bradshaw as "High School Principal" that arose from an employer-employee dispute. *Bradshaw*, 207 F.3d at 817. In that case the speech at issue was held to be private rather than public and thus, did not involve a matter of public concern. *Id.* at 818.

## D. DEFENDANTS' INTEREST IN EFFICIENCY OUTWEIGHS THE PLAINTIFF'S INTEREST IN SPEAKING

35.     Even if this Court finds that Plaintiff did speak on a matter of public concern, Defendants still cannot be held liable because the Defendants interest in efficiency in managing the City and its personnel outweighs Plaintiff's interest in speaking. Government employers can fire their employees for speaking on a matter of public concern if their interest in efficiency at the office outweighs the employee's interest in speaking. *Kennedy*, 224 F.3d at 377. In striking this balance, a Court should examine whether the speech was likely to generate controversy and disruption, whether it impeded the department's general performance and operation, and affected working relationships necessary to the department's proper functioning. *Brawner v. Richardson*, 855 F.2d 187, 192 (5th Cir.1988).

36.     The competent summary judgement evidence shows that Plaintiff's speech was likely to generate disruption amongst other managers, would have impeded the department's performance and operation, and would have affected working relationships necessary to the department's proper functioning. The Assistant City Manager fired Plaintiff on November 24, 1998, because of his failure to properly respond to the City Manager's request, his refusal to accept the decision of his supervisors to purchase the Sweetsoft 2000 software, his failure to meet with EMS to assess its billing needs, his insubordination, and his refusal or failure to cooperate with fellow workers, and conduct reflecting unfavorably towards the City. (Ex. B & F). Upon review, the City Manager agreed with the determination of the Assistant City Manager, and affirmed Plaintiff's termination. (Ex. E).

37.     When an employee fails or refuses to perform their necessary job functions, simply because the City disagrees with their recommendations, it creates an unstable working atmosphere. The City

must be able to maintain discipline within its employment ranks.  To allow the Plaintiff to disregard the needs of other departments because of his concerns for his own, does not promote efficiency for the City.  As a result, the City's interest in terminating the Plaintiff outweighs his right to speak on this particular issue.

### E.    DEFENDANTS CANNOT BE LIABLE UNDER 42 U.S.C. §1983 BECAUSE PLAINTIFF HAS SHOWN NO POLICY, CUSTOM, OR PRACTICE

38.    Even if this Court finds the facts of this case might amount to a violation of the First Amendment, Defendants cannot be liable under 42 U.S.C. §1983 because Plaintiff has shown no policy, custom, or practice on the part of the City of Brownsville that caused this alleged violation. To establish municipal liability under 42 U.S.C. § 1983, a complainant must demonstrate an official policy or custom which causes a constitutional deprivation.  *See  Monell v. Department of Social Services*, 436 U.S. 658 (1978).  The Fifth Circuit has defined official policy as:

> a) A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [district] ... or by an official to whom the [district] has delegated policy making authority; or
>
> b) A persistent, widespread practice of [district] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents [district] policy.  Actual or constructive knowledge of such custom must be attributable to the governing body of the [district] or to an official to whom that body dad delegated policy-making authority.

*Eugene v. Alief Ind. School Dist.,* 65 F.3d 1299, 1304 (C.A.5 (Tex.) 1995).

39.     Requiring the Plaintiff to locate a "policy" ensures that a municipality is held liable *only* for those deprivations resulting from the decision of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. *Monell,* 436 U.S. at 694. However, it is not enough for a §1983 Plaintiff merely to identify conduct properly attributable to the municipality. The Plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 117 S.Ct. 1382 (1997).

40.     Nowhere in his complaint does Plaintiff allege that the City of Brownsville had a policy, custom, or practice that caused his supposed constitutional violation. Such allegations do not state a claim for which relief can be granted against the City of Brownsville or the Individual Defendants in their official capacities under 42 U.S.C. § 1983 for violation of the First Amendment to the U.S. Constitution. Additionally, Plaintiff admits that he knows of no other employee terminated under similar circumstances or for similar reasons. (Ex. G page 53, lines 19-22). This hardly shows a policy, custom, or practice of firing employees for their speech. Accordingly, Defendants are entitled to summary judgement on Plaintiff's §1983 claims.

## CONCLUSION

41.     The individual defendants are entitled to qualified immunity and Plaintiff has not shown how qualified immunity can be overcome. As a result the individual defendants should be dismissed. Additionally, Plaintiff's claims are barred by the statute of limitations which entitles Defendants to summary judgement. Defendants are also entitled to summary judgement on the grounds that the speech at issue in this case did not touch on a matter of public concern. This means that Plaintiff cannot show a constitutional violation as required by 42 U.S.C. §1983. Even if this

Court finds that Plaintiff can show a constitutional violation, Plaintiff cannot succeed because Defendants' interest in the efficient operation of the City outweighed Plaintiff's interest in speaking. Further, Plaintiff has not shown that a policy, custom, or practice on the part of Defendants caused his alleged deprivation. Thus, Plaintiff cannot succeed under 42 U.S.C. §1983, and Defendants are entitled to summary judgement.

## PRAYER

42.    WHEREFORE, PREMISES CONSIDERED, Defendants pray that this Motion to Dismiss and Motion for Summary Judgement be granted on all claims asserted by Plaintiff, that Plaintiff take nothing by this suit, and that all taxable costs of court be taxed against Plaintiff. Defendants further pray for such other and further relief, at law or in equity, to which they may show themselves to be justly entitled.

Signed on October 8, 2001.

Respectfully submitted,

WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, Texas 78521
Telephone      : (956) 541-1846
Facsimile      : (956) 541-1893

BY: _____
RYAN HENRY
State Bar No. 24007347
Fed ID. No. 22968

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT has been served on all counsel of record, via certified mail return receipt requested as follows:

Mr. Alejandro Garcia
Mr. Frank Costilla
LAW OFFICE OF FRANK COSTILLA, P.L.L.P.
5 E. Elizabeth Street
Brownsville, Texas 78520

on this the ___9th___ day of October, 2001

RYAN HENRY


## CERTIFICATE OF CONFERENCE

The local rules do not require a certificate of conference for this motion.

RYAN HENRY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JUAN PEQUENO                                    §
                                                §
VS.                                             §
                                                §
CITY OF BROWNSVILLE                             §        CIVIL ACTION NO. B-00-180
BLANCA VELA (Honorable Mayor)                   §            (Jury Requested)
CARLTON RICHARDS (Commissioner)                 §
ERNIE HERNANDEZ (Commissioner)                  §
HARRY MCNAIR, JR. (Commissioner)                §
JOHN WOOD (Commissioner)                        §
IVAN WELKER (Assistant City Manager)            §
EFREN FERNANDEZ (Human Resource                 §
Director), HENRY GONZALEZ,                      §
(Previous Mayor), CARLOS RUBINSTEIN             §
(Previous City Manager)                         §

# EXHIBIT "A"

| | |
|---|---|
| (PLAINTIFF)<br>Juan Pequeno<br><br>vs<br><br>(DEFENDANT)<br>City of Brownsville<br>Blanca Vela (Honorable Mayor)<br>Carlton Richards (Commissioner)<br>Ernie Hernandez (Commissioner)<br>Harry McNair, Jr. (Commissioner)<br>John Wood (Commissioner)<br>Ivan Welker (Assistant City Manager)<br>Efren Fernandez (Human Resource Director)<br><br>Henry Gonzalez, (Previous Mayor)<br>Carlos Rubinsten (Previous City Manager) | )(<br>)(<br>)(<br>)(<br>)(<br>)(<br>)(<br>)(<br>)(<br>)(<br>)(<br>)(<br>)(<br>)(<br><br>)(<br>)( | U.S. District Federal Court<br><br>Southern District of Texas<br><br>Brownsville Division<br>**B - 00 - 18 1**<br><br>United States District Court<br>Southern District of Texas<br>RECEIVED<br><br>NOV 2 7 2000<br><br>Michael N. Milby, Clerk of Cou t |

## ORIGINAL PETITION

NOW COMES PLAINTIFF JUAN PEQUENO, citizen of Brownsville, T xas and

employee for fourteen years with DEFENDANT CITY OF BROWNSVILLE, B ownsville,

Texas, from October 1984 to December 1998.

PLAINTIFF files suit against DEFENDANT under the 42 U.S.C. § 1983 f

First Amendment violations and the Fourteenth Amendment violations by DEF IDANT

CITY OF BROWNSVILLE.

page 1 o 4

DEFENDANT willfully, violated PLAINTIFF'S constitutional right of spe  cing as

a citizen, about a matter of public concern, at a public city meeting on October 2(  1998.

PLAINTIFF did not benefit personally from his speech and his speaking was abo  t a record

high City yearly revenue collection of over $1.3 million dollars which would be a  ected

significantly and adversely.     After speaking at the public city meeting,  DEFE  DANT,

in bad faith, maliciously retaliated against PLAINTIFF with a series of unlawful  olations

including unconscionable and abusive behavior, threats, harrassment, and false c  ims of

insubordination and misconduct;  and quickly moved to discharge PLAINTIFF b  letter,

after PLAINTIFF notified DEFENDANT that PLAINTIFF was on sick leave.     After

PLAINTIFF requested a hearing, DEFENDANT  denied a hearing for PLAINTI  F by

unlawfully deciding to discharge PLAINTIFF while PLAINTIFF was on sick lea  e and in

doing so, DEFENDANT also violated PLAINTIFF'S constitutional right of fair  ocedural

due process.     In addition, DEFENDANT lied about PLAINTIFF'S  job perf  mance and

conduct at the Texas Workforce hearings and DEFENDANT  has committed lib  and

slander.     Violations by the DEFENDANT are still occurring even today.      ie

DEFENDANT has also knowingly, in bad faith, reported to the Internal Revenu  Service

(IRS) over $17,000 of PLAINTIFF'S wages when in fact DEFENDANT has wi  held these

monies from PLAINTIFF.

page 2 c  4

TEXAS WORKFORCE COMMISSION (TWC) hearing officer, Mr. Edward

Manning ruled on December 7, 1999 in favor of PLAINTIFF, finding that there had been

no misconduct by PLAINTIFF.     After the DEFENDANT appealed the TWC hearing

officer's decision, the TWC COMMISSIONERS ruled on March 9, 2000, again

in favor of PLAINTIFF for benefits to be awarded, and also found that there had been no

misconduct by PLAINTIFF.


DEFENDANT willfully violated PLAINTIFF'S First Amendment constitutional

right by taking severe adverse employment actions against PLAINTIFF for speaking

as a citizen about a public concern at a public city meeting and denying fair procedural

due process.

WHEREFORE PREMISES PLAINTIFF  prays that court grant

reinstatement to previous job position of MIS Director,

backpay equivalent to the time PLAINTIFF has been unlawfully discharged,

benefits of retirement funds, sick/annual funds, and insurance coverage equivalen

to the time PLAINTIFF has been unlawfully discharged, accumulated interests,

attorneys fees and all other just remedies to which PLAINTIFF is entitled.


Respectfully Submitted,

By: _____
Juan Pequeño
ATTORNEY-IN-FACT
P.O. Box 5692
Brownsville, Texas  78523

page 4 of

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| VS. | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commissioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, | § | |
| (Previous Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| | § | |
| VS. | § | |
| | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commissioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, | § | |
| (Previous Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

## AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | * |
| | * |
| COUNTY OF CAMERON | * |

BEFORE ME, the undersigned notary appeared **Ivan Welker** who being personally known to me sworn under oath, deposed and stated as follows:

1) "My name is **Ivan Welker**. I am over 21 years of age, of sound mind, capable of making this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

2) I am the former Assistant City Manager for the City of Brownsville.

3) On October 20, 1998, at a City Commission meeting, Juan Pequeno voiced his objections to the City's proposed purchase of the "Sweetsoft 2000" software. Prior to that moment, Mr. Pequeno had not raised any objection with City management about purchasing this software despite the fact that the practice is for department directors to make any objections known to the City Manager before Commission meetings are held.

4) Shortly thereafter, the City Manager asked Mr. Pequeno to meet with the Emergency Medical Services (EMS) Director to prepare a proposal that outlined the specific needs of EMS and detailed how the City's Management Information Services (MIS) staff could meet those needs as well as or better than the "Sweetsoft 2000" package.

5) In response, Mr. Pequeno submitted two "proposals." One dated October 29, 2000, and the other dated November 9, 1998, both defending MIS and the job they had done in the past. After the first insufficient "proposal", the City Manager sent Mr. Pequeno a memo detailing exactly what was expected of him. Neither of the "proposals" fulfilled the request by the City Manager. Additionally, Mr. Pequeno failed to meet with the EMS Director to assess the needs of EMS.

6) On November 19, 1998, I placed Mr. Pequeno on administrative leave with pay pending a pre-disciplinary hearing. This was due to Mr. Pequeno's failure to respond properly to the City Manager's request, his refusal to accept the decision of his supervisors to purchase the Sweetsoft 2000 software, his failure to meet with EMS to assess its billing needs, his insubordination, and his refusal or failure to cooperate with fellow workers. Mr.Pequeno failed to attend his pre-disciplinary hearing.

7) On November 24, 1998, I decided that Mr. Pequeno's employment with the City of Brownsville would be terminated. This termination took effect at 5:00 p.m. on November 24, 1998. Written notice of this termination was delivered to Mr. Pequeno on November 24, 1998. As the Assistant City Manager, I had the authority to terminate Mr. Pequeno.

"Further Affiant sayeth naught."

IVAN WELKER

SUBSCRIBED AND SWORN TO BEFORE ME on the ___3rd___ day of October, 2001, to certify which witness my hand and official seal.

Notary Public - State of Texas

My Commission Expires: ___3-10-02___



CHRIS D GONZALEZ
Notary Public, State of Texas
My Commission Expires 03-10-02

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| VS. | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commissioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, | § | |
| (Previous Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

# EXHIBIT "C"

Civil Action No. B-00-180

| | | |
|---|---|---|
| Juan Pequeño | § | U.S. District Court |
| | § | |
| vs. | § | Southern District |
| | § | |
| City of Brownsville, et al | § | Brownsville Division |

**City of Brownsville**
**City Commission Meeting 10/20/98**

**TRANSCRIPT**

**ITEM 12**  **Consideration and Action awarding the contract for the purchase of the Sweet Soft Ambulance 2000 Complete Accounts Receivable Program for use by the EMS Department**

1st Person (Art):  Honorable Mayor and Commissioners, pursuant to Local Government Code 252.022 "General Exemptions". Items that are available from only source because of patent, copyrights, secret processes, or natural monopolies are exempt from the competitive bidding process. Inasmuch as this software is available only from the developer and copyright holders Sweet Computer Service, Inc. The City of Brownsville may make this purchase without soliciting additional quotations. Management of EMS is satisfied with the performance of this software. Various EMS facilities including several in South Texas have proven positive experience using the product. Staff has met with Mr. Leonard Calliard, Deputy Director of Harlingen EMS to review the program and its application. Mr. Calliard has had the system installed for eight years and is very satisfied with it. He pointed out the very specific nature of EMS billing and the systems capability to manage the various billing and aging methods required by agencies such as Medicare, Medicaid and Private insurance. It is significant to point out that in the findings and recommendations by the City's Internal Auditor to the audit committee, a new

ORIGINAL

accounting system specifically designed for EMS operations should be acquired. To quote from the Long, Chilton, Payte and Hardin, L.L.P., September 17, 1998 report, "An industry's specific software would enhance the billing and collection processes and guarantee timely updates to any changes in the laws affecting Medicare and Medicaid. Summary financial information will be batched and transmitted to the Finance Department through the City's existing computer network. The vendor has stated that the software is the year 2000 compliance. The computer software proposal from the vendor is attached for commission consideration and action. We do have one very slight change the EMS Director presented to me today the request to add one additional module to the package. The cost of that module is $895.00. The purpose of that module is to deliver the information in aske format. Which is a computer code format, which will allow for smoother interface to the City's existing system. The staff recommends the following, award a contract for the purchase of the Sweet Soft Ambulance 2000 Complete Accounts Receivable software program to Sweet Computer Services, Inc., West Union, Iowa, the sole source provider at $13,600.00 plus an additional $895.00 for the module just mentioned. Total amount $14,495.00 including the multi-user base program, all required modules, manuals, telephone support, installation, training and delivery. Funding for this procurement is available from the General Fund.

2nd Person:    Can we get a report back in about six months to see if this has helped us to keep our delinquencies.

1st Person (Art):    We can do that.

2nd Person:    Make a note that we do that, …

1st Person (Art):    Absolutely.

.

2nd Person:        because I think it's real important.  It will pay for it's self
                       real quick if it works.  Motion to approve.

1st Person (Art):   Yes, sir.

3rd Person:           Second.

Mayor Gonzalez:  All those in favor.  Oh, oh. So is our computer expert.

4th Person (Pequeño):      I just want to point out a couple of things. I respect
my colleague's opinions and you know in going with a
… looking another software, like Sweet Soft.  In fact we
got to demo it about eight months ago in this room
ourselves.  And, one of the things about it was that it was
DOS base, and one of the main drawbacks of it.    It
started back in 1981.  And, what that means is that when
the PCs first started, that's what they first started with.
And, basically… and we asked the consultant that was
selling it you know, "When are you going to look at
upgrading it."  And, he really didn't know.  And, the
company does sell this software through out the country.
But one of the things… we've been …I look ah…  This
company has a web site on the Internet.  And, I just
found out about this on the Agenda.  It was going to be
on the Agenda this coming week from my…  and ah.
But anyway…. And I got together with Art.  And, kind of
last minute deal.  But we have been collecting this year
we have collected more than we ever have from
Ambulance, $1.3 million.  Last year it was $1.1 million.
The year before .8, you know $800,000.00.  So we have
been going, cons… you know consecutively going up
and up.   The only from this that concerns me that we
might be going a little bit backwards. Going with an
older PC DOS base system.  Also, the system that we
have is working well.  The bottom line you can look at
the figures. Is money coming, you know, coming in? It
is.  And, it is attributed to two major factors, that we got
a new computer three years ago. So we don't have wait
on the computer any more like we use to.  Plus also Art
has implemented a lot of procedures.   You know that

CMPDF - www.fenna.page

they have to ... the billings has to go out by a certain time.  And, we implemented all these other processes that have helped the collection process.  Plus he sent his people to get further training.  And, I looked at the Internet, and the main thing to collection to increase revenue for Ambulance is education and learning how to use the program.  Ah, after looking at it my recommendation is that this software just might not be the package for the City of Brownsville.  But Art, you know, feels it is. But, but...

Mayor Gonzalez:  But, let me suggest something, that maybe we table this for a couple of weeks and you all get together and iron this out, and be together on it to see that we are doing the right thing for the City.

4th Person (Pequeño):     See he ...

1st Person (Art):  May I make... After we met, I met with Mr. Pequeño on two of the issues that this running under DOS base character set.  But it has been optimized for Windows NT, Windows 98, and Windows95.  And, the next upgrade taking it into the Microsoft NTS server is due out in 18 months.  Eight months ago they would not release that information because they did not have enough facts.  In talking to the reps today.  They already are nearing a Beta test date to release the software for Beta.  Use Beta means that they release...

Mayor Gonzalez:  But the salesman is going to tell you that to make the sale.

1st Person (Art):  But what I want to emphasize on that is ... I don't want to state that it is a DOS base program and become obsolete.  It is being re... it is being optimized or recoded for the Windows NT environment.

Mayor Gonzalez:  Well, I still would like to make the same recommendation, that you table it for a couple of weeks. You all get together on it.  Get with the salesman and

whatever.  And, since Mr. Pequeño is the computer expert maybe you all can come up to a solution.

4th Person (Pequeño):    We just…

2nd Person:    Art or (inaudible) can answer this.

4th Person (Pequeño):    Well also we don't want … the issue of de-centralizing you know if, if…  Say once we move more operations to like EMS, if any.  It is going to rely more on their department to maintain the whole system.  We won't be tied in as like we said in network.  That's not… we're not there yet.   You know with the fiber we can later connect the computers together and backup each others data.   But the assurance right now, like if something happens over EMS all the data we keep it safe.  It is under lock and key.  And, that will be another issue that as you do that you open up the whole for security.  More so than you are now.

5th Person:    Why is this the sole source?  Why do we try… we fit the software to our hardware.  What are we doing?

1st Person (Art):    We … no sir.  This is the application that tailors to the … if you have seen through out the few weeks.  There is a lot of industry specific.  That are specific to Medicare, Medicaid and the way it handles the account.  The point being made about network security was brought up.  And in fact the module that I added today would interface so that there would be no security breaches in the network.  It can be done as safely as getting a diskette and hand carrying it.  Or it can be done on a secure network.

Mayor Gonzalez:    Well lets not get into a discussion here between personnel.

1st Person(Art):    Yes, sir.

Mayor Gonzalez:    Let's just table it for a couple of weeks. Commissioner…

2nd Person: I will rescind my motion to make a motion to table for two weeks.

Mayor Gonzalez: You all get together, and let's get the best thing that we can for our City.  You all get together on it.

1st Person (Art): Very well.

3rd Person (Pequeño):: Very Good.

Mayor Gonzalez: All those in favor.

Various Commisioners: Aye.

Mayor Gonzalez: Motion carries.


### TRANSCRIBER'S CERTIFICATION

I, Brenda Bustamante, do hereby affirm that I have transcribed an audiocassette containing Item 12 of the October 20, 1998, City of Brownsville, City Commission Meeting.


I transcribed the audiocassette to the best of my ability.  I did not  add or omit anything on this transcription.

Brenda Bustamante


SHOULD  YOU  HAVE  ANY  QUESTIONS  REGARDING  THE ABOVE, PLEASE CONTACT ME AT (956) 440-1007.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| VS. | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commissioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, | § | |
| (Previous Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

## EXHIBIT "D"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN PEQUEÑO | § | |
| | § | |
| | § | |
| VS. | § | |
| | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commissioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, | § | |
| (Previous Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

## AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | * |
| | * |
| COUNTY OF CAMERON | * |

BEFORE ME, the undersigned notary appeared **Lanny Lambert**, who being personally known to me sworn under oath, deposed and stated as follows:

1) "My name is **Lanny Lambert**. I am over 21 years of age, of sound mind, capable of making this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

2) I am the current City Manager for the City of Brownsville.

3) It is currently the policy of the City of Brownsville, that the Assistant City Manager has the authority to terminate City Employees such as Mr. Pequeno. The decision of the Assistant City Manager in such situations is final and binding unless overturned by the City Manager on appeal.

4)    This policy was in effect during the course of Mr. Pequeno's employment with the City of Brownsville. The Assistant City Manager had the authority to terminate City Employees such as Mr. Pequeno. The decision of the Assistant City Manager in such situations was final and binding unless overturned by the City Manager on appeal.

"Further Affiant sayeth naught."

LANNY LAMBERT

SUBSCRIBED AND SWORN TO BEFORE ME on the 19th day of September, 2001, to certify which witness my hand and official seal.

BEULAH MENDEZ RAMIREZ
Notary Public, State of Texas
My Commission Expires
04-21-2005

Notary Public - State of Texas

My Commission Expires: 4-21-05

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| VS. | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commissioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, | § | |
| (Previous Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

# EXHIBIT "E"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| VS. | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commisioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, | § | |
| (Previous Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

## AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | * |
| | * |
| COUNTY OF CAMERON | * |

BEFORE ME, the undersigned notary appeared **Carlos Rubinstein** who being personally known to me sworn under oath, deposed and stated as follows:

1) "My name is **Carlos Rubinstein**. I am over 21 years of age, of sound mind, capable of making this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

2) I am the former City Manager for the City of Brownsville.

3) On October 20, 1998, at a City Commission meeting, Juan Pequeno voiced his objections to the City's proposed purchase of the Sweetsoft 2000 software. Prior to that moment, Mr. Pequeno had not raised any objection with City management about purchasing this software despite the fact that the practice is for department directors to make any objections known to the City Manager before Commission meetings are held.

4)      Shortly thereafter, I asked Mr. Pequeno to meet with the Emergency Medical Services (EMS) Director a prepare to proposal that outlined the specific needs of EMS and detailed how the City's Management Information Services (MIS) staff could meet those needs as well as or better than the "Sweetsoft 2000" package.

5)      In response, Mr. Pequeno submitted two "proposals." One dated October 29, 1998, and the other dated November 9, 1998, both defending MIS and the job they had done in the past. After the first insufficient "proposal", I sent Mr. Pequeno a memo detailing exactly what was expected of him. Neither of the "proposals" fulfilled the request I made to Mr. Pequeno despite my detailing the requirements of the assignment to him. Additionally, Mr. Pequeno failed to meet with the EMS Director to assess the needs of EMS.

6)      On November 19, 1998, the Assistant City Manager placed Mr. Pequeno on administrative leave with pay pending a pre-disciplinary hearing. This was due to Mr. Pequeno's failure to meet with EMS to assess its billing needs, his failure to respond properly to the City Manager's request, his refusal to accept the decision of his supervisor to purchase the Sweetsoft 2000 software, his insubordination, actions tending to destroy friendly relations between the City and its employees, and his refusal or failure to cooperate with fellow workers. Mr. Pequeno failed to attend the pre-disciplinary hearing.

7)      On November 24, 1998, Mr. Pequeno's employment with the City of Brownsville was terminated. This termination took effect at 5:00 p.m. on November 24, 1998. Written notice of this termination was delivered to Mr. Pequeno on November 24, 1998. Mr. Pequeno was terminated by the Assistant City Manager, who had the authority to make termination decisions.

8)      On December 3, 1998, Mr. Pequeno appealed his November 24, 1998 termination to the City Manager's office, seeking to overturn his termination. An appeal hearing was set.

9)      The appeal hearing was rescheduled three times at Mr. Pequeno's request. Despite this, Mr. Pequeno never appeared and failed to deliver any documentary evidence in connection with his appeal to my office.

Page-2-

10)    The information before me fully justified Mr. Pequeno's November 24, 1998 termination. Further, Mr. Pequeno failed to produce any evidence to controvert the Assistant City Manager's findings. Therefore, on December 14, 1998, his termination was affirmed.

"Further Affiant sayeth naught."

_____

CARLOS RUBINSTEIN

    SUBSCRIBED AND SWORN TO BEFORE ME on the _____4th_____ day of October, 2001, to certify which witness my hand and official seal.

_____

Notary Public - State of Texas

My Commission Expires: __3-10-02__

CHRIS D. GONZALEZ
Notary Public, State of Texas
My Commission Expires 03-10-02

Page -3-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| VS. | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commissioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, | § | |
| (Previous Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

# EXHIBIT "F"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| VS. | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commissioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, | § | |
| (Previous Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

## AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | * |
| | * |
| COUNTY OF CAMERON | * |

BEFORE ME, the undersigned notary appeared **Maria L. Gonzales** who being personally known to me sworn under oath, deposed and stated as follows:

1)   "My name is **Maria L. Gonzales**. I am over 21 years of age, of sound mind, and capable of making this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

2)   I am the Human Resources Director for the City of Brownsville.

3)   Juan Pequeno's employment with the City of Brownsville was terminated on November 24, 1998. This termination took effect at 5:00 p.m. November 24, 1998 was the last date for which Mr. Pequeno was paid.

4)   I certify that the documents attached as exhibit "A" to this affidavit are true and correct copies of records contained in the personnel file of Juan Pequeno.

5)     These records were made at or near the time of the occurrence of the matters set forth within them, by, or from information transmitted by, a person with knowledge of those matters.

6)     These records were kept in the course of the regularly conducted activity of the City of Brownsville and made as a regular practice.

"Further Affiant sayeth naught."

_____
MARIA L. GONZALES

     SUBSCRIBED AND SWORN TO BEFORE ME on the ___13th___ day of August, 2001, to certify which witness my hand and official seal.

_____
Notary Public - State of Texas

My Commission Expires: _8-3-2004_

YOLANDA PEREZ
Notary Public, State of Texas
My Commission Expires
08-03-2004

EXHIBIT "A"

CutePDF – www.fastio.com



TO:    Carlos Rubinstein, City Manager
          Ivan Welker, Assistant City Manager

From: Juan Pequeno, MIS Director

RE:    Proposal to continue in-house processing of EMS billing

Date:  October 29, 1998


REASONS FOR PROCESSING EMS BILLING IN-HOUSE:

I.  Around March of 1996 the EMS director and I met with EMS staff from Harlingen
    which have a similar size operation as Brownsville. I noted the following differences:

|  | Harlingen | Brownsville |
|---|---|---|
| Years in operations | 8 | 10 |
| Platform(type of Computer) | PC-base on Novell | HP3000 server |
| **# of staff on Collections** | **4** | **2½** |
| Software | Sweetsoft Inc (DOS based) | In-house (customized) and updated on a continuous basis with agencies |
| Cost of Implementation | >$80,000 | In-house |
| Yearly Maintenance Support | $5,000 | In-house |
| Yearly Collections | $750,000 | >$800,000 in 1996 |

In the past 2 ½ years              Brownsville has now increased
                                           staff up to 5

                            Assigned 1 employee for collections only

page 1 of 4

Implemented new collection procedures

Sent staff for medicare/medacaid trainin

Have achieved highest collection ever o
$1.3 million

In 1996, the city's in-house software was collecting more revenue and incurring
less costs in implementation, maintenance, and staff, than the comparable city which
was using the Sweetsoft software.   The city of Brownsville has continuously
increase its revenue over the last years up to where it is today at $1.3 million with
potential for future increases if further collection policies are adhered to by EMS
such as monitoring of aging report efficiently.

The city of Brownsville now has a person assigned exclusively to delinquent
collection, making sure a notice of bill is sent to a customer promptly and also
placing a call to customers prior to sending bill to collection agency.  This alone
has greatly increased revenue collection for city of Brownsville.

II. Our current in-house EMS billing system was developed using 4th generation software
    following specific requirements from Medicare/Medacaid.  All facets of operations
    and billing have been automated over the past years.  The city's EMS system is
    customized to the EMS needs and to the federal government guidelines.   MIS has
    never missed a deadline of implementing a mandated computer change for
    Medicare or any other agency.

    MIS has had to continually retrain EMS personnel because of high turnover
    at EMS and MIS has also had to rush last minute changes on several occasions
    because of the untimeliness of receiving mandated changes from EMS department.
    It used to be months before MIS was advised about a  mandated change by EMS
    department.  This was corrected in-house by improved  communication.
    The sooner a government mandated change is received, the sooner
    the MIS department will schedule and implement accordingly.

III. Sweetsoft software is DOS-based and was develop in 1981.  Few companies or
     users are now using DOS based software.  For some unknown reason, this vendor
     has chosen not to update their software to Windows platform which is the
     future for the majority of the business world including the city of Brownsville.

Page 2 of 4

According to the vendor, his software can operate on WIN95 but it is still a 16 bit software. It does not have a graphical user interface (user friendly) (point/click); consequently, it requires a higher learning curve and this will not be an improvement over the city's current EMS system.  Every major module offered by Sweetsoft is already in operations and customized at the city of Brownsville.

The current in-house EMS billing is one the best software the city has.  MIS invested much time and effort to create the excellent and efficient system the city has today.  The city could put this in-house software against any other billing EMS system that is in a similar situation as the City of Brownsville.

IV. Neither the city management nor the city internal auditor included the MIS department on consideration of purchasing EMS billing software.

It has been normal procedure for the auditors to "ask" MIS about the current system so they can see the full picture and make an unbiased finding. An example of such was the procedure with the findings at Municipal Court just a month ago.  In this case,  MIS was only "told" about this agenda item and, MIS was only told about this item "after" the item had already been placed on the city agenda for approval.

V. Finance department had a difficult time getting a copy of the auditor's EMS findings to MIS.  After reading the misinformation and misleading statements in the auditor's finding on EMS concerning the need for a new system, MIS understand why a copy of this was delayed.

MIS has never missed a mandated computer change deadline from any government agency.  It is also standard procedure for the MIS department when making computer software changes, to do thorough testing as any good organization would include.  MIS' current method is extremely efficient, done accurately, and customized to the city's needs.  The current EMS  billing system is up to date with the latest changes mandated from medicare/medacaid. It contains all the major modules for EMS billing and accounting and interfaces with the city's General Ledger for up to the minute financial data.

VI. It is also fact that SweetComputer Services, Inc is not the sole provider of ambulance EMS billing software in the USA.   There are several other vendors with products that do the same similar functions of EMS billing and collections.

VII. The decentralization of EMS billing to their own department office would bring about duplication of data processing situations whose costs are currently already being absorbed by MIS; some of these are the following:

    a.  an additional computer server
    b.  an increased level of security threat to EMS data
    c.  an increased level of security threat to their computers
    d.  an increased level of fire or other natural disaster threat to EMS operations
    e.  a duplication of EMS data
    f.  maintaining accountability of data processing functions including backup of server by EMS personnel
    g.  an increased reliance on outside vendors
    h.  an increased reliance on software maintenance support

VIII. Instead of going backwards in time with the limited and DOS based Sweetsoft software, today's existing technology can join the eight billing and receiving locations spread throughout the city, and establish a "one-stop collection department".   This would simplify and improve the city's implementation of proper policies and collection and, this would also convenience our citizens of Brownsville.

Page 4 of 4

CIMPDF - www.fasisi.com

# CITY MANAGER'S OFFICE
# MEMORANDUM

TO:        Juan Pequeño, Director - MIS

FROM:      Carlos Rubinstein, City Manager

SUBJECT:   EMS Computer Program

DATE:      November 4, 1998

---

I have read the memo of October 29th you prepared relative to the aforementioned issue. The memo did not address the needs of this office, as communicated to you on October 27th. Please provide the following information:

1. Your understanding of the computer programming **needs** of BEMS. It would be very advisable to meet and discuss this issue with the EMS director as well as review and recognize the deficiencies noted in the recent internal audit of EMS.

2. A detail account of how MIS can satisfy the specific programming needs of BEMS. In this instance I am not interested in what has been provided for, but **how all documented needs** will be satisfied. Again it would be advisable to compare the services provided by the MIS code with those provided for and desired from the Sweetsoft program. Highlight those services provide by MIS which Sweetsoft does not provide for, as well as those Sweetsoft includes in its code and not provided by the MIS program.

3. Explain point V in your memo. Finance is an integral member of the Internal Audit Committee and as such is an immediate recipient of the internal auditor's findings and reports. Further explain how "MIS understands why a copy (of the report) was delayed", and the basis / intent of this comment.

I expect your response within the guidelines specified herein by Monday, November 9th at 4:00 PM. The City cannot afford to continue to delay resolution of this issue. I want this matter settled next week so that I can present management's recommendation a week from next Tuesday.

cc:    Ivan Welker, Assistant City Manager
       Pete Gonzalez, Finance Director
       Art Rodriguez, EMS Director



TO:   Carlos Rubinstein,  City Manager
      Ivan Welker, Assistant City Manager

From:  Juan Pequeno,  MIS Director

RE:   Response to memo received  11/05/98 - Asking for Proposal #2

Date:  November 9, 1998


SECOND PROPOSAL
TO CONTINUE  IN-HOUSE PROCESSING OF EMS BILLING

MIS memo of October 29, 1998 did address the current situation of
City's in-house EMS billing system. However, MIS will restate similar
information for perhaps a more clear understanding.


## CURRENT EMS SYSTEM EVALUATION OF $1.3 MILLION REVENUE

MIS' current evaluation is that the in-house EMS system is excellent, especially
in collection of revenue which is at an all time record high of $1.3 million.

The city of Brownsville has increased its revenue every year on a consistent
basis for the last four years.  The following facts have occurred
since October 1995:

    a)  the city purchased a new HP3000 server which is fast, efficient,
       networkable and which has directly increased productivity
       for all city departments especially EMS data entry and electronic billing,

    b)  EMS staff working with EMS billing systems has increased from
       2 ½ to 5 with one person assigned to calling and sending notices only,

    c)  EMS has been able to train staff on processing claims

page 1 of 6

d) MIS has kept software updated with latest changes from government agencies within deadlines

e) MIS has provided continuous training on in-house software to EMS

f) MIS has in-house programmers assigned to make changes for EMS

## CURRENT IN-PROGRESS PROJECTS FOR EMS SYSTEM

The in-progress projects for EMS in-house system are:

a) Year 2000 conversion of EMS database and software to be completed by 4/99 and implemented by 10/99 - Scheduled FY99

b) additional system code for batch processing of claims -Scheduled FY99

c) insurance screen modifications (Combine screens)- Scheduled FY99

d) additional comments to be used for event history - Scheduled FY99

e) setup of pre-qualification screening of claims submitted - Scheduled FY99

page 2 of 6

ClikPDF - www.fenrisi.com

## CURRENT IN-HOUSE ADVANTAGES OVER PC-BASED

Our in-house EMS billing system has the following advantages over any PC based system such as Sweetsoft:

1) customized to the city of Brownsville needs

2) complete interface with city's general ledger

3) provides high security of confidential EMS data with daily backup

4) faster processor than PC based

5) software written in 4th generation utilities (Cognos)

6) provides in-house programmers for quick response

7) lower maintenance and support cost for the city

8) updated continuously with latest changes to medicare/ medicaid

9) provides as needed in-house training

The current in-house EMS billing system is up-to-date with the latest changes mandated from medicare/ medicaid. It contains all the major modules for EMS billing and accounting and interfaces with the city's general ledger for up to the minute financial data.

Page 3 of 6

CMUPDF - www.fastio.com

CURRENT AND COMPLETED PROJECTS (STATED AS INCOMPLETE OR NOT AVAILABLE BY EMS DIRECTOR
in memo of  September 25, 1998 to City Manager)

1) programs to send trauma reports to Texas department of Health - Implemented 11/96

2) addition of help screens for descriptions of different EMS codes

3) creation of reporting system based on ad-hoc needs that EMS requests (over 100 different reports for EMS needs)

4) option to add electronic BCBS remittance
   (put on hold by EMS staff who stated they did not have time to do)

5) option to print EMS claims to EMS PC printer
   (currently prints to EMS printer link to HP3000)
   (also put on hold by EMS staff)


This software is also not the sole source as stated by EMS director and Purchasing.

page 4 of 6

# AUDITOR'S FINDINGS OF EMS AND FINANCE INEFFICIENCIES

In the internal auditor's findings on EMS, over 98% of the findings were about inefficiencies between EMS and Finance departments.

The inefficiencies involved current procedures:
either because of a lack of procedure or, not doing a process correctly.

Examples of these are the following:

1) not depositing money daily to the bank

2) having petty cash allowance at EMS which is city violation

3) misplacement of run reports by EMS staff

4) EMS and Finance not having setup procedure for
   writing off over 5 year accounts from EMS system

5) not filing proper papers with AETNA causing AETNA to
   withhold of 31% of claim

6) not following through with collections charges to hospitals

7) not efficiently using the age-trial report (30/60/90)
   consequently because EMS has "not written off 10 year accounts"

8) future increase in collections is possible if EMS continues to
   utilize proper collection policies and

9) future increase in collections by efficient use of the aging trial report
   which had not been used by EMS for the past four years

CM/PDF - www.texis.com

## MISREPRESENTATION OF FINDINGS
## WITH REGARD FOR EMS ACCOUNTING SYSTEM

A more serious matter that has occurred is the internal auditor's finding
on a need for an EMS accounting system includes gross misrepresentation
of the facts.
The statements made by the internal auditor are false with regard to
the in-house EMS billing system.

MIS has never missed a mandated computer change deadline from any
government agency.
MIS' current method is extremely efficient, done accurately, and customized
to the city's needs.
The current EMS billing system is up to date with the latest changes mandated
from medicare/ medicaid.
It includes all the major modules for EMS billing and accounting and interfaces
with the city's general ledger efficiently.

It has been normal procedure for the auditors to "ask" MIS about the current
system so they can see the full picture and make an unbiased finding.
An example of this was with the findings at Municipal Court just a month ago.
However, the EMS finding was arrived at after talking with EMS staff only.

The city management, city audit committee, and EMS failed to involve
MIS on this evaluation of current in-house EMS billing system.
MIS was only "told" about this agenda item and, MIS was only told
about this item "after" the item had already been placed on the
city's agenda for approval.
Bypassing MIS and knowing about the misrepresentation of facts
involving MIS, city management placed this item for approval on
the October 20, 1998 agenda.

The audit finding on EMS was completed on September 17, 1998
even though MIS did not received the audit finding until October 27, 1998.

This information/findings were never forwarded to MIS neither by
city management, nor by the internal auditor, nor by the audit committee.



*Ivan Welker*
*Assistant City Manager*

November 19, 1998

Juan Pequeno, #2205
M.I.S. Director
City of Brownsville, Texas

     Re:    Pre-Disciplinary Hearing.

Dear Mr. Pequeno:

The City of Brownsville is considering taking disciplinary action against you. This contemplated disciplinary action is based upon charges that you allegedly willfully violated the following points listed in the City's Personnel Policies Manual, Chapter VII Discipline, Section 703: Grounds, pages 38-39:

    11.    Insubordination: reference, in part, your memorandum dated October 29, 1998 Proposal to Continue In-House Billing, the City Manager's memorandum to you dated November 4, 1998 EMS Computer Program and your response dated November 9, 1998.

    17.    Actions which tend to destroy friendly relations between the City and its employees or between employees.

    18.    Failure or refusal to cooperate with fellow workers.

    28.    Conduct which would reflect unfavorably towards the City of Brownsville.

Also included is Chapter V, Absence, Section 504: Sick Leave, page 28:

    (g)    Employees using or attempting to use sick leave without proper cause shall be subject to disciplinary action, including dismissal. In this regard, please be prepared to substantiate the illness leading to your use of sick leave for the following days. November 12, 13, 16, 17, 1998.

A pre-disciplinary hearing will be held at my office located at City Hall on Tuesday, November 24, 1998 at 11:00 a.m. This hearing is to afford you the opportunity to present your side of the story. You may bring a representative of your choice; however, the representative cannot attend this meeting in your place or testify on your behalf. You are further advised that from the date and time you receive this letter, you are placed on **administrative absence with pay** until the scheduled hearing date and time.

In considering whether or not disciplinary action should be taken against you for these charges, the City will consider all information available pertaining to these charges. After hearing any evidence you wish to present, a decision will be made as to whether or not to carry out disciplinary action, if any. If you need assistance in preparing for your response, please call Efren Fernandez, Human Resources Director at 548-6035.

Sincerely,

Ivan Welker
Assistant City Manager

cc:     employee file



*Ivan Welker*
*Assistant City Manager*

November 24, 1998

Juan Pequeno, 2205
M.I.S. Director
City of Brownsville, Texas

Dear Mr. Pequeno:

Referencing my letter to you dated November 19, 1998, which was hand-delivered to your house on November 20, 1998, whereas, I outlined several points on which I was considering disciplinary action against you. To wit, your failure to follow instructions regarding your provision of specific written response(s), your exhibited insubordination during a meeting with the City Manager and myself; conduct which reflects unfavorably upon the City, plus your obvious refusal to work with and maintain friendly cooperative relations with, fellow employees. Further, my letter of November 19th indicated the use or attempted use of sick leave without proper cause.

In that same letter, you were afforded an opportunity to participate in a pre-disciplinary hearing scheduled for 11:00 a.m. today. You did not appear for the hearing or give me notice that you would not be in attendance.

Therefore, be advised that I have considered these charges and, it is my recommendation and decision *(Personnel Policies Manual, Chapter VII Discipline, Section 703: Grounds)* that you be separated from City service effective 5:00 p.m., November 24, 1998.

You may appeal this decision to the City Manager within five (5) working days. The decision of the City Manager is final.

Sincerely,

Ivan Welker
Assistant City Manager

cc:    employee file

RECEIVED  12- 3-98;    4:36PM;           J565049960 => CITY MANAGER B'VILLE;    #2
12/03/98  16:36 FAX 1956   9960                                              002

To:    Carlos  Rubinstein, City Manager

From:  Juan Pequeno,  MIS Director

Re:    Appeal of the decision by Assistant City Manager and City Manager
       to separate  MIS Director from city

Date:  December 2, 1998


The assistant city manager and you are incapable of making unbiased evaluations,

recommendations, or decisions about me as the MIS director for the

city of Brownsville; both of you have  been malicious, prejudicial, and

unconscionable as proven by your bad faith and deceiving schemes of harassment

with continuous lies, threats, and uncontained emotional outbursts of intense

rage and fury.


I, Juan Pequeno, hereby appeal the decision by the assistant city manager and

city manager and request that all lawful due process be administered to me

by the city.



**Carlos Rubinstein**
City Manager

December 14, 1998

Mr. Juan Pequeño
P.O. Box 5692
Brownsville, Texas 78523

Dear Mr. Pequeño:

     This letter is my written decision on your appeal of your November 24, 1998 termination and is being sent to you in accordance with Section 704 of the Personnel Policies Manual of the City of Brownsville. You were given the opportunity to place before me any information that you deemed appropriate as required by the Manual but did not submit anything. Based upon my review of all the evidence, I find:

1. On November 19, 1998 you were placed on administrative absence with pay and were given written notice that the City of Brownsville was contemplating disciplinary action against you and that a pre-disciplinary hearing was scheduled for November 24, 1998 at 11:00 a.m. That notice set forth the basis for the disciplinary hearing.

2. Neither you nor anyone on your behalf appeared for the pre-disciplinary hearing.

3. On November 24, 1998, the assistant city manager decided that you would be separated from City service effective 5:00 p.m. on November 24, 1998 and a written notice to that effect was delivered to you on November 24, 1998. That notice also informed you of your right to appeal.

4. On December 3, 1998, the fifth working day after you were notified of the assistant city manager's decision, I received your request for an appeal.

5. On December 4, 1998, a written notice was delivered to you setting your appeal hearing for December 7, 1998, at 9:30 a.m.

6. On Sunday December 6, 1998, you faxed a memo to my office that you would not attend the appeal hearing "due to illness."

7. On December 7, 1998, a notice was delivered to you that your appeal hearing had been rescheduled for December 9, 1998 at 2:00 p.m.

8. On December 9, 1998, you faxed a memo to my office that you would not attend the appeal hearing due to illness.

9. On December 10, 1998, a notice was delivered to you advising you of your right to submit to me any documentary evidence by 4:00 p.m. on December 11, 1998 so that I could render a written decision by December 14, 1998 as required by Section 704 of the Personnel Policies Manual.

10. On December 11, 1998, you faxed a memo to my office that you would not deliver any documentary evidence in connection with your appeal.

I conclude:

1. All Provisions of the Personnel Policies Manual of the City of Brownsville dealing with discipline of employees and the employee's right of appeal have been followed including giving you adequate opportunity to put before me anything you deemed appropriate in connection with your appeal.
2. The information before me fully justifies the assistant city manager's decision of November 24, 1998.
3. The decision of the assistant city manager that you be separated from City service effective November 24, 1998 at 5:00 p.m. is affirmed in all respects.

Very truly yours,

Carlos Rubinstein
City Manager

cc:     Efren Fernandez, HR Director
        Joseph Graham, Assistant City Attorney
        John Chosy, Legal Counselor
        File

# CITY OF BROWNSVILLE, TEXAS

## PERSONNEL ACTION NOTICE

| Employee's Name | Employee No. | Social Security Number | Effective Date |
|---|---|---|---|
| Juan Pequeno | 2205 | 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 | 11-24-98 |

| TYPE OF ACTION | EXPLANATION OF TERMINATION CODES |
|---|---|
| [ ] New Employee<br>[ ] Re-hire<br>[ ] Change of Funding Source<br>[ ] Name Change<br>[ ] Salary/Wage Change<br>[ ] Promotion<br>[ ] Transfer<br>[ ] Suspension<br>[ ] Demotion<br>[ ] Incentive Pay<br>[ ] Out-of-Classification Pay<br>[ ] Standby Pay<br>[x] Termination<br>[ ] Other (Explain) | 1. Resignation (Explain)    7. Reorganization<br>2. Failure to Qualify    8. Temporary Hire<br>3. Disciplinary Action    9. Disability<br>4. Abandonment of Duties    10. Retirement<br>5. Reduction in Force    11. Death<br>6. Work Performance    12. Other (Explain)<br><br>**EMPLOYMENT CATEGORY (Circle one)**<br>01 - Management/Supervision<br>02 - Clerical<br>03 - Labor Force<br>04 - Part-time<br>05 - Temporary |

### DETAILS OF ACTION (Fill in only items affected)

| | CHANGE FROM (or new hires) | CHANGE TO (or terminations) |
|---|---|---|
| NAME | Juan Pequeno | |
| HOME/ADDRESS/PHONE NUMBER | P.O. Box 5692<br>Brownsville, Tx 78523 | (548-7000) |
| JOB TITLE | MIS Director | |

| SALARY/WAGE INFORMATION | Annual | Bi-Weekly | Annual | Bi-Weekly |
|---|---|---|---|---|
| | 42,233 | 1624.34 | | |
| | Hourly | Grade/Step | Hourly | Grade/Step |
| | $20.3043 | 28/4 | | |

| EMPLOYMENT STATUS (Check one √) | Regular | Probationary | Regular | Probationary |
|---|---|---|---|---|
| | x | | | |
| | Full Time | Temporary | Part-Time | Full Time | Temporary | Part-Time |
| | x | | | | | |

| DEPARTMENT/DIVISION | 241 MIS | |
|---|---|---|

Explanation/Remarks:   Terminated from City service effective 11-24-98 at 5:00 p.m.

Credit Union: | Safety & Risk:

Date received at Human Resource Department  12-19-98

Date sent to C.M. _____

Date received from C.M. _____

Date sent to finance _____

| Sick Leave<br>Accrued Days | | Total _____ |
| Annual Leave<br>Accrued Days | | Total _____ |

Employee Signature _____   Date _____

Department Head Signature _[signature]_   Date 12/14/98

Authorized Signature _____   Date _____

**DISTRIBUTION WILL BE MADE BY PERSONNEL DEPARTMENT.**

WHITE: Personnel File.     YELLOW: Reporting Dept.     PINK: Finance Dept.     GOLDEN ROD: Credit Union

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| VS. | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commissioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, | § | |
| (Previous Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

# EXHIBIT "G"

CERTIFIED
COPY

1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      BROWNSVILLE DIVISION

 3   JUAN PEQUENO               )
                                )
 4   VS.                        )    NO. B-00-180
                                )
 5   CITY OF BROWNSVILLE,       )
     ET AL                      )
 6

 7   _____

 8

 9             ORAL VIDEOTAPED DEPOSITION OF

10                      JUAN PEQUENO

11                  SEPTEMBER 12, 2001

12   _____

13

14        ORAL VIDEOTAPED DEPOSITION of JUAN PEQUENO,

15   produced as a witness at the instance of the

16   Defendants, and duly sworn, was taken in the

17   above-styled and numbered cause on the 12th day of

18   September, 2001, from 9:04 a.m. to 10:56 a.m.,

19   before Sydnee Schwab, Certified Shorthand Reporter

20   in and for the State of Texas, reported by

21   computerized stenotype machine, at the offices of

22   Frank Costilla, P.L.L.P., 5 East Elizabeth Street,

23   Brownsville, Texas, pursuant to the Federal Rules of

24   Civil Procedure and the provisions stated on the

25   record or attached hereto.
```

2

1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4          Alejandro J. Garcia
           LAW OFFICES OF FRANK COSTILLA, P.L.L.P.
5          5 East Elizabeth Street
           Brownsville, Texas  78521
6
     FOR THE DEFENDANTS:
7
           Seth Moore
8          WILLETTE & GUERRA, L.L.P.
           International Plaza, Suite 460
9          3505 Boca Chica Boulevard
           Brownsville, Texas  78521
10

11

12   ALSO PRESENT: Yolanda Garza, Paralegal
                   Tele Video & Audio Productions
13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                               <u>**INDEX**</u>

5                                                              *PAGE*

6

JUAN PEQUENO

7        Examination by Mr. Moore......................4
         Examination by Mr. Garcia....................64

8        Examination by Mr. Moore.....................75
         Examination by Mr. Garcia....................82

9

Witness' Signature Page/Corrections...............85

10

Reporter's Certificate............................87

11

12

13                             <u>**EXHIBITS**</u>

14   *EXHIBIT*              *DESCRIPTION*              *PAGE*
     No. 1        10/29/98 memo from Pequeno to          34
15                Rubinstein and Welker
     No. 2        11/9/98 memo from Pequeno to           36
16                Rubinstein and Welker
     No. 3        12/2/98 memo from Pequeno to           46
17                Rubinstein
     No. 4        12/5/98 memo from Pequeno to           47
18                Rubinstein
     No. 5        12/8/98 memo from Pequeno to           48
19                Rubinstein
     No. 6        12/11/98 memo from Pequeno to          50
20                Rubinstein

21

22

23

24

25

1           **JUAN PEQUENO,**

2    having been first duly sworn, testified as follows:

3                   **EXAMINATION**

4         Q     (BY MR. MOORE)   Could you please state

5    your name for the record, please?

6         A     Juan Pequeno.

7         Q     And before we get started, Mr. Pequeno, I

8    just want to make -- just tell you a couple of

9    things.

10                   First of all, you do understand that

11   you have just been put under oath and testifying

12   here is the same as testifying in front of the jury

13   at trial?

14        A     Yes, sir.

15        Q     To that end, it's important that we make a

16   good record here so that the jury can review what we

17   discussed.   Therefore, if I mumble or if I do not

18   make my questions clear, then please ask me to speak

19   up, to rephrase the question, whatever you need so

20   that you'll fully understand what it is I'm asking

21   you, okay?

22        A     All right.

23        Q     And on the other side of that, if you go

24   ahead and answer my questions, I'm going to assume

25   that you heard what I asked and that you fully

1    understood and I'm going to accept your answer under

2    those pretenses, okay?

3         A    All right.

4         Q    Mr. Pequeno, where do you currently

5    reside?

6         A    Well, my mailing address is P.O. Box 5692,

7    Brownsville, Texas, 78523.

8         Q    And physical address?

9         A    Physical address is 1534 Jenkins here in

10   Brownsville, Texas.  78521, I believe.

11        Q    Okay.  How long have you lived at that

12   address?

13        A    About 16 years.

14        Q    Okay.  How long have you lived in the City

15   of Brownsville?

16        A    About since -- since '81, about 20, 21.

17        Q    Twenty-one years?  Did you go to high

18   school here in Brownsville?

19        A    No, I didn't.

20        Q    Where did you go to high school at?

21        A    La Feria High.

22        Q    What year did you graduate from La Feria?

23        A    1978.

24        Q    Okay.  And let's talk a little bit about

25   your education.  What did you do after high school?

1       A       I went to Pan American at Edinburg,

2   University of Pan American.

3       Q       Did you go immediately after high school

4   or did you work for a year or straight from

5   graduation?

6       A       I went right after graduation.

7       Q       And what year did you graduate from

8   college?

9       A       1981.

10      Q       1981.  And after you received your

11  undergraduate degree, what did you do next?

12      A       After that I started looking for a job.

13      Q       We all do.

14      A       Yeah, get your resume ready and -- ended

15  up applying for certain positions, one in McAllen

16  and one here in Brownsville, ended up getting here

17  in Brownsville with Cameron County Computer Center,

18  started off as a programmer with Cameron County.

19      Q       Okay.  How long did you stay with Cameron

20  County?

21      A       Approximately three years.

22      Q       Okay, three years.  After that any further

23  education after undergrad?

24      A       After -- yeah, after -- while I was

25  working with Cameron County, a friend of mine wanted

1    to pursue the MBA degree here at the university here

2    at Brownsville so we went -- kind of went as a team,

3    and we went and in two years we both got MBA's in

4    business.

5        Q    From UT-Brownsville?

6        A    From UT-Brownsville.

7        Q    What year was that degree awarded?

8        A    I think it was 1984.  We went from '82 to

9    '84.

10       Q    Okay.  Did you continue to work for

11   Cameron County while you were seeking your MBA?

12      A    Yes.

13      Q    Okay.  And what were some of your

14   responsibilities at Cameron County?  Said you worked

15   as a computer programmer?

16      A    Right.  It was basically -- I was assigned

17   to do certain programs like for office inventory and

18   also for the financials, like the general ledger,

19   accounts payables, basically maintain the programs

20   and add different modules or different changes that

21   they needed.

22      Q    After you left -- let me ask you.  What

23   year did you leave your employment with Cameron

24   County?

25      A    1984.

```
 1        Q     1984, okay.  And where did you go from
 2   there?
 3        A     From there I went to the City of
 4   Brownsville.
 5        Q     That's when you began working for the City
 6   of Brownsville?
 7        A     Right.  I got a position over there as a
 8   programmer analyst.
 9        Q     As programmer analyst?
10        A     Right.  Basically, the same type of work,
11   but it went like from application programmer to
12   programmer analyst.  It's a little higher title, a
13   little more pay and --
14        Q     It's a little different responsibilities,
15   more supervisory, or still writing programs?
16        A     Pretty much still writing programs with a
17   little bit less supervision I would say, more
18   expected out of you because it's a little bit higher
19   title.
20        Q     Was that position in the MIS department or
21   were you in a different department?
22        A     It's in the MIS.
23        Q     It's in the MIS department?
24        A     Right.
25        Q     Okay, you'll have to excuse me if I ask
```

1  elementary questions.  I don't know a whole lot

2  about computers.

3       A    No, that's fine.  The only thing is that

4  it used to be called data processing and then it was

5  called MIS and now I think it's called IS.  It keeps

6  evolving, and I think it's going to go back to data

7  processing.  But right now -- well, when I started

8  it was data processing department.

9       Q    Okay.  Now, you started as a programmer

10 analyst.  When did you change positions or were you

11 promoted or did you ask to be moved?

12      A    Well, I was -- for about ten years I was

13 programmer analyst and pretty much the City didn't

14 really have any -- like a systems analyst.  You're

15 pretty much -- you get into this slot, after that

16 you kind of do -- you wear many hats.  You kind of

17 learn the whole operation, the different duties of

18 the other people also, but the thing is that from

19 there it's really management.  The only next step is

20 to go to management.

21                    But in 1984 my boss at the time

22 retired, and then so the opening for the MIS

23 director became and that's when I applied for it,

24 and I was able -- I was acting I think for about six

25 months and then the -- the city manager made me MIS

1    director.

2         Q     Okay.  And when did you officially become

3    the MIS director?

4         A     I think it was about June 1994.

5         Q     Okay, June of 1994.  And explain to me a

6    little bit what you did as MIS director.

7         A     We oversaw basically 90 percent of the

8    data processing like all of the hardware, all of the

9    software that ran on the City and we were basically

10   an in-house shop which we had our own programmers

11   in-house that we -- we customized programs to

12   whatever the City needed, for the most part.  We

13   were 90 percent that way.

14                    And our main software was Cobalt

15   language that we were using plus another one

16   called -- it was from a company called Cognos out of

17   Canada.  The City had bought this utility to develop

18   programs, kind of similar to Cobalt but a lot easier

19   and supposedly you can develop them a lot faster

20   after you know -- you learn the language, of course,

21   but we had those two.  We had Cobalt and what they

22   call Powerhouse from that company Cognos.

23                    So we were mainly an in-house

24   development, that we customized softwares to the

25   City, but the City was basically pretty big where

1    like the Brownsville department was running their

2    own shop because they bought customized police

3    operational programs and also because there was a

4    mood that -- because they were tied into the federal

5    bureau -- these other government agencies, they have

6    to be separate from tying in from the City because

7    of security reasons basically, and so they ended up

8    setting up like their own little data processing

9    shop also, but we still communicated with them and

10   worked some of the -- like we met in the meetings to

11   discuss some data processing issues, but one of the

12   concerns was to try to keep it as centralized as we

13   could to save costs for the City.

14        Q    So in order to achieve that goal, they put

15   most of it -- most of the responsibility was with

16   MIS.

17        A    Right.

18        Q    Okay.

19        A    Right.

20        Q    All right.  And you say they were -- you

21   were mostly responsible -- the bulk of your work was

22   customizing these programs.  What other type of

23   responsibilities?

24        A    It was -- well, overseeing the staff and

25   then overseeing whatever requests were out there and

1    then reviewing the computer needs for the City, and

2    basically giving the recommendations, you know,

3    which -- you know, that's good because of this or

4    that's not good because of this, basically analyzing

5    it.  And the mood was -- because right around 19 --

6    right around that time -- well --

7                    MR. GARCIA:  Mr. Pequeno, just please

8    limit your answer to your duties as an MIS director.

9    I think that was what the question was.

10                   THE WITNESS:  Okay.

11        Q    (BY MR. MOORE)  Go ahead, I was -- I'm

12   interested in understanding exactly what your job

13   was.  Any other responsibilities other than

14   performing these program modifications, receiving

15   the requests?

16        A    It almost evolved.  Any kind of -- any

17   function having to do with computers, purchasing,

18   and like upgrading the system and trying to make --

19   basically overseeing, making sure that it runs, you

20   know, efficiently.

21        Q    Did you do troubleshooting?  For instance,

22   if someone was having a problem with their

23   computers, would they call MIS or did they call

24   someone else?

25        A    No, they called us.

1       Q       Okay.  And I guess you all were

2    responsible for both hardware and software problems?

3       A       That's correct.

4       Q       Okay.  And how many employees were in the

5    MIS department when you were director?

6       A       We had -- including me a total of five.

7       Q       Okay, including you a total of five.

8       A       We had --

9               MR. GARCIA:  Can we clarify the

10   timetable, Mr. Moore?  Are we talking about '84?

11              MR. MOORE:  No, I'm talking about as

12   when he was director, during his time as director

13   from '94 to the time he left his employment with the

14   City of Brownsville.

15      Q       (BY MR. MOORE)  There were five

16   employees?

17      A       That's correct.

18      Q       Okay.

19              MR. GARCIA:  Sorry.

20              MR. MOORE:  No problem.

21      Q       (BY MR. MOORE)  Of those five employees,

22   you were obviously the director, were the rest --

23   what were the other four employees?

24      A       Two programmer analysts, one operator,

25   computer operator, and one PC technician.

1      Q     Okay.  All right, I want to move on to the

2  EMS billing software that the MIS department

3  developed.

4      A     Mm-hm.

5      Q     Who was responsible for developing that

6  particular program?

7      A     The MIS department.

8      Q     Who within the -- was it all five of you,

9  who within the MIS department?

10      A     Well, actually, the software I believe --

11  see, I started in the City in 1984 and it was

12  already there, the EMS software, in-house, and they

13  had already done a lot of customized work for EMS

14  software for billing.  In other words, they were

15  already doing it in-house.

16            And what my previous boss did was

17  continue to customize it to the City's needs with

18  the Medicare and Medicaid, whatever government, and

19  so we kept enhancing it for -- you know, for all

20  those years, and so --

21      Q     It was constantly evolving, you would have

22  to make changes as needed.

23      A     As needed.

24      Q     Okay.

25      A     Right.

1     Q     Can you give me just maybe an example of

2  what types of changes you made during your time as

3  MIS director to this particular software?

4     A     We -- one that I can remember is that we

5  added like help functions.  Like when the user is

6  keying in a certain code, we added where they could

7  just click on one button and it would tell them all

8  the -- list all the different kind of codes that

9  would go in for that field, for that code.  So we

10  set it up -- we made it more like user-friendly,

11  more helpful so they would have basically the

12  reference online as opposed to looking it up in a

13  book.  That's one of the things that we did.

14     Q     Now, what exactly was the function of this

15  particular software, just determining what bills

16  were overdue or what exactly all did this program

17  do?

18     A     It was a total receiving, billing --

19  billing and receiving EMS software customized for

20  EMS billing, and it was set up to -- when an

21  ambulance would go out and pick up somebody, that

22  created what they call a run or a transaction.

23          From this sheet they would come back,

24  key it into the computer, and then it would

25  create -- from there it would create the charges and

1   then, if it had Medicare or Medicaid, they would get

2   that from the patient as soon as possible and then

3   it would create, you know, the proper forms for

4   either Medicare or Medicaid, and then it would print

5   out a form, and we modified it to do electronic

6   billing because everybody -- the government within

7   the last six, seven years has been moving more to

8   electronic billing so that was one of the major

9   changes also that we did.  We added the electronic

10  billing to it, function to it.

11               And then so -- so we started doing

12  that, and so it covered the full facet of

13  collecting -- billing, collecting, and also

14  interfacing with the City's financial books.  Like

15  if somebody went and paid $200 on their account, it

16  would reflect it right then and there.  When they

17  would -- the clerk will receive it.  It would

18  reflect it on their account, plus it would go into

19  the general ledger and it would update to the main

20  database in the City's computer.  So when the

21  financial director would look -- if he wanted to

22  know the latest revenue that came in, he could find

23  out right away.  So it was a complete package.

24       Q    Did the whole thing.

25       A    Yes.

```
 1        Q      When it comes to EMS billing and
 2   receiving --
 3        A      Right.
 4        Q      -- this ran the whole show.
 5        A      That's correct.
 6        Q      Okay.  And you said that this is just --
 7   this was just one of many programs that you all had
 8   customized or made, you've done several?
 9        A      EMS was a group of over -- I would say
10   like close to a hundred programs.  It wasn't just
11   one program that did everything.  It was a whole
12   group that worked together.  Just on the reports I
13   think there was like 50 different reports and report
14   programs that EMS personnel could run, and then
15   there was individual billing, checks, all kinds of
16   stuff that they had, but the whole system for EMS
17   was about a hundred programs.
18        Q      Okay.  Just to repeat -- I'm sorry, just
19   to repeat my previous question.  You all made and
20   customized other software packages for the City not
21   just this one?
22        A      That's correct.
23        Q      Okay.  Do you have any idea how many
24   others?
25        A      There was -- just like over 20.
```

1     Q     Okay.  I want to move forward and talk a

2   little bit about the Sweetsoft software that was

3   considered by the City.  What was it supposed to do,

4   the same thing as the in-house MIS software?

5     A     My understanding is that it was similar if

6   you bought the whole modules.  They had them all

7   separated like -- they had like -- I guess like --

8   that I saw like ten different modules and, if you

9   bought them all, then effectually you would have

10  something similar to what we had.

11    Q     And why did the City want to switch to

12  this other program?  Why did they even want to

13  consider it?  It sounds -- I mean, just from reading

14  some of the things I've read, that the in-house MIS

15  software, if it was so similar, why did they want to

16  switch to this new one?

17    A     I really don't -- talking to the EMS

18  director, which at that time Arturo Rodriguez,

19  because we had gone to Harlingen in 1996 because

20  City of Harlingen's EMS had Sweetsoft at that time,

21  and they've had it I believe for over ten years, and

22  I believe maybe the reason could be because

23  Harlingen had it and our EMS director wanted

24  something similar to what they had.  And the -- the

25  thing with the -- I believe was that they had -- one

1    of the differences is that it was on a PC network

2    environment as opposed to like an in-house server

3    environment.  But when we went to evaluate it -- to

4    answer your question, you said that why do you think

5    they wanted it, I think it was the EMS director's

6    personal likes for that software.

7        Q    So you think the EMS director was probably

8    instrumental in getting the ball rolling in

9    considering this Sweetsoft software?

10       A    Yes.

11       Q    Okay.  Now, I know you've had concerns

12    about switching from the MIS software to the

13    Sweetsoft software.  What were your concerns?

14       A    The main one was we were collecting at an

15    all-time revenue, close -- approximately 1.3 million

16    with this system, from -- in 1985 I believe it was

17    around like 600,000, and within a matter of a couple

18    of years we more than doubled the revenue, and so it

19    was at an all-time high, and I really -- I felt that

20    it was going to be detrimental to that.

21       Q    You felt the MIS software was doing a

22    pretty good job, let's leave a good thing alone?

23       A    It was doing an excellent job.  And it

24    wasn't just the MIS software, it was also the City

25    had put more people to collect for EMS, you know,

1   they had done some other procedures which I had told

2   them; but the PC software, that was not going to be

3   an improvement.  In fact, it was going to hurt the

4   collection.  It was going to hurt the collection,

5   basically.

6        Q    It was going to hurt the collection?  You

7   mentioned other procedures.  What other procedures

8   were you referring to?

9        A    The City had never really allocated enough

10  money -- I mean, enough people to collect, you know,

11  for EMS billing.  Then they dedicated I believe in

12  1986 or '97 a person just to send out the bills

13  because, part of the problem, they weren't

14  collecting because they weren't sending out the

15  bills.

16            And I believe the other department,

17  finance, their job -- one of their job duties was to

18  make sure they went out but they said, "EMS, you're

19  supposed to be doing that," so they were kind of

20  like passing each other that situation, and until

21  somebody really addressed it, that helped billing,

22  that helped collection aside from the computer --

23  one of the things that helped the whole city and EMS

24  was in 1985 we upgraded from a very slow computer, a

25  server for the City, to a very fast one.  And from

1   there on it helped, especially -- one of the

2   departments that it helped a lot was EMS because,

3   where they do data entry, before the new upgrade

4   they were having to wait to do the -- it was -- the

5   data entry took a long -- longer -- long time, and

6   then when we upgraded to the faster computer, it was

7   the other way around, the computer was waiting for

8   them and they were able to do their processing --

9   they were able to do a lot more from there on, from

10  1985, and so it was a combination of things that

11  helped the revenues skyrocket.

12          And when they were buying this

13  software, everybody seemed to not be talking about

14  that even though in our commissioners' meetings and

15  every meeting it was "How's the revenue doing, how's

16  the revenue?"  And with this issue like nobody --

17  nobody was saying anything about it and I said,

18  "This is going to affect it."

19      Q   So you felt like this rapid rise in

20  collections under the MIS software would have

21  continued into the future and that, if you switched

22  to the Sweetsoft, it might not continue at the same

23  rate, is that -- that's my understanding.  I'm

24  sorry.

25      A   Under Sweetsoft it was not going to go up.

CSM/PDF - www.fastio.com

1   It was going to probably go down, more than likely.

2   It was going to hurt, and it was not going to be an

3   improvement over what we had already.  And if the

4   City kept good billing procedures, we could probably

5   collect more.  We could probably collect more

6   because there was a lot of money out there.  I

7   believe out of like two million that was billed, two

8   million like for one year, the City was collecting

9   like a million and a third, so something like in the

10  70 percent, but some of it was uncollectible, of

11  course, but some of it had to be addressed, like

12  moved to collecting agency or something, but those

13  were things that they had to work out and do.

14       Q    I want to see if I can understand some of

15  the changes that would have been made when they

16  switched to the Sweetsoft software from the MIS

17  software.

18            Now, you mentioned this dedicated

19  person that was just doing billing.  Now, that

20  happened before they considered buying the Sweetsoft

21  package, correct?

22       A    Mm-hm.

23       Q    And this is one of the things that

24  enhanced the City's ability to collect.

25       A    Right.  It had -- pretty much had nothing

1   to do with whichever computer you go to.  It's just

2   what they call a procedural process, just a process.

3        Q    Now, would this person have still been

4   involved just doing billing under the new software?

5        A    I would imagine so.

6        Q    What types of changes -- what I'm trying

7   to understand is, what types of changes would have

8   happened?  Were you concerned about any changes that

9   would have involved -- you would have needed to run

10  the Sweetsoft software rather than run the MIS

11  software?

12       A    One of the things that concerned me when I

13  found out -- it was -- I found out right before they

14  were going to vote on this and -- because they had

15  set up an internal -- like an audit committee to

16  decide on this.  But the thing is, one of the main

17  concerns was that, before you switch over to another

18  system, you have to do parallel testing, that you

19  run both systems at the same time to make sure that

20  the new one that's coming on is going to work and it

21  won't be a detriment.

22            What they were going to do is just

23  run it -- you know, like shut off the other one and

24  just start EMS -- they were going to move -- they

25  were going to have to buy their own computers and

1    put them within the EMS department and then network

2    their computers within their department and run

3    their own software there, but -- then they were

4    going to have to -- all the issues that we were

5    concerned, like security of data, security of the

6    computer, itself, these were new issues that the EMS

7    director was going to have to take on aside from his

8    EMS director duties, so he was going to have to be

9    EMS director slash MIS for EMS.

10       Q    So he would have had to take over duties

11   that ordinarily would have been already in the MIS

12   department?

13       A    That's correct.  Right.

14       Q    So the EMS people, instead of -- like you

15   say, instead of doing EMS jobs would have been doing

16   some MIS jobs as well.

17       A    That's correct.

18       Q    Okay.  And I'm assuming that -- would MIS

19   have been involved or been responsible for

20   implementing this new software package if --

21       A    Yeah, we would had to have assisted.  One

22   of the other major things was the interfacing with

23   the general ledgers, the financial books, because

24   the new software was basically going to be like an

25   island, like a stand-alone.  They were going to do

1    their own processing but then they were going to

2    say, "Well, how am I going to link the revenue

3    collected over to the financial database?"  But

4    their solution, they said, was that all they had to

5    do was buy another module for that, buy another

6    thousand-dollar software to handle that interaction,

7    but that remained to be done.

8              And ours -- that that another concern.

9    See, because otherwise what was going to happen was

10   everything was going to go like back to manual, and

11   they were going to have to report the totals to

12   finance manually and it wasn't going to get updated,

13   you know, right away, you know, within a couple of

14   days.  It was going to take a week, two weeks, and

15   then you were going to have like a security issue of

16   money being held over at EMS which could be

17   thousands of dollars and then you've got other kinds

18   of problems, so the City was trying limit --

19   minimize -- all through when I was working, the

20   whole idea was to maintain as little money in the

21   different departments so there wouldn't be any

22   chance of really losing any money or, you know,

23   misaccounting of money, and so -- so as soon as the

24   money got collected, it was -- you had to go deposit

25   at the bank.  Record it in the computer first and

1    then deposit it and to -- you know, to keep it

2    running -- we had a centralized receiving system

3    that -- and EMS was one of the receiving

4    departments.  We also had like parking tickets,

5    municipal court fines and other departments, so that

6    was kind the method that we were doing and EMS was

7    going to break that.

8              MR. GARCIA:  Can we take a break for

9    just a second?

10             MR. MOORE:  Sure.

11             (Recess.)

12        Q    (BY MR. MOORE)  Mr. Pequeno, we were

13   discussing the Sweetsoft software package.  Now,

14   tell me, when did you first find out the City was

15   considering switching from the MIS software to the

16   Sweetsoft package?

17        A    It was I believe like in October, October

18   19th.

19        Q    All right.  And before we took a break you

20   had mentioned that the MIS package in its last year

21   collected -- was it 1.3 million?

22        A    Correct.

23        Q    Okay.  And you were concerned about

24   whether or not that type of collection would

25   continue under the new package if they switched.

1       A       Correct, I was concerned on that.

2       Q       Did you have any idea how much the new

3   software, the Sweetsoft package, might have been

4   able to collect?

5       A       The new one?

6       Q       Yes.  If they switched, do you have any

7   idea how much the Sweetsoft package would have been

8   able to collect?

9       A       No.

10      Q       Did you know at the time, did you have an

11  idea as to how much it would be able to collect?

12      A       No.

13      Q       But you were concerned that it might not

14  collect as much as the MIS in-house software.

15      A       Right.

16      Q       Okay.  And what gave you that concern,

17  what made you worry that it might not be able to

18  continue the types of collections that the City was

19  currently seeing?

20      A       One of the -- the main is that Harlingen

21  had Sweetsoft for over ten years, and they -- they

22  were no where close to what we were collecting, and

23  we were basically a similar size operation, and I

24  believe we were collecting at that point probably

25  more than half a million than they were because back

```
 1   in 1996 when we did an evaluation the City was
 2   collecting a hundred thousand more than they were
 3   and then we more than doubled.
 4        Q    Do you know how much -- how much did the
 5   City of Brownsville total bill, not collect, how
 6   much did they bill in EMS bills?
 7        A    I believe for 1998 that year if I -- I
 8   think I heard somebody mention that it was something
 9   like two million.
10        Q    And of that two million they collected
11   about 1.3?
12        A    That's correct, something like that.
13        Q    Okay.  But the City of Harlingen wasn't
14   collecting anywhere near that amount.
15        A    I don't believe so.
16        Q    And that was part of what made you
17   concerned that Sweetsoft might not be able to
18   collect as much?
19        A    (Nodding head.)
20        Q    Do you know how much total the City of
21   Harlingen billed?
22        A    No.
23        Q    Do you know how much total they collected?
24        A    Only in 1986 because that's when I talked
25   to their -- their EMS -- deputy EMS --
```

1    Q    I'm sorry, 1986 or 1996?

2    A    In 1996 I talked to Leonard Collier from

3   Harlingen.  He was the EMS director and he told us

4   what they were collecting, and we did like a

5   comparison study about -- that we were about the

6   same size as they were.

7    Q    But you don't know exactly how much they

8   billed or exactly how much they collected?

9    A    No.

10    Q    And, therefore, you don't really know the

11  percentage collection, whether they collected 60

12  percent of what they billed, 50 percent, 75 percent?

13    A    Right, I don't know.

14    Q    Okay.  Now, in our earlier discussion you

15  mentioned that another one of your concerns about

16  the Sweetsoft package was that it would force EMS to

17  have to do some non-EMS type jobs, the same types of

18  jobs that MIS was doing, is that correct?

19    A    They would have to be doing MIS job

20  functions.

21    Q    Okay.  And who would have had to train

22  them to do those MIS functions, would that have been

23  MIS' responsibility or would that have been someone

24  else?

25    A    If it has to do interfacing with the other

1    departments with the City, it would be MIS.

2         Q    So MIS would have had to show EMS how to

3    do a job that ordinarily they wouldn't have been

4    doing.

5         A    Right.

6         Q    And who would have had to implement the

7    new software, would that have been the sellers of

8    the Sweetsoft package or would that have been MIS?

9         A    It was going to be a combination, I

10   believe.

11        Q    Okay.  And if EMS had a problem with the

12   new Sweetsoft software, who would they have called?

13        A    The new vendor.

14        Q    They would have called the vendor?

15        A    Right.  If it has to do with the software,

16   it would be the new vendor.  If it had to do with

17   communicating with the other departments, it would

18   be MIS.

19        Q    So they would have had to call MIS on that

20   as well.  And so that -- I mean, it just seems like

21   this would have -- the new Sweetsoft and forcing EMS

22   to do all of these MIS functions would have forced

23   MIS to not only do their normal responsibilities but

24   kind of have to have a -- take on a teaching role

25   for EMS as well to show them how to do these types

1   of things.

2                MR. GARCIA: Objection, form.

3      Q   (BY MR. MOORE)  It was a bad question.

4             Would MIS have had to take on

5   additional responsibilities if this new software had

6   been purchased that they ordinarily wouldn't have

7   done?

8      A   Not -- it's tough -- at the beginning --

9   it could -- it's tough to say because at the

10   beginning it would seem like less because we

11   would -- the software would be going, you know, it

12   would be running out of EMS and the

13   responsibilities, they would have to be taking on

14   new responsibilities, EMS, but then at the same time

15   we would have to be -- it's a different kind of

16   responsibility.  MIS would have to be taking like an

17   overlooking or, you know, looking after them like,

18   "Watch out, you're going to get into trouble there;

19   watch out, you're going to do this."  A different

20   kind of function that we really -- before we didn't

21   have to do.

22      Q   And was that one of the concerns you had

23   with purchasing the Sweetsoft?

24      A   Not as much as the revenue.

25      Q   Not as much as the revenue, but it was one

1    of many that you had.

2         A    It was one of several.

3         Q    Okay.  All right, moving forward to this

4    commission meeting at which you spoke, I believe the

5    date was October 20, '98.  Does that sound correct?

6         A    October 20, '98?  Right, it was.

7         Q    Okay.  Now, at this meeting of the

8    commission, they brought up this agenda item, the

9    Sweetsoft software, and I believe you spoke on that

10   agenda item.  What did you tell them?

11        A    I told them that I had a concern on the

12   revenue aspect of it, that we were collecting at an

13   all-time record high and that buying this software

14   would not be in the best interests for the City of

15   Brownsville, and that we had done -- that I had

16   personally and the EMS director had done an

17   evaluation a couple of years earlier on it.

18        Q    Okay.  I need to understand.  Is this --

19   you've alleged in your petition that you were fired

20   in violation of your first amendment free speech

21   rights.  Now, is this the speech you were talking

22   about, this speech at the city commission meeting?

23        A    Yes, it was.

24        Q    Okay.  And you believe that this speech at

25   the city commission meeting is why you were

1   ultimately terminated?

2        A    That's -- after that the City management

3   moved to retaliate against me after the speech.

4        Q    Okay.  So here you are the MIS director of

5   the City trying to tell the city commission about

6   the job that this MIS billing program for EMS is

7   doing and telling them about the all-time collection

8   rate and they fire you for this, is that your

9   contention?

10       A    Well, what I'm saying is that after that

11  they started like -- they started a series of

12  retaliating things against me.

13       Q    So this started the retaliation which

14  ultimately led to your termination.

15       A    Right.  Right.

16       Q    Let's talk a little bit about the

17  retaliation.  Like I said, the speech you're

18  discussing or you're talking about in your petition

19  is the speech at the city commission meeting, is

20  that correct?

21       A    That's correct.

22       Q    Was there any other speech that you might

23  be -- that they might have retaliated against you

24  for?

25       A    No.

```
 1        Q     No others?

 2        A     No.

 3        Q     Okay.  I have here a document titled "The

 4   Reasons for Processing EMS Billing In-house."  Do

 5   you recognize this document?

 6              MR. MOORE:  Do you want to make

 7   copies of these?  I'm sorry, I didn't have enough

 8   time to make extra copies this morning.

 9              MR. GARCIA:  No, that's okay, I don't

10   need a copy.

11        Q     (BY MR. MOORE)  Do you recognize --

12        A     Yes.

13        Q     -- that document?

14        A     Right.

15        Q     Did you write this document?

16        A     Yes, I did.

17        Q     Okay.  Could you flip through the pages of

18   that document and let me know is that in

19   substantially the same form as it was when you wrote

20   it?

21        A     Yes, it is.

22              MR. MOORE:  I'm going to make this

23   Deposition Exhibit Number 1.

24              MR. GARCIA:  May I see it real quick?

25              MR. MOORE:  Yes, certainly.
```

```
1        Q     (BY MR. MOORE)   I want to talk about this
2   real quick.   This seems to me a fairly reasonable
3   defense of, you know, how well the MIS department's
4   software was doing when it comes to collecting for
5   EMS billing.   Do you believe that this, part of
6   this -- or excuse me, strike that.
7                      That this was part of the reason that
8   you were retaliated, do you believe that you were
9   retaliated against for writing this particular
10  document?
11       A     Well, that was one of the retaliatory that
12  they said later that -- they used that as
13  insubordination.   They said -- we had a -- the
14  answer is yes.
15       Q     And you believe that ultimately this is
16  part of the reason for which you were terminated?
17       A     Mm-hm.   Yes.
18       Q     All right.   Have another document here
19  titled "Second Proposal to Continue In-house
20  Processing of EMS Billing."   Do you recognize this
21  one?
22       A     Yes.
23       Q     And did you write that document as well?
24       A     Yes.
25       Q     And, once again, if you could flip through
```

1  it and is it in the same or substantially the same

2  form as when you first wrote it?

3      A    Yes.

4              MR. MOORE:  I'm going to mark this

5  Deposition Exhibit Number 2.

6              THE WITNESS:  I -- I would like to

7  add that these two proposals were requested by the

8  city manager.

9      Q    (BY MR. MOORE)  Yes.

10     A    For me to do.  It's not something that

11  I --

12     Q    I was just about to ask you about that.

13  These were both requested?  Who requested you to

14  write those two proposals?

15     A    The city manager, Carlos Rubinstein.

16     Q    And why were you requested to write two

17  proposals rather than just this first one, why was

18  the first one not sufficient?

19     A    His words were that -- Carlos Rubinstein's

20  was that the first one did not meet the needs.  In

21  their opinion it didn't meet what they wanted.

22     Q    Well, the first one seems to show every --

23  you know, all of the things that the MIS program was

24  doing.  Did you feel that this one was sufficient?

25     A    Yes.

1    Q    Did you feel that it was a good defense of

2    what the MIS department was doing when it comes to

3    EMS collecting?

4    A    From what I knew at the time because the

5    city manager gave me only two working days to do

6    this aside from my other duties as an MIS director,

7    plus he asked me to call the EMS director but I told

8    him that he wasn't -- wasn't communicating with me,

9    so the only thing I could concentrate was on the

10   knowledge that I knew at the time which is what I

11   put on the first proposal.

12   Q    Okay.  And that knowledge was how well the

13   MIS department was doing when it comes to EMS

14   collections.

15   A    Correct.

16   Q    Okay.

17   A    Which is what I said in the speech.

18   Q    Okay.  And this second proposal, is it

19   substantially similar to the first one, did you add

20   anything new or was it, you know, just a restatement

21   of "this is what we're doing, this is how much we

22   were collecting"?

23   A    It was essentially the same thing, but in

24   the second one the city manager asked a specific --

25   to comment on a certain paragraph or a certain

1    something and I added that to it because he asked

2    for that.

3         Q    Okay.  And this second proposal, why were

4    you retaliated against -- or do you believe you were

5    retaliated against for writing this proposal as

6    well?

7         A    Yes.

8         Q    Okay.  All right, so just -- so I can be

9    clear, you were retaliated against for your speech

10   at the October 20 commission meeting, these two

11   proposals as well, correct?

12        A    Correct.

13        Q    Is there anything else?

14        A    There was an abusive meeting after

15   these -- after the second proposal request the city

16   manager requested a hearing, like a meeting.  It was

17   the assistant city manager Ivan and the EMS director

18   Art and myself, us four, and then that's where they

19   were totally out of control and yelling and

20   basically screaming saying, you know, "What did you

21   do here?"

22              I said, "Well, this is what, you

23   know, what I said and what I believe."

24              And they said, "No, you're not.  This

25   does not help me.  This is total insubordination."

1          I said, "No, it's not.  I'm giving
2     you what you wanted plus I'm telling you the
3     situation."
4          And they said no.  And it was
5     totally -- instead of resolving the issue, it
6     escalated to insubordination.
7          Q     And when did this meeting occur, do you
8     remember?
9          A     I believe it was November the 10th.
10         Q     November the 10th.  So it was after both
11    of those proposals and after the commission meeting?
12         A     That's correct.
13         Q     And you were also believed retaliated
14    against for what you said in this meeting?
15         A     It stemmed from the same thing.
16         Q     They all stemmed from the same thing?
17         A     Right.
18         Q     Let's move forward to the events that
19    eventually led to your termination.  When were
20    you -- or were you notified that the City was
21    considering disciplinary action against you?
22         A     I was out ill at the time.
23         Q     So you weren't at work at the time.
24         A     That's correct.
25         Q     Okay.

1      A      They sent a letter to my house, and I
2  don't know exactly what date but it -- saying that I
3  had been placed on administrative absence and that
4  they were considering disciplinary action against
5  me.
6      Q      So you received a letter from the City, no
7  phone calls?
8      A      They might have sent a phone call that
9  they were going to send a letter or deliver a
10 letter.
11     Q      But you received a letter, and the letter
12 placed you on administrative absence?
13     A      Right.
14     Q      Was this with pay?
15     A      With pay.
16     Q      Okay.  And do you remember when that
17 administrative absence took effect?
18     A      I believe it was that same day that he
19 wrote -- that the assistant city wrote it, the 19th.
20     Q      Okay.  And so what were you -- what were
21 you thinking at this time when you received this
22 letter, did you -- I mean, what disciplinary action
23 did you think they might have been considering
24 against you?
25     A      Well, the letter said that it was these

1    proposals, and in the meeting they said that I was

2    the one that was being insubordinate or they said

3    that in the meeting -- they was switching it around

4    and saying that I was the one that was not

5    cooperative.  It was just -- all of them were

6    totally false.

7         Q    When you received this notification

8    letter, did you think you might actually be fired

9    for these things?

10        A    I didn't know -- all I saw was that they

11   were building up some kind of case or some reasons

12   to dismiss.

13        Q    Okay.  So you thought that this is the

14   disciplinary action they're considering, they're not

15   going to suspend me, they're not going to, you know,

16   do anything else, they're looking to dismiss me from

17   city service.

18        A    Mm-hm.

19        Q    Okay.  Did you attend any type of hearing

20   where they considered the disciplinary action

21   against you, was there any type of hearing?

22        A    They set up a hearing, but I let them know

23   that I was out ill.  I had already called that --

24   because of this stressful -- that meeting, that

25   abusive meeting, it really -- my stress was so high

1   I said -- I just -- I didn't even -- I didn't feel

2   well at all, and I -- and that's what I told them.

3       Q    So -- and do you remember when they

4   scheduled this meeting for?

5       A    Well, the letter said on the 24th.

6       Q    Okay.  But you let them know that you

7   weren't going to be able to attend on that day.

8       A    Right.  I let them -- I called to say that

9   I was out ill, that I was ill.  I wasn't well.

10      Q    Who did you speak to, do you remember?

11      A    I would call the city manager's secretary,

12  they had two ladies there.

13      Q    Okay.  So on November 24th they had this

14  hearing which you could not attend and you say you

15  could not attend because of illness, correct?

16      A    Correct.

17      Q    Okay.  And at that meeting a decision was

18  made to terminate you, correct?

19              MR. GARCIA:  Objection, form.

20      Q    (BY MR. MOORE)  What decision was made at

21  that meeting?

22      A    Well, I don't even know if they had the

23  meeting.

24      Q    What decision was made on that date that

25  they said they were going to have a meeting?

1    A    I received a letter like on the 27th, a
2  couple of days later to my house and then I think
3  they sent some certified or something that the
4  assistant city manager had recommended to separate
5  me from the City, and then in the letter it said
6  that I had to appeal to the city manager, that I had
7  five days to appeal to the city manager, which is
8  Carlos Rubinstein, and that his decision would be
9  final.
10   Q    Did this letter say when your termination
11 would take effect?
12   A    No, it said that you would have to appeal
13 to the city manager.  As far as pay, they said they
14 were going to stop pay or something on the 24th, but
15 the final decision would be with the city manager.
16   Q    Okay.  So it's your position that you were
17 not terminated on November 24th of '98, correct?
18   A    I was not terminated, right.
19   Q    Okay.  And what is your position, what did
20 happen to you on that date?
21   A    On what date?
22   Q    November 24th, '98.
23   A    Actually, I didn't know anything about it.
24 I didn't receive notice until like a couple of days
25 later, about the 27th, because it was the

```
1    Thanksgiving holidays and basically what I read was
2    that he was recommending me to separate but I needed
3    to appeal to the city manager, which was Carlos
4    Rubinstein, within five days, which is what I did
5    because his decision is the final decision.
6         Q    Okay.  So you were informed of what
7    happened on November 24th some several days later
8    you're saying?
9         A    Mm-hm.
10        Q    Do you remember exactly when?
11        A    No, it was two or three days later.
12        Q    Okay.  Two or three days after the 24th.
13        A    Right.
14        Q    So sometime the end of November.
15        A    Right.
16        Q    Okay.  Now, you stated your position is
17   that you were terminated when the decision was
18   finalized by the city manager?
19        A    That's correct.
20        Q    Okay.  What date was that?
21        A    December 14th.
22        Q    Okay.  So you believe you were terminated
23   effectively December 14th, 1998?
24        A    That's correct.
25        Q    Okay.  And you stated that you were given
```

1    a letter that said that the decision of the city

2    manager would be final, is that what you're relying

3    on in telling me that you were terminated on

4    December 14th, '98?

5         A    No, there is a letter that Mr. Rubinstein,

6    the city manager, wrote to me on the 14th saying, "I

7    am in receivance of your appeal and my decision is

8    final," and that's where he made the decision.

9         Q    Okay.  And so that's what you're relying

10   on in stating that the termination date was December

11   14th of 1998?

12        A    Right.

13        Q    Is there anything else you're relying on

14   in making that statement?

15        A    No, it's -- no.

16        Q    Okay.  So just that letter.

17        A    Just that letter.

18        Q    Let's go back.  You mentioned your appeal.

19   You appealed the November 24th, '98, decision of the

20   assistant city manager, correct?

21        A    It was his recommendation, yes, I appealed

22   it.

23        Q    You appealed it?

24        A    Because in the letter he said, "This is

25   what you have to" -- you know, "if you want to

1    appeal to the city manager, appeal to the city

2    manager, his word is -- his is the last word."

3        Q    Okay.  I have another document here.  It

4    says "Appeal of the decision by assistant city

5    manager to separate -- and city manager" -- excuse

6    me -- "to separate MIS director from City."  Do you

7    recognize that document?

8        A    Mm-hm.

9        Q    Okay.  Did you write that particular

10   letter?

11       A    Right.

12       Q    Is that in substantially similar form to

13   the way it was when you wrote it?

14       A    Yes.

15       Q    Okay.

16             MR. MOORE:  I'm going to mark this

17   Deposition Exhibit Number 3.  I'll mark it real

18   quick and then you can --

19            MR. GARCIA:  That's fine.

20       Q    (BY MR. MOORE)  And so this is your

21   appeal letter of the decision to terminate you or

22   the recommendation to terminate you.

23       A    Right.

24       Q    Okay.  And when you appealed, what

25   happened after that?

1    A    The city manager got the appeal and he set

2    up a hearing, you know, like one or two days later,

3    like a hearing, and then he -- they delivered

4    again -- see, I told them I'm not well at this time

5    and they knew.  I had already called in ill and --

6    but they scheduled a hearing I think -- as soon as

7    they got the appeal, they scheduled a hearing, and I

8    let them know that I wasn't going to be able to meet

9    that.

10    Q    Okay.  I actually have, I believe, the

11   letters you wrote informing them that you were ill

12   and you weren't going to be able to attend.  There

13   is three separate ones.  Let's go ahead and take

14   these individually.  Do you recognize this document?

15    A    Mm-hm.

16    Q    Okay.  And did you write it?

17    A    Yes.

18    Q    And is it in substantially similar form to

19   the way it was when you wrote it?

20    A    Yes, it is.

21    Q    Okay.

22         MR. MOORE:  I'm going to mark this

23   Deposition Exhibit 4.

24    Q    (BY MR. MOORE)  And this Deposition

25   Exhibit 4, this is what you wrote to Carlos

1    Rubinstein, the then city manager, informing him

2    that you would not be able to attend the appeal

3    hearing on December 7th, is that correct?

4         A    That's correct.

5         Q    All right.  I have here another one.  Do

6    you recognize that document?

7         A    Mm-hm.

8         Q    Did you write it?

9         A    Yes.

10        Q    Okay.  And is it in substantially similar

11   form?

12        A    Mm-hm.

13        Q    Okay.

14             MR. MOORE:  I'll mark this Deposition

15   Exhibit 5.

16        Q    (BY MR. MOORE)  Deposition Exhibit 5 is a

17   letter you wrote to -- again to Carlos Rubinstein

18   letting them know that you would not be able to

19   attend the appeal hearing on December 9th, '98, is

20   that correct?

21        A    Mm-hm.  Correct.

22        Q    So after you wrote -- they scheduled a

23   meeting for December 7th.  You weren't able to

24   attend.

25        A    Correct.

1     Q     You let them know and they rescheduled for

2  December 9th.

3     A     Yeah, a day later.

4     Q     Okay.  They rescheduled for December 9th

5  and you weren't able to attend that one either,

6  correct?

7     A     Right.

8     Q     All right.  And then they rescheduled

9  again for -- do you remember when the third one was?

10     A     Right after.

11     Q     Let's go ahead -- do you recognize this

12  document?

13     A     Mm-hm.

14     Q     And did you write that one as well?

15     A     Mm-hm.  On this one they just requested

16  info, they didn't want to -- they didn't schedule a

17  hearing.

18     Q     So it wasn't an in-person hearing, they

19  just asked you for information, what type of

20  information?

21     A     The first and second proposal, I would

22  imagine, just what documents, but they were using

23  those documents as insubordination.

24     Q     Back to this document.  You do recognize

25  it?

```
 1        A     Yes.

 2        Q     And you did write it?

 3        A     Mm-hm.

 4        Q     And is it in substantially similar form?

 5        A     Yes, it is.

 6        Q     Okay.

 7              MR. MOORE:  I'm going to mark this

 8   one Deposition Exhibit 6.

 9        Q     (BY MR. MOORE)  And this is a letter you

10   wrote again to the city manager saying that you

11   would not be able to provide information for the

12   December 11th, 1998, appeal hearing, correct?

13        A     Correct.

14        Q     Okay.  So you couldn't attend any of these

15   three hearings on your appeal, correct?

16        A     I was ill at the time.

17        Q     Okay.  And you could not attend because of

18   illness.

19        A     Right.

20        Q     What type of illness prevented you from

21   attending these meetings?

22        A     Mainly was overall weakness, the high

23   stress and this whole thing that they were doing to

24   me, and just feeling very -- very weak, and I wasn't

25   eating well, I wasn't sleeping.  I was sleeping very
```

1    little because they were firing me for something

2    that was totally false.

3         Q    Did you go see anyone for this, did you

4    see any medical doctors?

5         A    I did see a doctor and he prescribed rest,

6    and he said I had some kind of respiratory infection

7    that I had developed.

8         Q    What doctor was this?

9         A    I believe it was Dr. Jones.

10        Q    Where is Dr. Jones officed?

11        A    He used to be somewhere close to here

12   but -- I don't know the name of the street right

13   now.

14        Q    He's in Brownsville?

15        A    He's in Brownsville.

16        Q    Okay.  And did Dr. Jones prescribe you any

17   type of medication?

18        A    Yes, he did.

19        Q    Okay.  What was -- do you remember what

20   those were?

21        A    Not offhand.  I could barely read it, you

22   know how --

23        Q    Do you know what the medicines were for?

24        A    I don't remember right now.

25        Q    Now, after this third hearing on your

1    appeal, December 11th, '98, the city manager made

2    the decision to uphold the recommendation or the

3    decision of the assistant city manager, is that

4    correct?

5         A    He made the final decision.

6         Q    Okay.  And were you given any reasons why

7    he made that decision, why the city manager made

8    that decision?

9         A    Only what is listed in that letter for

10   December 14th.

11        Q    Okay.  So he sent you a letter dated

12   December 14th that laid out the reasons why he was

13   making his decision.

14        A    That's correct.

15        Q    And were there -- was there anything else,

16   were you phoned, was there another letter or just

17   that, is that all you have to rely on?

18        A    That's all I have.

19        Q    Okay.  Who, in your opinion, made the

20   decision to terminate you?

21        A    The city manager.

22        Q    The city manager.  And at that time that

23   was who?

24        A    Carlos Rubinstein.

25        Q    Carlos Rubinstein.  Just Mr. Rubinstein?

1       A    He had the final authority.

2       Q    Is he the person that was responsible for

3    the hiring and the termination of people in your

4    position?

5       A    Yes.

6       Q    He was the person responsible?

7       A    He's -- for the City of Brownsville he was

8    vested with that authority by the governing board

9    for all -- including the assistant city manager was

10   under the city manager.

11      Q    So it's his decision to do all of the

12   hiring and firing for the City?

13      A    The final.

14      Q    The final?

15      A    The final decision, yes.

16      Q    Okay.  And so he has -- all the

17   discretion, it's all vested with him, no one else?

18      A    Right.

19      Q    And do you know -- do you know of anyone

20   else who was terminated for the same reasons or

21   under similar circumstances as you were?

22      A    No.

23      Q    All right.  Let me ask you -- I forgot to

24   ask you earlier.  Are you currently working?

25      A    I have my own business.

1    Q    What is that business called?

2    A    The name of the company is Genesis GIS.

3    Q    Genesis GIS?

4    A    Mm-hm.

5    Q    What does GIS stand for?

6    A    It's just an acro -- not really for much.

7  It's just something that we like.

8    Q    And what does this company do, what do you

9  do?

10    A    We provide software contracting,

11  consulting and training.

12    Q    Okay.  And do you have any employees other

13  than yourself?

14    A    Just basically me and my wife and

15  hopefully a friend.  We have a friend that --

16  basically, it's just us two.

17    Q    Okay.  You have a friend that's --

18    A    He knows computers.

19    Q    But is he employed by Genesis GIS?

20    A    No.  I would say no.

21    Q    Is he paid by Genesis GIS?

22    A    No.

23    Q    So right now just your wife and yourself

24  are the only two employees of this new company?

25    A    Right.

1       Q       Okay.   When did you start up this new

2  company?

3       A       Like January of this year.

4       Q       January of 2001?

5       A       Mm-hm.

6       Q       Okay.   What did you do after the city

7  manager's decision to fire you on December 14th,

8  '98?

9       A       Well, I was kind of like in a state of

10  unbelief, and the first -- you know, talking with my

11  wife, I said, you know, "First I got to get well,"

12  and -- so basically was follow -- get a lot of rest

13  and look at my options and what I had to do and

14  the -- the only thing is that, as we know, the

15  bills -- the house bills don't -- you know, you need

16  to pay them right away, and so I was like -- I

17  rested like three to five months, I had to, but

18  during that time I had to -- the only money I had

19  available was what the City -- the City sent a

20  letter that they had -- they had my final check.

21  But when I talked to the HR director, he said they

22  needed an exit interview from me in order for me to

23  get the check.

24       Q       Okay.   When did you receive this letter

25  that let them -- let you know that you had a check?

1      A     It was about a week after they terminated
2  me.
3      Q     Okay.  So you didn't search for a job
4  immediately after your termination, you said you
5  rested three to five months?
6      A     Right, because I wasn't completely well.
7      Q     When did you start your job search or when
8  did you start looking for new employment?
9      A     I think it was something like June 19 --
10  May or June 1999.
11      Q     Okay, May or June of '99?  And did you
12  interview with anyone?
13      A     Well, I was thinking at the time of
14  starting my own -- my own company because anywhere
15  you go for an interview they are going to ask you
16  where did you last work, and basically this thing
17  was going to be that they were going to call my
18  previous employer and they'd say, "Well, he did
19  this, this and this," or -- so I didn't think my
20  likelihood of getting a job through an interview
21  might be too good but -- so I was looking at
22  starting our own business, something -- to
23  something, so I started looking at maybe, you know,
24  renting out some place where I could start, but at
25  the same time I -- the city had charged --

1          MR. GARCIA:  I'm sorry, the question

2   was did you interview with anybody.  That was the

3   question.

4          THE WITNESS:  I'm sorry.  I didn't

5   interview that I remember.

6      Q    (BY MR. MOORE)  Did you apply with any

7   particular companies that you could give me the name

8   of?

9      A    No.

10     Q    And since you've left the City of

11  Brownsville, is Genesis GIS the only job you've

12  held?

13     A    Well, I started another company right

14  before that one, but it really wasn't -- it was

15  really like just -- it wasn't really a company.  I

16  was just doing contracting or, you know, looking for

17  myself, but -- because on August I filed for

18  unemployment with the Texas Workforce and they told

19  me that I could apply for unemployment benefits, you

20  know, from the City but they said since they had

21  dismissed you that they were probably going to

22  contest it.

23     Q    So you said you did some contracting work.

24  What types of jobs did you do between the time you

25  left the City of Brownsville and the time you

1   started Genesis?

2       A   Really -- really was just looking for

3   different kind of -- not really jobs where you get

4   money but it was where I was trying to sort out like

5   a business plan, that's really what I was doing,

6   trying to really find out which direction I needed

7   to go.

8       Q   Okay.  So you were just deciding what kind

9   of company you wanted to begin.

10      A   Mm-hm.  Because you have to look at the

11  structure of the company, do you want to incorporate

12  it, every phase had its own things you had to do.

13      Q   So you weren't really doing any jobs for

14  any particular employer during that time.

15      A   Correct.

16      Q   Did you do any work through maybe a

17  placement agency or anything like that?

18      A   No.

19      Q   Okay.  So did you have any jobs between

20  the time you left Brownsville, the time you start

21  Genesis for which you were paid?

22      A   No.

23      Q   Okay.  Let me ask you about your final

24  check with the City of Brownsville.  You were sent a

25  letter about a week after your termination date

1    stating that they had your final check available, is

2    that correct?

3         A     Right.

4         Q     Did anyone phone you or contact you in any

5    other way?

6         A     I don't believe so.

7         Q     So it was just this letter?

8         A     Mm-hm.

9         Q     And can you tell me what that -- what did

10   that letter say?

11        A     It said something to the effect that we

12   have your check ready and -- but we need for you to

13   arrange -- but we need to arrange an exit interview

14   for you.

15        Q     The letter let you know about this exit

16   interview?

17        A     Yes.

18        Q     Okay.  What exactly is this exit

19   interview?

20        A     Well, my understanding from the human

21   resource director is they go over the reasons why

22   they thought -- you know, why they dismissed you.

23   It's like another hearing.

24        Q     So you called the human resources director

25   about this?

```
 1        A    I let him know that just to go ahead and
 2   send me the money because, you know, it was -- it
 3   was -- I didn't want no exit interview because of
 4   what, you know, they had done and -- and he said,
 5   "Well, I'll see what I can do about it."
 6        Q    So you asked the human resources director,
 7   "Just put the check in the mail."
 8        A    Right.
 9        Q    Okay.  Was that the last contact or the
10   only contact you had with the human resources
11   director, you called him this one time and asked him
12   to put the check in the mail?
13        A    Right, I think -- yeah, it wasn't until
14   like eight months later that I ran into him at one
15   of the local stores and I told him the same thing.
16        Q    But you didn't follow up with him after --
17   it was eight months before you followed up with him?
18        A    Well, I was expecting him to send it.
19        Q    Did you send him any letters in the
20   interim that said, "I asked you to send me my check,
21   please do so"?
22        A    No.
23        Q    Okay.  So you had this one phone
24   conversation with the human resources director and
25   eight months later you say you saw him again
```

1    someplace?

2        A    Right.

3        Q    And at that point did you all have a

4    discussion?

5        A    Yes.

6        Q    And what was said?

7        A    It was the same thing, that basically he

8    said, "We still have to do the exit interview."

9                And I said, "Just sent me, you know,

10   the funds."  Because also they had reported it to

11   the IRS that I had -- as earned income, which wasn't

12   true because they still had it.

13       Q    So during this whole time they have this

14   check of yours and you've asked them once by phone

15   to send it to you and eight months later you ask the

16   human resources director again face-to-face to send

17   you this check?

18       A    Mm-hm.  And once again he said, "Well,

19   I'll see what I can do."

20       Q    Let me ask you.  How were you normally --

21   how did you normally receive your checks when you

22   were employed by the City of Brownsville?

23       A    They would -- we had that electronic

24   deposit.

25       Q    They had electronic deposit?

```
 1        A      To the bank.

 2        Q      Okay.  Now, this check, when did you

 3   finally receive your final paycheck?

 4        A      Not until this year.

 5        Q      This year?

 6        A      May of this year.

 7        Q      May of this year?

 8        A      When I had to call Ryan Henry on it.

 9        Q      So you received it in May of 2001, and how

10   much was that check for?

11        A      It was for a net of 13,000.

12        Q      And did the check, did it say that this

13   check is -- what was the check for?  I'm sorry,

14   strike that.

15                   What was this check for?

16        A      Sick and annual -- accumulated sick and

17   annual benefits.

18        Q      Was it also -- did it also include any --

19   your final salary?

20        A      No.

21        Q      This was -- this didn't include any salary

22   monies.

23        A      It was -- well, it was considered -- it

24   was considered like salary, but it's one of your

25   fringe benefits.  The City, if you have any
```

1    accumulated benefits at the termination of your

2    employment, they pay you out whatever accumulated

3    benefits as a final check and that's what they do.

4        Q     Okay.  But your final salary check, when

5    did you receive a final check for salary?

6        A     They automatically deposited that to my

7    bank.

8        Q     Okay.  Do you remember when that was?

9        A     I think the first week of December of '98.

10       Q     First week of December '98.  And do you

11   know what was the last date for which you were paid

12   salary?

13       A     They recommended stop payment on the 24th.

14       Q     So November 24th of '98 was the last date

15   you were paid, last day of work for which you were

16   paid salary?

17       A     Correct.

18       Q     Okay.  And now --

19             MR. MOORE:  Let me just take just a

20   moment here to review a couple of notes and make

21   sure we're completely clear on everything.

22             Pass the witness.

23             MR. GARCIA:  Can we have a short

24   break?

25             MR. MOORE:  Do you want to take a

1    break now?  Sure.

2                   (Recess.)

3                   EXAMINATION

4        Q    (BY MR. GARCIA)  Mr. Pequeno, I'm just

5    going to follow up here with a couple of questions

6    for you.

7                   I would like to discuss the -- your

8    visit with the City of Harlingen EMS department.

9        A    Yes.

10       Q    I believe you said that took place in

11   19 --

12       A    '96.

13       Q    '96?

14       A    March of 1996.

15       Q    And who -- did you go visit the city's EMS

16   department?

17       A    Yes, the EMS department.

18       Q    Who accompanied you?

19       A    The EMS director here from Brownsville.

20       Q    Okay.  And what is his name?

21       A    Arturo Rodriguez.

22       Q    Okay.  Can you discuss some of the -- or

23   can you tell me what happened at that meeting in

24   March of '96?

25       A    Well, he asked -- he invited me to go over

1    to Harlingen to evaluate Sweetsoft because he

2    said -- he told me, "Harlingen has this software

3    that I would like for you to look at."

4         Q      He being Arturo?

5         A      Arturo.

6         Q      Okay.

7         A      So we scheduled a time to go and we both

8    went over there, and we met with Leonard Collier

9    which is the deputy EMS supervisor at Harlingen.

10   And I wrote a list of questions pretty much like

11   "When did you start, how much money are you

12   generating, what kind of system are you running,

13   what kind of software are you running, how much

14   money did it take to start up?"

15                Like one of the things he said, that

16   the initial cost of the software was like 15 -- 10

17   to $15,000 but he said, "But to make it work, it

18   ended up costing 75 to $90,000."

19        Q      Okay.  Did he give a reason as to why the

20   additional 75, $80,000 would be required?

21        A      Because -- to make it work, to interface

22   with the other functions of the City of Harlingen,

23   to make -- the extra programming that was required.

24        Q      Did Mr. Collier at that time tell you that

25   the City had already spent that 75, $80,000 to

1    implement the Sweetsoft?

2        A    That's what they had to do and later.

3    Initially, no, but to make it work, they had to

4    spend an additional, you know, $60,000 to make it

5    work.

6        Q    Okay.  Did Mr. Collier discuss the revenue

7    that was being generated by the City of Harlingen?

8        A    Yes.  He told us basically the number

9    of -- what they called ambulance runs or pick-ups.

10   They were very comparable to the City of

11   Brownsville.

12       Q    What's an -- what's an ambulance run?

13       A    That's when they get a call for like a 911

14   and they go pick up somebody and transport them to

15   the hospital, that's considered a run.

16       Q    Okay.  And do you know -- do you recall

17   how many ambulance runs he told you the City was

18   making?

19       A    I don't -- not off, but I know it was

20   several thousand, both the City and Harlingen

21   because Harlingen covers not just the City of

22   Harlingen but they cover all of the small

23   communities around Harlingen.  So when you compare

24   that with the City of Brownsville, it kind of comes

25   out to be a comparable number of runs or size.

1        Q       So even though you can't recall the number

2   of runs, do you recall it being comparable to the

3   City of Brownsville's number of ambulance runs?

4        A       Right.

5        Q       At that time?

6        A       That's correct.  After doing that

7   comparison we -- I saw the figures that we were

8   generating more money with less staff, with less

9   expenses, and also the two costs of implementing

10  like a Sweetsoft wasn't -- wasn't 14,000 or 15,000,

11  it was actually a much larger figure.  It was more

12  like 70,000.

13       Q       Do you know why Arturo Rodriguez asked you

14  to accompany him to the visit?

15       A       He -- I think him and the other director

16  were personal friends and they talked a lot about

17  the software, and I guess Mr. Collier talked about

18  Sweetsoft and he would talk about what we had and

19  they were comparing themselves with that, and he

20  wanted to see what kind of opinion I had about the

21  software.  He wanted to know what was our opinion

22  and my opinion on it which I told him.

23       Q       All right.  I would like to talk about the

24  city council meeting on October 20th of 1998.  Do

25  you know who spoke on this subject at that meeting

1    besides yourself?

2         A    The purchasing director, Paul Calapa.

3         Q    Can you spell that for us, please?

4         A    I believe it's C-a-l-a-p-a.

5         Q    What was Mr. Calapa's role or what was his

6    interest in speaking at the meeting?

7         A    Basically, the City had designated all new

8    contracts for almost anything in the City, any new

9    purchases to go under purchasing department, all

10   contracts, and he was like the spokesperson that

11   they -- that the City had done the proper bidding,

12   that they had followed the regulations to purchase a

13   certain thing, you know, whatever it might be,

14   either equipment or software, in this case, but he

15   was also a member of the audit committee of this

16   audit committee that was deciding this EMS billing,

17   but he is the one that was presenting it to the

18   commission at the beginning.

19        Q    Okay.  Who else spoke regarding the EMS

20   Sweetsoft software?

21        A    Arturo Rodriguez.

22        Q    Were those the only two people besides --

23   from yourself that spoke?

24        A    Yes.

25        Q    Is it your understanding that there was an

1   audit performed on the EMS Sweetsoft software prior

2   to the October 20th, 1998, meeting?

3          A    Yes.

4          Q    Do you know who performed that audit?

5          A    I believe it was Long & Chilton company,

6   Long & Chilton, CPA's.

7          Q    Can you tell us again when you found

8   out -- the first time you found out about the City's

9   decision to purchase the Sweetsoft software?

10         A    It was the day before basically that I --

11  that Art -- that I found out that they were

12  buying -- they were going to buy it, seriously

13  considering buying this software, and -- but the

14  audit findings I didn't find out about until the

15  actual meeting when Mr. Calapa was presenting it.

16         Q    So you were never aware that an audit was

17  being performed on the EMS software prior to the

18  October 20th, '98, meeting?

19         A    I knew that they were doing some audit for

20  the EMS, but I didn't get to see it until at the

21  meeting when it was being presented because I had

22  requested to see a copy of it a week earlier and I

23  couldn't get a copy of it.

24         Q    Did anybody with the audit committee ever

25  ask MIS department for its input while the audit was

1   being conducted?

2       A     They did not ask -- they didn't ask our

3   input like on the comparison on the software.  They

4   had asked one of my programmers to run some reports

5   on H trial -- H receivables because the City had all

6   of this old like transactions that are over ten

7   years old and they wanted to see how old

8   transactions were out there so we ran some

9   statistical reports for them, but that was all as

10  far as what they did with them, you know, as far as

11  our involvement with it, and I just knew through my

12  people -- my programmers that they were doing an

13  audit but that was it.

14      Q     All right.  In your mind were you speaking

15  on issues of public concern at the meeting on

16  October 20th, 1998?

17      A     Definitely.  Yes.

18      Q     Can you tell me why you believe that you

19  were speaking on issues of public concern?

20      A     Because it -- it dealt with a

21  significant -- a money issue that would be

22  negatively affected, and I felt that the mayor, the

23  commissioners didn't have all of the information

24  about what they were going to vote on, and I knew

25  the history of Sweetsoft and the evaluation as far

1    as dealing with us and that's why I -- because that

2    was not being presented in the -- by Mr. Calapa.

3        Q    Do you feel that the City was not -- or

4    the city commission and the mayor were not

5    knowledgeable about the revenue issues since MIS was

6    never -- since MIS was never part of the audit?

7        A    Right.  It was an issue that everybody

8    was -- well, they were like -- they were not talking

9    about it, and I felt that it was a very important

10   issue that should be considered because we had

11   considered it for many other projects.

12            Like one of the top issues was,

13   "Well, how is revenue going to get affected, is it

14   going to get affected," that was like one of the

15   questions that would be answered first, and in this

16   situation it was like "Let's not talk about" -- it

17   was being not talked about.

18       Q    All right.  You told us earlier, I believe

19   you told Mr. Moore that you did not know the exact

20   amount of revenue that was being generated by

21   Harlingen EMS.

22       A    Presently I -- the only year that I knew

23   was 1996 when he told -- he told me approximately.

24       Q    In 1996 did Mr. Collier tell you the

25   amount of revenue that was being generated by

1    Harlingen's EMS department?

2         A    Yes, he did.

3         Q    He also told you in addition to the amount

4    of revenue the number of ambulance runs that were --

5         A    What I remember is that it was comparable

6    or about the same amount that we did here in

7    Brownsville.

8         Q    Do you remember the revenue amount that

9    Mr. Collier told you was being generated?

10        A    Yes.   I wrote it down in the first

11   proposal, by the way, which is right there.

12              MR. MOORE:   First proposal is right

13   on top.   Deposition Exhibit Number 1.

14              MR. GARCIA:   I thought they were

15   stacked the other way.

16              THE WITNESS:   Under revenue.   I think

17   we were generating 100,000 more than they were at

18   that time.   But these were never really specifics.

19   It was just like general terms, so like to really

20   get a comparison you would have to get it from both

21   sides, but I know we were doing a lot better than

22   they were.

23        Q    (BY MR. GARCIA)   Let me show you

24   Deposition Exhibit Number 1.   In this proposal that

25   you submitted, you identify the yearly collections

1    for the City of Harlingen as $750,000?

2        A    Right.

3        Q    And that's based on what Mr. Collier told

4    you?

5        A    That's correct.

6        Q    All right.  And you also compare the

7    amount of yearly collections that the City of

8    Brownsville was receiving in 1996, is that correct?

9        A    That's correct.

10       Q    And that number is 800,000?

11       A    That's correct.

12       Q    All right.  Is it your understanding that

13   the assistant city manager does not have the

14   authority to termination you?

15       A    That's correct.

16       Q    In December -- let me rephrase.

17            It's your understanding that you were

18   not terminated until November -- or December 14th of

19   1998?

20       A    That's correct.

21       Q    All right.  Prior to that date there were

22   three hearings set by Mr. Rubinstein to discuss

23   your -- to discuss an appeal of the assistant city

24   manager's recommendation, is that correct?

25       A    That's correct.  Yeah, one day after the

1   other.

2       Q     And you explained that the last hearing

3   was done just for the purpose of getting

4   information?

5       A     Right, just to -- they would only -- they

6   would only be accepting documents.

7       Q     And the reason you were unable to attend

8   these hearings was because you were ill, is that

9   correct?

10      A     That's correct.  Excuse me, that's

11  correct.

12      Q     Thus, were you -- did you and Mr.

13  Rubinstein ever meet at any sort of hearing prior to

14  your December 14th, 1998, termination?

15      A     The only one was November the 10th where

16  it turned into an abusive meeting where they loudly

17  and were yelling and --

18      Q     Who was present at that meeting?

19      A     Was the city manager who requested the

20  meeting, Carlos Rubinstein; the assistant city

21  manager, Ivan Walker; and Arturo Rodriguez, the EMS

22  director; and myself.

23      Q     Had you made attempts to -- had you made

24  attempts to communicate with Arturo regarding the

25  implementation of the Sweetsoft software?

1      A      Yes, when the city manager asked me to do

2   these proposals, I -- to get the latest information,

3   I called EMS director, but he wouldn't -- he -- they

4   would tell -- the secretary would say, "Well, he's

5   in the office but he can't come to the phone right

6   now," and so I would leave -- I left several

7   messages with him but he wouldn't -- he wouldn't

8   return the calls, and I also communicated this to

9   the city manager at the time he asked me for the

10  proposal and he said, "Well, he's upset because --

11  because you spoke at the commission meeting, because

12  he was expecting to get his software," something

13  like that he said.  But I said, you know, "We need

14  to be able to communicate."

15     Q      How many attempts did you make to

16  communicate with the EMS director prior to

17  submitting your October 29th proposal?

18     A      It was at least three times.  Three

19  different occasions.

20              MR. GARCIA:  I have no further

21  questions.

22                      EXAMINATION

23     Q      (BY MR. MOORE)  I have got a few

24  follow-up questions.

25     A      Sure.

1  Q You met with Harlingen EMS in March of

2 '96, correct?

3  A Yes, I did.

4  Q Okay.  And the City of Brownsville

5 purchased Sweetsoft in November of 1998, correct?

6  A Say that again?

7  Q The City of Brownsville made the decision

8 to purchase the Sweetsoft software in November of

9 1998, correct?

10  A It was -- yeah, it was in that month.  I

11 think it was the middle of that month.

12  Q Okay.  And did you have a chance to meet

13 with anyone at Harlingen EMS in 1998?

14  A I called Leonard Collier at the time that

15 I was doing these proposals so I could get the

16 latest information from Harlingen; but as soon as

17 they found out the MIS director from the City of

18 Brownsville -- at one time I called and he said,

19 "Well, just a minute," but then when they found out

20 it was me, he said, "Well, he's not in the building

21 any -- I'm sorry, but he left, he had to leave."

22  Q So you didn't speak with him.

23  A I wasn't able to.

24  Q You didn't speak with him at any time in

25 1998.

```
 1        A     I wasn't able to.
 2        Q     Okay.  And so you don't know what type of
 3   revenues Harlingen EMS was producing in 1998 through
 4   their EMS billing, Sweetsoft software.
 5        A     Correct, I didn't.
 6        Q     So the numbers in your October 29th
 7   proposal, Deposition Exhibit 1, those are strictly
 8   the 1996 numbers.
 9        A     That's correct.
10        Q     Okay.  And as you stated earlier, you
11   don't know how much Harlingen EMS was billing in
12   1996.
13        A     Other than its comparable to what the
14   City --
15        Q     Okay.  But you don't know the exact number
16   of how much they were billing?
17        A     No.
18        Q     Okay.  And you said you did not know the
19   exact number that they were collecting either?
20        A     Only for '96.
21        Q     You know the exact number for '96 that
22   they were collecting?
23        A     Well, from Mr. Collier, that's what he --
24   that's what he told me that they were collecting for
25   1996.
```

1     Q    He told you they were collecting 750,000?

2     A    Approximately.

3     Q    Approximately?

4     A    Yeah, that's -- see, because he didn't

5 have his financial books and stuff.  He said, "Well,

6 we're collecting about so much."

7     Q    Okay.  But, again, you don't know how much

8 they were billing.

9     A    We didn't discuss that.

10    Q    Okay.  And, therefore, you couldn't place

11 a percentage on it.  Like you don't know what

12 percentage of their bills they were actually

13 collecting.

14    A    No.

15    Q    Okay.  And, once again, those numbers are

16 for 1996 only, you do not have their 1998 numbers.

17    A    Right.

18    Q    Okay.  This audit that was performed by

19 Long & Chilton, this was an audit of the EMS billing

20 in the City of Brownsville, correct?

21    A    It was for the -- the City had an audit

22 committee and it met with the CPA, the auditor, and

23 they would give him a list of what to -- like

24 what -- this is the department we want you to audit

25 and this is the things that we want you to look at.

1      Q      What department did they want them to
2   audit and what did they want them to look at?
3      A      EMS in this case.
4      Q      EMS?
5      A      Yes.
6      Q      Okay.  The billing and the collection
7   procedures and software for EMS?
8      A      I believe so.  I never saw the -- like the
9   outline, what exactly, but I would imagine that
10   that's what they did.
11      Q      And the audit findings, was the City --
12   were these turned over to the city commission?
13      A      I don't know.
14      Q      You don't know?
15      A      I would -- I know they turned it over to
16   the financial department.  Of course, the audit
17   committee was -- consisted of the city manager, the
18   purchasing officer, which is Paul Calapa, the
19   finance director, and then whatever department that
20   they were auditing.  I believe it was like four or
21   five people.
22      Q      Okay.  So they made their audit findings
23   and turned them over to the finance department.
24      A      I believe so, and then the finance -- I
25   don't know what they do with it.  Sometimes it goes

1    to the commission if it needs to or -- I don't know

2    exactly what the procedure after that.

3         Q    Was the commission aware of the audit --

4    that the audit was being done before they decided to

5    purchase Sweetsoft?

6         A    I'm not sure how much -- I don't know.

7    I'm not -- I know Mr. Calapa told them an audit was

8    done.

9         Q    So they knew that an audit was performed

10   before they purchased Sweetsoft?

11        A    Yes.

12        Q    Okay.  But you're not sure if they knew

13   the actual audit findings before they purchased

14   Sweetsoft.

15        A    Correct.

16        Q    Okay.  Now, you stated just a moment ago

17   that it is your belief that the assistant city

18   manager did not terminate you, correct?

19        A    Correct.

20        Q    Okay.  What are you relying upon in making

21   that statement?

22        A    That the city manager is the final

23   authority.

24        Q    Okay.  And on what are you relying for

25   stating that the city manager is the final

1  authority?

2      A    Because in the letter that I received from

3  Ivan, which is the assistant city manager, he said,

4  "You need to -- you can appeal this recommendation

5  to the city manager and his decision is final."

6      Q    Okay.  So that letter is what you're

7  relying for telling me that the assistant city

8  manager cannot fire you and that the city manager is

9  the final authority.

10     A    Being in the city government, I -- they

11 have -- they had said over and over that the city

12 manager was the final authority.  And, in fact, they

13 created the city -- assistant city manager position

14 only to assist the city manager, so they broke up

15 the departments into different groups, but the city

16 manager in the letter said, "I have total authority

17 over -- full final decision for everybody."

18     Q    So this letter is your evidence that the

19 city manager has the final authority and he's the

20 only one that can fire you.

21     A    He is the one that has the final

22 authority.  You can appeal to him and he has the

23 final authority.

24     Q    Was there -- is there anything else that

25 leads you to believe that the city manager has final

Case 1:00-cv-00180   Document 26   Filed in TXSD on 10/09/2001   Page 154 of 178

```
 1    authority and is the only person that can fire you?
 2        A    No.
 3        Q    Okay.
 4                    MR. MOORE:  Pass the witness.
 5                        EXAMINATION
 6        Q    (BY MR. GARCIA)  I'm sorry, just a couple
 7    of follow-up questions.
 8                    Was it your understanding in 1998
 9    that, if the Sweetsoft was purchased, that the City
10    would incur additional dollars besides the purchase
11    price to implement the program?
12        A    Yes.
13        Q    All right.  And do you know about how much
14    money would be required to do that?
15        A    Initially, they were allocating like
16    14,000 for the software, but I knew that it was
17    going to be much more than that because they had to
18    get new computers, new servers for EMS, which I
19    think they cost like 5, 6,000.  They needed at least
20    one of those and then they wanted to upgrade to new
21    computers, so just the hardware part of it was going
22    to cost like another 15,000 plus, then to have the
23    additional software to communicate, so with the rest
24    of the functions of the City it was going to be
25    another 20 or more, and that's just being a
```

1   conservative estimate, but -- so the answer is it

2   was going to cost more.

3       Q    All right.  Do you know if the Sweetsoft

4   software was ever actually purchased by the City of

5   Brownsville?

6       A    They passed it in middle of November and

7   then a week later they started -- you know, they

8   dismissed me so -- well, they recommended to dismiss

9   me.

10      Q    So do you know if the Sweetsoft software

11  is actually being utilized by the City of

12  Brownsville today?

13      A    I don't know.

14      Q    Okay.  You indicated that in addition to

15  their EMS department, the MIS department took care

16  of other department functions as well?

17      A    Yes.  We took care of the other data

18  processing needs of the other departments.

19      Q    Okay.  If the EMS software was going to be

20  purchased, was that going to affect your MIS

21  department in terms of losing any employees?

22      A    No.

23      Q    Was it going to affect your position as an

24  MIS director?

25      A    No.

1   Q Was it going to affect your salary as an

2 MIS director in any way?

3   A No.

4   Q Would the MIS department still have

5 several other departments to take care of?

6   A Yes.

7      MR. GARCIA:  That's all I have.

8      MR. MOORE:  I have no further

9 questions.

10      (Deposition concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     CHANGES AND SIGNATURE

2     PAGE LINE        CHANGE                    REASON

3     _____

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____

CVisPDF - www.fastio.com

1    I, JUAN PEQUENO, have read the foregoing
deposition and hereby affix my signature that same
2  is true and correct, except as noted above.

3

4

5                                   _____
                                     JUAN PEQUENO

6

7

8

THE STATE OF _____ )

9

COUNTY OF _____ )

10

11

    Before me, _____, on this day
12  personally appeared JUAN PEQUENO, known to me (or
proved to me on the oath of _____ or
13  through _____ (description of
identity card or other document)) to be the person
14  whose name is subscribed to the foregoing instrument
and acknowledged to me that he executed the same for
15  the purposes and consideration therein expressed.

16    (Seal) Given under my hand and seal of office
this _____ day of _____, _____.

17

18

19                                   _____
                                     NOTARY PUBLIC IN AND FOR

20                                   THE STATE OF _____

21

22

23

24

25

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3    JUAN PEQUENO              )
                                )
 4    VS.                       )   NO. B-00-180
                                )
 5    CITY OF BROWNSVILLE,      )
      ET AL                     )

 6

 7             REPORTER'S CERTIFICATION
        ORAL VIDEOTAPED DEPOSITION OF JUAN PEQUENO
 8                SEPTEMBER 12, 2001

 9        I, Sydnee Schwab, Certified Shorthand Reporter

10    in and for the State of Texas, hereby certify to the

11    following:

12        That the witness, JUAN PEQUENO, was duly sworn

13    by the officer and that the transcript of the

14    deposition is a true record of the testimony given

15    by the witness;

16        That the deposition transcript was submitted on

17    __9-14-01_____ to the witness or to the attorney

18    for the witness for examination, signature, and

19    return to Schwab Court Reporting Service by

20    __10-17-01_____;

21        I further certify that I am neither counsel

22    for, related to, nor employed by any of the parties

23    in the action in which this proceeding was taken,

24    and further that I am not financially or otherwise

25    interested in the outcome of this action.
```

1    Further certification requirements pursuant to

2    the Federal Rules of Civil Procedure will be

3    complied with after they have occurred.

4    CERTIFIED to by me this __13th___ day of

5    September, 2001.

6

7

8    _Sydnee Schwab_____

9    Sydnee Schwab
     Texas CSR 3442

     Expiration Date:  12/31/01

10   SCHWAB COURT REPORTING SERVICE
     2900 Central Boulevard, Suite C

11   P.O. Box 3665
     Brownsville, Texas  78520

12   (956) 544-5126

13

14

15

16

17

18

19

20

21

22

23

24

25

RECEIVED
OCT 29 1998
City of Brownsville
City Manager's Office

TO:     Carlos Rubinstein,  City Manager
        Ivan Welker, Assistant City Manager

From:  Juan Pequeno,  MIS Director

RE:    Proposal to continue in-house processing of EMS billing

Date:  October 29, 1998


REASONS FOR PROCESSING EMS BILLING IN-HOUSE:

I.  Around March of 1996 the EMS director and I met with EMS staff from Harlingen
    which have a similar size operation as Brownsville.  I noted the following differences

|  | Harlingen | Brownsville |
|---|---|---|
| Years in operations | 8 | 10 |
| Platform(type of Computer) | PC-base on Novell | HP3000 server |
| # of staff on Collections | 4 | 2½ |
| Software | Sweetsoft Inc (DOS based) | In-house (customized) and updated on a continuous basis with agenc |
| Cost of Implementation | >$80,000 | In-house |
| Yearly Maintenance Support | $5,000 | In-house |
| Yearly Collections | $750,000 | >$800,000 in 1996 |

In the past 2 ½ years                     Brownsville has now increased
                                                       staff up to 5

                                            Assigned 1 employee for collections on


DEPOSITION
EXHIBIT

                                                              page 1 of 4

Implemented new collection proced

Sent staff for medicare/medacaid trai

Have achieved highest collection eve
$1.3 million

In 1996, the city's in-house software was collecting more revenue and incurring
less costs in implementation, maintenance, and staff, than the comparable city which
was using the Sweetsoft software.   The city of Brownsville has continuously
increase its revenue over the last years up to where it is today at $1.3 million with
potential for future increases if further collection policies are adhered to by EMS
such as monitoring of aging report efficiently.

The city of Brownsville now has a person assigned exclusively to delinquent
collection,  making sure a notice of bill is sent to a customer promptly and also
placing a call to customers prior to sending bill to collection agency.  This alone
has greatly increased revenue collection for city of Brownsville.

II.  Our current in-house EMS billing system was developed using 4th generation softwar
following specific requirements from Medicare/Medacaid.  All facets of operations
and billing have been automated over the past years.  The city's EMS system is
customized to the EMS needs and to the federal government guidelines.  MIS has
never missed a deadline of implementing a mandated computer change for
Medicare or any other agency.

MIS has had to continually retrain EMS personnel because of high turnover
at EMS and MIS has also had to rush last minute changes on several occasions
because of the untimeliness of receiving mandated changes from EMS department.
It used to be months before MIS was advised about a  mandated change by EMS
department.  This was corrected in-house by improved  communication.
The sooner a government mandated change is received, the sooner
the MIS department will schedule and implement accordingly.

III. Sweetsoft software is DOS-based and was develop in 1981. Few companies or
users are now using DOS based software.  For some unknown reason, this vendor
has chosen not to update their software to Windows platform which is the
future for the majority of the business world including the city of Brownsville.

Page 2 of 4

CMsPDF - www.tevss.com

According to the vendor, his software can operate on WIN95 but it is still a 16 bit software. It does not have a graphical user interface (user friendly) (point/click); consequently, it requires a higher learning curve and this will not be an improvement over the city's current EMS system. Every major module offered by Sweetsoft is already in operations and customized at the city of Brownsville.

The current in-house EMS billing is one the best software the city has. MIS invested much time and effort to create the excellent and efficient system the city has today. The city could put this in-house software against any other billing EMS system that is in a similar situation as the City of Brownsville.

IV. Neither the city management nor the city internal auditor included the MIS department on consideration of purchasing EMS billing software.

It has been normal procedure for the auditors to "ask" MIS about the current system so they can see the full picture and make an unbiased finding. An example of such was the procedure with the findings at Municipal Court just a month ago. In this case, MIS was only "told" about this agenda item and, MIS was only told about this item "after" the item had already been placed on the city agenda for approval.

V. Finance department had a difficult time getting a copy of the auditor's EMS findings to MIS. After reading the misinformation and misleading statements in the auditor's finding on EMS concerning the need for a new system, MIS understand why a copy of this was delayed.

MIS has never missed a mandated computer change deadline from any government agency. It is also standard procedure for the MIS department when making computer software changes, to do thorough testing as any good organization would include. MIS' current method is extremely efficient, done accurately, and customized to the city's needs. The current EMS billing system is up to date with the latest changes mandated from medicare/medacaid. It contains all the major modules for EMS billing and accounting and interfaces with the city's General Ledger for up to the minute financial data.

Page 3 of 4

VI. It is also fact that SweetComputer Services, Inc is not the sole provider of ambulance EMS billing software in the USA.   There are several other vendors with products that do the same similar functions of EMS billing and collections.

VII. The decentralization of EMS billing to their own department office would bring about duplication of data processing situations whose costs are currently already being absorbed by MIS; some of these are the following:

    a.  an additional computer server
    b.  an increased level of security threat to EMS data
    c.  an increased level of security threat to their computers
    d.  an increased level of fire or other natural disaster threat to EMS operations
    e.  a duplication of EMS data
    f.  maintaining accountability of data processing functions including backup of server by EMS personnel
    g.  an increased reliance on outside vendors
    h.  an increased reliance on software maintenance support

VIII. Instead of going backwards in time with the limited and DOS based Sweetsoft software, today's existing technology can join the eight billing and receiving locations spread throughout the city, and establish a "one-stop collection department".   This would simplify and improve the city's implementation of proper policies and collection and, this would also convenience our citizens of Brownsville.

Page 4 of 4

JUAN PEQUENO

VS.                                    CIVIL ACTION NO. B-00-180

CITY OF BROWNSVILLE, ET AL

DEPOSITION(S) OF    JUAN PEQUENO

ATTORNEYS FOR THE PARTIES AGREE TO THE FOLLOWING CHECKED ITEMS:

**Formalities**:       ✓  Formal notice
                       _____  Agreement
                       _____  Court order

**Signature**:         ____  Signature waived.
                       ✓  The original transcript will be submitted to _Mr. Garcia_,
                       who will return the signed deposition to  Schwab Court Reporting Service
                       within   20   days.  If the deposition is not signed and returned, an
                       unsigned copy may be substituted as the signed original.

**Objections**:        ✓  Objections made according to the Rules.  (Form and Response.)
                       _____  Objections made at the time of deposition.
                       _____  Objections reserved until trial.

Government Code 52.029(a)(9) requires disclosure of a contractual relationship
between the court reporter and any party.  Failure to do so can result in revocation
of the reporter's certification.  Schwab Court Reporting is under no contractual
obligation to any party in this cause of action.

NAME: _____     ☒ Copy      ☐ E-Transcript

ATTORNEY FOR: _City of Brownsville_     ☒ ASCII    ☒ Condensed Transcript
                _et al._

NAME: _Alejandro J. Garcia_              ☐ Copy     ☐ E-Transcript

ATTORNEY FOR: _Juan Pequeno_             ☒ ASCII    ☒ Condensed Transcript

Date: _9/12/01_ ___ Trial or Hearing Date:_____  Witness Address:_____



TO:   Carlos Rubinstein, City Manager
           Ivan Welker, Assistant City Manager

From: Juan Pequeno, MIS Director

RE:    Response to memo received 11/05/98 - Asking for Proposal #2

Date: November 9, 1998

SECOND PROPOSAL
TO CONTINUE IN-HOUSE PROCESSING OF EMS BILLING

MIS memo of October 29, 1998 did address the current situation of City's in-house EMS billing system. However, MIS will restate similar information for perhaps a more clear understanding.

## CURRENT EMS SYSTEM EVALUATION OF $1.3 MILLION REVENUE

MIS' current evaluation is that the in-house EMS system is excellent, especially in collection of revenue which is at an all time record high of $1.3 million.

The city of Brownsville has increased its revenue every year on a consistent basis for the last four years. The following facts have occurred since October 1995:

   a) the city purchased a new HP3000 server which is fast, efficient, networkable and which has directly increased productivity for all city departments especially EMS data entry and electronic billing,

   b) EMS staff working with EMS billing systems has increased from 2 ½ to 5 with one person assigned to calling and sending notices only,

   c) EMS has been able to train staff on processing claims



**DEPOSITION EXHIBIT**

page 1 of 6

d) MIS has kept software updated with latest changes from government agencies within deadlines

e) MIS has provided continuous training on in-house software to EMS

f) MIS has in-house programmers assigned to make changes for EMS

## CURRENT IN-PROGRESS PROJECTS FOR EMS SYSTEM

The in-progress projects for EMS in-house system are:

a) Year 2000 conversion of EMS database and software to be completed by 4/99 and implemented by 10/99 - Scheduled FY99

b) additional system code for batch processing of claims -Scheduled FY99

c) insurance screen modifications (Combine screens)- Scheduled FY99

d) additional comments to be used for event history - Scheduled FY99

e) setup of pre-qualification screening of claims submitted - Scheduled FY99

page 2 of 6

## CURRENT IN-HOUSE ADVANTAGES OVER PC-BASED

Our in-house EMS billing system has the following advantages over any PC based system such as Sweetsoft:

1) customized to the city of Brownsville needs

2) complete interface with city's general ledger

3) provides high security of confidential EMS data with daily backup

4) faster processor than PC based

5) software written in 4th generation utilities (Cognos)

6) provides in-house programmers for quick response

7) lower maintenance and support cost for the city

8) updated continuously with latest changes to medicare/ medicaid

9) provides as needed in-house training

The current in-house EMS billing system is up-to-date with the latest changes mandated from medicare/ medicaid.  It contains all the major modules for EMS billing and accounting and interfaces with the city's general ledger for up to the minute financial data.

Page 3 of 6

CURRENT AND COMPLETED PROJECTS (STATED AS INCOMPLETE (
NOT AVAILABLE BY EMS DIRECTOR
                    in memo of September 25, 1998 to City Manager)

1) programs to send trauma reports to Texas department of Health -
   Implemented 11/96

2) addition of help screens for descriptions of different EMS codes

3) creation of reporting system based on ad-hoc needs that EMS requests
   (over 100 different reports for EMS needs)

4) option to add electronic BCBS remittance
   (put on hold by EMS staff who stated they did not have time to do)

5) option to print EMS claims to EMS PC printer
   (currently prints to EMS printer link to HP3000)
   (also put on hold by EMS staff)

This software is also not the sole source as stated by EMS director and
Purchasing.

                                                    page 4 of 6

# AUDITOR'S FINDINGS OF EMS AND FINANCE INEFFICIENCIES

In the internal auditor's findings on EMS, over 98% of the findings were about inefficiencies between EMS and Finance departments.

The inefficiencies involved current procedures:
either because of a lack of procedure or, not doing a process correctly.

Examples of these are the following:

1) not depositing money daily to the bank

2) having petty cash allowance at EMS which is city violation

3) misplacement of run reports by EMS staff

4) EMS and Finance not having setup procedure for
   writing off over 5 year accounts from EMS system

5) not filing proper papers with AETNA causing AETNA to
   withhold of 31% of claim

6) not following through with collections charges to hospitals

7) not efficiently using the age-trial report (30/60/90)
   consequently because EMS has "not written off 10 year accounts"

8) future increase in collections is possible if EMS continues to
   utilize proper collection policies and

9) future increase in collections by efficient use of the aging trial report
   which had not been used by EMS for the past four years

## SREPRESENTATION OF FINDING
## WITH REGARD FOR EMS ACCOUNTING SYSTEM

A more serious matter that has occurred is the internal auditor's finding
on a need for an EMS accounting system includes gross misrepresentation
of the facts.
The statements made by the internal auditor are false with regard to
the in-house EMS billing system.

MIS has never missed a mandated computer change deadline from any
government agency.
MIS' current method is extremely efficient, done accurately, and customized
to the city's needs.
The current EMS billing system is up to date with the latest changes mandated
from medicare/ medicaid.
It includes all the major modules for EMS billing and accounting and interfaces
with the city's general ledger efficiently.

It has been normal procedure for the auditors to "ask" MIS about the current
system so they can see the full picture and make an unbiased finding.
An example of this was with the findings at Municipal Court just a month ago.
However, the EMS finding was arrived at after talking with EMS staff only.

The city management, city audit committee, and EMS failed to involve
MIS on this evaluation of current in-house EMS billing system.
MIS was only "told" about this agenda item and, MIS was only told
about this item "after" the item had already been placed on the
city's agenda for approval.
Bypassing MIS and knowing about the misrepresentation of facts
involving MIS, city management placed this item for approval on
the October 20, 1998 agenda.

The audit finding on EMS was completed on September 17, 1998
even though MIS did not received the audit finding until October 27, 1998.

This information/findings were never forwarded to MIS neither by
city management, nor by the internal auditor, nor by the audit committee.

Page 6 of 6

RECEIVED  12- 3-99;   4:36PM;     '9565049960 =» CITY MANAGER B'VILLE;   #2
          12/03/99  1? ² 9 FAX 1956   9960                                    ☎002

To:     Carlos Rubinstein, City Manager

From:   Juan Pequeno, MIS Director

Re:     Appeal of the decision by Assistant City Manager and City Manager
        to separate MIS Director from city

Date: December 2, 1998


The assistant city manager and you are incapable of making unbiased evaluations,

recommendations, or decisions about me as the MIS director for the

city of Brownsville; both of you have been malicious, prejudicial, and

unconscionable as proven by your bad faith and deceiving schemes of harassment

with continuous lies, threats, and uncontained emotional outbursts of intense

rage and fury.


I, Juan Pequeno, hereby appeal the decision by the assistant city manager and

city manager and request that all lawful due process be administered to me

by the city.


**DEPOSITION EXHIBIT**

3

To:    Carlos Rubinstein, City Manager



From:  Juan Pequeño, MIS Director

Re:    Meeting on December 7, 1998 at 9:30 a.m.

Date:  December 5, 1998


This is to inform you that I will not be available

on December 7, 1998 at 9:30 a.m. due to illness.

DEPOSITION EXHIBIT

To:     Carlos Rubinstein, City Manager

From:  Juan Pequeno, MIS Director

Re:     Meeting on December 9, 1998 at 2:00 p.m.

Date:  December 8, 1998



This is to inform you that I will not be available
on December 9, 1998 at 2:00 p.m. due to illness.

**DEPOSITION EXHIBIT**

5

TDDTX WORKFORCE AUSTIN    PAGE:018   R=100%    -11-99 15:14 MON   TEL:13

CERTIFIED

Z 559 152 084

MAIL



RECEIVED
DEC 15 1998
City of Brownsville
City Manager's Office

_tein, City Manager

From: Juan Pequeno, MIS Director

Re:    December 11, 1998, 4:00 p.m.

Date:  December 11, 1998

This is to inform you that I will not be available to provide information

on December 11, 1998, 4:00 p.m. due to illness.



DEPOSITION
EXHIBIT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| VS. | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commissioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, | § | |
| (Previous Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

## ORDER SETTING HEARING

On this the _____ day of _____ 2001, came on to be considered Defendants' Motion to

Dismiss and Motion for Summary Judgement. After considering same, the Court is of the opinion

that a hearing should be held.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that Defendants' Motion to

Dismiss and Motion for Summary Judgement is hereby set for hearing on the _____ day of

_____, 2001 at _____ o'clock _____. m., in this Honorable Court.

SIGNED FOR ENTRY on this the _____ day of _____, 2001.


_____
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| VS. | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commissioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, | § | |
| (Previous Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
## AND MOTION FOR SUMMARY JUDGEMENT

On this the _____ day of _____, 2001, came on for consideration

Defendants' Motion to Dismiss and Motion for Summary Judgement. Having examined same and

considered the arguments of counsel, this Court is of the opinion that said Motion should be

GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that Defendants' Motion to

Dismiss and Motion for Summary Judgement is GRANTED. It is further ORDERED that the

Plaintiff take nothing against the Defendants, and all Plaintiff's claims are dismissed with prejudice.

It is further ORDERED all taxable costs are to be assessed against the Plaintiff. All relief requested

and not expressly granted is hereby denied.

SIGNED this _____ day of _____, 2001.

_____
UNITED STATES DISTRICT JUDGE