3'

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

NOV 2 8 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JUAN PEQUENO. | § | |
| | § | |
| vs. | § | |
| | § | CIVIL ACTION NO. B-00-180 |
| CITY OF BROWNSVILLE. | § | (Jury Requested) |
| IVAN WELKER (Assistant City Manager), | § | |
| and CARLOS RUBINSTEIN (Previous City | § | |
| Manager) | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION
TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted.

**LAW OFFICES OF FRANK COSTILLA, P.L.L.P.**
5 East Elizabeth Street
Brownsville, Texas 78520
Telephone:  (956) 541-4982
Facsimile:   (956) 544-3152

*Frank Costilla*  w/ permission Af O

**Frank Costilla**
Attorney-in-Charge for Plaintiff
State Bar No. 04856500
Federal I.D. No. 1509

# TABLE OF CONTENTS

Table of Contents ............................................................................................. 2

Table of Authorities ....................................................................................... 3

Introduction ..................................................................................................... 4

Evidence on Defendant's Motion to Dismiss ...................................................... 4

Summary Judgment Evidence ........................................................................... 5

Factual Summary and Statement of Genuine Issues ............................................ 6

Response to Defendants' Motion to Dismiss ...................................................... 8

Response to Defendants' Motion for Summary Judgment .................................... 9

Plaintiff's Claims Are Not Barred by the Statute of Limitations ......................... 9

Plaintiff's Speech Involved a Matter of Public Concern ..................................... 13

Plaintiff's Constitutional Rights were Violated by
Execution of City Policy and Custom ................................................................. 18

Defendant's Had No Interest in Efficiency Which Would
Outweigh Plaintiff's Interest in Speaking ........................................................... 19

Conclusion ....................................................................................................... 20

Prayer ............................................................................................................... 21

# TABLE OF AUTHORITIES

<u>Cases</u>

*Brandon v. Holt*, 469 U.S. 464 (1985) .................................................................................... 10

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) ........................................................... 18

*Connick v. Myers*, 461 U.S. 138 (1983) ................................................................................ 14

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989) ........................................................... 18

*Kentucky v. Graham*, 473 U.S. 159 (1985) ............................................................................ 9

*Perry v. Sindermann*, 408 U.S. 593 (1972) .......................................................................... 17

*Pickering v. Board of Education*, 391 U.S. 563 (1968) ..................................................... 14, 17

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ........................................................... 19

*Bonham v. Dresser Indus.*, 569 F.2d 187(3d Cir. 1977) ...................................................... 13

*Gonzalez v. Benavides*, 774 F.2d 1295 (5th Cir. 1985) ........................................................ 18

*Harris v. Victoria Ind. Sch. Dist.*, 168 F.3d 216 (5th Cir.) ................................................ 17

*Moore v. City of Kilgore*, 877 F.2d 364 (5th Cir. 1989) ...................................................... 14

*Thompson v. City of Starkville*, 901 F.2d 456 (5th Cir. 1990) ............................................ 17

*Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128 (5th Cir. 1992) ....................................... 13

*Luna v. Frito-Lay, Inc.*, 726 S.W.2d 624 (Tex. App.–Amarillo 1987, no writ) ................. 13

<u>Rules</u>

FED R. CIV. P. 6 ................................................................................................................ 10, 11

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| JUAN PEQUENO, § | |
| § | |
| vs. § | CIVIL ACTION NO. B-00-180 |
| § | (Jury Requested) |
| CITY OF BROWNSVILLE. § | |
| IVAN WELKER (Assistant City Manager), § | |
| and CARLOS RUBINSTEIN (Previous City § | |
| Manager) § | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION
## TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE U.S. DISTRICT COURT:

Plaintiff JUAN PEQUENO files this his Response to Defendant's Motion to Dismiss and

Motion for Summary Judgment and in support of said response would show the Court as follows,

to-wit:

### INTRODUCTION

On or about December 14, 1998, Juan Pequeno ("Plaintiff") was terminated from his

employment as the Management Information Systems Director with the City of Brownsville (the

"City"). Plaintiff's discharge came about after a fourteen year career with the City and was a

retaliatory action by the City, the City Manager and the Assistant City Manager for exercising his

right to free speech under the First Amendment at a public meeting of the City Commission on

October 20, 1998.

### EVIDENCE ON DEFENDANTS' MOTION TO DISMISS

Exhibit 1      Court's Order of May 30, 2001

| | |
|---|---|
| Exhibit 2 | Plaintiff's First Amended Complaint |
| Exhibit 3 | Stipulation of Dismissal |

## SUMMARY JUDGMENT EVIDENCE

| | |
|---|---|
| Exhibit A | Affidavit of Juan Pequeno |
| Exhibit B | Audit Report from LCP & H, dated September 17, 1998 |
| Exhibit C | Agenda Item for October 20, 1998 Meeting With Attached Purchasing Department Memorandum, dated October 15, 1998 |
| Exhibit D | Transcript of Plaintiff's Speech at October 20, 1998 Meeting |
| Exhibit E | Memorandum of October 26, 1998 Meeting |
| Exhibit F | Plaintiff's Proposal, dated October 29, 1998 |
| Exhibit G | Excerpts-Deposition of Arturo Rodriguez |
| Exhibit H | City Manager's Memorandum, dated November 4, 1998 |
| Exhibit I | Plaintiff's Second Proposal, dated November 9, 1998 |
| Exhibit J | Welker's letter recommending termination, dated November 24, 1998 |
| Exhibit K | City of Brownsville Personnel Policy |
| Exhibit L | Excerpts From Deposition of Ivan Welker |
| Exhibit M | Rubinstein's letter officially terminating Plaintiff, dated December 14, 1998 |
| Exhibit N | Calendar of November 2000 |
| Exhibit O | Plaintiff's Letter Appealing Termination, dated December 2, 1998 |
| Exhibit P | Transcript of Meeting Discussing Purchasing Procedures, dated November 23, 1998 |
| Exhibit Q | City Manager and Assistant City Manager Job Descriptions |

## FACTUAL SUMMARY AND STATEMENT OF GENUINE ISSUES

Plaintiff objects to the Defendants' Statement of Facts in its Motion for Summary Judgment and provides his own factual summary revealing numerous factual issues.

1.      Plaintiff Juan Pequeno was employed for fourteen years with the City of Brownsville between 1984 and 1998. Ex. A. During this time, Plaintiff had never been the subject of any documented disciplinary action by the City. Ex. A. On October 20, 1998, Plaintiff was the Director of the Management Information Systems ("MIS") Department for the City. Ex. A.

2.      Long, Chilton, Payte & Hardin, LLP, delivered an "audit report" to the City of Brownsville Audit Committee, dated September 17, 1998, outlining various findings and recommendations to the internal control structure of the City's Emergency Medical Services ("EMS") Department. Ex. B. At that time, the City's MIS Department, through an "in-house" software program was responsible for tracking and maintaining accounts receivable information for the City's EMS Department. Ex. A. The audit report recommended the purchase and use of an industry specific software program to handle the functions of the present in-house system. Ex. B. However, because the auditors did not properly analyze the in-house system, the report was subjective, incomplete and contained misrepresentations about the capabilities and efficiency of the in house system. Ex. A. In short, the audit committee and ultimately the city commission was being misinformed and was not being provided with all the facts.

3.      On October 20, 1998 at a public meeting of the Brownsville City Commission, the City, through its purchasing officer, Paul J. Calapa, proposed to purchase an industry specific software program called "Sweetsoft Ambulance 2000" to handle the accounting for the EMS Department. Ex. C. During the meeting, Plaintiff spoke publicly against the City's purchase of this software. Ex.

<u>D</u>. Consequently, the issue was tabled by the commission, and no decision to purchase was made at that time.

4.      Afterwards, a meeting was scheduled to review the proposed acquisition of the Sweetsoft software. Although this meeting was originally scheduled to take place on Tuesday, October 27, 1998, after Plaintiff returned from vacation leave, the meeting was re-scheduled to Monday, October 26, 1998. <u>Ex. A</u>; <u>Ex. E</u>. There was no explanation for this rescheduling other than to prevent Plaintiff's attendance. <u>Ex. A</u>.

5.      Upon returning to work, Plaintiff was notified on October 27, 1998 by Defendant Rubinstein that he would be given a mere two days to submit a written proposal on the pros and cons of the City's in-house software program and the Sweetsoft program. <u>Ex. A</u>. He was also instructed to contact the EMS Director, Arturo Rodriguez on the issue. <u>Ex. A</u>. The proposal was produced on October 29, 1998 and is attached hereto as <u>Exhibit F</u>. Although Plaintiff made several unsuccessful attempts to contact Mr. Rodriguez, <u>Ex. A</u>, Mr. Rodriguez, who was mad at Plaintiff for his comments at the October 20th meeting, unilaterally decided that a meeting was not necessary. <u>Ex. A</u>; <u>Ex. G. pp. 114:14-25, 115:1-4, 155:14-25, 156:1-16</u>.

6.      Defendant Rubinstein requested a second proposal on November 4, 1998, which requested the same information that Plaintiff had already provided. <u>Ex. H</u>. In compliance with management's instruction, Plaintiff submitted this second proposal on November 9, 1998. <u>Ex. I</u>. The following day, Arturo Rodriguez and Plaintiff attended a meeting with Rubinstein and Welker where Rubinstein and Welker verbally abused Plaintiff, referred to the two proposals as acts of insubordination, and used this meeting and Plaintiff's alleged "insubordination" as a pretext for Plaintiff's termination. <u>Ex. A</u>.

7.     On November 24, 1998, Welker recommended that Plaintiff be terminated. Ex. J. This termination, however was subject to a final decision by the city manager, Rubinstein, and the resolution of Plaintiff's appeal. Ex. K, p. 41; Ex. L, p. 81:23-25, p. 82:1-7. On December 14, 1998, Rubinstein sent a letter to Plaintiff informing him that he was affirming Welker's previous recommendation to terminate Plaintiff. Ex. L.

## RESPONSE TO DEFENDANT'S MOTION TO DISMISS

8.     By this Court's Order of May 30, 2001, attached hereto as Exhibit 1, Plaintiff was ordered to file a Rule 7(a) reply in order to provide specific facts and allegations that would support Plaintiff's 42 U.S.C. § 1983 claims against the individual Defendants in their individual capacities. The deadline to file said reply was July 16, 2001.

9.     By July 16, 2001, Plaintiff, who no longer sought to appear *pro se*, had sought professional representation, and in accordance with the Court's order, Attorney Moises M. Salas, Jr., filed Plaintiff's First Amended Complaint on July 16, 2001, attached hereto as Exhibit 2. In this complaint, Plaintiff indicated that the individual Defendants had been or would be dismissed in their individual capacities pursuant to a "Stipulation of Dismissal" that had been signed by the parties and would be filed with the Court. Attached as Exhibit 3 is the Stipulation of Dismissal which was filed with this Court and which dismissed the Defendants in their individual capacities. Accordingly, there is no basis for Defendants' Motion to Dismiss.

10.     After Defendants were made aware of the filing of the First Amended Complaint and the Stipulation of Dismissal, Defendants filed a supplemental motion which seeks the dismissal of Defendants Carlos Rubinstein and Ivan Welker in their official capacities. Because Rubinstein and Welker are properly named Defendants in this lawsuit, this supplemental motion should be denied.

11.     Although Defendants cite *Kentucky v. Graham*, 473 U.S. 159 (1985) for the proposition that "A suit against them [Rubinstein & Welker] in their official capacities is the functional equivalent of a suit against the entity they represent, which is the City of Brownsville," the holding in *Graham* did not indicate in any way that a government official was entitled to be dismissed from a lawsuit simply because he or she had been sued in an official capacity. Rather, that case simply stood for the proposition that a suit against a government official in his personal capacity could not lead to the imposition of liability on the governmental entity. *Id.* at 168-69.

12.     In fact, there is no basis in law for the dismissal of these two individuals at this point, because "the only immunities that can be claimed in an official capacity action are forms of sovereign immunity that the entity may possess . . . ." *Id.* at 167. Moreover, Rubinstein and Welker are proper Defendants in this lawsuit and must remain so because a judgment against them in their official capacities will properly trigger liability against the City of Brownsville. *See Brandon v. Holt*, 469 U.S. 464, 471-72 (1985) (judgment against public servant in his official capacity imposes liability on the entity that he represents). Accordingly, Defendants have failed to come forward with any reasons, legal or otherwise, for granting the dismissal of Rubinstein and Welker in their official capacities.

## RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### PLAINTIFF'S CLAIMS ARE NOT BARRED
### BY THE STATUTE OF LIMITATIONS

13.     Defendants contend that Plaintiff's suit, which was filed on November 27, 2000, was not filed within the two year statute of limitations period because he was allegedly terminated by the Assistant City Manager on November 24, 1998. Because Plaintiff's suit was filed on Monday,

following the Thanksgiving Holiday and this Court was closed on Friday, November 24, 2000, the suit was timely filed in accordance with Rule 6 of the Federal Rules of Civil Procedure. Moreover, genuine issues of material fact exist with respect to when Plaintiff received notice of his termination as well as when he was actually terminated.

### *Plaintiff's Suit was Timely Filed*

14.     Plaintiff's suit was filed timely pursuant to Rule 6(a) of the Federal Rules of Civil Procedure provides in relevant part:

> The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the office of the clerk of the district court inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days.

FED. R. CIV. P. 6. Plaintiff's suit was timely filed because it was filed on the next day following the Thanksgiving Holiday on Thursday, November 23, 2000, and the clerk's office was closed and inaccessible for filings on the following day, Friday, November 24, 2000. Attached hereto as Exhibit A is Plaintiff's affidavit wherein he states that he attempted to file his petition on Friday, November 24, 2000, but was unable to because the Federal District Clerk's office was closed. Attached hereto as Exhibit N is a true and correct copy of the November 2000 calendar identifying the relevant dates. Thus, Plaintiff's lawsuit was timely filed as a matter of law.

### *Termination Did Not Take Place on November 24, 1998*

15.     Alternatively, genuine issues of material fact exist with regard to when Plaintiff's cause of action accrued. Defendants' contention is that the cause of action accrued on November 24, 1998. However, the attached summary judgment evidence reveals that the Assistant City Manager only *recommended* termination on this date. Exhibit J, attached hereto, is a letter dated November 24,

1998, from Assistant City Manager Ivan Welker advising Plaintiff that it is his "*recommendation* and

decision . . . that you [Juan Pequeno] be separated from City Service effective 5:00 p.m., November

24, 1998." (emphasis added). The letter goes on to add, "You may appeal this decision to the City

Manager within five (5) working days. The decision of the City Manger is final."

16.     In other words, only the City Manager, and not the Assistant City Manager, had the authority

to make a decision on *final* termination. According to the City's Personnel Policy Manual in effect

during 1998, attached hereto as Exhibit K, only the City Manager had the authority to make the final

decision on a Department Director's termination. The relevant portions of the Manual provide:

> The City Manager shall have <u>final authority</u> and responsibility for the administration
> and enforcement of the policies set forth in this Personnel Policies Manual, and all
> other aspects of the City of Brownsville's operations.

Ex. K, Chapter 1, Section 101, II, Administration, p. 14. Under Chapter 7 relating to discipline, the

Manual provides further:

> Persons who are already employed by the City on the effective date of this Manual
> may be disciplined for just cause by a Department Director, a supervisor, or the City
> Manager as appropriate.

Ex. K, Chapter 7, Section 703(A), p. 37. Again, the manual says nothing about giving the Assistant

City Manager the type of authority to terminate an employee which is consistent with Mr. Welker's

letter (Ex. J) which merely recommends termination and advises Plaintiff of his right to appeal.

17.     Exhibit O indicates that Mr. Pequeno did in fact appeal the Assistant City Manager's

recommendation to terminate. In connection with an appeal of termination, Section 704 of the

Personnel Manual indicates that because Plaintiff was a Department Director, his recommended

termination was subject to a "Level Two Appeal." Wit respect to a Level Two Appeal, the Manual

provides, "The decision of the City Manager (or the Department Director if there is no Level Two

appeal) is final." <u>Ex. K, Chapter 7, Section 704, Decisions on Appeals, p. 41</u>. In fact, Plaintiff was not officially terminated until on or about December 14, 1998, as evidenced by the City Manager's letter to Plaintiff, attached hereto as <u>Exhibit M</u>. Defendant Welker further admits that Plaintiff was not officially terminated on November 24, 1998, because his termination was "subject to" an appeal process and the City Manager had the final say. <u>Ex. L, p. 81:23-25, p. 82:1-7</u>. For the foregoing reasons, material fact issues exist with respect to the actual date of Plaintiff's termination.

### *No Notice of Termination on November 24, 1998*

18.    Alternatively, and even if the Assistant City Manager's recommendation to terminate Plaintiff on November 24, 1998 could be construed as a final decision on behalf of the City, Plaintiff did not receive notice of his termination on November 24, 1998. <u>Ex. A</u>. This is further evidenced by the fact that the recommendation to terminate was not effective until 5:00 p.m. on that day (<u>Ex. J</u>), and Defendants' summary judgment evidence provides no indication that this letter was ever provided to Plaintiff on this date. The envelope containing the certified letter reveals that it was not even postmarked until November 25, 1998. <u>Ex. R</u>.

19.    Where fact issues exist with respect to the termination date of an employee, the focus is on when a plaintiff receives notice of the act giving rise to his or her claim. In the context of a wrongful termination case, a cause of action will commence when the employee receives unequivocal notice of his termination or when a reasonable person would know of his termination. *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 134 (5th Cir. 1992); *see also Luna v. Frito-Lay, Inc.*, 726 S.W.2d 624, 628 (Tex. App.–Amarillo 1987, no writ) (accrual of an action for termination of employment under federal statutes occurs when the employee is informed that his employment will be terminated, not when it actually is terminated). In this case, Plaintiff did not receive the Assistant City Manager's

letter recommending termination until after November 27, 1998.  Ex. A.

20.    In connection with this rule, the court in *Thurman* reviewed the holding in *Bonham v.*

*Dresser Indus.*, 569 F.2d 187 (3d Cir.1977) and noted that the *Bonham* court was suspect of any rule

that focused on the employer's termination date, reasoning:

> A company may use different termination dates for different purposes. . . .
> Moreover, we would be wary of any approach which determines the timeliness of an
> employer's suit against his employer solely on the basis of records which are within
> the exclusive control of the employer.

*Thurman*, 952 F.2d at 133 (citing *Bonham*, 569 F.2d at 191-92).  Accordingly, fact issues exist

regarding the date when Plaintiff received notice of his termination.

## PLAINTIFF'S SPEECH INVOLVED A MATTER OF PUBLIC CONCERN

21.    Plaintiff's speech which prompted his termination has been transcribed and is set forth in

Exhibit D.  This speech took place during a public meeting of the Brownsville City Commission on

October 20, 1998, and focused on the reasons why the City should not purchase a new software

program, "Sweetsoft Ambulance 2000," to handle the accounting and billing requirements for the

City's EMS Department.

22.    One of the necessary elements to establish a First Amendment violation requires Plaintiff to

show that his speech involved a matter of public concern.  *See Pickering v. Board of Education*, 391

U.S. 563 (1968).  Whether an employee's speech addresses a matter of public concern is a question

of law and must be determined by the content, form, and context of a given statement, as revealed

by the whole record.  *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).  Additionally, the speech's

content, form, and context must be considered as a whole package, and the significance of these

factors will differ depending on the circumstances of the particular situation.  *Moore v. City of*

*Kilgore*, 877 F.2d 364, 370 (5th Cir. 1989). Applying the *Connick* factors of content, form, and context to the facts of this case reveals that Plaintiff's speech clearly addressed a matter of public concern.

### *Content*

23.    First, the content of Plaintiff's speech addressed the obsolete nature of the PC-DOS based software program that was being proposed for purchase. Plaintiff pointed out that using software which required use of a "DOS base" operating system, a system which originated in 1981, would be a step in the wrong direction. In other words, instead of advancing technologically, the City would be regressing by purchasing this software package. To this Plaintiff stated:

> And one of the things about it was that it was DOS base, and one of the main drawbacks of it. * * * The only from this [sic] that concerns me that we [the City] might be going a little bit backwards.

He also noted that the software representative was unable to determine when there would be future upgrades to the software:

> [A]nd we asked the consultant that was selling it you know, 'When are you going to look at upgrading it.' And, he really didn't know.

Plaintiff further stated that the purchase of the software would be unnecessary because record high revenues for the EMS department were being generated with the present in-house software program:

> But we have been collecting this year . . . we have collected more than we ever have from Ambulance, $1.3 million. Last year it was 1.1 million. The year before .8, you know $800,000. So we have been going . . . you know consecutively going up and up.

He also informed the commission and the public who was attending the meeting that the in-house program was being constantly updated to meet EMS's needs and was being run effectively with the City's present computer system which had been purchased only three years ago. Finally, Plaintiff

added that the purchase of the software would decentralize the City's EMS billing system requiring the EMS Department to maintain their own system and subject the City and the EMS Department to computer security issues. He stated:

> Say once we move more operations to like EMS, if any. It is going to rely more on their department to maintain the whole system. * * * But the assurance right now, like if something happens over EMS all the data we keep it safe. It is under lock and key. And, that will be another issue that as you do that you open up the whole for security. More so than you are now.

24. All     of these issues touch directly on an unnecessary expenditure by City government for a software program that, in Plaintiff's opinion, would decrease the efficiency and effectiveness of the City's ability to collect revenue from its EMS billings. Naturally, the citizens of Brownsville are concerned about the city's expenditures as well as the efficient operation of the City's EMS Department, which is responsible for responding and providing emergency medical services. Additionally, Plaintiff's comments regarding a centralized computer system and security of computer information raise concerns about privacy issues for those individuals who have used the City's EMS services.

25.     Furthermore, Plaintiff's comments at the October 20th meeting question whether the City is purchasing the correct type of industry specific software program: "Ah, after looking at it my recommendation is that this software just might not be the package for the City of Brownsville. But Art [EMS Director], you know feel that it is." This comment, taken in conjunction with <u>Exhibit C</u> consisting of the City's Agenda Request Form and a Purchasing Department Memorandum, allude to the fact the City may have been violating a statute which requires a competitive bidding process. To be sure, that such a concern was a justifiable one, <u>Exhibit P</u> consists of a transcript of a meeting in which the Purchasing Department's purchasing procedures for the Sweetsoft program were being

reviewed.

### *Form & Context*

26.     The form of the speech involves the manner, place, and time of its occurrence.  Plaintiff's speech was made before the members of the Brownsville City Commission and the general public who attended the City meeting.  Choosing this public forum to discuss the reasons the City should not purchase the software is indicative that Plaintiff's interest in discussing the subject was to make the public and the City Commission aware of the problems surrounding the software and why it was an unnecessary expenditure.  If this had been a work related personal concern as Defendants contend, then it would have made no sense for Plaintiff to address the City Commission and the citizens of Brownsville who attended the meeting.  Analyzing the content of the speech above in connection with the form in which it was made signifies that Plaintiff's concerns were focused on issues affecting the general public.

27.     In fact, numerous cases involving an individual's speech in a public forum, such as that used by Plaintiff, have resulted in a finding that the speech addressed public concerns.  *See Perry v. Sinderman*, 408 U.S. 593 (1972) (newspaper advertisement containing criticism of college's board of regents); *Pickering v. Board of Education*, 391 U.S. 563 (1968) (published newspaper article criticizing Board's allocation of school funds); *Harris v. Victoria Ind. Sch. Dist.*, 168 F.3d 216 (5th Cir.), *cert. denied*, 528 U.S. 1022 (1999) (committee meeting of the school district); *Moore v. City of Kilgore*, 877 F.2d 364 (5th Cir. 1989) (interview with news media regarding the effectiveness of Fire Department Services).

28.     Defendants simply miss the mark when they say that "Plaintiff was acting as Juan Pequeno, MIS Director for the City of Brownsville, not Juan Pequeno, citizen." It is obvious from reviewing

the content of Plaintiff's speech that nothing he said relates to any job-related grievance or personal interest he had.  See Ex. D.  Furthermore, the fact that Plaintiff was the MIS Director who was looking out after the interests of another Department Director's interests (the EMS Department) is wholly inconsistent with the Defendants' attempted portrayal of Plaintiff as a "disgruntled employee" with an "internal grievance."

29.     But even if Plaintiff's speech could be perceived as combining a private or personal interest, which Plaintiff denies, an employee's speech may contain an element of personal interest and yet still qualify as speech on a matter of public concern. In *Thompson v. City of Starkville*, 901 F.2d 456 (5th Cir. 1990), the Court held: "The existence of an element of personal interest on the part of an employee in his or her speech does not, however, dictate a finding that the employee's speech does not communicate on a matter of public concern." *Thompson*, 901 F.2d at 463.  In recognizing that an employee's speech may contain a mixture of public and private concerns and still be actionable, the court cited *Gonzalez v. Benavides*, 774 F.2d 1295, 1298 (5th Cir. 1985), where the court stated: "We do not read *Connick*, however, to exclude the possibility that an issue of private concern to the employer may also be an issue of public concern."

30.     The events and circumstances giving rise to Plaintiff's speech involve an audit of the City's EMS Department.  Ex. B.  Because the MIS Department played such a critical role in the EMS's billing and accounting systems, Plaintiff was shocked to discover that the MIS Department was not even consulted or interviewed with regard to the findings and recommendations made by the auditors.  Ex. A.  Because the auditors did not properly analyze the in-house system, the report was subjective, incomplete and contained misrepresentations about the capabilities and efficiency of the in house system.  The audit committee and ultimately the city commission were going to be

misinformed. <u>Ex. A</u>. As Plaintiff's affidavit states:

> Thus, I was concerned because I believed that the new software package manufactured by a company called Sweetsoft would not be in the best interests of the City and I also felt that the city commission was not being provided with enough information regarding the in-house system to make an objective and knowledgeable decision.

<u>Ex. A</u>. Finally, the City's decision to have the accounts receivable of the EMS audited (<u>Ex. B</u>) shows that the issue is a matter of public concern.

31.     Accordingly, analysis of these factors, form and context support the proposition that Plaintiff's speech addressed a matter of public concern.

## PLAINTIFF'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY EXECUTION OF CITY POLICY AND CUSTOM

32.     Defendants correctly point out on page 24 of their motion that to establish municipal liability under 42 U.S.C. § 1983, a complaint must demonstrate an official policy or custom which causes a constitutional deprivation. However, Defendants are blatantly incorrect when they state that no such policy exists. A city policy, custom or practice can be created through a single act of a final policymaker designated as such under state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122-23 (1988); *Pembaur v. Cincinnati*, 475 U.S. 469, 478-79 (1986). The question of who is a final policymaker is a question of state law to be determined by the Court. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989).

33.     In the present case, the actions of Defendants Rubinstein and Welker are at issue. Both had final policymaking authority as evidenced by their job descriptions, attached hereto as <u>Exhibit Q</u>. As stated in the job description, the City Manager is required to "prepare policy and procedural proposals . . . ." <u>Ex. Q</u>. The Assistant City Manager performs the duties of the City Manager in his

absence. and "directs, communicates and monitors policies. . . ." Ex. Q. In addition, both had final

policymaking authority over the termination and recommendation to terminate a Department

Director such as Plaintiff. Ex. K, pp. 37-42. This final policymaking authority forms the basis for

municipal liability under § 1983.

34.     Additionally, Defendant and former Assistant City Manager Ivan Welker admitted that the

City of Brownsville had a policy in effect which prevented its employees from asserting their

constitutionally protected right to free speech.   When asked whether there was a policy that

prevented Mr. Pequeno from addressing the city commission at the meeting on October 20, 1998,

Welker stated, "It all depends on what he's going to be talking to them about." Ex. L, p. 35:4-5.

This statement alone reflects that Plaintiff's constitutional right to speak on issues of public concern

was being infringed upon by a City policy. Welker added, "If an employee wants to talk about an

item that's on the posted agenda, he needs to talk over with his supervisory staff first, his superior,

or their superiors." Ex. L, p. 35:13-16. Clearly, Welker's remarks show that the City policy which

was being carried out mandated Plaintiff to seek "permission" from City management prior to being

allowed to assert his constitutional right to speak freely.

## DEFENDANT'S HAD NO INTEREST IN EFFICIENCY WHICH WOULD OUTWEIGH PLAINTIFF'S INTEREST IN SPEAKING

35.     Defendants have failed to show that the City's interest in promoting efficient government was

affected in any manner. Although Plaintiff voiced concerns about the software on October 20, 1998,

he did not have the authority to veto the purchase and the software was ultimately purchased by the

City and utilized by the EMS Department. Ex. L, pp. 21:19-25, 22:1-3. As shown by Ex. D,

Plaintiff's speech was relatively brief and did not cause a disruption of the meeting. The only

immediate consequence of his speech was that the commission decided to table the issue.

36.   Furthermore, Defendants cannot be allowed to fabricate pretextual reasons for termination and then use those reasons to conclude that the City's interest in running an efficient government was disrupted. In this regard, Mr. Welker practically admits that Plaintiff was terminated for exercising his right to free speech at the October 20, 1998 meeting. Ex. L, p. 42:22-25, p. 43:1-7.

37.   Accordingly, Defendants have no support for their assertion that an "unstable working atmosphere" was created and Plaintiff's interest in free speech outweighs the City's interest, if any, in promoting efficient government.

## CONCLUSION

38.   The United States Supreme Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection. *See Connick*, 461 U.S. at 145. Because Plaintiff was wrongfully terminated for asserting his right to free speech, Defendants are not entitled to summary judgment and Defendants Rubinstein and Welker are not entitled to be dismissed in their official capacities.

39.   Defendants' Statute of Limitations argument fails as a matter of law by virtue of Rule 6 of the Federal Rules of Civil Procedure. In addition, Plaintiff has shown that genuine issues of materia fact exist with regard to when Plaintiff received notice of his alleged termination on November 24, 1998. By virtue of Mr. Rubinstein's and Mr. Welker's status as City Manager and Assistant City Manager, both were policymakers whose improper actions gave rise to the City's liability under § 1983. Additionally, genuine issues of material fact exist regarding the existence of a policy or custom by the City which infringed on Plaintiff's constitutional rights; that his protected speech addressed matters of public concern; and that his interest in speaking outweighed any interests the

City may have had in promoting efficient government. Defendants have failed to prove they are entitled to summary judgment as a matter of law and genuine issues of material fact exist with regard to the grounds presented in their motion. Accordingly, such motions must be denied.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants' Motion to Dismiss and Motion for Summary Judgment be denied on all grounds and that Plaintiff have a trial on the merits in this cause. Plaintiff further prays that all taxable costs of court be taxed against Defendants and for such other and further relief, at law or in equity, to which Plaintiff may show himself to be justly entitled.

Respectfully submitted,

**LAW OFFICES OF FRANK COSTILLA, P.L.L.P.**
5 East Elizabeth Street
Brownsville, Texas 78520
Telephone:  (956) 541-4982
Facsimile:  (956) 544-3152

**Frank Costilla**
State Bar No. 04856500
Federal I.D. No. 1509

## CERTIFICATE OF SERVICE

On this the 26th day of November, 2001, a true and correct copy of the above and foregoing document was sent to all counsel involved in the manner indicated below:

Mr. Ryan Henry                          Via **CM/RRR # 7001 0320 0004 7247 0195**
**Willette & Guerra, L.L.P.**
International Plaza, Suite 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521

_Frank Costilla_ w/ permission AJ J

**Frank Costilla**

# EXHIBIT 1

*18*

United States District Court
Southern District of Texas
ENTERED

MAY 3 1 2001

Michael N. Milby, Clerk of Court
By Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

Pequeno,

     Plaintiff,

v.

City of Brownsville, et al.,

     Defendants.

§
§
§
§
§
§
§
§
§

CIVIL ACTION NO. B-00-180

## ORDER

BE IT REMEMBERED, that on May 29, 2001 the Court **DENIED** the Plaintiff's Motion to Strike [Dkt. No. 15] the Defendants' Motion to Compel Rule 7(a) Reply [Dkt. No. 10], **GRANTED** Defendants' Motion to Compel Rule 7(a) Reply [Dkt. No. 10], and **ORDERED** the Plaintiff to submit a Rule 7(a) reply on claims made against individual Defendants in their individual capacities by July 16, 2001.

The Plaintiff argues that the Defendants' Motion to Compel Rule 7(a) Reply [Dkt. No. 10] should be stricken because it does not contain a proper certificate of conference as required by this Court's Chamber and Local Rules. The Defendants' motion was filed on April 16, 2001 and states that "[t]he undersigned was unable to contacted [sic] the Plaintiff regarding this motion. Plaintiff has not provided a valid phone number in which [sic] we may contact him regarding said lawsuit. For all reasons Defendants counsel [sic] must believe Plaintiff is opposed to the filing of said motion" [Dkt. No. 10]. The Court held an initial pretrial conference on the same day the Defendants filed their motion. The Defendants informed the Court at the initial pretrial conference that they had not been able to contact the Plaintiff prior to April 16, 2001 because the Plaintiff had not provided them with adequate contact information. The Plaintiff did not make any statements to the contrary. Therefore, the certificate of conference included in the Defendants' motion was proper at the time the motion was filed and the Plaintiff's motion to strike lacks merit.

1

The Court granted the Defendants' Motion to Compel Rule 7(a) Reply [Dkt. No. 10] because the Plaintiff's complaint contains no specific allegations to support 42 U.S.C. § 1983 claims against the individual Defendants in their individual capacities [Dkt. No. 1]. "Faced with sparse details of claimed wrongdoing by officials, trial courts ought routinely require plaintiffs to file a reply under Federal Rule of Civil Procedure 7(a) to qualified immunity defenses." Reyes v. Sazan, 168 F.3d 158, 161 (5th Cir. 1999).

A proper Rule 7(a) reply should provide specific facts that address the defense of qualified immunity and give rise to a constitutional claim under 42 U.S.C. § 1983. See Baker v. Putnal, 75 F.3d 190, 195 (5th Cir. 1996); Schultea v. Wood, 47 F.3d 1427, 1433-44 (5th Cir.1995) (en banc). To overcome a qualified immunity defense a plaintiff must plead that a defendant committed an objectively unreasonable violation of a clearly established constitutional right. See Kipps v. Caillier, 197 F.3d 765, 768 (5th Cir. 1999). "Heightened pleading demands more than bald allegations and conclusionary statements. The plaintiff must allege facts specifically focusing on the conduct of the defendant which caused his injury." Wicks v. Mississippi State Employment Servs., 41 F.3d 991, 994-995 (5th Cir. 1995) (citations omitted). See Warnock v. Pecos County, Tex., 116 F.3d 776, 779 (5th Cir. 1997); Streetman v. Jordan, 918 F.2d 555, 556 (5th Cir.1990).

DONE at Brownsville, Texas, this 30 day of May 2001.

Hilda G. Tagle
United States District Judge

2

# EXHIBIT 2

COPY

U.S. DISTRICT COURT
SOUTHERN DISTRICT TEXAS
FILED
MICHAEL N. MILBY, CLERK

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION  01 JUL 16 PM 4: 39

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| | § | |
| VS. | § | |
| | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commissioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, (Previous | § | |
| Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

NOW COMES, JUAN PEQUENO, Plaintiff, and files this his First Amended Original Petition

and would show the court as follows:

### I.
### PARTIES

Plaintiff is an individual residing in Brownsville, Cameron County, Texas.

Defendant City of Brownsville ("City") is a municipality which has been served and which has

answered herein.

Defendant, Carlos Rubenstein, "former" City Manager, has been served and has answered

herein and the same is being sued in his official capacity as City Manager, City of Brownsville,

Cameron County, Texas.

Defendant Ivan Welker, Assistant City Manager, has been served and has answered herein and the same is being sued in his official capacity as Assistant City Manager, City of Brownsville, Cameron County, Texas.

Defendant Blanca Vela (Mayor) has been served and has answered herein and the same has been or will be dismissed from this action pursuant to the "Stipulation of Dismissal" signed by the parties and to be filed in this caused, in accordance with Rule 41(a)(1)(ii), Federal Rules of Civil Procedure.

Defendant Carlton Richards (Commissioner) has been served and has answered herein and the same has been or will be dismissed from this action pursuant to the "Stipulation of Dismissal" signed by the parties and to be filed in this caused, in accordance with Rule 41(a)(1)(ii), Federal Rules of Civil Procedure.

Defendant Ernie Hernandez (Commissioner) has been served and has answered herein and the same has been or will be dismissed from this action pursuant to the "Stipulation of Dismissal" signed by the parties and to be filed in this caused, in accordance with Rule 41(a)(1)(ii), Federal Rules of Civil Procedure.

Defendant Harry McNair, Jr., (Commissioner) has been served and has answered herein and the same has been or will be dismissed from this action pursuant to the "Stipulation of Dismissal" signed by the parties and to be filed in this caused, in accordance with Rule 41(a)(1)(ii), Federal Rules of Civil Procedure.

Defendant John Wood (Commissioner) has been served and has answered herein and the same has been or will be dismissed from this action pursuant to the "Stipulation of Dismissal" signed by the parties and to be filed in this caused, in accordance with Rule 41(a)(1)(ii), Federal Rules of Civil

Procedure.

Defendant Efren Fernandez (Human Resource Director) has been served and has answered herein and the same has been or will be dismissed from this action pursuant to the "Stipulation of Dismissal" signed by the parties and to be filed in this caused, in accordance with Rule 41(a)(1)(ii), Federal Rules of Civil Procedure.

Defendant Henry Gonzalez, (Former Mayor) has been served and has answered herein and the same has been or will be dismissed from this action pursuant to the "Stipulation of Dismissal" signed by the parties and to be filed in this caused, in accordance with Rule 41(a)(1)(ii), Federal Rules of Civil Procedure.

## II.
## VENUE

Venue is proper in Cameron County, Texas pursuant to Texas Civil Practice and Remedies Code §§15.001, 15.002, as all or a substantial portion of the events giving rise to this cause of action took place in Cameron County.

## III.
## JURISDICTION

This Court has jurisdiction of this matter pursuant U.S.C.S., 28 §§ 1331 and 1343.

## III.
## FACTS

Plaintiff was employed by the City of Brownsville between 1984 and 1998. On October 20, 1998, Plaintiff was the Director of the Management Information Systems ("M.I.S") Department for the City of Brownsville.

On or about October 20, 1998 at a public meeting of the Brownsville City Commission, the City Manager proposed to purchase a software program called "SweetSoft" for the operation of City's Emergency Medical Services ("EMS") Department. At that meeting, Plaintiff spoke publicly concerning his objections as Director of M.I.S. to the purchase of said software by the City. Consequently, the City Commissioner's decision to make such purchase for the City was postponed for a later date.

In addition, following Plaintiff's public speech, the City Manager, Carlos Rubenstein and Assistant City Manager, Ivan Welker proceeded to engage in various actions directed toward Plaintiff in retaliation for his speech concerning his objections as M.I.S. Director to the purchase of the software at issue. For example, immediately following Plaintiff's speech, the City Manager directed Plaintiff to prepare proposals concerning the computer programming needs of the City's EMS. Plaintiff prepared a proposal to which the City Manager objected. Thereafter, Plaintiff prepared a subsequent proposal to which the City Manager also objected. The City Manager's objections were unfounded and were otherwise made solely to harass Plaintiff and to fabricate allegations of insubordination and misconduct by Plaintiff. More significantly, the City Manager began a series of accusations against the Plaintiff, both orally and in writing, accusing Plaintiff of insubordination and misconduct. In addition, the City Manager and Assistant City Manager, without any basis, accused the Plaintiff, both orally and in writing, of destroying "friendly relations" between the City and City employees, of refusing to cooperate with fellow workers, of conduct unfavorable toward the City and of attempting to use the City's sick leave policy without proper cause. These actions by said city officials began immediately after Plaintiff's speech and by November 24, 1998, only a month later, the Assistant City Manager recommended that Plaintiff be terminated. Each and every of the

allegations of insubordination and misconduct made by the City Manager and Assistant City Manager were unfounded, made for purposes of harassment and in order to fabricate a basis for terminating Plaintiff in retaliation for his public speech. Further, although the accusations were unfounded, the City Manager and Assistant City Manager, in their official capacity, proceeded to take unwarranted disciplinary action against Plaintiff.

In that regard, while Plaintiff was ill, had taken sick leave and was unable to respond to the City Manager's allegations or return to work, the City Manager scheduled a so-called "pre-disciplinary hearing". Such hearing were scheduled at a time that Plaintiff had called in sick pursuant to the City's sick leave policy and was unable to attend. Nevertheless, the City Manager proceeded with such hearing in the Plaintiff's absence. Thereafter, on or about December 14, 1998, the City Manager notified Plaintiff of his decision to terminate Plaintiff. Plaintiff has suffered injury and damages as a result.

At all times relevant, Defendant Carlos Rubenstein was acting in his official capacity as City Manager. Further, at all times relevant, Defendant Ivan Welker was acting in his official capacity as Assistant City Manager.

## IV.
## U.S.C.S. §1983
## VIOLATION OF CONSTITUTIONAL RIGHTS

Plaintiff brings this action against the City of Brownsville, and the Brownsville City Manager and Assistant City Manager in their official capacities pursuant to 42 U.S.C.S., §1983 for violations of the Plaintiff's First Amendment and Fourteenth Amendment rights, in terminating Plaintiff in retaliation for his speech concerning the City's purchase of the proposed "SweetSoft", software.

In that connection, at all times relevant, Plaintiff's speech involved a matter of public concern such that it is of interest to the community of Brownsville. In addition, the speech by Plaintiff was a substantial or motivating factor for the retaliatory conduct engaged in by the City, City Manager, and Assistant City Manager, which conduct would not otherwise have been engaged in.

In addition, the City is liable as a result of the conduct and decisions by its official and authorized policymaker, the City Manager. At all times relevant the City Manager had the significant and final authority in personnel matters including the decision to terminate Plaintiff. Further, the edicts and acts by the City Manager represent the policy and/or custom of the City. This is highlighted by the fact that although the Plaintiff advised the Mayor of the City and the City Commissioners of the conduct engaged in by the City's City Manager and Assistant City Manager, neither the City nor the City Commissioners took any corrective action. The City is liable to Plaintiff for the actions of its City Manager, whose acts and edicts, including the termination of Plaintiff for his public speech, represent the official policy or custom of the City, which is in violation of 42 U.S.C.S. §1983.

## V.
## DAMAGES

As a consequence of the willful and knowing conduct engaged in by Defendants in violation of Plaintiff's First and Fourteenth Amendment rights, Plaintiff has been caused to suffer injury and damages including, loss of wages in the past, loss of wages in the future and loss of employment benefits.

## VI.
## ATTORNEY'S FEES

Pursuant to 42 U.S.C.S. §1988, Plaintiff seeks reasonable attorney's fees.

**WHEREFORE PREMISES CONSIDERED**, Plaintiff prays that the Defendants be cited to appear and answer and that upon final trial of this cause, Plaintiff have Judgment against Defendants for loss of wages in the past, loss of wages in the future, loss of employment benefits, prejudgment interest and attorneys fees and such other and further relief to which Plaintiff may show himself justly entitled to receive.

Respectfully submitted,

**MOISES M. SALAS JR.**
**ATTORNEYS AT LAW**
1325 Palm Boulevard, Suite G
Brownsville, Texas 78520
Tel. No. (956) 541-2862
Fax. No. (956) 541-2864

By: _____
Moises M. Salas, Jr.
State Bar No. 00786217
Fed. Id No. 17506 (former)
**ATTORNEYS FOR PLAINTIFF**

By: _____
Juan Pequeno, Pro Se

## CERTIFICATE OF SERVICE

I, Moses M. Salas, Jr., do hereby certify that on this, the ____ day of July, 2001, a true

and correct copy of the above and foregoing document has been sent, via certified mail, return receipt

requested, to all counsel of record, to wit:


Mr. Ryan Henry
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521

COUNSEL FOR DEFENDANTS


Moises M. Salas, Jr.

# EXHIBIT 3



IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUL 2 5 2001

Michael N. Milby
Clerk of Court

| | |
|---|---|
| JUAN PEQUENO | § |
| | § |
| VS. | § |
| | § |
| CITY OF BROWNSVILLE | § |
| BLANCA VELA (Honorable Mayor) | § |
| CARLTON RICHARDS (Commissioner) | § |
| ERNIE HERNANDEZ (Commissioner) | § |
| HARRY MCNAIR, JR. (Commissioner) | § |
| JOHN WOOD (Commissioner) | § |
| IVAN WELKER (Assistant City Manager) | § |
| EFREN FERNANDEZ (Human Resoure | § |
| Director), HENRY GONZALEZ, (Previous | § |
| Mayor), CARLOS RUBINSTEIN | § |
| (Previous City Manager) | § |

CIVIL ACTION NO. B-00-180
(Jury Requested)

## STIPULATION OF DISMISSAL

COME NOW Plaintiff and Defendant and file this stipulation of dismissal under Federal Rule of Civil Procedure 41(a)(1)(ii).

1.   Plaintiff is JUAN PEQUENO; Defendants are CITY OF BROWNSVILLE, BLANCA VELA (Honorable Mayor), CARLTON RICHARDS (Commissioner), ERNIE HERNANDEZ (Commissioner), HARRY MCNAIR, JR. (Commissioner), JOHN WOOD (Commissioner), IVAN WELKER (Assistant City Manager), EFREN FERNANDEZ (Human Resoure Director), HENRY GONZALEZ, (Former Mayor), and CARLOS RUBINSTEIN(Former City Manager).

2.   On November 27, 2000, Plaintiff sued Defendants.

3.   Plaintiff moves to dismiss the following Defendants:

    a.   BLANCA VELA (Honorable Mayor, In Her Individual and Official Capacity);
    b.   CARLTON RICHARDS (Commissioner, In His Individual and Official Capacity);
    c.   ERNIE HERNANDEZ (Commissioner, In His Individual and Official Capacity);
    d.   HARRY MCNAIR, JR. (Commissioner, In His Individual and Official Capacity);
    e.   JOHN WOOD (Commissioner, In His Individual and Official Capacity);

      f.     EFREN FERNANDEZ (Human Resource Director, In His Individual and Official Capacity);

      g.     HENRY GONZALEZ, (Former Mayor, In His Individual and Official Capacity);

      h.     IVAN WELKER, In His Individual Capacity Only; and

      i.     CARLOS RUBENSTEIN, In His Individual Capacity Only.

4.     Defendants, each have answered and agree to the dismissal.

5.     This case is not a class action.

6.     A receiver has not been appointed in this action.

7.     This case is not governed by any federal statute that requires an order of the court for dismissal of the case.

8.     Plaintiff has not previously dismissed an action based on or including the same claims as those presented in this suit.

9.     This dismissal is without prejudice.

Respectfully submitted,

**MOISES M. SALAS, JR.**
**ATTORNEY AT LAW**
1325 Palm Boulevard, Suite G
Brownsville, Texas 78520
Tel. No. (956) 541-2862
Fax. No. (956) 541-2864

By: _____
Moises M. Salas, Jr.
State Bar No. 00786217
Fed. Id No. 17506 (former)
**ATTORNEYS FOR PLAINTIFF**

By: _____
Ryan Henry
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521
ATTORNEY FOR DEFENDANTS

By: _____
Juan Pequeno, Pro Se

# CERTIFICATE OF SERVICE

I. Moses M. Salas, Jr.. do hereby certify that on this, the 23rd day of July, 2001, a true and correct copy of the above and foregoing document has been sent, via certified mail, return receipt requested, to all counsel of record, to wit:

> Mr. Ryan Henry
> WILLETTE & GUERRA, L.L.P.
> International Plaza, Suite 460
> 3505 Boca Chica Blvd.
> Brownsville, Texas 78521
>
> COUNSEL FOR DEFENDANTS

Moises M. Salas, Jr.

f.   EFREN FERNANDEZ (Human Resource Director, In His Individual and Official Capacity);

g.   HENRY GONZALEZ, (Former Mayor, In His Individual and Official Capacity);

h.   IVAN WELKER, In His Individual Capacity Only; and

i.   CARLOS RUBENSTEIN, In His Individual Capacity Only.

4.   Defendants, each have answered and agree to the dismissal.

5.   This case is not a class action.

6.   A receiver has not been appointed in this action.

7.   This case is not governed by any federal statute that requires an order of the court for dismissal of the case.

8.   Plaintiff has not previously dismissed an action based on or including the same claims as those presented in this suit.

9.   This dismissal is without prejudice.

Respectfully submitted,

MOISES M. SALAS, JR.
ATTORNEY AT LAW
1325 Palm Boulevard, Suite G
Brownsville, Texas 78520
Tel. No. (956) 541-2862
Fax. No. (956) 541-2864

By: _____

Moises M. Salas, Jr.
State Bar No. 00786217
Fed. Id No. 17506 (former)
ATTORNEYS FOR PLAINTIFF

By: _____
Ryan Henry
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521
ATTORNEY FOR DEFENDANTS

By: _____
Juan Pequeno, Pro Se

2

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN PEQUENO, | § | |
| | § | |
| vs. | § | |
| | § | CIVIL ACTION NO. B-00-180 |
| CITY OF BROWNSVILLE, | § | (Jury Requested) |
| IVAN WELKER (Assistant City Manager), | § | |
| and CARLOS RUBINSTEIN (Previous City | § | |
| Manager) | § | |

## AFFIDAVIT

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF CAMERON** | § |

BEFORE ME, the undersigned authority, on this day personally appeared JUAN PEQUENO, known to me to be the person who subscribed his name below, who, after having first been duly sworn by me, on oath deposes and says:

"My name is JUAN PEQUENO. I am over the age of twenty-one (21) years, am competent in all respects to testify herein and I have personal knowledge of the facts herein.

"Between 1984 and 1998, I was employed with the City of Brownsville. In 1994, I became the Department Director for the City's Management Information Systems (MIS) Department. I remained in this position as Director until my termination from the City on December 14, 1998. During this time, I had never been the subject of any documented disciplinary action by the City.

"One of the many functions which the MIS Department was responsible for was to input accounting data for the City's Emergency Medical Services (EMS) Department and keep track of EMS' accounts receivables. The MIS Department was responsible for maintaining the EMS data and keeping it secure. This was done through an in-house software program which had been consistently developed and modified over the years to accommodate the ever changing needs of the EMS Department and the various state and federal laws which mandated the requirements for submission of insurance claims and other matters. During my tenure as MIS Director, there was a consistent increase in revenue being collected on behalf of EMS and during my final year as director, EMS had collected a record high and unprecedented revenue collection of approximately 1.3 million dollars.

"On October 20, 1998, the City of Brownsville held a regular public city council meeting. When Paul Calapa, Purchasing Director for the City, got up to speak, I was surprised to find out that the city commission was being presented with the idea of replacing the entire in-house EMS software

system with another package which would affect the City of Brownsville significantly and adversely. The decision to replace the existing system was based on an audit report, dated September 17, 1998, which made findings and recommendations to the City's audit committee on how accounting procedures for the EMS Department could be improved. Because the MIS Department played such a critical role in the EMS's billing and accounting systems, I was shocked to discover that the MIS Department was not even consulted or interviewed with regard to the findings and recommendations made by the auditors. Because the auditors did not properly analyze the in-house system, the report was subjective, incomplete and contained misrepresentations about the capabilities and efficiency of the in house system. In short, the audit committee and ultimately the city commission was being misinformed and was not being provided with all the facts.

"Thus, I was concerned because I believed that the new software package manufactured by a company called Sweetsoft would not be in the best interests of the City and I also felt that the city commission was not being provided with enough information regarding the in-house system to make an objective and knowledgeable decision. Thus, I arose to express my concerns, which I believed to be public concerns to the members of the city commission and the general public who was attending the meeting. After I spoke at this meeting and based on my comments, Mayor Henry Gonzalez and the commission members voted to table the issue for two weeks.

"On October 21, 1998, I met with Assistant City Manager Ivan Welker to discuss the scheduling of an audit committee meeting as directed by the Mayor and the commission. The following morning, Mr. Welker approved my vacation leave for Friday, October 23, 1998 and Monday, October 26, 1998 and Mr. Welker also advised that the audit committee meeting would be held on Tuesday morning, October 27th. On Sunday, October 25, 1998, I was informed that the meeting was going to be rescheduled to Monday, October 26, 1998, the day I had scheduled for vacation. There was no explanation for rescheduling this meeting other than to prevent my attendance. Ms. Bruciak attended the meeting in my place and was told that I would need to prepare an evaluation study of the in-house software and the Sweetsoft program within two days. There was no specific outline provided to me of what the evaluation study should contain. Upon my return from vacation, I was also instructed to contact the EMS Director, Arturo Rodriguez on the issue, despite the fact that I had told Mr. Rubinstein that Mr. Rodriguez was not talking to me or taking my calls.

"Two days was an unreasonable amount of time to prepare such a study, but I nevertheless complied to the best of my ability and submitted the proposal to City Manager Carlos Rubinstein. A few days later, I was informed by Mr. Rubinstein that I would need to submit a second report outlining the two systems. Once again, I complied to the best of my ability and followed the instructions given to me and submitted the report to Mr. Rubinstein. I also made numerous attempts to contact Mr. Rodriguez about the issue and left several messages with his secretary. However, he was not taking my calls, nor was he returning them.

"On November 10, 1998, I attended a meeting with Mr. Rubinstein, Mr. Welker, Mr. Rodriguez and myself in attendance. During this meeting, I was verbally abused and harassed by Mr. Welker and Mr. Rubinstein who unreasonably criticized my two proposals. During this meeting, these two individuals accused me of insubordination by the submission of my proposals, which they

had requested. They threatened to use the proposals as evidence of insubordination against me. They asked me questions and if I answered, they yelled at me and told me my answers were insubordination. If I did not answer, they yelled out that my not answering was insubordination. Mr. Rubinstein ordered me to read aloud from my proposal and if I did not read, I was threatened with insubordination. Their rage, fury and yelling threats continued throughout the meeting. Although I was unable to convince my supervisors of such, I never committed any acts of insubordination and I made every attempt to cooperate and communicate with my fellow employees.

"After November 27, 1998, I received notice for the first time that Assistant City Manager Ivan Welker was recommending my termination subject to being appealed to the City Manager. On December 2, 1998, I advised Mr. Rubinstein that I would be appealing Mr. Welker's recommendation to terminate me. However, I was ill during this period and hearings on my appeal were being unilaterally scheduled by Mr. Rubinstein during this time , despite the fact that he knew I was unable to attend because of my illness. Thereafter, I received Mr. Rubinstein's letter dated December 14, 1998, informing me of my official termination. In these letters, Mr. Rubinstein and Mr. Welker made numerous false accusations about the reasons for my termination. These accusations are false and the reason I was terminated was for speaking publicly on a matter of public concern at the October 20, 1998 city commission meeting, which was a violation of my constitutional right to speak freely.

"With regards to the present lawsuit, I attempted to file my petition on Friday, November 24, 2000, the day after Thanksgiving, but was unable to do so because the Federal District Clerk's office in Brownsville was closed. Instead, I filed it on the next available day that the clerk's office was open which was Monday, November 27, 2000.

_____
JUAN PEQUENO

**SUBSCRIBED AND SWORN** to me by JUAN PEQUENO on this the 26th day of November, 2001, to certify which witness my hand and seal of office.

ROSALINDA M. GARZA
Notary Public, State of Texas
My Commission Expires
06-27-2005

_____
Notary Public, State of Texas

# EXHIBIT B

# CITY OF BROWNSVILLE

# AGREED-UPON PROCEDURES

# SEPTEMBER 17, 1998

*ENCLOSURE #3*

**LCP & H**  **LONG, CHILTON, PAYTE & HARDIN, LLP**

A PARTNERSHIP OF PROFESSIONAL CORPORATIONS AND INDIVIDUALS

CERTIFIED PUBLIC ACCOUNTANTS & CONSULTANTS



McGLADREY **NETWORK**
An Independently Owned Member
Worldwide Services Through RSM International

Members – Division of Firms.
American Institute of CPAs

745 E. ST. CHARLES
BROWNSVILLE, TEXAS 78520
(956) 546-1655
FAX (956) 546-0377

To the Audit Committee
City of Brownsville

We have performed the procedures enumerated below, which were agreed to by the City of Brownsville's Audit Committee, solely to assist them with respect to the evaluation of the internal control structure at the Emergency Medical Service (EMS) department. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of the procedures is solely the responsibility of the specified users of the report. Consequently, we make no representation regarding the sufficiency of the procedures described below either for the purpose for which this report was requested or for any other purpose.

The procedures performed and findings are as follows:

1. We interviewed Arturo Rodriguez, Director, and Esther Garza, Office Manager, to obtain an understanding of the operations of the EMS department. Based on our understanding of the accounting system, we designed tests to determine whether the system was working as described.

2. We selected, at random, the "911" log reports for the following dates: October 23, 1997; November 7 & 18, 1997; January 6, 1998; February 16 & 27, 1998; March 3, 9, 10, & 19, 1998; April 15, 21 & 30, 1998; May 8 & 29, 1998; June 19, 1998 and July 8, 13, 15 & 20, 1998. We reviewed these reports and verified that each "911" call corresponds to an EMS run report.

3. From those dates listed above, we selected one run per day for a total of 20 run reports and performed the following:

   a. Matched the "911" log call to the appropriate run report;
   b. Checked the run report for paramedics signatures;
   c. Evidence of supervisor review by reference to their initials;
   d. Agreed information on run report to the data entered in the computer system;

BROWNSVILLE    •    HARLINGEN    •    McALLEN

     e.  Traced copy of the bill to either medicare, medicaid, private insurance, or patient;

     f.  Traced to payment received by either of the above listed parties; and

     g.  If payment received by patient in person, traced to the receipt.

4.  Verified that all receipts are prenumbered and controlled.

5.  Reviewed the accounts receivable aging report as of August 19, 1998 to determine collectibility of significant outstanding accounts.

6.  Obtained the total runs and the total amount billed and collected per run for the month of February. Calculated the net collections for those runs made during the month.

*Findings and Recommendations:*

*Cash Receipts and Petty Cash*

We noted that often cash received on account is held for change.

We suggest that the City establish a petty cash fund for EMS to have available for change. Effective June 17, 1998, the City amended its Cash Receipting System Procedures. The new policy requires all departments to make a deposit when receipts reach $100 and also on the last banking day of the week and of the month. With this new system in place, EMS will not have cash on hand for change unless a petty cash fund is established.

*Accounting System*

After discussions with EMS personnel, we noted that the EMS accounting data is processed using an in-house software developed many years ago. Any changes to the medicare and medicaid laws require alterations to the program so that all claims are coded properly to ensure immediate payment. Errors in filing the reports will cause denial of claims. These changes to the program require thorough testing before processing claims. This process is time consuming and inefficient.

We recommend that EMS abandon its current software and acquire a new, more efficient software specifically designed for EMS operations. An industry specific software would enhance the billing and collection processes and guarantee timely updates to any changes in the laws affecting medicare and medicaid. Any new purchases should be Year 2000 compliant.

*Run Reports*

Only one out of twenty run reports selected for testing could not be located by EMS personnel. EMS staff obtained a copy of this report from the hospital; the original remains misplaced.

*February 1998 Billings and Collections*

A review of the total runs for the month of February 1998 revealed billings of $ 254,582.60, receipts (through 8/3/98) of $ 137,547.33 (54.03%), and balance due (accounts receivable) of $117,035.27 (45.97%).

We recommend that the EMS department adopt a policy to address collection efforts for all accounts including the medicare/medicaid accounts. This policy should include, but not be limited to, collection procedures, medicare/medicaid appeals, and write-off procedures.

*Hospital Charges*

The February report shows several runs billed to both Brownsville hospitals and which remain uncollected for a total of $ 12,710.00. Based on discussions with Esther Garza, the hospital informs EMS whether the filing of the claim is the hospitals' or EMS's responsibility (depending on the type of coverage). If the hospital files the claim, then it will pay EMS directly. For all others the responsibility falls to EMS. If a claim is filed by EMS, the hospital charge is deleted from the system and reentered under the patient's account number. Therefore, no separate claims have been filed for these February runs.

We recommend that all past due hospital accounts be reviewed to verify that all claims have been properly filed and perform follow-up procedures on those that remain unpaid.

*Accounts Receivable Subsidiary*

We found that the accounts receivable subsidiary ledger contains data dating back to when the software was originally installed. The subsidiary contains 35,345 accounts receivable records totaling $ 6,655,381.55. The breakdown of the accounts receivable is as follows:

| Private/Cash | | Medicare/Medicaid | |
|---|---|---|---|
| Current | $ 66,225.60 | Current | $ 78,943.10 |
| 31-60 days | 102,973.65 | 31-60 days | 123,777.62 |
| 61-90 days | 108,087.28 | 61-90 days | 68,239.51 |
| 91-120 days | 709,037.03 | 91-120 days | 314,058.96 |
| Over 120 days | 3,277,463.09 | Over 120 days | 1,806,575.71 |
| | $ 4,263,786.65 | | $ 2,391,594.90 |
| Credits | $ 310,924.28 | Credits | $ 1,109,271.99 |
| Adjustments | $ 20,646.12 | Adjustments | $ 448,637.89 |

After speaking with Gail Bruciak, MIS Department, it was discovered that the credits as shown on the aging report are not credit balances. The amounts represent unapplied payments to the accounts. Actual credit balances totaled $ 69,235.16.

We expanded our testing and selected ten accounts with a credit balance over $100 and three accounts with a credit balance under $100 to determine the cause for the credits. Our tests revealed several reasons for these credit balances and were as follows:

    a. Clerical errors (i.e., applying payments to wrong account, coding payments incorrectly, etc.) was the most common.

    b. One account shows an overpayment of $1,050 by an insurance company. According to Esther, reimbursement has been made, but the account was not cleared. All reimbursements are run through the finance department. Currently, finance does not provide documentation to EMS confirming that the reimbursement was made.

    c. Two accounts indicate overpayment by the patient and no reimbursement has been made thus far.

    d. One account shows incorrect application of the payments received from AETNA insurance company. AETNA is currently withholding 31% from all checks because they do not have the City's correct federal identification number on file. AETNA requires appropriate documentation from the finance department to clear this up and discontinue the withholding.

We recommend that all credit accounts be researched and cleared up. The finance department should return to EMS documentation verifying payment of reimbursement checks. The situation with AETNA should also be addressed; 31 % of each check is lost revenue to the City. If possible, collection attempts should be made on all previously withheld amounts.

Accounts dating back many years are included in the over 120 days accounts listing. The present EMS staff does not know if the data has ever been purged. Based on our discussions with the EMS staff, accounts are rarely written off. Gail Bruciak stated that all accounts including those with zero balances are still in the system. No account will be deleted until they are instructed to do so. Because of minimal staff, collection efforts (prior to turning over to the collection agency) are practically nonexistent and it is difficult for the EMS staff to follow-up on medicare/medicaid denials. It was also mentioned to us that a complete subsidiary report has never been generated for EMS review; therefore, the data contained within the system has not been reviewed for potential collections or write-offs.

Additionally, the medicare/medicaid laws allow for a maximum of five appeals per denied claim. Currently, EMS will appeal a denied claim only twice due to staffing constraints.

We recommend that a complete review of the accounts receivable subsidiary ledger be performed. We suggest that all accounts over two years old be written off. Of the remaining accounts, any medicare/medicaid claims which have not been filed and for which time has lapsed, should be written off. Additionally, initial denials on which the time has lapsed to file the appeals should be written off.

EMS should be provided with a detail aging report of all accounts receivable. EMS (collection staff) should review the report and make every collection effort possible and clear up credit balances timely.

We recommend that an additional staff position be created _strictly_ for collection efforts. This person should devote 100% of his/her time in collecting past due accounts prior to turning them over to a collection agency and following up on medicare/medicaid claims. This new person coupled with a new EMS, industry specific software will promote improved efficiencies in both the billing and collection processes.

## _Additional Comments_

We noticed that the EMS administration facility is inadequate for the existing staff and required storage. It is also poorly located with no additional parking for customers/visitors. We recommend that the City explore the possibilities of moving the administration of EMS to a more centrally located area of the City and providing a larger building for staff, storage, and anticipated growth.

We were not engaged to, and did not, perform an audit, the objective of which would be the expression of an opinion on the specified elements, accounts, or items. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

This report is intended solely for the use of the specified users listed above and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

September 17, 1998

# EXHIBIT C



## CITY OF BROWNSVILLE
## AGENDA REQUEST FORM

ITEM # _____

| DATE OF MEETING: | OCTOBER 20, 1998 |
|---|---|
| NAME/DEPARTMENT: | E.M.S. DEPT. |

ITEM DESCRIPTION:

## CONSIDERATION AND ACTION TO AWARD A CONTRACT FOR THE PURCHASE OF THE "*SWEETSOFT*™ AMBULANCE *2000*" COMPLETE ACCOUNTS RECEIVABLE PROGRAM FOR USE BY THE CITY OF BROWNSVILLE E.M.S. DEPARTMENT.

RECOMMENDATIONS/COMMENTS:

## FAVORABLE ACTION IS REQUESTED.

FUNDING FOR THIS ACQUISITION WILL BE FROM THE GENERAL FUND.

SIGNATURE: _____

CITY MANAGER COMMENTS:

_____
_____
_____

SIGNATURE: _____

COMMISSIONER'S ACTION:

| VOTE: | AYES: | NAYS: | OTHER: |
|---|---|---|---|



# PURCHASING DEPARTMENT MEMORANDUM

Date:       15-Oct-98

To:         Mr. Carlos Rubinstein, City Manager

Via:        Mr. Pete Gonzalez, Finance Director

CC:         Mr. Art Rodriguez, E.M.S. Director

            Ms. Melissa Dennany Morales, City Secretary

From:       Paul J. Calapa, Purchasing / Contracting Officer

Subject:    Agenda item for City Commission meeting of October 20, 1998,
            "Consideration and Action to Award a Contract for the Purchase of the
            "*Sweetsoft*™ AMBULANCE 2000" Complete Accounts Receivable
            Software Program for use by the City of Brownsville E.M.S.
            Department".

Pursuant to Local Government Code § 252.022 General Exemptions: *"items that are available from only one source because of patents, copyrights, secret processes, or natural monopolies..."* are exempt from the Competitive Bidding Process. Inasmuch as this software is available only from the developer and copyright holder, Sweet Computer Services, Inc.™, the City of Brownsville may make this purchase without soliciting additional quotations.

Management of EMS is satisfied with the performance of this software. Various EMS facilities, including several in South Texas have proven positive experience using the product. Staff has met with Mr. Leonard Callier, Deputy Director of Harlingen EMS, to review the program and it's application. Mr. Callier has had the system installed for 8 years and is very satisfied with it. He pointed out the very specific nature of EMS billing and the system's capability to manage the various billing and aging methods required by agencies such as Medicare, Medicaid and private insurance.

It is significant to point out that in the findings and recommendations by the City's internal auditor to the Audit Committee a new accounting system specifically designed for EMS operations should be acquired. To quote from the Long, Chilton, Payte & Hardin, LLP September 17, 1998 report: *"An industry specific software would enhance the billing and collection processes and guarantee timely updates to any changes in the laws affecting medicare and medicaid."*

Summary financial information will be batched and transmitted to the Finance Department through the City's existing computer network.

The vendor has stated that the software is Y2K compliant.

The Computer Software Proposal from the vendor is attached for Commission consideration and action.

Case 1:00-cv-00180   Document 34   Filed in TXSD on 11/28/2001   Page 54 of 120

*RECOMMENDATION*

Staff recommends the following:

1. Award a Contract for the Purchase of the "*Sweetsoft*™ AMBULANCE *2000*" Complete Accounts Receivable Software Program to **Sweet Computer Services, Inc.**™ of West Union, IA, the sole source provider[1] at **$13,600.00** including the multi user base program, required modules, manuals, telephone support, installation, training and delivery.

Funding is available for this project from the General Fund.

[1] *Texas Local Government Code* - § 252.022

Attachments

# EXHIBIT D

Civil Action No. B-00-180

| | | |
|---|---|---|
| Juan Pequeño | § | U.S. District Court |
| | § | |
| vs. | § | Southern District |
| | § | |
| City of Brownsville, et al | § | Brownsville Division |

**City of Brownsville**
**City Commission Meeting 10/20/98**

**TRANSCRIPT**

**ITEM 12**   **Consideration and Action awarding the contract for the purchase of the Sweet Soft Ambulance 2000 Complete Accounts Receivable Program for use by the EMS Department**

1st Person (Art):   Honorable Mayor and Commissioners, pursuant to Local Government Code 252.022 "General Exemptions". Items that are available from only source because of patent, copyrights, secret processes, or natural monopolies are exempt from the competitive bidding process. Inasmuch as this software is available only from the developer and copyright holders Sweet Computer Service, Inc. The City of Brownsville may make this purchase without soliciting additional quotations. Management of EMS is satisfied with the performance of this software. Various EMS facilities including several in South Texas have proven positive experience using the product. Staff has met with Mr. Leonard Calliard, Deputy Director of Harlingen EMS to review the program and its application. Mr. Calliard has had the system installed for eight years and is very satisfied with it. He pointed out the very specific nature of EMS billing and the systems capability to manage the various billing and aging methods required by agencies such as Medicare, Medicaid and Private insurance. It is significant to point out that in the findings and recommendations by the City's Internal Auditor to the audit committee, a new

Page 1



accounting system specifically designed for EMS operations should be acquired. To quote from the Long, Chilton, Payte and Hardin, L.L.P., September 17, 1998 report, "An industry's specific software would enhance the billing and collection processes and guarantee timely updates to any changes in the laws affecting Medicare and Medicaid. Summary financial information will be batched and transmitted to the Finance Department through the City's existing computer network. The vendor has stated that the software is the year 2000 compliance. The computer software proposal from the vendor is attached for commission consideration and action. We do have one very slight change the EMS Director presented to me today the request to add one additional module to the package. The cost of that module is $895.00. The purpose of that module is to deliver the information in aske format. Which is a computer code format, which will allow for smoother interface to the City's existing system. The staff recommends the following, award a contract for the purchase of the Sweet Soft Ambulance 2000 Complete Accounts Receivable software program to Sweet Computer Services, Inc., West Union, Iowa, the sole source provider at $13,600.00 plus an additional $895.00 for the module just mentioned. Total amount $14,495.00 including the multi-user base program, all required modules, manuals, telephone support, installation, training and delivery. Funding for this procurement is available from the General Fund.

2nd Person:        Can we get a report back in about six months to see if this has helped us to keep our delinquencies.

1st Person (Art):  We can do that.

2nd Person:        Make a note that we do that, …

1st Person (Art):  Absolutely.

| | |
|---|---|
| 2nd Person: | because I think it's real important. It will pay for it's self real quick if it works. Motion to approve. |

2nd Person:    because I think it's real important. It will pay for it's self real quick if it works. Motion to approve.

1st Person (Art):    Yes, sir.

3rd Person:    Second.

Mayor Gonzalez:    All those in favor. Oh, oh. So is our computer expert.

4th Person (Pequeño):    I just want to point out a couple of things. I respect my colleague's opinions and you know in going with a ... looking another software, like Sweet Soft. In fact we got to demo it about eight months ago in this room ourselves. And, one of the things about it was that it was DOS base, and one of the main drawbacks of it. It started back in 1981. And, what that means is that when the PCs first started, that's what they first started with. And, basically... and we asked the consultant that was selling it you know, "When are you going to look at upgrading it." And, he really didn't know. And, the company does sell this software through out the country. But one of the things... we've been ...I look ah... This company has a web site on the Internet. And, I just found out about this on the Agenda. It was going to be on the Agenda this coming week from my... and ah. But anyway.... And I got together with Art. And, kind of last minute deal. But we have been collecting this year we have collected more than we ever have from Ambulance, $1.3 million. Last year it was $1.1 million. The year before .8, you know $800,000.00. So we have been going, cons... you know consecutively going up and up. The only from this that concerns me that we might be going a little bit backwards. Going with an older PC DOS base system. Also, the system that we have is working well. The bottom line you can look at the figures. Is money coming, you know, coming in? It is. And, it is attributed to two major factors, that we got a new computer three years ago. So we don't have wait on the computer any more like we use to. Plus also Art has implemented a lot of procedures. You know that

they have to ... the billings has to go out by a certain time. And, we implemented all these other processes that have helped the collection process. Plus he sent his people to get further training. And, I looked at the Internet, and the main thing to collection to increase revenue for Ambulance is education and learning how to use the program. Ah, after looking at it my recommendation is that this software just might not be the package for the City of Brownsville. But Art, you know, feels it is. But, but...

Mayor Gonzalez: But, let me suggest something, that maybe we table this for a couple of weeks and you all get together and iron this out, and be together on it to see that we are doing the right thing for the City.

4th Person (Pequeño):      See he ...

1st Person (Art):      May I make... After we met, I met with Mr. Pequeño on two of the issues that this running under DOS base character set. But it has been optimized for Windows NT, Windows 98, and Windows95. And, the next upgrade taking it into the Microsoft NTS server is due out in 18 months. Eight months ago they would not release that information because they did not have enough facts. In talking to the reps today. They already are nearing a Beta test date to release the software for Beta. Use Beta means that they release...

Mayor Gonzalez: But the salesman is going to tell you that to make the sale.

1st Person (Art):      But what I want to emphasize on that is ... I don't want to state that it is a DOS base program and become obsolete. It is being re... it is being optimized or recoded for the Windows NT environment.

Mayor Gonzalez: Well, I still would like to make the same recommendation, that you table it for a couple of weeks. You all get together on it. Get with the salesman and

whatever.   And, since Mr. Pequeño is the computer expert maybe you all can come up to a solution.

4th Person (Pequeño):       We just…

2nd Person:          Art or (inaudible) can answer this.

4th Person (Pequeño):       Well also we don't want … the issue of de-centralizing you know if, if… Say once we move more operations to like EMS, if any.  It is going to rely more on their department to maintain the whole system.  We won't be tied in as like we said in network.  That's not… we're not there yet.   You know with the fiber we can later connect the computers together and backup each others data.    But the assurance right now, like if something happens over EMS all the data we keep it safe. It is under lock and key.  And, that will be another issue that as you do that you open up the whole for security. More so than you are now.

5th Person:          Why is this the sole source?  Why do we try… we fit the software to our hardware.  What are we doing?

1st Person (Art):     We … no sir.  This is the application that tailors to the … if you have seen through out the few weeks.  There is a lot of industry specific.  That are specific to Medicare, Medicaid and the way it handles the account.  The point being made about network security was brought up.  And in fact the module that I added today would interface so that there would be no security breaches in the network. It can be done as safely as getting a diskette and hand carrying it.  Or it can be done on a secure network.

Mayor Gonzalez:  Well lets not get into a discussion here between personnel.

1st Person(Art):    Yes, sir.

Mayor Gonzalez:  Let's just table it for a couple of weeks. Commissioner…

| | |
|---|---|
| 2nd Person: | I will rescind my motion to make a motion to table for two weeks. |

2nd Person:    I will rescind my motion to make a motion to table for two weeks.

Mayor Gonzalez:    You all get together, and let's get the best thing that we can for our City. You all get together on it.

1st Person (Art):    Very well.

3rd Person (Pequeño)::    Very Good.

Mayor Gonzalez:    All those in favor.

Various Commisioners:    Aye.

Mayor Gonzalez:    Motion carries.


## TRANSCRIBER'S CERTIFICATION


I, Brenda Bustamante, do hereby affirm that I have transcribed an audiocassette containing Item 12 of the October 20, 1998, City of Brownsville, City Commission Meeting.


I transcribed the audiocassette to the best of my ability. I did not add or omit anything on this transcription.

_____

Brenda Bustamante


SHOULD YOU HAVE ANY QUESTIONS REGARDING THE ABOVE, PLEASE CONTACT ME AT (956) 440-1007.

# EXHIBIT E

Case 1:00-cv-00180   Document 34   Filed in TXSD on 11/28/2001   Page 63 of 120



# PURCHASING DEPARTMENT MEMORANDUM

Date:      23-Oct-98

To:        <u>City Staff Members and Internal Auditor</u>

Via:       Mr. Pete Gonzalez, Finance Director

CC:        Mr. Carlos Rubinstein, City Manager

From:      Paul J. Calapa, Purchasing / Contracting Officer

Subject:   Review Meeting

### Distribution:

Mr. Ivan Welker, Assistant City Manager
Mr. Pete Gonzalez, Finance Director
Mr. Arturo Rodriguez, EMS Director
Mr. Juan Pequeño, MIS Director
Mr. Carlos Barrera, Internal Auditor

- The committee will meet **Monday, October 26th,** at 9:00 AM at the City Manager's Conference Room, to review the proposed acquisition of the *Sweetsoft* EMS specific billing software.

- Please advise <u>at once</u> if you are unable to attend this meeting.

# EXHIBIT F

*Enclosure #1*

TO:    Carlos Rubinstein,  City Manager
       Ivan Welker, Assistant City Manager

From:  Juan Pequeno,  MIS Director

RE:    Proposal to continue in-house processing of EMS billing

Date:  October 29, 1998


REASONS FOR PROCESSING EMS BILLING IN-HOUSE:

I.  Around March of 1996 the EMS director and I met with EMS staff from Harlingen
    which have a similar size operation as Brownsville.  I noted the following differences:

|                              | Harlingen | Brownsville |
|------------------------------|-----------|-------------|
| Years in operations          | 8         | 10          |
| Platform(type of Computer)   | PC-base on Novell | HP3000 server |
| **# of staff on Collections** | **4**    | **2½**      |
| Software                     | Sweetsoft Inc (DOS based) | In-house (customized) and updated on a continuous basis with agencies |
| Cost of Implementation       | >$80,000  | In-house    |
| Yearly Maintenance Support   | $5,000    | In-house    |
| Yearly Collections           | $750,000  | >$800,000 in 1996 |
| In the past 2 ½ years        |           | Brownsville has now increased staff up to 5 |
|                              |           | Assigned 1 employee for collections only |

page 1 of 4

Implemented new collection procedures

Sent staff for medicare/medicaid training

Have achieved highest collection ever of
$1.3 million

In 1996, the city's in-house software was collecting more revenue and incurring
less costs in implementation, maintenance, and staff, than the comparable city which
was using the Sweetsoft software.   The city of Brownsville has continuously
increased its revenue over the last years up to where it is today at $1.3 million with
potential for future increases if further collection policies are adhered to by EMS
such as monitoring of aging report efficiently.

The city of Brownsville now has a person assigned exclusively to delinquent
collection,  making sure a notice of bill is sent to a customer promptly and also
placing a call to customers prior to sending bill to collection agency.  This alone
has greatly increased revenue collection for city of Brownsville.

II. Our current in-house EMS billing system was developed using 4th generation software
   following specific requirements from Medicare/Medicaid.  All facets of operations
   and billing have been automated over the past years.  The city's EMS system is
   customized to the EMS needs and to the federal government guidelines.  MIS has
   never missed a deadline of implementing a mandated computer change for
   Medicare or any other agency.

   MIS has had to continually retrain EMS personnel because of high turnover
   at EMS and MIS has also had to rush last minute changes on several occasions
   because of the untimeliness of receiving mandated changes from EMS department.
   It used to be months before MIS was advised about a  mandated change by EMS
   department.  This was corrected in-house by improved  communication.
   The sooner a government mandated change is received, the sooner
   the MIS department will schedule and implement accordingly.

III. Sweetsoft software is DOS-based and was develop in 1981.  Few companies or
   users are now using DOS based software.  For some unknown reason, this vendor
   has chosen not to update their software to Windows platform which is the
   future for the majority of the business world including the city of Brownsville.

Page 2 of 4

According to the vendor, his software can operate on WIN95 but it is still a 16 bit software. It does not have a graphical user interface (user friendly) (point/click); consequently, it requires a higher learning curve and this will not be an improvement over the city's current EMS system. Every major module offered by Sweetsoft is already in operations and customized at the city of Brownsville.

The current in-house EMS billing is one the best software the city has. MIS invested much time and effort to create the excellent and efficient system the city has today. The city could put this in-house software against any other billing EMS system that is in a similar situation as the City of Brownsville.

IV. Neither the city management nor the city internal auditor included the MIS department on consideration of purchasing EMS billing software.

It has been normal procedure for the auditors to "ask" MIS about the current system so they can see the full picture and make an unbiased finding. An example of such was the procedure with the findings at Municipal Court just a month ago. In this case, MIS was only "told" about this agenda item and, MIS was only told about this item "after" the item had already been placed on the city agenda for approval.

V. Finance department had a difficult time getting a copy of the auditor's EMS findings to MIS. After reading the misinformation and misleading statements in the auditor's finding on EMS concerning the need for a new system, MIS understands why a copy of this was delayed.

MIS has never missed a mandated computer change deadline from any government agency. It is also standard procedure for the MIS department when making computer software changes, to do thorough testing as any good organization would include. MIS' current method is extremely efficient, done accurately, and customized to the city's needs. The current EMS billing system is up to date with the latest changes mandated from medicare/medicaid.
It contains all the major modules for EMS billing and accounting and interfaces with the city's General Ledger for up to the minute financial data.

VI. It is also fact that SweetComputer Services, Inc is not the sole provider of ambulance EMS billing software in the U.S.A.   There are several other vendors with products that do the same similar functions of EMS billing and collections.


VII. The decentralization of EMS billing to their own department office would bring about duplication of data processing situations whose costs are currently already being absorbed by MIS; some of these are the following:

   a. an additional computer server
   b. an increased level of security threat to EMS data
   c. an increased level of security threat to their computers
   d. an increased level of fire or other natural disaster threat to EMS operations
   e. a duplication of EMS data
   f. maintaining accountability of data processing functions including backup of server by EMS personnel
   g. an increased reliance on outside vendors
   h. an increased reliance on software maintenance support


VIII. Instead of going backwards in time with the limited and DOS based Sweetsoft software, today's existing technology can join the eight billing and receiving locations spread throughout the city, and establish a "one-stop collection department".   This would simplify and improve the city's implementation of proper policies and collection and, this would also convenience our citizens of Brownsville.

Page 4 of 4

# EXHIBIT G

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JUAN PEQUENO,          )(
      Plaintiff     )(
                    )(
VS.                )(  CIVIL ACTION NO. B-00-180
                    )(
CITY OF BROWNSVILLE,  )(
ET AL.,           )(
      Defendants    )(

---

ORAL AND VIDEOTAPED DEPOSITION OF
ARTURO RODRIGUEZ
NOVEMBER 8, 2001

---

ORAL AND VIDEOTAPED DEPOSITION OF ARTURO
RODRIGUEZ, produced as a witness at the instance of the
PLAINTIFF, taken in the above styled and numbered cause
on NOVEMBER 8, 2001, reported by CORINNA N. GARCIA,
Certified Court Reporter No. 5210, in and for the State
of Texas, at The Law Offices of Frank Costilla,
P.L.L.C., 5 East Elizabeth Street, Brownsville, Texas,
pursuant to the Texas Rules of Civil Procedure.

COPY

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

11:55:22 1    commission?

11:55:22 2        A.  By the podium, and I was standing up there.

11:55:25 3        Q.  And then you made your comments after

11:55:26 4    Mr. Pequeno?

11:55:28 5        A.  Yes, sir.  And Mr. -- I think it was Mr. Welker

11:55:33 6    requested that it be tabled or -- I don't remember who

11:55:36 7    requested it be tabled.  Maybe the finance director.

11:55:41 8        Q.  And was it, in fact, tabled?

11:55:42 9        A.  The item was tabled to a later commission

11:55:45 10   meeting.

11:55:46 11       Q.  What was the -- what were the instructions that

11:55:48 12   the commission gave?

11:55:49 13       A.  To go back and come back in agreement.

11:55:54 14       Q.  Okay.  So after the meeting on October 20th,

11:55:58 15   what action did you have to take in order to resolve

11:56:04 16   this issue?

11:56:05 17       A.  Well, the commission got an impression that

11:56:10 18   Mr. Pequeno and I had not spoken on this issue, and

11:56:15 19   that's what I was upset over, because, in fact, I did

11:56:18 20   not blind-side him on this.  They knew it was coming.

11:56:21 21   They knew it was DOS-based.  They knew it was DOS-based

11:56:26 22   because I had told them it was DOS-based.  You know,

11:56:30 23   and my question was "If you never knew about this, then

11:56:33 24   how do you know it's a DOS-based program?  How do you

25   know that the software I've got and I'm presenting

11:56:40 1    tonight is DOS-based if you don't know anything about
11:56:40 2    it?" And I was mad at him for that reason because we
11:56:43 3    had talked about it and we had discussed the DOS-base
11:56:48 4    issue specifically.
11:56:49 5        Q.  Wouldn't Mr. Pequeno have known that it was
11:56:52 6    DOS-based based on the meeting that you all had in
11:56:58 7    Harlingen with Mr. Collier?
11:57:00 8        A.  Yes, sir.
11:57:04 9        Q.  So based on that meeting with Mr. Collier,
11:57:07 10   then, Mr. Pequeno was justified in knowing and saying
11:57:14 11   that it was DOS-based, wasn't he?
11:57:21 12       A.  If he had picked it up when we saw the
11:57:23 13   software -- you can pretty much pick up -- when you see
11:57:27 14   DOS software, you can see it by the screen that it
11:57:30 15   looks a little bit different.  You could.  But we had
11:57:35 16   talked about it beforehand, and that had been -- a real
11:57:41 17   concern of mine had been the DOS ability to it, but I
11:57:50 18   looked at what the capabilities of it were, and in
11:57:54 19   talking to companies, I knew that Windows versions of
11:58:01 20   this were down the road.
11:58:05 21       Q.  Okay.  So --
11:58:07 22       A.  So the DOS issue to me became a nonissue when I
11:58:12 23   knew that compatibility would continue, you know, you
11:58:17 24   could upgrade to the Windows version and not lose your
11:58:21 25   data in the database.  Because that was a big thing for

13:03:05  1          MR. MOORE:  Okay.  I think I'll reserve
13:03:15  2     the rest of our questions.  Pass the witness.
          3                    EXAMINATION
          4     BY MR. GARCIA:
13:03:21  5          Q.  Sorry, Mr. Rodriguez.  Just a few more.
13:03:24  6                    On October 21st did Mr. Welker instruct
13:03:28  7     you and Mr. Pequeno to meet and resolve the differences
13:03:34  8     you all had?
13:03:37  9          A.  Would the 21st have been the day after?
13:03:40 10          Q.  The day after the October 20th meeting you
13:03:42 11     indicated that you all met with Mr. Welker.
13:03:45 12          A.  Yeah, we met with Mr. Welker, and he wanted us
13:03:47 13     to come to a resolution on that, and, yeah, move on it.
13:03:51 14          Q.  Okay.  Did you and Mr. Pequeno ever meet one on
13:03:55 15     one to discuss it?
13:03:56 16          A.  We agreed that we would meet, and I did try and
13:04:01 17     I did place some phone calls.  And then after that I
13:04:04 18     took it that I guess we're both going to do our own
13:04:08 19     thing and meet for that meeting and discuss it there.
13:04:10 20     I didn't think anything of it.  I just thought,
13:04:14 21     "Well" --
13:04:14 22          Q.  So you made some attempts to contact him?
13:04:16 23          A.  Yes, sir, because I originally took it -- Ivan
13:04:20 24     to mean, "You both need to meet and discuss it."  But
13:04:27 25     since it wasn't happening, I took it as "Oh, I guess I

13:04:30 1   misunderstood.  We just need to do our own thing, and

13:04:33 2   when we meet on that meeting day, we're going to

13:04:36 3   discuss it as a group."

13:04:38 4        Q.  How many times did you attempt to contact

13:04:40 5   Mr. Pequeno?

13:04:42 6        A.  I can only think of at least two times.

13:04:50 7        Q.  And after that second attempt, you said that,

13:04:54 8   "Well, maybe we're just supposed to do" -- or you

13:04:57 9   thought that "Maybe we're just supposed to do our own

13:05:00 10  thing"?

13:05:01 11       A.  Well, I left messages to call me, and that's

13:05:05 12  what it was about.  And I just figured, "Well, I'll

13:05:05 13  move forward with it."  I didn't see it as a big old

13:05:07 14  meeting.  I mean, it was -- we both already knew what

13:05:11 15  the gist of what we had was.  It wasn't like a new

13:05:15 16  meeting of something we hadn't discussed.

13:05:18 17       Q.  Do you know if Mr. Pequeno ever made attempts

13:05:21 18  to contact you?

13:05:22 19       A.  I don't know, sir.

13:05:23 20       Q.  You don't recall ever seeing any messages?

13:05:26 21       A.  No, he could have and I may not have received

13:05:28 22  them.  I don't know that he did or didn't.

13:05:30 23       Q.  Okay.  After October 20th, did you ever feel

13:05:38 24  that Mr. Pequeno had failed to cooperate with you, with

13:05:45 25  regard to the instruction you had been given by

# EXHIBIT H

# CITY MANAGER'S OFFICE
## MEMORANDUM

TO:        Juan Pequeño, Director - MIS

FROM:      Carlos Rubinstein, City Manager

SUBJECT:   EMS Computer Program

DATE:      November 4, 1998

---

I have read the memo of October 29th you prepared relative to the aforementioned issue. The memo did not address the needs of this office, as communicated to you on October 27th. Please provide the following information:

1. Your understanding of the computer programming **needs** of BEMS. It would be very advisable to meet and discuss this issue with the EMS director as well as review and recognize the deficiencies noted in the recent internal audit of EMS.
2. A detail account of how MIS can satisfy the specific programming needs of BEMS. In this instance I am not interested in what has been provided for, but **how all documented needs** will be satisfied. Again it would be advisable to compare the services provided by the MIS code with those provided for and desired from the Sweetsoft program. Highlight those services provide by MIS which Sweetsoft does not provide for, as well as those Sweetsoft includes in its code and not provided by the MIS program.
3. Explain point V in your memo. Finance is an integral member of the Internal Audit Committee and as such is an immediate recipient of the internal auditor's findings and reports. Further explain how "MIS understands why a copy (of the report) was delayed", and the basis / intent of this comment.

I expect your response within the guidelines specified herein by Monday, November 9th at 4:00 PM. The City cannot afford to continue to delay resolution of this issue. I want this matter settled next week so that I can present management's recommendation a week from next Tuesday.

cc:    Ivan Welker, Assistant City Manager
       Pete Gonzalez, Finance Director
       Art Rodriguez, EMS Director



EXHIBIT

D

# EXHIBIT I

*Enclosure #2*

TO:    Carlos Rubinstein,  City Manager
       Ivan Welker, Assistant City Manager

From:  Juan Pequeno,  MIS Director

RE:    Response to memo received  11/05/98 - Asking for Proposal #2

Date:  November 9, 1998


SECOND PROPOSAL
TO CONTINUE  IN-HOUSE PROCESSING OF EMS BILLING

MIS memo of October 29, 1998 did address the current situation of
City's in-house EMS billing system. However, MIS will restate similar
information for perhaps a more clear understanding.


## CURRENT EMS SYSTEM EVALUATION OF $1.3 MILLION REVENUE


MIS' current evaluation is that the in-house EMS system is excellent, especially
in collection of revenue which is at an all time record high of $1.3 million.

The city of Brownsville has increased its revenue every year on a consistent
basis for the last four years.  The following facts have occurred
since October 1995:

   a) the city purchased a new HP3000 server which is fast, efficient,
      networkable and which has directly increased productivity
      for all city departments especially EMS data entry and electronic billing,

   b) EMS staff working with EMS billing systems has increased from
      2 ½ to 5 with one person assigned to calling and sending notices only,

   c) EMS has been able to train staff on processing claims


page 1 of 6

d) MIS has kept software updated with latest changes from government agencies within deadlines

e) MIS has provided continuous training on in-house software to EMS

f) MIS has in-house programmers assigned to make changes for EMS

## CURRENT IN-PROGRESS PROJECTS FOR EMS SYSTEM

The in-progress projects for EMS in-house system are:

a) Year 2000 conversion of EMS database and software to be completed by 4/99 and implemented by 10/99 - Scheduled FY99

b) additional system code for batch processing of claims -Scheduled FY99

c) insurance screen modifications (Combine screens)- Scheduled FY99

d) additional comments to be used for event history - Scheduled FY99

e) setup of pre-qualification screening of claims submitted - Scheduled FY99

## CURRENT IN-HOUSE ADVANTAGES OVER PC-BASED

Our in-house EMS billing system has the following advantages over any PC based system such as Sweetsoft:

1) customized to the city of Brownsville needs

2) complete interface with city's general ledger

3) provides high security of confidential EMS data with daily backup

4) faster processor than PC based

5) software written in 4th generation utilities (Cognos)

6) provides in-house programmers for quick response

7) lower maintenance and support cost for the city

8) updated continuously with latest changes to medicare/ medicaid

9) provides as needed in-house training

The current in-house EMS billing system is up-to-date with the latest changes mandated from medicare/ medicaid. It contains all the major modules for EMS billing and accounting and interfaces with the city's general ledger for up to the minute financial data.

CURRENT AND COMPLETED PROJECTS (STATED AS INCOMPLETE OR
NOT AVAILABLE BY EMS DIRECTOR
                    in memo of  September 25, 1998 to City Manager)


1) programs to send trauma reports to Texas department of Health -
   Implemented 11/96

2) addition of help screens for descriptions of different EMS codes

3) creation of reporting system based on ad-hoc needs that EMS requests
   (over 100 different reports for EMS needs)

4) option to add electronic BCBS remittance
   (put on hold by EMS staff who stated they did not have time to do)

5) option to print EMS claims to EMS PC printer
   (currently prints to EMS printer link to HP3000)
   (also put on hold by EMS staff)


This software is also not the sole source as stated by EMS director and
Purchasing.

# AUDITOR'S FINDINGS OF EMS AND FINANCE INEFFICIENCIES

In the internal auditor's findings on EMS, over 98% of the findings were about inefficiencies between EMS and Finance departments.

The inefficiencies involved current procedures:
either because of a lack of procedure or, not doing a process correctly.

Examples of these are the following:

1) not depositing money daily to the bank

2) having petty cash allowance at EMS which is city violation

3) misplacement of run reports by EMS staff

4) EMS and Finance not having setup procedure for
   writing off over 5 year accounts from EMS system

5) not filing proper papers with AETNA causing AETNA to
   withhold of 31% of claim

6) not following through with collections charges to hospitals

7) not efficiently using the age-trial report (30/60/90)
   consequently because EMS has "not written off 10 year accounts"

8) future increase in collections is possible if EMS continues to
   utilize proper collection policies and

9) future increase in collections by efficient use of the aging trial report
   which had not been used by EMS for the past four years

## MISREPRESENTATION OF FINDINGS
## WITH REGARD FOR EMS ACCOUNTING SYSTEM

A more serious matter that has occurred is that the internal auditor's finding
on a need for an EMS accounting system includes gross misrepresentation
of the facts.
The statements made by the internal auditor are false with regard to
the in-house EMS billing system.

MIS has never missed a mandated computer change deadline from any
government agency.
MIS' current method is extremely efficient, done accurately, and customized
to the city's needs.
The current EMS billing system is up to date with the latest changes mandated
from medicare/ medicaid.
It includes all the major modules for EMS billing and accounting and interfaces
with the city's general ledger efficiently.

It has been normal procedure for the auditors to "ask" MIS about the current
system so they can see the full picture and make an unbiased finding.
An example of this was with the findings at Municipal Court just a month ago.
However, the EMS finding was arrived at after talking with EMS staff only.

The city management, city audit committee, and EMS failed to involve
MIS on this evaluation of current in-house EMS billing system.
MIS was only "told" about this agenda item and, MIS was only told
about this item "after" the item had already been placed on the
city's agenda for approval.
Bypassing MIS and knowing about the misrepresentation of facts
involving MIS, city management placed this item for approval on
the October 20, 1998 agenda.

The audit finding on EMS was completed on September 17, 1998
even though MIS did not receive the audit findings until October 27, 1998.

This information/findings were never forwarded to MIS neither by
city management, nor by the internal auditor, nor by the audit committee.

Page 6 of 6

# EXHIBIT J



*Ivan Welker*
*Assistant City Manager*

November 24, 1998

Juan Pequeno, 2205
M.I.S. Director
City of Brownsville, Texas

Dear Mr. Pequeno:

Referencing my letter to you dated November 19, 1998, which was hand-delivered to your house on November 20, 1998, whereas, I outlined several points on which I was considering disciplinary action against you. To wit, your failure to follow instructions regarding your provision of specific written response(s), your exhibited insubordination during a meeting with the City Manager and myself; conduct which reflects unfavorably upon the City, plus your obvious refusal to work with and maintain friendly cooperative relations with, fellow employees. Further, my letter of November 19th indicated the use or attempted use of sick leave without proper cause.

In that same letter, you were afforded an opportunity to participate in a pre-disciplinary hearing scheduled for 11:00 a.m. today. You did not appear for the hearing or give me notice that you would not be in attendance.

Therefore, be advised that I have considered these charges and, it is my recommendation and decision *(Personnel Policies Manual, Chapter VII Discipline, Section 703: Grounds)* that you be separated from City service effective 5:00 p.m., November 24, 1998.

You may appeal this decision to the City Manager within five (5) working days. The decision of the City Manager is final.

Sincerely,

Ivan Welker
Assistant City Manager

cc:   employee file

EXHIBIT

A

# EXHIBIT K

# PERSONNEL POLICIES MANUAL

*CITY OF BROWNSVILLE*



CITY OF BROWNSVILLE

CITY HALL

P.O. BOX 911

BROWNSVILLE, TEXAS 78520

Adopted by Resolution of

The City Commission on

July 7, 1998

It must be made clear that the City reserves the right to determine the appropriate level of discipline for misconduct by City employees. The types of progressive discipline which may be given include, but are not limited to:

Oral Warnings-      Meet with the employee to discuss the matter. Inform the employee of the nature of the problem and the action necessary to correct it.

Written Warnings-   Issue a written reprimand to the employee describing the deficiency or infraction and the action necessary to correct it. Warn the employee that a subsequent incident will result in more severe disciplinary action up to and including termination, and prepare and forward to the Human Resource Department the Employee Warning Form.

Suspensions-        Issue a written reprimand and Notice of Suspension describing the deficiency or infraction and the action necessary to correct it. Warn the employee that a subsequent incident will result in more severe disciplinary action up to and including termination. Suspend the employee without pay for the amount of time as determined by the Department Director not to exceed thirty (30) days, OR suspend the employee indefinitely and recommend termination. Employees suspended from work will not receive or accrue any employee benefits during the suspension.

Demotion-           Issue a Demotion notice describing the reasons for such action. Also determine whether the demotion is in salary, position or both.

Dismissal-          Issue a notice describing the deficiencies or infractions involved and date of dismissal.

**Section 703: Grounds**

A. Persons who are already employed by the City on the effective date of this manual may be disciplined for just cause by a Department Director, a supervisor, or the City Manager as appropriate. Just cause includes, but is not limited to, illegal, unethical, abusive, or unsafe acts; violation of City rules, regulations, policies, or procedures; insubordination, neglect or abandonment of duties, participation in prohibited political activity or solicitation; abuse of sick leave or other benefits; tardiness or absence without leave; falsification of official documents or records; using or being under the influence of drugs or intoxicating beverages while on duty;

waste, damage or unauthorized use or disclosure of official information as well as those actions listed in Section 703 {C} of this manual.

B. Persons who become employed by this City after the effective date of this manual are at-will employees and nothing in this manual shall be construed to constitute a contract of employment, either expressed or implied.  Absent an expressed written contract specifically identifies the employee by name, no at-will employee is entitled to job tenure.  Although it is intended that the relationship between the City and its employees will benefit both, the relationship is terminable at will at any time by either the City or the employee.

C. For your guidance, the following is a partial list of actions that are considered against the best interest of the City and its employees.  Such actions as well as violations of the Code of Ethics also included in this Manual are subject to discipline up to and including termination.

    1. Thefts, abuse or deliberate destruction or defacing of property not belonging to the employee.

    2. Attempting to coerce an employee to join or resign from any employee association or organization by means of threats, intimidation, or abusive conduct.

    3. Falsification of City of Brownsville records, such as employment applications, time cards, expense reports, etc., or the reason for any employee's absence from work.

    4. Discourteous or abusive conduct toward members of the public.

    5. Revealing, without authorization, confidential information obtained in the course of employment, including confidential City records.

    6. Fighting or assaulting anyone on work premises or during working hours.

    7. Tampering with or using fire equipment for purposes other than fire prevention.

    8. Commission of any crime while on duty or on City premises or vehicles.

    9. Possession of unauthorized weapons or explosive materials on City premises or vehicles.

    10. Acceptance of any commission, kickback, discount, or other thing of value from persons or companies doing business with the City.

    11. Insubordination (refusal or deliberate failure to follow a reasonable, specific instruction of, or abusive conduct toward a supervisor).

12. Racial, religious, sexist or ethnic slurs or remarks.

13. Leaving work during working hours without the permission of the immediate supervisor.

14. Carelessness or negligence which results in the destruction or damage of property not belonging to the employee, or endangers life or property.

15. Participation in horseplay or practical jokes, or disorderly conduct of any kind while on work premises or during working hours, including the use of abusive, profane, or threatening language.

16. Careless or inefficient performance of duties, including failure to maintain proper standards of work performance.

17. Malicious gossip or false accusations which tends to destroy friendly relations between the City and its employees or between employees.

18. Failure or refusal to cooperate with fellow workers.

19. Operation of City vehicles without possession of valid and/or proper operator's license or failure to maintain satisfactory driving record.

20. Misappropriating City funds, property, or assets.

21. Possession of or being under the influence of drugs or intoxicating beverages or narcotics while on duty, on call or on City property, or reporting to work under the influence of intoxicants or narcotics.

22. Convicted of a felony or the distribution of a controlled substance in violation of State or Federal law.

23. Doing personal work on City time or property;

24. Willful violation or disregard of safety, fire, traffic, or other departmental regulations;

25. Loaning or permitting the duplication of keys to any property, equipment or buildings of the City of Brownsville;

26. Loafing, wasting working time, being out of the working area without permission, or sleeping on the job;

27. Posting of notices or signs, or writing in any form, on official bulletin boards, or removing approved notices, without the specific approval of the City Manager or his designated representative;

28. Conduct outside of work of a criminal, dishonest or immoral nature or other conduct which would reflect unfavorably towards the City of Brownsville;

29. Failing to report to supervisor upon returning from sickness or accident;

Certain of the actions described above are subject to criminal prosecution subject to Section 39.01 (titled "Official Misconduct") or other appropriate sections of the Texas Penal Code. All employees should be advised that the City may, but is not required, to pursue criminal charges in addition to disciplinary action as described in these guidelines.

It is not possible to list all rules of conduct, and the various forms of prohibited conduct identified in this Personnel Policies Manual are not necessarily all-inclusive of the reasons for which an employee may be disciplined or discharged. The City tries to avoid unnecessary restriction on your personal conduct because we feel certain that you will exercise common sense and follow the generally accepted customs of good taste. The degree of discipline imposed for a particular offense may vary, from an oral warning, to a written reprimand, to suspension or termination, depending on the circumstances.

## Section 704: Appeal of Disciplinary Action

### Actions which are appealable

All city employees have the right to appeal disciplinary actions including disciplinary terminations, which become a part of the employee's personnel record. "Personnel record" means the employee's permanent personnel file maintained in the Human Resources Department and any file maintained on the employee in the employee's department.

### Level One Appeal

An employee who wants to appeal disciplinary action must file a written statement within 5 working days with the employee's departmental director. The statement must set forth the nature and date of the disciplinary action taken, the name of the person who imposed the discipline, the reason why the employee believes the disciplinary action was not warranted, and the action which the employee wants taken if the employee's appeal is successful. The Department Director shall investigate the appeal and issue a written decision on the appeal within 7 working days of the Director's receipt of the appeal.

If the person who imposed the discipline is the employee's Department Director, the Level One appeal shall be directly to the City Manager who may delegate the investigation as if the appeal were a Level Two appeal.

### Level Two Appeal

If the employee is not satisfied with Department Director's decision, the employee may further appeal to the City Manager by submitting a written statement within 5 working days of the Department Director's written decision

to the City Manager. The written statement shall include the written statement submitted to the Department Director, a copy of the Department Director's written decision, and the reasons why the employee is not satisfied with the Department Director's decision.

The City Manager shall investigate the appeal in such a manner as the City Manager deems appropriate and issue a written decision within 7 working days of the City Manager's receipt of the employee's appeal. The City Manager may delegate the investigation to any assistant City Manager or any Department Director other than the Director whose decision is being appealed and may rely on that investigation on making a decision. The decision of the City Manager is final.

## Decisions on Appeals

During the course of the investigation, the employee may put such evidence before the person conducting the investigation as the employee deems pertinent. Any such evidence must be presented in a timely fashion so that the written decision can be delivered within the time deadlines prescribed in this manual.

Any written decision whether at Level One or at Level Two shall contain a succinct explanation of the reasons for the decision. The decision may affirm, reverse, or modify the disciplinary action, including making the disciplinary action greater or lesser that the discipline originally imposed. However, no discipline may be made more severe because the employee chose to appeal.

The decision of the City Manager (or the Department Director if there is no Level Two appeal) is final. There shall be no right of appeal to or action in any court except on constitutional or statutory grounds. The administrative remedy set out in this chapter is the exclusive remedy.

## Section 705: Grievances

A grievance is a complaint about the terms of an employee's employment or about the conditions under which he or she does the job. Examples include complaints about the employee's physical environment, the employee's treatment by their supervisor or co-workers, and alleged unlawful conduct or discrimination. Grievances do not include appeals from disciplinary measures because those appeals are covered by section 704 of this manual.

All city employees are free to take advantage of this grievance procedure at any time. City policy prohibits anyone from taking any adverse action against an employee for the sole reason that the employee filed a grievance in good faith. However, an employee who abuses the grievance processes by repeatedly filing grievances in bad faith may be subject to discipline.

Before an employee files a formal grievance, he or she should talk to the person about whom you intend to complain. Experience shows that many

grievances result from misunderstandings that could be avoided by prompt. effective communication.

## Step 1:

An employee may submit a written grievance to his or her immediate supervisor within five working days after the cause of the grievance arises or becomes known to the employee. If the grievance is not resolved to the employee's satisfaction by the supervisor within five days of the time the grievance was submitted, the employee may proceed to Step 2.

If the grievance is about the employee's immediate supervisor, the grievance process starts at Step 2. If the grievance is about the employee's department director, the grievance starts with Step 2 grievance submitted to the Human Resources Department.

## Step 2:

The written grievance shall be submitted to the employee's Department Director within three working days of completing Step 1. The Department Director shall then attempt to resolve the grievance. The Department Director must deliver a written decision on the grievance within five working days. The Department Director may extend the time for a decision by adding five working days by so notifying the employee in writing with a brief statement of the reasons for the extension. If the grievance is still not resolved to the employee's satisfaction, the employee may proceed to Step 3.

## Step 3:

The written grievance and a copy of the Department Director's decision may be submitted to the City Manager within three working days of completing Step 2. The City Manager shall deliver a written decision on a grievance within five working days. The City Manager may extend the time for a decision by an additional five working days by so notifying the employee in writing with a brief statement of the reasons for the extension. The City Manager's decision on the grievance is final.

Department Directors and the City Manager may delegate the processing of grievances to another managerial level City employee. However, a department director may not delegate a grievance to the employee's immediate supervisor and the City Manager may not delegate a grievance to the employee's Department Director.

# EXHIBIT L

1

```
1            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                    BROWNSVILLE DIVISION

3    JUAN PEQUENO,            )(
                Plaintiff     )(
4                             )(
     VS.                      )(    CIVIL ACTION NO
5                             )(    B-00-180
     CITY OF BROWNSVILLE,     )(
6    ET AL.,                  )(
                Defendants    )(
7    ------------------------------------------------

8              ORAL AND VIDEOTAPED DEPOSITION OF
                          IVAN WELKER
9                      NOVEMBER 2, 2001

10   ------------------------------------------------

11        ORAL AND VIDEOTAPED DEPOSITION OF IVAN WELKER,

12   produced as a witness at the instance of the

13   PLAINTIFF, taken in the above styled and numbered

14   cause on November 2, 2001, reported by ELIZABETH F.

15   TORRES, Certified Court Reporter No. 5516, in and

16   for the State of Texas, at the law offices of

17   Willette & Guerra, L.L.P., International Plaza,

18   Suite 460, 3505 Boca Chica Blvd., Brownsville,

19   Texas, pursuant to the Federal Rules of Civil

20   Procedure.

21

22

23

24

25                                      ORIGINAL
```

BRYANT & STINGLEY, INC.
McAllen          Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

13:31:46   1   by "concern?"

13:31:50   2      Q.   Well, as far as the cost of buying the

13:31:58   3   program, who would have been concerned about the

13:32:00   4   price?

13:32:02   5      A.   Who would have been concerned?

13:32:06   6      Q.   What department or what individuals with

13:32:06   7   the City --

13:32:10   8      A.   It would be the Finance office, myself,

13:32:10   9   and the City Manager.

13:32:12   10      Q.   Okay.

13:32:18   11      A.   Ultimately by -- through the City

13:32:18   12   Commission, because we'd have to go through them

13:32:22   13   for authority to -- to award a contract.

13:32:24   14      Q.   Okay. Did you know what the Sweetsoft

13:32:26   15   software was going to cost? Or did you have an

13:32:26   16   idea?

13:32:30   17      A.   I had a basic idea, but it was -- it was

13:32:38   18   not accurate. It was several thousands of dollars.

13:32:44   19      Q.   Do you know what the -- let me ask you

13:32:48   20   this. Do you know if the Sweetsoft software was

13:32:50   21   ultimately purchased by the City?

13:32:52   22      A.   Yes, it was.

13:32:54   23      Q.   All right. Do you know how much it cost

13:32:54   24   the City?

13:32:54   25      A.   I don't remember.

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

1:33:04  1      Q.    Okay.  When you left in June of this year,

1:33:08  2  was it still being utilized by the EMS department?

1:33:08  3      A.    Yes.  Uh-huh.

1:33:18  4      Q.    Do you know if it -- did you ever make a

1:33:24  5  comparison after -- after the new software was put

1:33:28  6  in place and was working, did y'all ever -- or did

1:33:32  7  anybody ever make a comparison as to how well it

1:33:36  8  was functioning compared to how well the previous

1:33:38  9  in-house software was functioning?

1:33:42 10      A.    I'm not sure of that, but I know that it's

1:33:48 11  taken a longer period of time than probably would

1:33:50 12  have -- City had originally anticipated for

1:33:54 13  wrapping up to learn how to use that system.

1:34:00 14      Q.    Explain that to me.  Does that mean

1:34:02 15  that --

1:34:06 16      A.    There was a long learning curve.

1:34:08 17      Q.    Okay.  And who was involved in that

1:34:12 18  learning curve?  Obviously the EMS department

1:34:12 19  personnel.

1:34:14 20      A.    Yes, sir.

1:34:16 21      Q.    How about the MIS department personnel?

1:34:18 22  Did they have any more involvement once this new

1:34:20 23  software was purchased?

1:34:22 24      A.    Very little.  Very little.

1:34:30 25      Q.    So were the MIS department's duties to EMS

BRYANT & STINGLEY, INC.
     McAllen            Harlingen            Brownsville
 (956)618-2366      (956)428-0755       (956)542-1020

14:02:24  1    A.    At the time, it's my opinion, no.    It was

14:02:28  2    an administrative matter, it should be taken care

14:02:30  3    of prior to that meeting.   So if there was a

14:02:36  4    problem, it would have given staff a chance to say

14:02:38  5    we want to postpone action on the item or not

14:02:40  6    address the item at all or go ahead and buy the --

14:02:42  7    buy the software.   That was not done.

14:02:52  8    Q.    All right.   Do you -- do you remember --

14:02:54  9    do you recall who else spoke at that meeting with

14:02:56  10   respect to this agenda item?

14:03:02  11   A.    I don't really.   I would think that --

14:03:06  12   that Pete Gonzalez and Paul were going to speak or

14:03:10  13   were speaking, but I can't be sure.

14:03:14  14   Q.    Okay.   As I understand, you and maybe

14:03:18  15   others were caught off guard by Mr. Pequeno's

14:03:18  16   statements.

14:03:22  17   A.    Well, we were -- we were not off guard,

14:03:26  18   but we were surprised at the statements when the

14:03:30  19   policy has been, "If there's a problem or if

14:03:34  20   there's a concern, bring it to the City Manager's

14:03:34  21   office's attention."

14:03:40  22   Q.    Okay.   Did Mr. Pequeno, speaking out at

14:03:42  23   that October 20th meeting, factor into your

14:03:44  24   decision to terminate him?

14:03:50  25   A.    His failure to follow administratively

43

EXHIBIT 1

| | | |
|---|---|---|
| 4:03:54 | 1 | that -- that process, that was a reason for |
| 4:03:56 | 2 | bringing him in, yes. |
| 4:03:58 | 3 | Q.   So -- |
| 4:04:00 | 4 | A.   Grounds for disciplinary action. |
| 4:04:02 | 5 | Q.   So it did factor into your decision to |
| 4:04:04 | 6 | terminate him?  Yes or no? |
| 4:04:06 | 7 | A.   Grounds, yes. |
| 4:04:18 | 8 | Q.   If the -- do you recall how the transition |
| 4:04:22 | 9 | took place between the new software and -- and the |
| 4:04:24 | 10 | old in-house system? |
| 4:04:26 | 11 | A.   No.  No, sir.  I don't know that. |
| 4:04:28 | 12 | Q.   Would that be something that maybe Gail |
| 4:04:30 | 13 | would know or -- |
| 4:04:38 | 14 | A.   Gail Bruciak might know, Pete Gonzalez |
| 4:04:42 | 15 | might know, and then Purchasing agent, Paul Calapa |
| | 16 | might know. |
| 4:04:44 | 17 | Q.   And Art? |
| 4:04:46 | 18 | A.   Yeah, Art. |
| 4:04:46 | 19 | Q.   Art, as well? |
| 4:04:48 | 20 | A.   Art, of course.  I'm sorry. |
| 4:05:04 | 21 | Q.   Okay.  The next document I'm going to |
| 4:05:06 | 22 | reference is Exhibit No. 5. |
| 4:05:06 | 23 | A.   Okay. |
| 4:05:22 | 24 | Q.   I understand this memo is a -- was |
| 4:05:26 | 25 | distributed to several individuals and there was |

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

14:59:34    1      A.    Because I was representing the City

14:59:34    2    Manager's office.

14:59:42    3      Q.    And if the decision of the City Manager is

14:59:48    4    final, was he representing the City?

14:59:50    5      A.    I was representing -- representing the --

14:59:52    6    the City.  I was stating it again.

15:00:04    7      Q.    Okay.  But in no way was your decision

15:00:06    8    simply a recommendation?

15:00:08    9      A.    No.  No.  I had full authority to

15:00:10   10    terminate.

15:00:14   11      Q.    When an employee appeals the termination,

15:00:26   12    has that employee -- does that employee need to be

15:00:34   13    rehired if -- say, for instance, an employee is

15:00:38   14    terminated, and then that employee decides to

15:00:44   15    appeal the decision, and on appeal, his job is --

15:00:54   16    his or her job is reinstated.  Does that employee

15:01:00   17    become -- is that employee considered a rehire at

15:01:00   18    that point?

15:01:02   19      A.    No.  It's as if nothing ever happened.

15:01:04   20      Q.    Okay.

15:01:06   21      A.    With the exception of corresponding

15:01:10   22    paperwork which is kept in that file.

15:01:12   23      Q.    So, then, would it be fair to say that an

15:01:16   24    employee is terminated subject to --

15:01:18   25      A.    An appeal process.

15:01:20  1        Q.   An appeal process.

15:01:22  2        A.   Should they -- should they choose to go

15:01:22  3   through the appeal process.

15:01:26  4        Q.   And after that appeal process is

15:01:28  5   finalized, that's it?

15:01:32  6        A.   Yes.   Final authority is the City

15:01:36  7   Manager's office.   It gets no higher.

15:01:40  8        Q.   Were you ever responsible for addressing

15:01:42  9   an appeal of termination?

15:01:44 10        A.   Yes.

15:01:48 11        Q.   In this instance --

15:01:50 12        A.   Other than Juan?

15:01:52 13        Q.   Other than Juan.

15:01:54 14        A.   Oh, yeah.   Sure.   Yes, sir.

15:01:58 15        Q.   Is that something that you and Mr.

15:02:02 16   Rubinstein shared duties on?

15:02:04 17        A.   Generally, I handled all of the appeals.

15:02:04 18        Q.   Okay.

15:02:12 19             THE VIDEOGRAPHER:   I'm sorry.   Can I

15:02:12 20   have a quick break?   I need to swap tapes.

15:03:00 21             MR. GARCIA:   Okay.

15:03:00 22             (Off the record.)

15:03:08 23        Q.   Mr. Welker, we're going to go back to

15:03:14 24   Exhibit No. 9, I believe.

15:03:16 25        A.   That one?

# EXHIBIT M



**Carlos Rubinstein**
City Manager

December 14, 1998

Mr. Juan Pequeño
P.O. Box 5692
Brownsville, Texas 78523

Dear Mr. Pequeño:

      This letter is my written decision on your appeal of your November 24, 1998 termination and is being sent to you in accordance with Section 704 of the Personnel Policies Manual of the City of Brownsville. You were given the opportunity to place before me any information that you deemed appropriate as required by the Manual but did not submit anything. Based upon my review of all the evidence, I find:

1. On November 19, 1998 you were placed on administrative absence with pay and were given written notice that the City of Brownsville was contemplating disciplinary action against you and that a pre-disciplinary hearing was scheduled for November 24, 1998 at 11:00 a.m. That notice set forth the basis for the disciplinary hearing.
2. Neither you nor anyone on your behalf appeared for the pre-disciplinary hearing.
3. On November 24, 1998, the assistant city manager decided that you would be separated from City service effective 5:00 p.m. on November 24, 1998 and a written notice to that effect was delivered to you on November 24, 1998. That notice also informed you of your right to appeal.
4. On December 3, 1998, the fifth working day after you were notified of the assistant city manager's decision, I received your request for an appeal.
5. On December 4, 1998, a written notice was delivered to you setting your appeal hearing for December 7, 1998, at 9:30 a.m.
6. On Sunday December 6, 1998, you faxed a memo to my office that you would not attend the appeal hearing "due to illness."
7. On December 7, 1998, a notice was delivered to you that your appeal hearing had been rescheduled for December 9, 1998 at 2:00 p.m.
8. On December 9, 1998, you faxed a memo to my office that you would not attend the appeal hearing due to illness.
9. On December 10, 1998, a notice was delivered to you advising you of your right to submit to me any documentary evidence by 4:00 p.m. on December 11, 1998 so that I could render a written decision by December 14, 1998 as required by Section 704 of the Personnel Policies Manual.
10. On December 11, 1998, you faxed a memo to my office that you would not deliver any documentary evidence in connection with your appeal.

I conclude:

1. All Provisions of the Personnel Policies Manual of the City of Brownsville dealing with discipline of employees and the employee's right of appeal have been followed including giving you adequate opportunity to put before me anything you deemed appropriate in connection with your appeal.
2. The information before me fully justifies the assistant city manager's decision of November 24, 1998.
3. The decision of the assistant city manager that you be separated from City service effective November 24, 1998 at 5:00 p.m. is affirmed in all respects.

Very truly yours,

Carlos Rubinstein
City Manager

cc:     Efren Fernandez, HR Director
        Joseph Graham, Assistant City Attorney
        John Chosy, Legal Counselor
        File



Carlos Rubinstein
City Manager

December 14, 1998


Mr. Juan Pequeño
P.O. Box 5692
Brownsville, Texas 78523

Dear Mr. Pequeño:

This letter is my written decision on your appeal of your November 24, 1998 termination and is being sent to you in accordance with Section 704 of the Personnel Policies Manual of the City of Brownsville. You were given the opportunity to place before me any information that you deemed appropriate as required by the Manual but did not submit anything. Based upon my review of all the evidence, I find:

1. On November 19, 1998 you were placed on administrative absence with pay and were given written notice that the City of Brownsville was contemplating disciplinary action against you and that a pre-disciplinary hearing was scheduled for November 24, 1998 at 11:00 a.m. That notice set forth the basis for the disciplinary hearing.

2. Neither you nor anyone on your behalf appeared for the pre-disciplinary hearing.

3. On November 24, 1998, the assistant city manager decided that you would be separated from City service effective 5:00 p.m. on November 24, 1998 and a written notice to that effect was delivered to you on November 24, 1998. That notice also informed you of your right to appeal.

4. On December 3, 1998, the fifth working day after you were notified of the assistant city manager's decision, I received your request for an appeal.

5. On December 4, 1998, a written notice was delivered to you setting your appeal hearing for December 7, 1998, at 9:30 a.m.

6. On Sunday December 6, 1998, you faxed a memo to my office that you would not attend the appeal hearing "due to illness."

7. On December 7, 1998, a notice was delivered to you that your appeal hearing had been rescheduled for December 9, 1998 at 2:00 p.m.

8. On December 9, 1998, you faxed a memo to my office that you would not attend the appeal hearing due to illness.

9. On December 10, 1998, a notice was delivered to you advising you of your right to submit to me any documentary evidence by 4:00 p.m. on December 11, 1998 so that I could render a written decision by December 14, 1998 as required by Section 704 of the Personnel Policies Manual.

10. On December 11, 1998, you faxed a memo to my office that you would not deliver any documentary evidence in connection with your appeal.

EXHIBIT

B

I conclude:

1. All Provisions of the Personnel Policies Manual of the City of Brownsville dealing with discipline of employees and the employee's right of appeal have been followed including giving you adequate opportunity to put before me anything you deemed appropriate in connection with your appeal.
2. The information before me fully justifies the assistant city manager's decision of November 24, 1998.
3. The decision of the assistant city manager that you be separated from City service effective November 24, 1998 at 5:00 p.m. is affirmed in all respects.

Very truly yours,

Carlos Rubinstein
City Manager


cc:    Efren Fernandez, HR Director
       Joseph Graham, Assistant City Attorney
       John Chosy, Legal Counselor
       File

# EXHIBIT N

Case 1:00-cv-00180   Document 34   Filed in TXSD on 11/28/2001   Page 108 of 120



## November 2000                                        Back

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| 29<br><br>Daylight Savings Time Ends [USA] | 30 | 31<br><br>Halloween [USA] | 1 | 2 | 3 | 4 |
| 5 | 6 | 7<br><br>Election Day [USA] | 8 | 9 | 10 | 11<br><br>Veteran's Day [USA] |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23<br><br>Thanksgiving Day [USA] | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 1 | 2 |

Print Date: **Nov 16 11:56am**                *Copyright © 2001 Yahoo! Inc. All Rights Reserved.*

# EXHIBIT O

To:     Carlos  Rubinstein, City Manager

From:  Juan Pequeno,  MIS Director

Re:     Appeal of the decision by Assistant City Manager and City Manager
        to separate  MIS Director from city

Date:  December 2, 1998


The assistant city manager and you are incapable of making unbiased evaluations,

recommendations, or decisions about me as the MIS director for the

city of Brownsville; both of you have  been malicious, prejudicial, and

unconscionable as proven by your bad faith and deceiving schemes of harassment

with continuous lies, threats, and uncontained emotional outbursts of intense

rage and fury.


I, Juan Pequeno, hereby appeal the decision by the assistant city manager and

city manager and request that all lawful due process be administered to me

by the city.

# EXHIBIT P

Lidia- Today is November 23, 1998, and it is 10:51 in the morning. We are here to take a statement in reference to the purchasing procedures used in the purchase of software for EMS. Present at this statement is Paul Calapa, Efren Fernandez, and myself Lidia Gonzales. Would you raise your right hand, do you swear to tell the truth, the whole truth and nothing but the truth so help you God?

Paul- Yes ma'am, I do.

Efren- Basically we are here just for one question, there has been a question that has risen over a software that was purchased for EMS. The question that was brought up was whether it was the only software that was available, that if we in fact purchased it under, everything was legally done, so, we just wanted to here what, you know, what procedure you use and that type of thing to make sure we have it documented what was done.

Paul- First of all, the first thing the purchasing department doesn't initiate purchases, the purchasing department follows a process, procurements are asked for us to be made by the user departments. In this case, the director of EMS, Art Rodriguez, requested that we procure for him a product called Sweetsoft Ambulance 2000. To my understanding Sweetsoft Ambulance 2000, is a billing software that would be utilized by the EMS Department for their billings on the ambulance (garbled). What he approached me with the information and a quote, which he had received, from Sweetsoft, I looked at the package, asked him for several items, which he complied with. One of the items was the statement or some information from the manufacturer of this product that it was copyrighted, and if it was available through distributors, or if it was available only from the company that writes the software. After pursuing that avenue, we determined that the Sweetsoft Ambulance 2000 was available only from that company, Sweetsoft, which is a trademark name. The software is copyrighted, according to the documentation received from Sweetsoft. The other thing that I asked just as a side part to this conversation, would be that we go to the nearest facility that had the software installed, so that we can take a look at a demonstration of it. We did, we went Harlingen EMS, visited with Leonard Calier there who is the Deputy Director of EMS to determine that the product, other things that I always like to do is to make a determination to assist the departments in what they are buying is actually legitimate, and will work as it is quoted to work, as apposed as simply taking literature from the manufacturer or an advertisement, or a demonstration from a salesman. That helps us to insure that what they are receiving will perform to the way they stated, and we satisfied that. The next thing that we did was, we took this item to the city commission, procurement, state procurement practices require that any purchase $15,000 or more be authorized by the city commission, this purchase as you may recall, is for under $15,000, in fact the exact amount was $14,495, as a matter of course, however, departments when they are going to procure something which is for them a major procurement, always have the option of taking it before the city commission, and my understanding is that after Mr. Rodriguez spoke to our City Manager, they decided that it would be good to take it to the city commission, so that the commissioners would have knowledge of the advantages and the rational for taking this. The other reason that Mr. Rodriguez was making this procurement was based on audit, which was done by the City's internal auditor at a presentation made to the audit committee. This audit is dated September 17th, 1998, and it is also referenced in my agenda item so (garbled). That was one of the reasons for the impetus for Mr. Rodriguez going out looking for this particular software. Now as to the issue of the procurement, and the legality of the procurement, I would like to point out to you the opening paragraph, and my remarks to the City Commission. And I quote, this was stated on October the 20th, and is stated again on October the 29th to the City Commission, the item was tabled on October the 20th, and then brought back in on October the 29th, immediately after that, which would be November 17th, was when this item was brought to the commission and was approved. First paragraph:

> Pursuant to local government code, Section 252.022 on the general exemptions, items that are available from only one source because of patents, copyrights, secret processes, or natural monopolies, etc., are exempt from the competitive bidding process.

I go on to say (garbled) this software is available only from the developer and copyright holder Sweet Computer Services Inc. the City of Brownsville may make this purchase without soliciting additional quotations. To the best of my knowledge, and the best of my understanding, the City did not violate any procurement regulations or statutes in making this purchase, Hum, to approach it from a logical point of view, if the material is copyrighted, then obviously there are limited sources where it can be purchased. Now, the issue may have been for the interpretation of the question that you asked me may have been, could other software be available to do the job, which would be, the analogy I could be, if you needed to buy a particular type of automobile, could another automobile get you there? The answer obviously is, yes there probably is more than one type automobile, and there probably may be other types of software that do this, but it is not the role of the purchasing department to seek out all the different types of vendors for the particular procurement that the department might need. It is simply our role to insure that the department can procure the item or the service, in this case the software, and doing it legally. An example would be when we purchased books for the library, it was also exempt. As a matter of fact we purchased items for the MIS department, which are procuring in the same fashion. An example of that would be the annual contract for maintenance on the Hewlett Packard system is available from Hewlett Packard. It is a similar type of procurement.

Efren- Well I think you have told us a whole lot. But that really is all the information we needed to make sure that we had a statement as to how it was done. That is all I have

Lidia- We close this statement at 11:00am. Thank You.

# EXHIBIT Q



| | | |
|---|---|---|
| **CLASS TITLE:** | **CITY MANAGER** | **EXEMPT** |
| **SALARY:** | **NEGOTIABLE WITH EXPERIENCE** | |
| **DEPARTMENT:** | **CITY MANAGER** | |
| **REPORTS TO:** | **CITY COMMISSION** | |

## JOB SUMMARY:

Appointed by and reports to five (5) member City Commission consisting of a Mayor and four Commissioners. Serves as the chief administrative and executive officer of the City; assures that all laws and city ordinances are enforced; and does related work as required.

## ESSENTIAL JOB FUNCTIONS:

The City Manager is the chief administrative and executive officer of the City. Incumbents are responsible to the City Commission for the proper administration of all the City affairs assigned to the City Manager by charter, ordinances or direction of the Commission. Tasks performed include: appoints department directors; performs administrative tasks required to maintain executive control of the functions of various departments; prepares policy and procedural proposals for review and adoption by the City; approves budget proposals prepared by the budget director and submits the budget for adoption by the Commission; monitors execution of the budget during the year and advises the Commission concerning the financial status of the City; delegates administration of law enforcement through the City Police Department; executes deeds, deeds of trust, easements, releases, contracts and other instrument binding the City to financial obligations; attends meetings of the City Commission to receive instructions and policy; reviews operations franchised by the City to insure that obligations are met and dictates correspondence and memorandums; the City Manager or a designee will represent the City in professional and civic organizations and other meetings as appropriate. Performs other related duties as required.

## MATERIALS AND EQUIPMENT USED:

Personal computer          General office equipment

## Knowledge, Skills, and Abilities:

Knowledge of all phases of city administration to include methods for establishing appropriate policies and procedures. Laws governing conduct of city administration.

Skills in effectively communications with people of diverse backgrounds, including appointed and elected officials and employees; expertise in collective bargaining negotiations and coordination; responsible expertise with the Local Government Code - Chapter 143 (Civil Service: Fire and Police).

## MINIMUM QUALIFICATIONS REQUIRED:

### Education and Experience:

Bachelor's degree (Master's preferred) from an accredited college or university in Public Administration or related field. Must possess ten (10) years municipal government managerial experience or equivalent. Private sector experience considered. Must demonstrate proven skills in urban planning, public administration and T. Q. M.

### License and Certifications:

Valid driver's license and satisfactory motor vehicle record.

## BENEFITS:

The City of Brownsville offers an excellent retirement system, vacation, sick leave, health and life insurance.

## HOW TO APPLY:

A resume may be submitted to:

**CITY OF BROWNSVILLE**
**HUMAN RESOURCES DEPARTMENT**
**P.O. BOX 911**
**BROWNSVILLE, TX  78522**
**EEO/ADA/AA**

**IF YOU NEED AN ACCOMMODATION, PLEASE CALL:**
**(210) 548-6058 OR VOICE/TDD (210) 548-6037**

**OPEN FOR APPLICATION BY CITY EMPLOYEES AND BY PUBLIC**
**DURING_____**

| CLASS TITLE: | *ASSISTANT CITY MANAGER* | *FLSA STATUS: E* |
|---|---|---|
| DEPARTMENT: | *CITY MANAGER* | |
| SALARY: | *$5435.92 – 6251.33* | |

## JOB SUMMARY:

Provides support to the City Manager in the performance of delegated responsibilities for city administration. Supervises major municipal activities. Directs and supervises the overall operations of a diverse group of City Departments and Directors. Makes recommendations for service improvements and policies.

## ESSENTIAL FUNCTIONS:

Supervises and reports interdepartmental activities.

Develops long-range goals, objectives, organizational structure and overall direction for various departments.

Coordinates and assists in providing the annual operation budget to the City Manager

Provides revenue forecasting and analysis.

Negotiates contracts and other legal agreements with outside agencies and contractors.

Performs the duties of the City Manager in his absence.

Serves as liaison with other governmental jurisdictions and outside agencies; represents the City at various functions such as making speeches at civic and business associations, meeting with influential persons within the community, developers, officials, citizens, and representatives of the press, to establish goodwill and resolve/respond to issues.

Directs, communicates and monitors policies, procedures and standards and recommends and initiates improvements when necessary.

Establishes and maintains effective working relationships with City officials, other departments and the general public.

Directs special projects when needed, including establishing strategic planning, economic development, capital improvements and special construction projects.

Performs other related duties as required.

Develops, communicates and monitors policies, procedures, and standards and recommends improvements when necessary.

Assists in supervising and coordinating the day to day operations of the City government.

Assists in the development of major administrative policy.

Assists in the recruitment of executive personnel and in overall organization development.

## MATERIALS AND EQUIPMENT USED:

General Office Equipment                    Personal Computer

## MINIMUM QUALIFICATIONS REQUIRED:

### Education and Experience

Extensive professional knowledge of the principles and practices of city administration and operation as normally acquired through completion of a Bachelors degree in Government, Public Administration, or related field, or equivalent years of training and experience.

At least six years or more of progressively complex and responsible related work experience, which includes three to four years of responsible managerial experience, in order to effectively develop and direct multiple departments, missions and operations.

### Licenses and Certifications:

Must possess a valid state driver's license and satisfactory motor vehicle record.

## KNOWLEDGE, SKILLS AND ABILITIES:

Knowledge of administrative planning and program development.

Knowledge of Budget preparation.

Knowledge of local government management and business theory, practice and administration in order to oversee planning and implementation of all department functions.

Knowledge of principles and practices of organization management, supervision, accounting. personnel, data processing and budgeting.

Knowledge of applicable state, federal and local laws, rules and regulations.

Knowledge of administrative principles and practices, including goal setting and program budget development and implementation.

A very high level of analytical skills necessary in order to develop and implement division mission, goals and procedures; determine needs for capital expenditures, personnel and operating budgets.

An advanced level of interpersonal skills necessary in order to provide effective leadership to subordinate management, as well as to develop cooperative working relationships with employees, senior management, elected officials and other governmental agency officials.

An extensive knowledge and skills related to Fire & Police Collective Bargaining negotiations and contract administration; and extensive familiarity with Texas Firemen's and Police Civil Service law of the Texas Local Government Code Chapter 143 and related statutes.

Ability to plan, assign, and coordinate the work required within a municipal department.

Ability to prepare and present reports; understand and carry out oral and written directives; present ideas clearly and effectively, orally and in writing; and work with figures.

Physical ability to lift articles, sometimes weighing up to 20 pounds maximum and carrying of objects weighing up to 20 pounds; pushing and/or pulling objects weighing up to 20 pounds maximum.

Works in a normal office environment where there are little or no physical discomforts associated with changes in weather or discomforts associated with noise, dust, dirt and the like.

Duties are usually performed seated. Sitting is relieved by brief or occasional periods of standing or walking.

This class specification should not be interpreted as all inclusive. It is intended to identify the major responsibilities and requirements of this job. The incumbents may be requested to perform job-related responsibilities and tasks other than stated in this specification.

<u>BENEFITS</u>:

City of Brownsville offers benefits including a retirement system, vacation, sick leave, health and life insurance.

<u>HOW TO APPLY</u>:

Application forms are available at City Hall or at http://hr.ci.brownsville.tx.us .

Applications and resume may be submitted to:

City of Brownsville
Human Resources Department
P O Box 911
City Hall / Market Square
Brownsville, Texas 78522-0911
EEO/ADA/AA

If you need an accommodation, please call
(210) 548-6037 or (TDD) 1-800-RELAY TX
email: jlmendez@ci.brownsville.tx.us
**OPEN FOR APPLICATION BY CITY EMPLOYEES AND PUBLIC DURING**
**<u>Until Filied</u>**

# EXHIBIT R



OFFICE OF CITY MANAGER
**City of Brownsville**
P.O. Box 911 / City Hall / Market Square
Brownsville, Texas 78520

CERTIFIED

Z 140 653 350

MAIL

Mr. Juan Pequeno
MIS Director
City of Brownsville
Post Office Box 5692
Brownsville, Texas 78520

78523+5632

U.S.POSTAGE

PB METER
6822976

BROWNSVILLE BRO
USPS

MCALLEN, TX
25 NOV
1998
PM

Return to
Sender
1st Notice
and Notice
Return