

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
United States District Court
Southern District of Texas
        ENTERED

    FEB 0 7 2002

Michael N. Milby, Clerk of Court
By Deputy Clerk
```

| | | |
|---|---|---|
| JUAN PEQUENO, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-00-180 |
| | § | |
| CITY OF BROWNSVILLE, et al., | § | |
| | § | |
| DEFENDANTS. | § | |

### ORDER

BE IT REMEMBERED, that on February 7, 2002, the Court **GRANTED IN PART** and **DENIED IN PART** Defendants' Motion to Dismiss and Motion for Summary Judgment [Dkt. No. 26].

### I.   Summary and Procedural History

Plaintiff Juan Pequeno filed this suit on November 27, 2000, after his termination from employment with the City of Brownsville ("City"). Plaintiff argues that his rights under the First and Fourteenth amendments were violated, and seeks damages pursuant to 42 U.S.C. §1983. The City is named in this suit, as well as several City officials and employees in their official and individual capacities. Defendants have filed a Motion to Dismiss and Motion for Summary Judgment [Dkt. No. 26].

### II.   Facts in the Summary Judgment Record

At the time of the events in question, Plaintiff was the Director of the Management Information Systems (MIS) Department for the City. Carlos Rubenstein was the City Manager for the City of Brownsville, and Ivan Welker was the Assistant City Manager. The MIS Department oversaw most of the data processing for the City [Dkt. 26 Ex. G]. On October 20, 1998, at a meeting of the City Commission, Plaintiff voiced objection to the City's proposed purchase of the "Sweetsoft Ambulance 2000" software for the City's

1

Emergency Medical Service ("EMS") billing system. "Sweetsoft Ambulance 2000" is a comprehensive accounting program designed for county and city EMS divisions to be used in keeping track of billing, accounts receivable, and other accounting needs.

Plaintiff's speech consisted of two parts: one oral speech delivered at a public meeting of the City Commissioners, and two proposals submitted after the meeting. Plaintiff's speech at the meeting was transcribed [Dkt. No. 34 Ex. D]. The bulk of his oral statement was as follows:

> I just want to point out a couple of things. I respect my colleague's opinions . . . in going with . . . another software, like SweetSoft. In fact we got to demo it about eight months ago in this room ourselves. And one of the things about it was that it was DOS base (sic), and one of the main drawbacks of it (sic). It started back in 1981. And, what that means is that when the PCs first started, that's what they first started with. And basically . . . and we asked the consultant that was selling it you know, "when are you going to look at upgrading it." And, he really didn't know. And, the company does sell this software through out (sic) the country. But one of the things . . . we've been . . . this company has a web site on the internet. And, I just found out about this on the Agenda. . . [W]e have been collecting more this year than we ever have from Ambulance, $1.3 million. Last year it was $1.1 million. The year before it was . . . $800,000. So we have been going, . . . consecutively going up and up. The only (sic) from this that concerns me (sic) that we might be going a little bit backwards. Going with an older PC DOS base (sic) system. Also, the system that we have is working well. The bottom line (sic) you can look at the figures. Is money coming . . .in? It is. And, it is attributed to two major factors, that we got a new computer three years ago. So we don't have to wait on the computer any more like we use (sic) to. Plus also Art has implemented a lot of procedures. You know that . . . the billings has (sic) to go out by a certain time. And, we implemented all these other processes that have helped the collection process. Plus he sent his people to get further training. And, I looked at the Internet, and main thing to collection (sic) to increase revenue for Ambulance is education and learning how to use the program. [A]fter looking at it my recommendation is that this software might not be the package for the City of Brownsville.
> 
> [Id.]

A short exchange ensued between Plaintiff and several other persons on the same topic. Plaintiff was asked shortly after the meeting to meet with the EMS Director and to submit a proposal to the City Manager outlining the specific needs of EMS and detailing how the in-house system could meet those needs as well or better than Sweetsoft. Plaintiff,

although he did not meet with the EMS Director, submitted two proposals [Dkt. No. 26 Ex. A]. The first proposal, dated October 29, 1998, is entitled "Reasons for Processing EMS Billing In-House." It outlines the extent to which Plaintiff feels that the in-house billing system has been successful in saving costs to the City. "In 1996, the city's in-house software was collecting more revenue and incurring less costs in implementation, maintenance, and staff, than the comparable city [Harlingen] which was using Sweetsoft software." [Id.] In a memo dated November 4, 1998, City Manager Rubenstein wrote to Plaintiff, expressing his view that the October 29 proposal was inadequate because it did not address "the computer programming needs of BEMS."[Dkt. No. 26 Ex. A] Rubenstein went on to say that he was "not interested in what has been provided for, but how all documented needs will be satisfied. . . .Again it would be advisable to compare the services provided for and desired from the Sweetsoft Program. Highlight those services provide (sic) by MIS which Sweetsoft does not provide for, as well as those Sweetsoft includes in its code and not provided for in the MIS program." [Id.] Plaintiff's second proposal, dated November 9, 1998, is entitled "Second Proposal to Continue In-House Processing of EMS Billing." [Id.] It again details the efficiency of the billing system developed by Plaintiff's department, concluding again that MIS's in-house system was satisfactory, and ending in a list of "Misrepresentation of Findings with Regard For EMS Accounting Systems." [Id.] On November 19, 1998, Welker notified Plaintiff by letter that Plaintiff was being placed on administrative leave, a form of discipline according to the City's Personnel Policies, for:

11. Insubordination: reference, in part, your memorandum dated October 29, 1998 Proposal to Continue In-house Billing, the City Manager's memorandum to you dated November 4, 1998 EMS Computer Program and your response dated November 9, 1998.
17. Actions which tend to destroy friendly relations between the City and its employees or between employees.
18. Failure or refusal to cooperate with fellow workers.
28. Conduct which would reflect unfavorably towards the City of Brownsville.
(G) Employees using or attempting to use sick leave without proper cause shall be subject to disciplinary action, including dismissal. In this regard, please be prepared to substantiate the illness leading to your use of sick leave for the following days. November 12, 13, 16, 17, 1998. [Id.]

3

Plaintiff was informed that a disciplinary hearing would be held on November 24, 1998, "to afford [Plaintiff] the opportunity to present [his] side of the story." [Dkt. No. 26 Ex. A]. Plaintiff did not attend the due process hearing set for November 24, 1998. On that day, Welker informed Plaintiff by letter of his "recommendation and decision" to the City Manager that Plaintiff be "separated from City service effective 5:00 p.m., November 24, 1998." [Id.] On December 2, 1998, Plaintiff appealed the termination and an appeal hearing was set. [Id.] Plaintiff did not appear at the hearing and did not deliver any documentary evidence, instead faxing notice that he was ill. The dismissal was upheld by the City Manager on December 14, 1998. [Id.]

### III.     Summary Judgment and Dismissal Standards

The strict standard of review under Rule 12(b)(6) has been summarized as follows: "The question . . . is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief." See Shipp v. McMahon, 234 F.3d 907 (5th Cir. 2000) superseded on other grounds at 234 F.3d 907 (5th Cir. 2000) cert. denied 121 S. Ct. 293 (May 29, 2001) quoting 5A Wright & Miller § 1357. The standard of review is the same for motions to dismiss under Rule 12(b)(6) and Rule 12(b)(1). See Benton v. United States, 960 F.2d 19, 21 (5th Cir. 1992).

Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). See Hunt v. Cromartie, 526 U.S. 541, 552 (1999). The party making a summary judgment motion has the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings and discovery documents which demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Colson v. Grohman, 174 F.3d 498, 506 (5th Cir.1999). If the moving party meets this burden, the non-movant then must designate specific facts showing there is a genuine issue for trial to survive

summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994).

IV.     Claims Against Individual Defendants

On May 29, 2001, the Court denied Plaintiff's Motion to Strike [Dkt. No. 15] the Defendants' Motion to Compel Rule 7(a) Reply [Dkt. No. 10], granted Defendants' Motion to Compel Rule 7(a) Reply [Dkt. No. 10], and ordered the Plaintiff to submit a Rule 7(a) reply on claims made against individual Defendants in their individual capacities by July 16, 2001 [Dkt. No. 18]. Plaintiff did not submit the 7(a) Reply. Pursuant to a joint Stipulation of Dismissal filed on July 26, 2001 [Dkt No. 23], Defendants Blanca Vela, Carlton Richards, Ernie Hernandez, Harry McNair, John Wood, Efren Fernandez, Henry Gonzalez, Carlos Rubenstein and Ivan Welker, in their individual capacities, are hereby **DISMISSED** from the case.

IV.     Claims against Rubenstein and Welker in their Official Capacities

Defendants Rubenstein and Welker seek dismissal from the case in their official capacities. Kentucky v. Graham, 473 U.S. 159 (1985) states, "Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." Id. quoting Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978). While at first glance Graham may appear to mandate dismissal of the officials where the government entity is also named in the suit, upon further examination it becomes apparent that the Court was contemplating the entity from which a damages award could be sought.

> As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, *in all respects other than name*, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, *a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.*
> Graham at 166 (some emphasis added).

5

Graham does not mandate the dismissal of the Welker and Rubenstein in their official capacities where the City is also named in the suit. It simply makes clear that when sued in their official capacities, any damages award will be satisfied by the City, and not from the personal assets of the individuals. Defendants' Motion to Dismiss Welker and Rubenstein in their official capacities is therefore **DENIED**.

VI      Statute of Limitations

Defendants' Motion asserts that Plaintiff's claims are barred by the statute of limitations. Although there is no federal statute of limitation for actions pursuant to 42 U.S.C. § 1983, federal courts look to the general statute of limitations governing personal injuries in the forum state. The statute of limitations for personal injury claims is two years. Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (Vernon's 1999). The limitations period for § 1983 claims begins to run "the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." Piotrowski v. City of Houston, 237 F.3d 567, 576 (5th Cir. 2001); Burrell v. Newsome, 883 F.2d 416, 418 (5th Cir. 1989). Defendants argue that the limitations period began to run from the date of termination, November, 24, 1998, and that Plaintiff missed the deadline for filing by three days. Plaintiff argues that he was not officially terminated until his appeal was denied on December 14, 1998.

In Burns v. Harris County Bail Bond Bd., 139 F.3d 513, 517 (5th Cir. 1998), the court held that the limitations period began to run when the plaintiff was informed her liquor license would not be renewed, rather than the date it actually expired. In Brossette v. City of Baton Rouge, 29 F.3d 623 (5th Cir. 1994), the limitation period began to run on the day he received notice of the suspension of his liquor license, rather than the day the suspension took effect. The Court agrees that Plaintiff knew or had reason to know on November 24, 1998, that he would be terminated.

Defendants claim that Plaintiff's deposition statement, "they're looking to dismiss me" is evidence that he knew as early as November 19, 1998, when he was placed on administrative leave, that he was going to be terminated [Dkt. No 26 Ex. G at 41]. Even if he suspected he would be fired, he could not know that he would be fired until he was, in

6

fact, fired. For this reason, had he attempted to file a complaint on November 19, 1998, it would have been dismissed for lack of standing because the injury was not yet imminent. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 563 fn. 2 (1992) ( to have standing a plaintiff must allege a future injury which is "*certainly* impending.") (emphasis in original) (citations omitted). Rubenstein's December 14 letter states that the date of termination was November 24, 1998 [Dkt. No. 26 Ex. F]. Therefore, for purposes of the statute of limitations, Plaintiff was terminated on November 24, 1998.

Plaintiff claims that his petition was timely filed on November 27, 2000, because the Clerk's office at the Court was closed and inaccessible for filing on November 24, 2000. Fed. R. Civ. P. 6 states,"The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the office of the clerk of the district court inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days." November 23, 2000 was Thanksgiving Day [Dkt. No. 34 Ex. N]. Plaintiff states in his affidavit [Dkt. No. 34 Ex. A] that on Friday, November 24, the office of the clerk was closed and inaccessible for filings. Defendant has offered no evidence to the contrary. Defendant's motion for dismissal on statute of limitations grounds is therefore **DENIED**.

VII.   First Amendment Claim

Four factors must be present for an employee to state a claim for a First Amendment violation against an employer: 1) the plaintiff must suffer an adverse employment decision, 2) the speech at issue must involve a matter of public concern, 3) the plaintiff's interest in speaking out must outweigh the defendant's interest in promoting efficiency, and 4) the plaintiff's speech must have motivated the adverse employment decision. See Teague v. City of Flower Mound, Tex., 179 F.3d 377, 380 (5th Cir. 1999). Defendants first dispute the second factor, arguing that Plaintiff's speech at the meeting and his subsequent communications with his superiors were not on a matter of public concern. Defendants state that Plaintiff "was primarily concerned with defending his MIS department and the job they were doing." [Ex. 26 at 21]. Plaintiff alleges that he did speak on a matter of public

7

concern, and his speech is therefore protected under the First Amendment. <u>Pickering v. Board of Education</u>, 391 U.S. 563 (1968).

The Court determines whether speech addresses a matter of public concern by examining the content, form, and context of a given statement, as revealed by the record. <u>Connick v. Meyers</u>, 461 U.S. 138, 147-48 (1983). "When a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." <u>Id</u>. at 147. The content, form, and context are viewed together, and the significance of each factor differs according to the circumstances. See <u>Moore v. City of Kilgore</u>, 877 F.2d 364, 370 (5th Cir. 1989).

A.   Pickering Test

1.   Content

The content of the speech is an important factor in determining whether a public concern is implicated. See, e.g., <u>Pickering</u>, 391 U.S. 563 (1968) (newspaper article which criticized allocation of school funds was held protected); <u>Perry v. Sinderman</u>, 408 U.S. 593 (1972) (newspaper advertisement containing criticism of a college board of regents was held protected); <u>Denton v. Morgan</u>, 136 F.3d 1038 (5th Cir. 1998) (juvenile probation officer's letter to a state education agency which reported alleged wrongdoing by school district protected as matter of public concern); <u>Moore</u>, 877 F.2d 364 (5th Cir. 1989)(speech by a firefighter who spoke to newspapers concerning alleged understaffing in the Fire Department was held protected).

An employee's speech may contain an element of personal interest and yet still qualify as speech on matter of public concern. See <u>Harris v. Victoria Indep. Sch. Dist.</u>, 168 F.3d 216 (5th Cir. 1999) (speech of school committee members who criticized their superior at a meeting was held to be protected, even though "they also had strong interests as committee members in achieving the goals the committee set for itself and the school."); see also <u>Benningfield v. City of Houston</u>, 157 F.3d 369, 375 (5th Cir. 1998); <u>Thompson v. City of Starkville, Miss.</u>, 901 F.2d 456, 463-65 (5th Cir. 1990).

8

Here, it is undisputed that Plaintiff's Department, MIS, developed the EMS billing software which was in use at the time of the City Commissioners' meeting. Plaintiff's oral statement voiced a concern that replacing existing accounting software was not the best choice for the City and that the MIS-developed system had been successful in increasing revenues. He states in his deposition that he was concerned that Sweetsoft might halt the steady rise in revenues that the City had seen over the previous few years. [Id. at 21]. Plaintiff acknowledges in his deposition that some of the duties of MIS would be transferred over to EMS. Dkt. No. 26 Ex. G. at 24]. In addition, he states that MIS would have been put in the position of training EMS on the new software, implementing it, and troubleshooting if EMS had a problem with the software, thereby forcing MIS to take on different responsibilities, including training and oversight. [Id. at 30-31]. Significantly, however, when asked in his deposition whether the new responsibilities concerned him, Plaintiff responded, "[n]ot as much as the revenue." [Id. at 31].

Defendants speculate, based on Plaintiff's testimony that MIS's responsibilities may change due to the adoption of Sweetsoft, that he was motivated by a personal interest in defending the MIS software. Other than Defendants' characterization, however, there is no evidence that Plaintiff's primary motivation in speaking and writing the proposals was personal. The two written proposals reiterated Plaintiff's opinion, given orally at the meeting, that the MIS software adequately met the needs of EMS, and had yielded positive revenues in the past. All three communications outline his concern that the new software would slow or halt the increase in revenues which had emerged in previous years and contain no reference to a personal motivation.

Defendants imply, by their repeated reference to the fact that the software was developed by MIS, that Plaintiff took personally the decision to discontinue the use of the software which his department developed. The idea that he would take the change personally is unsubstantiated in the summary judgment record. The content of the speech, despite Defendants' argument that it shows Plaintiff's private desire to protect his department, touches on matters of public concern.

9

2. Form

Plaintiff's oral statement was rendered during a public meeting of the City Commission. He also submitted two proposals which were solicited by his superiors [Dkt. No. 26 Ex. A]. The public nature of Plaintiff's oral speech weighs in favor of the speech being protected. See e.g., Harris, 168 F.3d 216 (5th Cir. 1999). As to the proposals, the fact that they were solicited weighs in favor of their being protected. Victor v. McElveen, 150 F.3d 451, 458 (5th Cir. 1998) ("when an employee speaks in response to an invitation and on a matter pertinent to that request, the context factor weighs in his favor.")

3. Context

Defendants argue that Plaintiff has attempted to "transform a personal conflict into an issue of public concern simply by arguing that individual concerns might have been of interest to the public under different circumstances." [Dkt. No 26 at 20] citing Dodds v. Childers, 933 F.2d 271, 273 (5th Cir. 1991). See also Terrell v. University of Texas System Police, 792 F.2d 1360, 1362 (5th Cir. 1986) ("[T]he mere fact that the topic of the employee's speech was one in which the public might or would have a great interest is of little moment . . . because almost anything that occurs within a public agency could be of concern to the public"). In Gomez v. Tex. Dept. of Mental Health and Mental Retardation, 794 F.2d 1018 (5th Cir. 1986), an employee's statement to another employee that the state facility had changed its policy on the length of patient stays was not protected by the First Amendment, because it was not a matter of debate in the community. Rather, it concerned those two employees since, viewed in context, the policy change placed an additional burden on the county center. Id.

Defendants argue that Plaintiff's statements were made against the backdrop of additional burden being placed on MIS. Plaintiff states in his deposition that he was primarily concerned about Sweetsoft's inefficiency in collecting revenues, and only secondarily about its effect on his Department than he was about its possible shortcomings in collecting revenue for the City. The oral speech itself centers mainly around the revenues issue, and not the added burden.

10

As in <u>Harris</u>, there is no evidence of an underlying personal dispute between Plaintiff and Defendants. Nor is there is evidence that the Plaintiff's speech merely concerned an employment related squabble with his supervisors. In fact, there is evidence that he was concerned about the efficiency of the proposed system. <u>Id</u>. Plaintiff's statement at the meeting, as well as his subsequent written communications with Rubenstein and Welker, cannot be "accurately characterized as an employee grievance concerning internal office policy." <u>Connick</u>, 461 U.S. at 154. fn. 10. The context therefore weighs in favor of protection.

4.    Conclusion

The Court views Plaintiff's oral statement and subsequent communications with Rubenstein and Welker as statements on a topic of public concern, and as such are protected by the First Amendment. Viewed as a whole, the content, form and context of Plaintiff's speech show that he was acting out of concern for the City, and was not airing a personal grievance.

B.    Efficiency

Defendants next claim that Plaintiff was discharged for insubordination in the form of the inadequate proposals and his failure to meet with the EMS Director, and that therefore their interest in efficiently running the City outweighs any protected speech interest.[1] [Dkt. No 26 at 23]. See <u>Teague</u>, 179 F.3d at 380 (5th Cir. 1999). As such, Defendants again ask for summary judgment in their favor. Plaintiff argues that the

---

[1]    As a matter of due process, the letter of November 19, 1998 is woefully devoid of factual allegations of Plaintiff's conduct which, if true, would constitute insubordination. See <u>North Alabama Exp. Inc. v. United States</u>, 585 F.2d 783 (5th Cir. 1978) (due process requires that interested parties be afforded a reasonable opportunity to the know claims against them and opportunity to respond to those claims.) The allegations in Welker's November 19 letter would not reasonably apprise Plaintiff of the facts giving rise to the charges against him. Although Plaintiff does not raise a due process violation as an issue, the lack of factual allegations in the letter may be considered by the finder of fact as evidence that Plaintiff's termination for insubordination was pretextual.

11

allegedly insubordinate behavior was a pretext for terminating him for exercising his right to speak.

In examining this issue, the Court examines whether Plaintiff's speech was likely to generate controversy and disruption, whether it impeded the department's general performance and operation, and affected working relationships necessary to the department's proper functioning. Brawner v. Richardson, 855 F.2d 187, 192 (5th Cir. 1988). Defendants contend that Plaintiff's behavior, his "failure to properly respond to the City Manager's request, his refusal to accept the decision of his supervisors to purchase the Sweetsoft 2000 software, his failure to meet with EMS to assess its billing needs, his insubordination, and his refusal to cooperate with fellow workers, and conduct reflecting unfavorably towards the City," was likely to generate disruption amongst other managers, would have impeded the Department's performance and operation, and would have affected working relationships necessary to the Department's proper functioning. [Dkt. No 26 at 23 & Ex. B]. Plaintiff, however, has offered evidence, such as the total failure to provide the required due process, from which a finder of fact might infer that his employment was terminated for speaking out [Dkt. No. 34 Ex. L at 35]. Plaintiff gives explanations for several of Defendants' allegations which are not refuted. He states in his affidavit that he was unable to meet with the EMS Director because the Director was not taking Plaintiff's calls. [Dkt. No. 34 Ex. A]. In response to Defendants' assertion that Plaintiff was insubordinate by refusing to accept the decision to adopt Sweetsoft, Plaintiff points out that he had no power to decide which software would be adopted, making his disagreement irrelevant [Dkt. No 34 Ex. L at 21-22]. Defendants have not offered evidence of any action taken by Plaintiff pursuant to his disagreement which might constitute insubordination.

Defendants have not shown that no issue of fact remains as to the pretext issue. Defendants have not shown that Plaintiff's oral statement disrupted the meeting or his work environment, nor have they shown that his written proposals were disruptive, even if they were inadequate. As such, Defendants have failed to meet their burden of showing that Plaintiff was terminated for insubordination rather than for exercising his right to

speak freely. See Hunt, 526 U.S. at 552. Because an issue of fact remains regarding the reason for Plaintiff's termination, summary judgment is **DENIED**.

C.   Policy, Custom, or Practice

To bring a case pursuant to 42 U.S.C .§1983, Plaintiff must show that the constitutional deprivation he suffered was caused by an official policy, custom, or practice. Monell, 436 U.S. 658 (1978). Plaintiff claims that the termination of his employment by Welker and Rubenstein in retaliation for his exercise of his First Amendment right was pursuant to a policy. Plaintiff maintains that the policy is evidenced by two remarks in Welker's deposition: 1) in response to the question of whether there was a policy preventing Plaintiff from speaking at the meeting, Welker stated: "[i]t all depends on what he's going to be talking to them about"; and 2) in response to the question of whether employees are encouraged to present their agenda items, Welker stated that "[i]f an employee wants to talk about an item that's on the posted agenda, he needs to talk over (sic) with his- with his supervisory staff first, his superior, or their superiors." [Dkt. No. 34 Ex. L p. 35].

The Fifth Circuit has defined official policy as: "a policy, statement, ordinance, regulation or decision that is officially adopted and promulgated by the [City] . . . or by an official to whom the [City] has delegated policymaking authority . . ." Eugene v. Alief Indep. Sch. Dist., 65 F.3d 1299, 1304 (5th Cir. 1995). Plaintiff argues that a policy, custom or practice can be created through the single act of a final policymaker. City of St. Louis v. Praprotnik, 485 U.S. 112, 122-23 (1988). It is true that an unconstitutional governmental policy may be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business. Id. For instance, a single decision by a legislative body "unquestionably constitutes an act of official government policy." Pembaur v. City of Cincinnati, 475 U.S. 469 (1986) quoting Owen v. City of Independence, 445 U.S. 622 (1980) (City Council passed a resolution firing the plaintiff without a pretermination hearing). Here, Plaintiff asks the Court to infer

13

a policy of deterring exercise of First Amendment rights from the single act of Plaintiff's termination.

In Pembaur, the Supreme Court outlined when a single decision may be enough to establish an unconstitutional municipal policy. 475 U.S. 469 (1986). 1) Municipalities may be held liable only for acts which the municipality itself has officially sanctioned or ordered; 2) only those municipal officials who have final policymaking authority may by their actions subject the government to 1983 liability; 3) whether a particular official has final policymaking authority is a question of state law; and 4) the action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business. See id. at 480-483 & n. 12. "[A] single action by a municipal official possessing final policymaking authority regarding the action in question constitutes the official policy of the municipality and . . . the determination of whether a municipal official wields final policymaking authority regarding a particular action constitutes a question of state law." Brady v. Fort Bend County, 145 F.3d 691, 698 (5th Cir.1998) (citing McMillian v. Monroe County, 520 U.S. 781 (1997)). "[T]he authority to make municipal policy is necessarily the authority to make *final* policy." Prapotnik, 485 U.S. at 123. "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." Id.

Plaintiff next argues that Rubenstein was a final policymaker. The Personnel Policies Manual states that with regard to termination or other discipline of employees "the decision of the City Manager . . . . is final. There shall be no right of appeal to or action in any court except on constitutional or statutory grounds." [Dkt. No. 33 Ex. K]. The Court distinguishes Praprotnik, in which supervisors were held not to be final policymakers in matters of personnel administration because a civil service commission had been established to review personnel decisions. Id., 485 U.S. at 128-29. There is no evidence that any person or body had the ability to review the personnel decisions of the City Manager. Therefore Rubenstein is an official policymaker for purposes of §1983, and as such is capable of making official policy through the single act of terminating Plaintiff's employment, which in turn subjects the City to suit under § 1983.

14

## VIII.   Conclusion

Pursuant to the Joint Stipulation of the Parties, the Defendants in their individual capacities are **DISMISSED**. Defendants' Motion to Dismiss Welker and Rubenstein in their official capacities is **DENIED**. Because an issue of fact remains with regard to whether Plaintiff was terminated legally for insubordination, or pretextually in violation of his First Amendment rights as a matter of official city policy, summary judgment for Defendants on the §1983 issue is **DENIED**.

DONE this 7th day of February, 2002 at Brownsville, Texas.

Hilda G. Tagle
United States District Judge