UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAR 1 8 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| VS. | § | |
| | § | |
| CITY OF BROWNSVILLE | § | CIVIL ACTION NO. B-00-180 |
| BLANCA VELA (Honorable Mayor) | § | (Jury Requested) |
| CARLTON RICHARDS (Commissioner) | § | |
| ERNIE HERNANDEZ (Commissioner) | § | |
| HARRY MCNAIR, JR. (Commissioner) | § | |
| JOHN WOOD (Commissioner) | § | |
| IVAN WELKER (Assistant City Manager) | § | |
| EFREN FERNANDEZ (Human Resource | § | |
| Director), HENRY GONZALEZ, | § | |
| (Previous Mayor), CARLOS RUBINSTEIN | § | |
| (Previous City Manager) | § | |

---

## DEFENDANTS' RENEWED RULE 50 MOTION FOR JUDGEMENT AS A MATTER OF LAW

---

Respectfully submitted,
WILLETTE & GUERRA, L.L.P.
International Plaza, Ste. 460
Brownsville, Texas 78521
Telephone    : (956) 541-1846
Facsimile    : (956) 541-1893

BY: _____
RYAN HENRY
State Bar No. 24007347
Fed ID. No. 22968
HUGH P. TOUCHY
State Bar No. 20150800
Fed ID. No. 12401
ATTORNEY FOR DEFENDANTS

# TABLE OF CONTENTS

Page

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Statement of the Nature and Stage of the Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Summary of the Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Argument and Authorities

      I.      Prima Facie Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      II.     The Evidence Establishes the Plaintiff
               Did Not Speak on a Matter of Public Concern . . . . . . . . . . . . . . . . . . . . . . . . . 8
      III.    The Plaintiff's Right in Speaking is Not
               Outweighed by the Defendants' Interest
               in Promoting efficiency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      IV.    Statue of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      V.     The Evidence is Legally Insufficient to
               Support a Finding the Plaintiff's Speech Was a
               Motivating Factor in Upholding His Termination . . . . . . . . . . . . . . . . . . . . . . . 19

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Prayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Certificate of Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

**CASES**                                                                                    Page

*Adickes v. S.H. Kress 7 Co.*, 398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Bennett v. City of Slidell*, 728 F.2d 762 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Bennett v Pippin*, 74 F.3d. 578  (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bradshaw v. Pittsburg Ind. School Dist.*, 207 F.3d 814 (5th Cir.  2000) . . . . . . . . . . . . . . . . 9, 10

*Brawner v. Richardson*, 855 F.2d 187  (5th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Burns v. Harris County Bail Bond Bd.*, 139 F.3d 513 (5th Cir.  1998) . . . . . . . . . . . . . . . . . . . 18

*Burrell v. Newsome*, 883 F.2d 416  (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*City of Oklahoma City v. Tuttle*, 471 U.S. 808  (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915,
    99 L.Ed.2d 107 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) . . . . . . . . . . . . 7, 8,15

*Coughlin v. Lee*, 946 F.2d 1152 (5th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 15

*Flores v. Cameron County, Tex.*, 92 F.3d 258  (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Gardetto v. Mason*, 100 F.3d 803 (10th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Gillum v. City of Kerrville*, 3 F.3d 117 (5th Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216 (5th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . 7

*Kennedy v. Tangipahoa Parish Library Bd. Of Control*
224 F.3d 359 (5th Cir.  2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Languirand v. Hayden*, 717 F.2d 220  (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731,
    20 L.Ed.2d 811 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rankin v McPherson* 483 U.S. 378 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Russell v. Bd. Of Trustees*, 968 F.2d 489 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Teague v. City of Flower Mound, Tex.*, 179 F.3d 377, (5th Cir. 1999) . . . . . . . . . . . . 7, 8, 9, 10, 15

*Terrell v. University of Tex. Sys. Police*, 792 F.2d 1360 (5th Cir.1986) . . . . . . . . . . . . . . . . . . . . 8

*Turner v. Upton County, Texas*, 915 F.2d 133 (5th Cir.1990),
*cert. denied*, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991) . . . . . . . . . . . . . . . . . . . . 20

**STATUTES**

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 18

TEX. CIV. PRAC. & REM. CODE. ANN. §16.003(a) (Vernon 1999) . . . . . . . . . . . . . . . . . . . . . . . . 18

**RULES**

FED. R. CIV. P. 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| VS. | § | |
| | § | |
| CITY OF BROWNSVILLE, | § | CIVIL ACTION NO. B-00-180 |
| IVAN WELKER, in his official capacity, and | § | (jury requested) |
| CARLOS RUBINSTEIN, in his official | § | |
| capacity | § | |

## DEFENDANTS' RENEWED RULE 50 MOTION FOR JUDGEMENT AS A MATTER OF LAW

TO THE HONORABLE U.S. DISTRICT COURT:

COME NOW DEFENDANTS CITY OF BROWNSVILLE, IVAN WELKER, AND CARLOS RUBINSTEIN, in their official capacities, and file this their Renewed Motion for Judgment as a Matter of Law, brought pursuant to Federal Rule of Civil Procedure 50 and would respectfully submit unto the court the following:

## EXHIBITS

| | |
|---|---|
| Exhibit A | Transcript of Juan Pequeno's Testimony |
| Exhibit B | Jury Instructions |
| Exhibit C | Plaintiff's Trial Exhibit 6 |
| Exhibit D | Plaintiff's Trial Exhibit 8 |
| Exhibit E | Plaintiff's Trial Exhibit 9 |
| Exhibit F | Plaintiff's Trial Exhibit 32 |
| Exhibit G | Plaintiff's Trial Exhibit 30 |

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

1.      This is Defendants' Renewed Motion for Judgment as a Matter of Law.  This case was submitted to a jury which returned a verdict in favor of the Plaintiff.  After the Plaintiff rested his case in chief Defendants filed a Motion for Judgment as a Matter of Law at Close of Plaintiff's Case, which this court denied.  Defendants re-urged their request for dismissal by way of another Motion for Judgment as a Matter of Law at the end of all evidence which was denied.  Defendants now renew their Motions for Judgment as a Matter of Law. Defendants would further show there is no legally sufficient evidentiary basis for a reasonable jury to have found for the Plaintiff on the numerous issues submitted.

2.      Plaintiff sued a unit of government, the City of Brownsville, and several City elected officials.  Plaintiff sued Defendants for damages allegedly sustained when Plaintiff was allegedly retaliated against by the City of Brownsville.  Plaintiff alleges violations of his First and Fourteenth Amendment rights guaranteed by the United States Constitution and brings suit under 42 U.S.C. §1983.

3.      Plaintiff filed his Original Petition on November 27, 2000.  Defendants were served on March 2, 2001 and timely answered. Trial began before a jury on February 11, 2002 and the jury returned a verdict on February 15, 2002.

## SUMMARY OF THE ARGUMENTS

4.      Now that the trial court has been able to view all the evidence and circumstances surrounding the allegations, Defendants request the trial court reverse the jury verdict and render in favor of the Defendants. Defendants first assert the Plaintiff, as a matter of law, did not establish the essential elements of his case.  Plaintiff did not establish  that he spoke out about a matter of public concern. The evidence demonstrated his speech centered on his private concerns regarding his employment.

Plaintiff also did not establish as a matter of law that his interest in speaking outweighed the Defendants' interest in maintaining efficiency. Defendants assert they properly established the Plaintiff did not timely file his compliant and that his claims are barred by the statue of limitations. Defendants also assert there is no legally sufficient evidentiary basis for a reasonable jury to find for the Plaintiff on the several issues required to establish liability against the Defendants.

## ARGUMENT AND AUTHORITIES

### I.    PRIMA FACIE ELEMENTS

5.    There are four elements to an employee's First Amendment retaliation claim against his employer: (1) the plaintiff must suffer an adverse employment decision, (2) the speech must involve a matter of public concern, (3) the plaintiff's interest in speaking must outweigh the defendant's interest in promoting efficiency, and (4) the plaintiff's speech must have motivated the adverse employment decision. *See Teague v. City of Flower Mound, Tex.*, 179 F.3d 377, 380 (5th Cir. 1999)(quoting *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir.1999)). A court must review a First Amendment retaliation claim under the four-step test derived from *Connick* and *Pickering. Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Questions two and three are legal in nature and are for the court to resolve. *See Connick*, 461 U.S. at 147-48, n. 7, 103 S.Ct. 1684; *Teague*, 179 F.3d at 380; *Coughlin v. Lee*, 946 F.2d 1152, 1156 (5th Cir.1991). Initially, the trial court must determine whether the employee's speech can be "fairly characterized as constituting speech on a matter of public concern." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. Next the trial court must  balance the employee's interest, as a citizen, in commenting upon matters of public concern against "the interest of the State, as an employer, in promoting the efficiency of the public service[s] it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731.

It is then for a jury to resolve any remaining factual disputes as to whether plaintiff's protected speech was a substantial or motivating factor in the adverse employment decision, or whether the employer would have made the same employment decision in the absence of the protected speech. *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir.1996).

## II.    THE EVIDENCE ESTABLISHES THE PLAINTIFF SPOKE OUT ON A MATTER OF PRIVATE CONCERN, NOT A MATTER OF PUBLIC CONCERN.

### A.    Legal Analysis

6.    The trial court must first determine if the Plaintiff spoke out about a matter of public concern. The trial court's obligation in mixed speech cases, such as this one, is to decide whether the speech at issue was made *primarily* in the plaintiff's role as citizen or *primarily* in his role as employee. *Teague* at 381. (Citing, *Terrell v. University of Tex. Sys. Police*, 792 F.2d 1360, 1362 (5th Cir.1986). In making this determination the trial court is bound to use the *Connick* factors of content, context, and form to determine whether the speech is public or private. *Teague* at 382. The trial court is to elevate the role of context over content. The focus is on the "hat worn by the employee when speaking" rather than upon the importance of the issue. *Teague* at 382. (Citing, *Gillum v. City of Kerrville*, 3 F.3d 117, 121 (5th Cir.1993)).

7.    Two cases decided by the United States Court of Appeals for the Fifth Circuit illustrate the type of balancing that is required by the trial court. In *Teague v. City of Flower Mound, Tex*, the Plaintiff was a long-time police officer employed by the Flower Mound Police Department. Teague became aware of possible wrongdoing by fellow officers, specifically he suspected fellow officers of committing perjury. *Id.* at 379. As Teague was an internal affairs investigator he began an investigation into the perjury suspicions. Teague reported his investigative results to the chief of police. Teague and his fellow officers who assisted in the investigation were then placed on

administrative leave and then ultimately terminated. Teague sued alleging his First Amendment rights were violated. *Id.* at 380.

8.       The United States Court of Appeals for the Fifth Circuit held that in terms of content, the speech in question was predominantly public since it is well settled that speech concerning police misconduct is public in content.  *Id.* at 383.  However, simply because the content may touch on a public matter does not make the Plaintiff's speech a matter of public concern.  The Court of Appeals held that in terms of context,  Teague's grievance is more appropriately characterized as private. Teague signed all documents and investigative reports as a member of the internal affairs division. He also routinely characterized his speech in terms of his employment role. Further, when suspended, Teague's actions focused primarily on clearing his name and not on exposing corruption. While corruption in an internal affairs department is a matter of public concern, Teague's  focus was, however, on the issue as it impacted his wish to continue his investigation. *Id* at 383.  As a result, the court held that Teague did not speak out about a matter of public concern.  While loss of City revenue can be a matter of public concern, Mr. Pequeno's focus was, however, on the issue as it impacted the MIS department and his wish to continue collections for the EMS department.

9.       In *Bradshaw v. Pittsburg Ind. School Dist.*, a school principal spoke out about the alleged mismanagement of public funds. 207 F.3d 814. (5th Cir. 2000.) The United States Court of Appeals for the Fifth Circuit held that speech rises to the level of public concern when an individual speaks primarily as a citizen rather than as an employee and that an analysis of the content, form, and context are required.  *Id.* at 816.   In *Bradshaw*, the court held the principal was more interested in clearing her name as opposed to speaking out for the benefit of the public. She wrote several memos which were objectionable to the school board. Even though the memos spoke out about the alleged mismanagement of public funds, the court held that her actions and speech were more akin to an

employee grievance than matters of public concern. *Id.* at 818. Retrospective embellishment dealing with public moneys cannot transform personal grievances into matters of public concern. *Id.* at 818. Just as in *Bradshaw*, Mr. Pequeno, in this case, did not focus his speech on matters relating to public funds as he claims, but instead focused on defending his department and airing his personal grievances.

10.    Both *Teague* and *Bradshaw* emphasize that a plaintiff cannot focus merely on the content of his speech in order to entitle his speech to First Amendment protection. While the content is important, a court must consider the entire context and the surrounding situation. The court must also consider the form used. As evident in *Teague* and *Bradshaw*, the context and surrounding circumstances should be given greater weight than the mere content of the speech.

**B.    Content**

11.    Here the testimony establishes the Plaintiff spoke out numerous times about his disagreement with the classification of his department's software as ineffective and the purchase of the SweetSoft software package. However, the Plaintiff's speech and his actions are more akin to private speech as opposed to matters of public concern. Examining the entire situation and course of events it is clear the Plaintiff's primary purpose was to discuss matters related principally to his own personal employment situation and to defend his department from criticism contained within the CPA audit report.

12.    The Plaintiff testified he discovered on October 16, 1998, the Friday before the October 20, 1998 Tuesday meeting, that the City was contemplating purchasing SweetSoft. (Ex. A at 16, lines 22-25, pg 17, lines 1-8.) The Plaintiff discovered the attempt to purchase via a copy of the agenda. (Ex. A at pg 17, lines 2-8.) The Plaintiff did not object or express any concerns to anyone on Friday. (Ex. A at 104.) The Plaintiff did not express any concerns to anyone over the weekend. (Ex. A at

24, lines 15-22, p.104, lines 14-18.) On Monday, October 19, 1998 the Plaintiff met with Art Rodriguez and they briefly discussed the purchase. (Ex. A at 104.) At this time the Plaintiff only mentioned one issue to Mr. Rodriguez, he mentioned a parallel testing issue. (Ex. A at 105, lines 1-16.) The Plaintiff did not discuss any concerns regarding a potential decrease in revenue collections or any other matter. (Ex. A at 105, lines 17-25.) The Plaintiff did not discuss any concerns about SweetSoft with management on October 19, 1998. (Ex. A at 105, lines 17-25.) During the entire business day on Tuesday, October 20, 1998, the Plaintiff did not consult with management or anyone else regarding any concerns about SweetSoft. The Plaintiff then testified that the first time he heard any criticism of the MIS software, and the recommendation for the complete abandonment of the MIS software was during the City Commission meeting the night of October 20, 1998. (Ex. A at 107, lines 5-25, p. 108, lines 1-5.) It was at this moment the Plaintiff expressed concerns regarding the purchase of SweetSoft. (Ex. A at 107.) Plaintiff testified it was at this point he felt the City Commission was being provided misinformation and he felt he had to speak. (Ex. A at 107, lines 17-22.) When asked what facts were being misrepresented, the Plaintiff testified that the facts being misrepresented were the auditor's findings that the MIS software was inefficient. (Ex. A at 65, lines 8-16, p. 165, lines 1-10.) The Plaintiff did not mention any misrepresentations regarding SweetSoft. The Plaintiff did not mention any misrepresentations regarding revenues. The Plaintiff did not mention any decrease in revenue. It was the alleged misinformation that prompted his speech. The Plaintiff even testified he was concerned about the criticism of his department. (Ex. A at 65, lines 17-23.) The Plaintiff apparently did not feel it necessary to speak out about the purchase of SweetSoft until criticism of the MIS software and his department surfaced.

13.    Once the Plaintiff decided to speak, he expressed his concerns via the October 20, 1998 hearing, and several memorandums. Examining the actual content of the Plaintiff's speech, he did

not address matters which would qualify as matter's of public concern. All of his comments should be categorized as matters of private concern. The Plaintiff testified during trial that his speech addressed concerns the SweetSoft package would not be as efficient in collecting revenues as the MIS in-house software. (Ex. A at 26-27.) However, none of the speech submitted to the City in 1998 mentions a decrease in collections. ( Ex. C, Ex. D, Ex. G.) The only mention of revenue at all in the Plaintiff's speech is his continued assertion that the MIS in-house software had collected $1.3 million dollars the past year. He never mentioned a possible decrease in collections. The Plaintiff testified that he did not know if collections would increase or decrease because he did not research the collection issue at any time. (Ex. A at 128, lines 2-16, p. 171 lines 10-14.) As a matter of fact, the Plaintiff testified he only had information relating to a version of SweetSoft which was over two years old and that the software had changed significantly since then. (Ex. A at 126, lines 13-22.) If the Plaintiff did not comment that revenues would decrease and had no idea if revenues would increase or decrease in 1998, the Plaintiff cannot now assert that the content of his speech encompassed a concern the collections would decrease. Such testimony amounts to nothing more than retrospective embellishment.

14.    The Plaintiff's speech was primarily his assertion the auditors were making gross misrepresentations. The content of the Plaintiff's speech was content associated with his personal opinion about the past efficiency of the MIS software, which is principally an employment concern, not a matter of public concern. The content never mentions a decrease in revenue collection if SweetSoft is purchased.

**B.    Context**

15.    Even if the *content* had commented on a decrease in the collection of revenues, the content of the speech does not stand alone. The *context* of the speech must also be examined. The Plaintiff

Page -12-

spoke about numerous issues completely unrelated to any public matters and which would be more akin to private concerns. The Plaintiff criticized the auditors by alleging they grossly misrepresented facts regarding the current MIS software. (Ex. A at 65, lines 8-16, p. 165, lines 1-10.) He spoke about how well the MIS department had done for the City with regards to other programs and services, such as the purchase of a faster computer. (Ex. A at 44, lines 3-21, p. 45, lines 22-25, p. 46, lines 1-14. Ex. C at 2, 3, Ex. D at 1-2.) He praised his department and the in-house software package by stating.

> The current in-house EMS billing is one of the best software the city has. MIS invested much time and effort to create the excellent and efficient system the city has today. The city could put this in-house software against any other billing EMS system that is in a similar situation as the City of Brownsville.
> (Ex. C at 3.)

16.    The Plaintiff praised his department for never having missed a governmental deadline and in how well his staff had trained other employees. ( Ex. C at 2, Ex. D at 1, 3, 6.) He praised the MIS software again by stating he did not know of a way any software on the market could do a better job than the MIS software. (Ex. A at 125, lines 2-5.) He testified his memorandums to the City were intended to convey that MIS was doing a good job and that it had consistently done a good job for the City year after year. (Ex. A at 66, lines 5-6.) The Plaintiff complained that the MIS department had been bypassed and was never consulted regarding the audit. (Ex. A at 66, line 25, p. 67, line 1, Ex. C at 3, Ex. D at 6.) He also complained that the purchase of SweetSoft would result in a decentralization of the computers. (Ex. A at 50, lines 6-18.)

17.    Plaintiff then accused the City Manager and Assistant City Manger of mismanaging the City of Brownsville and lying to the City Commission. (Ex. A at 138, lines 18-25, p. 142-144, Ex. F at 1-12.) He requested the City Council give him a raise and back pay consistent with an undisclosed

salary study and he criticized city management for not having given him the raise many years ago. (Ex. A at 145, lines 16-20, Ex. F at 10-12.) The Plaintiff criticized various other departments in the City including the Purchasing department, the EMS department, and the Finance department. (Ex. A at 123, lines 9-25, Ex D at 1 and 5.) As part of his criticism, the Plaintiff attributed 98% of all problems with collections to the EMS department and the Finance department. (Ex. A at 123, lines 9-25, Ex. D at 1.) The Plaintiff complained that city management had loudly and for no reason "ordered" one of his staff to do something without consulting with him. (Ex. D at 3.) The Plaintiff also complained over and over again that the MIS in-house software was not ineffective and was one of the best programs in existence. (Ex. A at 27, lines 3-25, p. 56, lines 5-15, p. 64, lines 10-18, p. 65, lines 8-23, p. 69, lines 11-18, p. 108, lines 24, p. 109, lines 1-9, Ex. C. at 2, Ex. D. at 1, 5, 6, Ex. F at 2.) The totality of the Plaintiff's speech encompasses a variety of topics from how well his department had done for the City in the past to personal attacks on city management. The Plaintiff's speech and memos were centered on the Plaintiff's belief that his department was doing a good job and the criticism of inefficiency of the MIS in-house software was unfounded. (Ex. A. at 66, lines 3-10.) The Plaintiff felt the MIS in-house software was efficient and that it's collection rate of 54% could not possibly be surpassed. (Ex. A. at 124, lines 11-24, p. 125, lines 2-5, Ex. C at 3.) Little to no emphasis was placed on any concerns which would qualify for First Amendment protection, such as a reduction in revenue collections.

18.     While the Plaintiff retroactively points to the content of one issue in his speech which he feels qualifies as a matter of public concern, he disregards the entire context surrounding the situation. Taken as a whole, Plaintiff's speech seems to focus far more on his employment and less on any matter of public concern.   The primary purpose of the Plaintiff's speech was not to bring public matters to light, but was to address grievances he had with city management and to defend

employee's interest in speaking. *Kennedy v. Tangipahoa Parish Library Bd. Of Control*, 224 F.3d 359, 377 (5th Cir. 2000.) In striking this balance, a court should examine whether the speech was likely to generate controversy and disruption, whether it impeded the City's general performance and operation, and affected working relationships necessary to the City's proper functioning. *Brawner v. Richardson*, 855 F.2d 187, 192 (5th Cir.1988).

21.     The testimony establishes the Plaintiff wrote several proposals which he admits could be viewed as destroying friendly relations with his supervisors. (Ex. A at 136, lines 9-25, p. 137, lines 1-5.) The testimony of Defendants' Welker and Rubinstein established the Plaintiff's memorandums were viewed as accusations of fraud and intentionally misleading the City Council. There was also testimony the Plaintiff's proposals were viewed as criticizing other departments and alleging the internal auditors were intentionally providing gross misrepresentations to the City Council.

22.     The Plaintiff's testimony establishes his speech was not only likely to generate controversy and disruption, but did. The Plaintiff himself listed several instances of disruption and disharmony in his November 16, 1998 memorandum. (Ex. F at 2, 3, and 4.) The Plaintiff testified that after his speech the EMS director became upset with him and would not return his phone calls. (Ex. A at 57, lines 1-16, p. 69, lines 15-20, p. 78, lines 10-14, p. 79, lines 13-20.) He also stated that other departments began showing disrespect to the MIS department and numerous disruptions ensued. (Ex. F at 2-4.)

23.     The Plaintiff asserts his interest in informing the City Council about the inefficiency of SweetSoft outweighs the City's interest in preventing such disruption. However, the testimony is legally insufficient to establish such a finding. The Plaintiff testified he had no knowledge of how efficient SweetSoft was in 1998. (Ex. A at 127, lines 8-16, p. 128, lines 2-16, p. 171, lines 10-14.) He admits he only presented information he obtained in 1996. (Ex. A at 126, lines 13-15.) He admits

his department from his perceived attacks by the audit report. As a result, Plaintiff's speech cannot be said to be addressing matters of public concern. Defendants therefore request this court reverse the jury verdict and render a take nothing judgment in favor of Defendants.

## III.    PLAINTIFF'S RIGHT IN SPEAKING IS NOT OUTWEIGHED BY THE DEFENDANTS' INTEREST IN PROMOTING EFFICIENCY.

19.    The Plaintiff's interest in speaking out about the issues involved do not outweigh the City's interest in promoting efficiency as a matter of law. The balancing of the Plaintiff's interest with the City's interest is a legal determination to be decided by the court. *See Connick*, 461 U.S. at 147-48, n. 7, 103 S.Ct. 1684; *Teague*, 179 F.3d at 380; *Coughlin v. Lee*, 946 F.2d 1152, 1156 (5th Cir.1991).

20.    Even if the Plaintiff did speak out about a matter of public concern, the manner in which he spoke out and the issues involved do not outweigh the City's interest in maintaining discipline within the employment ranks. Employee statements are not considered in a vacuum. *Rankin v McPherson* 483 U.S. 378, 388 (1987). The manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose. *Rankin* at 388. The City's interest portion of the test

focuses on the effective functioning of the City's enterprise. *Id.* Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function. Avoiding such interference is a strong City interest. *Id.* If the Plaintiff's speech, the manner in which it was spoken, and the context surrounding it disrupts work performance or breaks down working relationships within the City, his interest does not outweigh the City's interest in maintaining discipline and promoting efficiency. Government employers can terminate their employees for speaking on a matter of public concern if their interest in efficiency at the office outweighs the

the computer industry changed drastically within that two years time period. (Ex. A at 126, lines 19-22.) The Plaintiff did not contact anyone at SweetSoft or the City of Harlingen to gain information on the 1998 efficiency of SweetSoft. The Plaintiff did not provide any documentary evidence to establish the foundation of his opinions. In fact, he testified he did not know in 1998 and did not know at the time of trial whether SweetSoft's would result in an increase or decrease of revenue collections. (Ex. A at 127, lines 8-16, p. 128, lines 2-16, p. 171, lines 10-14.)

24.     The Plaintiff's speech caused significant disruption and controversy within the City. It caused a breakdown in communication between department heads as well as between other employees. The evidence established that due to his speech, disruption, distrust, low morale and a strain on employee communications developed. (Ex. F at 2-4.) The City of Brownsville has a compelling interest in preventing such disruption. Substantial evidence exists that the manner in which the Plaintiff spoke and the context surrounding the speech negatively impacted the City's operations. The Plaintiff admitted that he could have used a less hostile and more appropriate means of communicating his objections and opinion. (Ex. A at 137, lines 6-15, p. 165, lines 13-19.) However, he chose to speak in the manner he did which resulted in mass disruption. Given the topic of the Plaintiff's speech, and the manner in which he expressed his objections, it cannot be said the Plaintiff's interest in speaking outweighs the City's interest in promoting efficiency and maintaining discipline within its employment ranks, as a matter of law. The Defendants therefore request the trial court reverse the jury verdict and render a take nothing judgment.

## IV.    STATUTE OF LIMITATIONS

25.     There is no federal statute of limitations for actions under 42 U.S.C. §1983 and therefore, federal courts look to the general statute of limitations governing personal injuries in the forum state. *Flores v. Cameron County, Tex.*, 92 F.3d 258, 271 (5th Cir. 1996). Texas has a two year statute of

limitations for personal injury claims. TEX. CIV. PRAC. & REM. CODE. ANN.  §16.003(a) (Vernon 1999).

26.     The Plaintiff testified at trial that he has brought suit alleging a First Amendment violation when he spoke out about a matter of public concern on October 20, 1998. (Ex. A at 130-132.) He alleges and testified that as a direct result of this speech, he was retaliated against by the Defendants on November 10, 1998 when he was verbally abused at a meeting with his supervisors. (Ex. A at 132, lines 6-11.) He testified he became ill as a direct result of the abuse and retaliation and could not return to work at all. (Ex. A at 132-133.) The Plaintiff testified he did not return to work anytime after November 10, 1998. (Ex. A at 133.) On November 10, 1998 the Plaintiff began experiencing this illness which lasted for months and Plaintiff was very clear in his testimony that this illness and injury was a direct result of the retaliation of the Defendants for his speaking out about an alleged matter of public concern. He testified he suffered physical fatigue as well as mental anguish. (Ex. A at 133, lines 2-9.) Plaintiff testified that he is specifically seeking relief from this court and jury for the injury and damages he alleges he sustained on November 10, 11, 12, 13, 14, 15, 16, 17, of 1998 and on into the future. (Ex. A at 133, lines 17-23.)

27.     Under federal law, the limitations period for a §1983 claim begins to run "the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001)(quoting *Russell v. Bd. Of Trustees*, 968 F.2d 489, 493 (5th Cir. 1992)); *See also Burrell v. Newsome*, 883 F.2d 416, 418 (5th Cir. 1989). In other words, "a cause of action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Burns v. Harris County Bail Bond Bd.*, 139 F.3d 513, 517 (5th Cir. 1998). A plaintiff only needs to know the facts that would ultimately support a claim; he need not know that he has a claim. *Piotrowski,* 237 F.3d at 576.

28.    The Plaintiff testified he was actually injured on November 10, 1998 as a direct result of the Defendants' actions.  He specifically testified these actions were in retaliation for his speech at the October 20, 1998 meeting.  He requested the jury compensate him for this injury.  Plaintiff was aware that he suffered an injury on November 10, 1998 but failed to file his lawsuit until November 27, 2000.  As a result, the Plaintiff's claims are barred by the statute of limitations.

29.    As further evidence of this point, Plaintiff also established in his deposition filed with the trial court and his trial testimony that he knew on November 19 through November 23,  1998 that alleged retaliatory actions were being taken to have him terminated. (Ex. G to Defendant' Motion for Summary Judgment page 41, lines 13-18.)  He testified he wrote a detailed letter to the City Council outlining the alleged retaliation of the Defendants because he knew they were going to terminate him. (Ex. A at 84, lines 8-18.)  As a result, he was aware of the injury on November 10, 1998, testified again that he knew about the alleged retaliation on November 19 through 23, 1998, but failed to file his lawsuit until November 27, 2000. The Plaintiff's claims are therefore barred by the statute of limitations. The Defendants move this court reverse the jury verdict and render a take nothing judgment in favor of the Defendants.

## V.    THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT A FINDING THE PLAINTIFF'S SPEECH WAS A MOTIVATING FACTOR IN THE FINAL POLICYMAKERS DECISION TO UPHOLD HIS TERMINATION.

30.    The Plaintiff sued the City of Brownsville, Ivan Welker and Carlos Rubinstein in their official capacities.  A suit against an city official  in his official capacity is a suit against the municipality itself.  *Bennett v Pippin*, 74 F.3d. 578, 584 (5th Cir. 1996).  As a result, the only entity involved is the City of Brownsville.  In order to find the Defendants liable, the Plaintiff must attribute liability to the City itself.  *Monell v. New York City Department of Social Services*, 436

U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978). Typically, in order to attribute liability to the municipality itself, a plaintiff must demonstrate an official policy or custom which causes a constitutional violation. *Id.* In cases based on custom or practice, "considerably more proof than [a] single incident will be necessary . . . to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.*; see also *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 824 (1985) (emphasis added). A "pattern of similar incidents" that is "general or widespread" must be shown. *Languirand v. Hayden,* 717 F.2d 220, 227-28 (5th Cir. 1983). Such a pattern is evident if there are numerous prior incidents showing systemic violation of constitutional rights. *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (en banc) (citing *Adickes v. S.H. Kress 7 Co.*, 398 U.S. 144, 167 & n. 39 (1970)). In short, when dealing with a policy, more than one incident is required in order to attribute liability.

31.     However, a single decision may create municipal liability if that decision were made by a final policymaker responsible for that activity. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-25, 108 S.Ct. 915, 924-25, 99 L.Ed.2d 107 (1988); *Turner v. Upton County, Texas*, 915 F.2d 133, 136-37 (5th Cir.1990), *cert. denied*, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991). This is a case where the Plaintiff is attempting to attribute liability to the Defendants based on a single decision by a final policymaker. Ivan Welker is the individual who terminated the Plaintiff, however, Mr. Welker was not a final decision maker.

32.     The Plaintiff appealed his termination to Carlos Rubinstein. As this court held, Mr. Rubinstein was a final policymaker. As a result, in order to attribute liability to the Defendants, the Plaintiff had to submit legally sufficient evidence to establish the Plaintiff's speech was a motivating factor in upholding his termination.

33.     The testimony reveals the Plaintiff appealed his termination to Carlos Rubinstein, the City

Manger. Mr. Rubinstein testified the Plaintiff's speech was never a factor in upholding his termination. The Plaintiff has not presented legally sufficient evidence the speech was a motivating factor in upholding the termination. In fact, the Plaintiff presented no evidence that Carlos Rubinstein considered the speech dealing with the Plaintiff's concerns of decreased revenue collection at all. The evidence presented establishes the Plaintiff was terminated due to the wording used in his memorandums and his failure to properly follow directions. As a result, a reasonable jury cannot determine his speech was a motivating factor in the final policymaker's decision upholding of his termination. Defendants therefore move this court reverse the jury verdict and render a take nothing judgment in favor of Defendants.

## CONCLUSION

34.     The Plaintiff brought suit against the Defendants alleging he was retaliated against for speaking out about a matter of public concern. Defendants have established the Plaintiff did not speak out about a matter of public concern. He did not mention any matter within the content of his speech which qualifies as a matter of public concern. However, even if he did, taking the context of the speech and the surrounding circumstances, the primary reason behind the Plaintiff's speech was private in nature. He therefore did not speak out about a matter of public concern.

35.     Defendants have also established that even if the Plaintiff had spoken out about an uncontested matter of public concern, the manner in which he spoke negatively impacted the Defendants' operations. The degree of the impact created significant disruption at the City. As a result, his interest in speaking out did not outweigh the Defendants' interest in maintaining discipline and promoting efficiency in the workplace, as a matter of law.

36.     Defendants have established the Plaintiff failed to timely file his claim within the statute of limitations. The Plaintiff asserts he was retaliated against and suffered injury on November 10,

1998. Plaintiff did not file his petition until November 27, 2000. As a result, he did not timely file suit and his claims are barred by the statute of limitations.

37.    Defendants also assert there no legally sufficient evidentiary basis for a reasonable jury to conclude the Plaintiff's speech was a motivating factor in upholding his termination. In order to assert liability against the City the Plaintiff must establish a final policymaker was motivated to violated his constitutional rights by retaliating against him for speaking out about a matter of public concern. The evidence presented at trial is legally insufficient for a reasonable jury to determine Carlos Rubinstein upheld the Plaintiff's termination due to the fact the Plaintiff spoke out about an alleged matter of public concern.

38.    Based on the above arguments, Defendants move this court reverse the jury verdict and render a take nothing judgment in favor of the Defendants. Defendants' believe such a ruling is warranted and necessary so that justice may be done.

## PRAYER

39.    WHEREFORE, PREMISES CONSIDERED, Defendants pray that this Renewed Rule 50

Motion for Judgment as a Matter of Law be granted on all claims asserted by Plaintiff, that this court

reverse the jury's verdict and render a take nothing judgment against Plaintiff, and that all taxable

costs of court be taxed against Plaintiff.  Defendants further pray for such other and further relief,

at law or in equity, to which they may show themselves to be justly entitled.

                    Respectfully submitted,

                    WILLETTE & GUERRA, L.L.P.
                    International Plaza, Suite 460
                    3505 Boca Chica Boulevard
                    Brownsville, Texas 78521
                    Telephone    : (956) 541-1846
                    Facsimile    : (956) 541-1893

                    BY: _____
                        RYAN HENRY
                        State Bar No. 24007347
                        Fed ID. No. 22968
                        HUGH P. TOUCHY
                        State Bar No. 20150800
                        Fed ID. No. 12401

                    **ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing Renewed Motion for Judgment as a Matter of Law  has been served on all counsel of record, via hand delivery to the following:

Mr. Alejandro Garcia
Mr. Frank Costilla
LAW OFFICE OF FRANK COSTILLA, L.L.P.
5 E. Elizabeth Street
Brownsville, Texas 78520

on this the ___18___ day of March, 2002

RYAN HENRY

## **CERTIFICATE OF CONFERENCE**

The local rules do not require a certificate of conference for this motion.

RYAN HENRY

```
 1                IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3      ——————————————————————————————)
                                       )
        JUAN PEQUENO                   )
 4                                     )
                                       )  CIVIL ACTION NO.
 5      VS.                            )  B-00-180
                                       )
 6      CITY OF BROWNSVILLE, TEXAS     )
        ——————————————————————————————)
 7

 8

 9                    EXCERPT OF TESTIMONY OF:
                           JUAN PEQUENO
10          BEFORE THE HONORABLE HILDA G. TAGLE
                     FEBRUARY 13 & 14, 2002
11
        APPEARANCES:
12

13      For the Plaintiff:        MR. FRANK COSTILLA, JR.
                                   MR. ALEJANDRO GARCIA
14                                 Attorneys at Law
                                   Brownsville, Texas
15
        For the Defendant         MR. HUGH TOUCHY
16                                 MR. RYAN S. HENRY
                                   Brownsville, Texas
17
        Transcribed by:           BRECK C. RECORD
18                                 Official Court Reporter
                                   600 E. Harrison, Box 16
19                                 Brownsville, Texas  78520
                                   (956)548-2510
20

21

22

23

24

25
```

EXHIBIT
A
ALL-STATE LEGAL®

Captured and Transcribed by Computer - Eclipse

7C

United States District Court
Southern District of Texas
FILED

FEB 1 5 2002

11:14

Michael N. Milby, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| JUAN PEQUENO | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. B-00-180 |
| CITY OF BROWNSVILLE, | § | (Jury Requested) |
| IVAN WELKER, in his official capacity | § | |
| and CARLOS RUBINSTEIN, in his official | § | |
| capacity | § | |

**JURY INSTRUCTIONS**

LADIES AND GENTLEMEN OF THE JURY:

You have heard the evidence in this case. I will now instruct you on the law you

must apply. It is your duty to follow the law as I give it to you. On the other hand, you the

jury, are the judges of the facts. Do not consider any statement that I have made in the

course of trial or make in these instructions as an indication that I have any opinion about

the facts of this case.

Statements and arguments of attorneys are not evidence and are not instructions

on the law. They are intended only to assist the jury in understanding the evidence and

the parties' contentions.

Answer each question from the facts as you find them. Do not decide who you think

should win and then answer the questions accordingly. Your answers and your verdict

must be unanimous.

You must answer all questions from a preponderance of the evidence. A

"preponderance of the evidence" means the greater weight and degree of the credible



EXHIBIT
B

evidence admitted in this trial. It does not necessarily mean the greater volume of evidence or the greater number of witnesses. To establish or prove something by a preponderance of the evidence means to prove that something is more likely true than not. In other words, a preponderance of the evidence in this case means such evidence that, when considered and compared with that opposed to it, has more convincing force and produces in your minds a belief that what is sought to be proved is more likely true than not.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important act, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something that was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembered it, because people may forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you are justified in light of common experience. In other words, you may make deductions and reach conclusions

2

that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

I.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

You may, in your determination of the facts of this case, consider both direct and circumstantial evidence. Direct evidence is the testimony of a witness who actually saw an event occur. Circumstantial evidence is proof of a chain of circumstances pointing to the occurrence of a fact or the existence of a fact. Direct evidence includes a witness's testimony as to facts within that person's own personal knowledge, matters that the witness saw and heard, and matters that came to the witness out of that person's own senses or observations. Circumstantial evidence, rather than or in addition to direct evidence, can be used to establish a fact if that fact may be fairly and reasonably inferred from all other facts and circumstances proved in the case. In order to establish a fact or conclusion by circumstantial evidence, the facts that were directly proven in the case must be such as to make the fact or conclusion sought to be shown by circumstantial evidence more reasonably probable to be true than alternative facts or conclusions. As a general rule, the law makes no distinction between direct or circumstantial evidence, but simply requires that the jury find the facts in accordance with a preponderance of all the evidence in the case, both direct and circumstantial.

3

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field--he is called an expert witness--is permitted to state his opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely upon it.

In deciding whether to rely upon the opinion of an expert witness, you may consider any bias of the witness, including any bias you may infer from evidence that the expert witness has been or will be paid for reviewing the case and testifying, or from evidence that he testifies regularly as an expert witness and his income from such testimony represents a significant part of his income.

Any notes that you may have taken during this trial are only aids to memory. If your memory should differ from your notes, then you should rely on your memory and not on the notes. The notes are not evidence. A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of the other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

It is your sworn duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong. However, do not give up your honest beliefs solely because the others think differently, or merely to finish the case.

4

When you retire to the jury room to deliberate on your verdict, you may take the exhibits which the court has admitted into evidence. Select your Presiding Juror and conduct your deliberations. If you recess during your deliberations, follow all of the instructions that the Court has given you about your conduct during the trial. After you have reached your unanimous verdict, your Presiding Juror is to fill in on the form your answers to the questions. Do not reveal your answers until such time as you are discharged, unless otherwise directed by me. You must never disclose to anyone, not even to me, your numerical division on any questions.

If you want to communicate with me at any time, please give a written message or question to the bailiff, who will bring it to me. I will then respond as promptly as possible, either in writing or by having you brought into the courtroom so that I can address you orally. I will always first disclose to the attorneys your question and my response before I answer your question.

Remember that in a very real way you are the judges - judges of the facts. Your only interest is to seek the truth from the evidence in the case.

After you have reached a verdict, you are not required to talk to anyone about the case unless the Court orders otherwise.

DONE this 15th day of February, 2002, at Brownsville, Texas.

_____
Hilda G. Tagle
United States District Judge

5

II.

Section 1983 of Title 42 of the United States Code provides that every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The Plaintiff claims that the Defendants, while acting "under color of state law," intentionally deprived the Plaintiff of rights under the Constitution of the United States.

The constitutional right that the Plaintiff claims the Defendants violated is the right to free speech.

The First Amendment to the United States Constitution gives every citizen the right to freedom of speech. There are four elements to an employee's First Amendment retaliation claim against his employer: (1) the plaintiff must suffer an adverse employment decision, (2) the speech must involve a matter of public concern, (3) the plaintiff's interest in speaking must outweigh the defendant's interest in promoting efficiency, and (4) the plaintiff's speech must have motivated the adverse employment decision.

In this case, the Parties have stipulated that the Defendants acted "under color of law" of the State of Texas. It is also undisputed that the Plaintiff suffered an adverse employment decision.

6

You are instructed that the comments by Juan Pequeno made at the City
Commission meeting and subsequent communications with Carlos Rubinstein and Ivan
Welker regarding his concerns about Sweetsoft's inefficiency in collecting revenues
were statements involving a matter of public concern and are therefore protected.

You must determine if the Plaintiff has proven by a preponderance of the
evidence that the Defendants intentionally committed acts that violated his First
Amendment rights. The violation of any of his federally protected rights must have
been committed by a final policy-maker. You are instructed that Carlos Rubinstein was
a final policy-maker for the City of Brownsville.

The Plaintiff must also prove that his protected speech was a substantial or
motivating factor in the Defendants' decision to take action against him. The Plaintiff's
protected speech was a substantial or motivating factor in the Defendants' decision to
take action against him if it played a substantial part in the actual decision to take action
against him. The Defendants may have taken action for no reason whatsoever. If so,
then the Plaintiff's speech was not a substantial or motivating factor in the Defendants'
decision. The Defendants may have taken action for one sole reason. If that one sole
reason was not the Plaintiff's protected speech, then the Plaintiff's speech was not a
substantial or motivating factor in the Defendants' decision. The Defendants may have
taken action for several reasons. If so, then you must determine whether one of those
reasons was the Plaintiff's speech involving his concerns about Sweetsoft's inefficiency
in collecting revenues. If such protected speech was one of those reasons, then you
must determine whether it played a substantial part in the actual decision to take action

7

against Plaintiff. If it did not, then the Plaintiff's speech was not a substantial or
motivating factor in the Defendants' decision.

You must also balance the Plaintiff's First Amendment interests against the
Defendants' interests in promoting the efficiency of the public service it performs
through its employees. In striking this balance, you should examine whether the
speech was likely to generate controversy and disruption, whether it impeded the City's
general performance and operation, and whether it affected working relationships
necessary to the City's proper functioning. If you find the Plaintiff's interest in his
speech does not outweigh the Defendant's interest in promoting efficiency, you must
find for the Defendants.

8

**Question No. 1.**  Was the protected First Amendment speech a substantial or motivating factor in the City of Brownsville's decision to discharge Juan Pequeno?

Yes __X__    No _____

If you answered "yes" to Question No. 1,  answer Question No. 2.  Otherwise do not answer Question No. 2.

9

**Question No. 2.**

If you answered yes to Question No. 1, then you must decide whether the City of Brownsville discharged Juan Pequeno for other reasons, even if he had not engaged in his protected speech activities. In other words, the Defendants must show by a preponderance of the evidence that they would have made the same decision without considering the Plaintiff's protected speech.

Was Juan Pequeno discharged by the City of Brownsville for other reasons, outside the protected First Amendment speech?

Answer: "Yes" _____        "No" __X__

If you answered "no" to Question No. 2, answer Question No. 3. Otherwise, do not answer Question No. 3.

10

## DAMAGES

### Cautionary Instructions on Damages

If you find that the Plaintiff has proven, by a preponderance of the evidence, all of the elements of his claim, you must then decide if he suffered any injuries as a result of the violation of his federally protected rights.

The fact that I am giving you instructions on damages does not mean that you must reach the issue of damages. Also just because I give you instructions on damages does not mean I have an opinion on liability, one way or the other. It is for you alone to decide whether the Defendants whom you are considering are liable to the Plaintiff.

### Compensatory Damages

If you find that the Defendants are liable to the Plaintiff, then you must determine an amount that is fair compensation for all of the Plaintiff's damages. The purpose of compensatory damages is to compensate the Plaintiff for the injuries, if any, that he sustained as a result of the Defendants' acts. Compensatory damages are not allowed as a punishment and cannot be imposed or increased to penalize the Defendants. You should not award compensatory damages for speculative injuries, but only for those injuries which the Plaintiff has actually suffered or that the Plaintiff is reasonably likely to suffer in the future.

11

## Mental Anguish

In assessing compensatory damages, you may include an amount for emotional distress, caused by the constitutional violation, that you determine to be reasonable compensation in light of all the evidence in this case. We all know that the nature and degree of pain and mental distress may differ widely from person to person. Consequently, the law does not try to fix, nor does the law permit a precise formula by which pain or emotional distress as an element of compensatory damages may be measured and reduced to dollars and cents. Instead of providing a formula for measuring these damages, the law leaves the determination of the amount of damages to the common sense of you, the jurors.

You should arrive at a monetary amount, in light of your common knowledge and general experience, and without regard to sentiment, that you deem to be fair, reasonable, and adequate. In other words, without favor, without sympathy, and without any precise formula, you as jurors should arrive at a sum of money that will justly, fairly and adequately compensate the Plaintiff for the actual pain, suffering, and emotional distress you find that he endured as a direct result of any constitutional deprivation he may have suffered. The amount of damages should be neither excessive nor inadequate. It should be fair, just, and reasonable.


## Lost Earnings in the Past and in the Future

In assessing compensatory damages, you may include an amount for lost past and future earnings that you determine to be reasonable compensation in light of all the

12

evidence in this case.

An award of future damages requires that payment be made now for a loss that Plaintiff will not actually suffer until some future date. Accordingly, if you should award future earnings, then you must determine the present worth in dollars of such future earnings. If you award future earnings, you must consider two factors: (1) you should reduce any award by the amount of the expenses that the Plaintiff would have incurred in making those earnings; and (2) you must reduce the amount to present value by considering the interest that the Plaintiff could earn on the amount of the award if he made a relatively risk free investment.

**Mitigation of Damages**

A person who claims damages resulting from the wrongful act of another has a duty under the law to use reasonable diligence to mitigate, that is, to avoid or minimize those damages.

If you find the Defendants are liable and the Plaintiff has suffered damages, the Plaintiff may not recover for any item of damage which he could have avoided through reasonable effort. If you find by a preponderance of the evidence the Plaintiff unreasonably failed to take advantage of an opportunity to lessen his damages, you should deny him recovery for those damages which he would have avoided had he taken advantage of the opportunity.

You are the sole judge of whether the Plaintiff acted reasonably in avoiding or minimizing his damages. An injured Plaintiff can not sit idly by when presented with an

13

opportunity to reduce his damages. The Defendants have the burden of proving the damages which the Plaintiff could have mitigated.

## Nominal Damages

If you return a verdict in the Plaintiff's favor on his claim, but find that he failed to meet his burden of proving that he suffered any actual injuries, then you must award the Plaintiff "nominal damages" not to exceed one dollar. Nominal damages are the law's way of recognizing that constitutional rights must be scrupulously observed, even when constitutional violations have not been shown to have caused actual injury.

## Attorneys' Fees

Pursuant to federal statute, the prevailing party in this action may recover reasonable attorneys' fees as part of the costs of suit.

14

TO:   Carlos Rubinstein,  City Manager
      Ivan Welker, Assistant City Manager

From: Juan Pequeno,  MIS Director

RE:   Proposal to continue in-house processing of EMS billing

Date: October 29, 1998

REASONS FOR PROCESSING EMS BILLING IN-HOUSE:

I.  Around March of 1996 the EMS director and I met with EMS staff from Harlingen
    which have a similar size operation as Brownsville.  I noted the following differences:

|                             | Harlingen | Brownsville |
|-----------------------------|-----------|-------------|
| Years in operations         | 8         | 10          |
| Platform(type of Computer)  | PC-base on Novell | HP3000 server |
| **# of staff on Collections** | 4       | 2½          |
| Software                    | Sweetsoft Inc (DOS based) | In-house (customized) and updated on a continuous basis with agencies |
| Cost of Implementation      | >$80,000  | In-house    |
| Yearly Maintenance Support  | $5,000    | In-house    |
| Yearly Collections          | $750,000  | >$800,000 in 1996 |

In the past 2 ½ years                    Brownsville has now increased
                                              staff up to 5

                                         Assigned 1 employee for collections only





PLAINTIFF'S
EXHIBIT
B-00-180
6.

page 1 of 4

Implemented new collection procedures

Sent staff for medicare/medicaid training

Have achieved highest collection ever of
$1.3 million

In 1996, the city's in-house software was collecting more revenue and incurring less costs in implementation, maintenance, and staff, than the comparable city which was using the Sweetsoft software.   The city of Brownsville has continuously increased its revenue over the last years up to where it is today at $1.3 million with potential for future increases if further collection policies are adhered to by EMS such as monitoring of aging report efficiently.

The city of Brownsville now has a person assigned exclusively to delinquent collection, making sure a notice of bill is sent to a customer promptly and also placing a call to customers prior to sending bill to collection agency.  This alone has greatly increased revenue collection for city of Brownsville.

II. Our current in-house EMS billing system was developed using 4th generation software following specific requirements from Medicare/Medicaid.  All facets of operations and billing have been automated over the past years.  The city's EMS system is customized to the EMS needs and to the federal government guidelines.  MIS has never missed a deadline of implementing a mandated computer change for Medicare or any other agency.

MIS has had to continually retrain EMS personnel because of high turnover at EMS and MIS has also had to rush last minute changes on several occasions because of the untimeliness of receiving mandated changes from EMS department. It used to be months before MIS was advised about a mandated change by EMS department.  This was corrected in-house by improved communication. The sooner a government mandated change is received, the sooner the MIS department will schedule and implement accordingly.

III. Sweetsoft software is DOS-based and was develop in 1981.  Few companies or users are now using DOS based software.  For some unknown reason, this vendor has chosen not to update their software to Windows platform which is the future for the majority of the business world including the city of Brownsville.

Page 2 of 4

According to the vendor, his software can operate on WIN95 but it is still a 16 bit software. It does not have a graphical user interface (user friendly) (point/click); consequently, it requires a higher learning curve and this will not be an improvement over the city's current EMS system.  Every major module offered by Sweetsoft is already in operations and customized at the city of Brownsville.

The current in-house EMS billing is one the best software the city has.  MIS invested much time and effort to create the excellent and efficient system the city has today.  The city could put this in-house software against any other billing EMS system that is in a similar situation as the City of Brownsville.

IV. Neither the city management nor the city internal auditor included the MIS department on consideration of purchasing EMS billing software.

It has been normal procedure for the auditors to "ask" MIS about the current system so they can see the full picture and make an unbiased finding. An example of  such was the procedure with the findings at Municipal Court just a month ago.  In this case,  MIS was only "told" about this agenda item and, MIS was only told about this item "after" the item had already been placed on the city agenda for approval.

V. Finance department had a difficult time getting a copy of the auditor's EMS findings to MIS.  After reading the misinformation and misleading statements in the auditor's finding on EMS concerning the need for a new system, MIS understands why a copy of this was delayed.

MIS has never missed a mandated computer change deadline from any government agency.  It is also standard procedure for the MIS department when making computer software changes, to do thorough testing as any good organization would include.   MIS' current method is extremely efficient, done accurately, and customized to the city's needs.  The current EMS  billing system is up to date with the latest changes mandated from medicare/medicaid.
It contains all the major modules for EMS billing and accounting and interfaces with the city's General Ledger for up to the minute financial data.

Page 3 of 4

VI. It is also fact that SweetComputer Services, Inc is not the sole provider of
ambulance EMS billing software in the USA.   There are several other vendors
with products that do the same similar functions of EMS billing and collections.

VII. The decentralization of EMS billing to their own department office would
bring about duplication of data processing situations whose costs are
currently already being absorbed by MIS; some of these are the following:

   a. an additional computer server
   b. an increased level of security threat to EMS data
   c. an increased level of security threat to their computers
   d. an increased level of fire or other natural disaster threat to EMS operations
   e. a duplication of EMS data
   f. maintaining accountability of data processing functions including backup
      of server by EMS personnel
   g. an increased reliance on outside vendors
   h. an increased reliance on software maintenance support

VIII. Instead of going backwards in time with the limited and DOS based
Sweetsoft software, today's existing technology can join the eight billing
and receiving locations spread throughout the city, and establish a
"one-stop collection department".   This would simplify and improve the
city's implementation of proper policies and collection and, this would also
convenience our citizens of Brownsville.

Page 4 of 4

 *ENCLOSURE #2*

TO:    Carlos Rubinstein, City Manager
       Ivan Welker, Assistant City Manager

From: Juan Pequeno, MIS Director

RE:    Response to memo received 11/05/98 - Asking for Proposal #2

Date: November 9, 1998


SECOND PROPOSAL
TO CONTINUE IN-HOUSE PROCESSING OF EMS BILLING

MIS memo of October 29, 1998 did address the current situation of
City's in-house EMS billing system. However, MIS will restate similar
information for perhaps a more clear understanding.


## CURRENT EMS SYSTEM EVALUATION OF $1.3 MILLION REVENUE


MIS' current evaluation is that the in-house EMS system is excellent, especially
in collection of revenue which is at an all time record high of $1.3 million.

The city of Brownsville has increased its revenue every year on a consistent
basis for the last four years. The following facts have occurred
since October 1995:

   a) the city purchased a new HP3000 server which is fast, efficient,
      networkable and which has directly increased productivity
      for all city departments especially EMS data entry and electronic billing,

   b) EMS staff working with EMS billing systems has increased from
      2 ½ to 5 with one person assigned to calling and sending notices only,

   c) EMS has been able to train staff on processing claims





PLAINTIFF'S
EXHIBIT
B-00-180
8

page 1 of 6

d) MIS has kept software updated with latest changes from government agencies within deadlines

e) MIS has provided continuous training on in-house software to EMS

f) MIS has in-house programmers assigned to make changes for EMS

## CURRENT IN-PROGRESS PROJECTS FOR EMS SYSTEM

The in-progress projects for EMS in-house system are:

a) Year 2000 conversion of EMS database and software to be completed by 4/99 and implemented by 10/99 - Scheduled FY99

b) additional system code for batch processing of claims -Scheduled FY99

c) insurance screen modifications (Combine screens)- Scheduled FY99

d) additional comments to be used for event history - Scheduled FY99

e) setup of pre-qualification screening of claims submitted - Scheduled FY99

page 2 of 6

## CURRENT IN-HOUSE ADVANTAGES OVER PC-BASED

Our in-house EMS billing system has the following advantages over any PC based system such as Sweetsoft:

1) customized to the city of Brownsville needs

2) complete interface with city's general ledger

3) provides high security of confidential EMS data with daily backup

4) faster processor than PC based

5) software written in 4th generation utilities (Cognos)

6) provides in-house programmers for quick response

7) lower maintenance and support cost for the city

8) updated continuously with latest changes to medicare/ medicaid

9) provides as needed in-house training

The current in-house EMS billing system is up-to-date with the latest changes mandated from medicare/ medicaid. It contains all the major modules for EMS billing and accounting and interfaces with the city's general ledger for up to the minute financial data.

Page 3 of 6

CURRENT AND COMPLETED PROJECTS (STATED AS INCOMPLETE OR NOT AVAILABLE BY EMS DIRECTOR
                              in memo of  September 25, 1998 to City Manager)

1) programs to send trauma reports to Texas department of Health - Implemented 11/96

2) addition of help screens for descriptions of different EMS codes

3) creation of reporting system based on ad-hoc needs that EMS requests
   (over 100 different reports for EMS needs)

4) option to add electronic BCBS remittance
   (put on hold by EMS staff who stated they did not have time to do)

5) option to print EMS claims to EMS PC printer
   (currently prints to EMS printer link to HP3000)
   (also put on hold by EMS staff)


This software is also not the sole source as stated by EMS director and Purchasing.

## AUDITOR'S FINDINGS OF EMS AND FINANCE INEFFICIENCIES

In the internal auditor's findings on EMS, over 98% of the findings were about inefficiencies between EMS and Finance departments.

The inefficiencies involved current procedures:
either because of a lack of procedure or, not doing a process correctly.

Examples of these are the following:

1) not depositing money daily to the bank

2) having petty cash allowance at EMS which is city violation

3) misplacement of run reports by EMS staff

4) EMS and Finance not having setup procedure for
    writing off over 5 year accounts from EMS system

5) not filing proper papers with AETNA causing AETNA to
    withhold of 31% of claim

6) not following through with collections charges to hospitals

7) not efficiently using the age-trial report (30/60/90)
    consequently because EMS has "not written off 10 year accounts"

8) future increase in collections is possible if EMS continues to
    utilize proper collection policies and

9) future increase in collections by efficient use of the aging trial report
    which had not been used by EMS for the past four years

## MISREPRESENTATION OF FINDINGS
## WITH REGARD FOR EMS ACCOUNTING SYSTEM

A more serious matter that has occurred is that the internal auditor's finding
on a need for an EMS accounting system includes gross misrepresentation
of the facts.
The statements made by the internal auditor are false with regard to
the in-house EMS billing system.

MIS has never missed a mandated computer change deadline from any
government agency.
MIS' current method is extremely efficient, done accurately, and customized
to the city's needs.
The current EMS billing system is up to date with the latest changes mandated
from medicare/ medicaid.
It includes all the major modules for EMS billing and accounting and interfaces
with the city's general ledger efficiently.

It has been normal procedure for the auditors to "ask" MIS about the current
system so they can see the full picture and make an unbiased finding.
An example of this was with the findings at Municipal Court just a month ago.
However, the EMS finding was arrived at after talking with EMS staff only.

The city management, city audit committee, and EMS failed to involve
MIS on this evaluation of current in-house EMS billing system.
MIS was only "told" about this agenda item and, MIS was only told
about this item "after" the item had already been placed on the
city's agenda for approval.
Bypassing MIS and knowing about the misrepresentation of facts
involving MIS, city management placed this item for approval on
the October 20, 1998 agenda.

The audit finding on EMS was completed on September 17, 1998
even though MIS did not receive the audit findings until October 27, 1998.

This information/findings were never forwarded to MIS neither by
city management, nor by the internal auditor, nor by the audit committee.

Ivan Welker
Assistant City Manager



## BROWNSVILLE
*On the Border, By the Sea*

November 19, 1998

Juan Pequeno, #2205
M.I.S. Director
City of Brownsville, Texas

   Re: Pre-Disciplinary Hearing.

Dear Mr. Pequeno:

The City of Brownsville is considering taking disciplinary action against you. This contemplated disciplinary action is based upon charges that you allegedly willfully violated the following points listed in the City's Personnel Policies Manual, Chapter VII Discipline, Section 703: Grounds, pages 38-39:

> 11. Insubordination: reference, in part, your memorandum dated October 29, 1998 Proposal to Continue In-House Billing, the City Manager's memorandum to you dated November 4, 1998 EMS Computer Program and your response dated November 9, 1998.

> 17. Actions which tend to destroy friendly relations between the City and its employees or between employees.

> 18. Failure or refusal to cooperate with fellow workers.

> 28. Conduct which would reflect unfavorably towards the City of Brownsville.

Also included is Chapter V, Absence, Section 504: Sick Leave, page 28:

> (g) Employees using or attempting to use sick leave without proper cause shall be subject to disciplinary action, including dismissal. In this regard, please be prepared to substantiate the illness leading to your use of sick leave for the following days. November 12, 13, 16, 17, 1998.

A pre-disciplinary hearing will be held at my office located at City Hall on Tuesday, November 24, 1998 at 11:00 a.m. This hearing is to afford you the opportunity to present your side of the story. You may bring a representative of your choice; however, the representative cannot attend this meeting in your place or testify on your behalf. You are further advised that from the date and time you receive this letter, you are placed on **administrative absence with pay** until the scheduled hearing date and time.





In considering whether or not disciplinary action would be taken against you for these charges, the City will consider all information available pertaining to these charges. After hearing any evidence you wish to present, a decision will be made as to whether or not to carry out disciplinary action, if any. If you need assistance in preparing for your response, please call Efren Fernandez, Human Resources Director at 548-6035.

Sincerely,

Ivan Welker
Assistant City Manager

cc:    employee file

TO:    Henry Gonzalez,  Honorable Mayor
         Carlton J. "und" Richards, Commissioner Place #1
         Ernie Hernandez, Commissioner Place #2
         Harry E. McNair, Jr., Commissioner Place #3
         John Wood, Commissioner Place #4

From:  Juan Pequeno,  MIS Director

RE:    Mismanagement by the city manager and assistant city manager

Date:  November 16, 1998

This is to inform you of the serious mismanagement by the city manager and
assistant city manager that has been occurring for an unspecified amount of time
at the city of Brownsville.

The mismanagement is discussed briefly within 4 main areas in the next several
pages with enclosures that follow.

    I.  Mismanagement of the entire process surrounding the EMS software
       item on the agenda:

        1.  The city management, internal auditor, and audit committee
           bypassed MIS in the process of deciding whether to replace
           one of city's most updated, efficient and excellent in-house systems
           which collected over $1.3 million in revenue this past fiscal year
           with a PC system based on DOS.

           MIS' recommendation is to stay with the current in-house system
           because of the outstanding results the city is achieving.

           The DOS based Sweetsoft cannot increase the yearly revenue and
           studies show that revenues will most probably decrease the first
           several years.

           The current in-house system can collect more money
           if Finance and EMS improve their procedures.

           Over 98% of the deficiencies mentioned in the auditor's report
           stem from improper or lack of procedures with Finance and EMS.

                                         Page 1 of 12





*10 of 38*

2. The internal auditor made false and unfavorable statements about city's MIS in-house system in their findings which were being used as reasons to purchase PC software, and these were presented to the commissioners.

3. City management placed the EMS software on the agenda before MIS had information about the EMS findings.

4. Purchasing Officer presented false information to the commissioners,

5. City management placed this item for approval on the October 20, 1998 agenda. The audit findings on EMS were completed on September 17, 1998 eventhough MIS did not receive the audit findings until October 27, 1998.

6. Purchasing Officer held a meeting regarding the EMS software on October 26, 1998 eventhough I had notified his secretary and city management that I would be out until October 27, 1998.

7. City management has created bad relations between MIS and EMS and Finance and Purchasing because of the mishandling of the whole situation.

8. City management has also denied any wrong doings by anybody and consequently has done nothing to remedy the situation but instead has become hostile, threatening, and abusive towards MIS department.

9. The city manager angrily ended a meeting, stating he would place and favor the EMS software item on the agenda.

I was also warned that the lies would continue with the Commission, since the city manager stated he would answer any question from the Commission about MIS in the following manner:
"MIS was not able to meet the needs of this department".

Page 2 of 12

11 of 38

a hostile en...ironment and lacking concern by ... ... providing any remedy.

City of Brownsville Mission Statement:
"To earn and maintain public trust by providing customers efficient and
quality municipal services with courtesy and concern."

Examples of these are:

1. Rapid decline of respect has filtered directly from the city management
   through to the MIS employees, and other city employees, causing
   disruption, distrust, lower morale, and strain in the communication
   with other city employees.

2. My staff has been experiencing an increased level of disrespect
   from city employees and since this is occurring on a more frequent
   basis, I have had to meet with my staff and other directors in order
   to alleviate this growing trend.

3. The city manager loudly, rudely and discourteously for no reason
   "ordered" one of my staff to do something.

4. The assistant city manager discourteously and angrily asked questions
   to one of my staff and then loudly and rudely hung up on him.

5. The city manager and assistant city manager unethically utilized negative
   and false information about the value and efficiency of the software
   created in-house by one of my staff.

6. The city manager and assistant city manager have established a reputation
   for mistreating city directors and for abusing of their position in order to
   immaturely scheme games, with total disregard for the
   responsibility and respect that they owe to the city.

7. The city manager called a meeting with the intention of teaming up
   against me with the assistant city manager in order to try to
   intimidate in a yelling and out of control manner, calling both of
   my proposals a waste of time and " _ _ _ _ ", and using the EMS
   director as an audience.

**Page 3 of 12**

12 of 38

8. At the same meeting above, the city manager threatened insubordination
   and suggested that I apologize to the assistant city manager for
   having written the facts in the proposals.

   The city manager alleged that I was alluding to a conspiracy by them
   and ordered repeatedly in an out of control manner to read the
   following statement from the end of the second proposal:
   "Bypassing MIS and knowing about the misrepresentation of facts
    involving MIS, city management placed this item for approval
    on the October 20, 1998 agenda".

   ("The audit finding on EMS was completed on September 17, 1998
     even though MIS did not receive the audit finding
     until October 27, 1998.")

9. The assistant city manager used the same "meeting"
   above as a platform for also yelling, losing control,
   and trying to intimidate by threatening with insubordination for
   merely answering, threatening by waving his arm out of control,
   verbancally launching himself at me, and using the EMS director
   at trying to intimidate in order to discourage me from going to the
   commission about this matter. The assistant city manager,
   out of control, denied that the citizens of Brownsville and the
   city commissioners were our bosses and instead threatened that the
   city manager was our only boss.

11. The city manager angrily ended the meeting stating that he would
    place and favor the EMS software item on the agenda.

    I was also warned that the lies would continue with the Commission,
    since city manager stated he would answer any question from the
    Commission, about MIS, in the following manner:
    "MIS was not able to meet the needs of this department."

page 4 of 12

*13 of 38*

III. Mismanagement by deceivingly scheming to put on a false picture of my job performance in order to justify not granting me a merit raise and therefore, being unconscionable, and showing bad faith with malicious intent.

1. I recently found out that one of the city directors got a $5,000 salary increase even though the director had been suspended for a city violation earlier in the year.

   One must wonder what kind of merit system is this.
   A merit system will only work if it is done honestly and correctly and, if it is monitored through some kind of check and balance system.

2. However, in my case, the scheme used against me included the assistant city manager fabricating in a letter, false statements of events that never occurred.

3. The assistant city manager used unsigned negative letters against me, on several occasions with the city manager encouraging and supporting this action.
   (I found out after discussing this with the city manager and I expressed to him that what the assistant city manager had done was highly unethical.)

   If city management uses unsigned letters against me, they are as guilty as having written the letters themselves.

4. The assistant city manager gave all directors a copy of the the performance based evaluation on February 1998 which he said he would use for job performance evaluation.

   The assistant city manager specifically stated that this was a contract signed by the director and the assistant city manager.

   Assistant city manager stated that this contract would be the basis for our job performance evaluation.

   However, he conveniently did not use the current performance based evaluation form but instead use a primitive evaluation form which our own quality management trainer called a 'failure' because it affected city morale negatively.

Page 5 of 12

14 of 38

The city manager himself said he would not use this primitive type of evaluation himself, yet when I reminded him of this and explained the assistant city manager's malicious actions, the city manager responded that the assistant city manager would not do those kinds of things, supported him in his decision, and said that he would look into it (which up to now, the city manager has done nothing).

5. The assistant city manager conducted a poor, biased, derogatory, false, and primitive evaluation of my job performance.

6. The assistant city manager requested to meet with me 15 minutes before noon to discuss my evaluation which contained the unethical and malicious use of letters with questionable dates and some with no signatures.

7. The evaluation contained no discussion of my current job performance such as the current Year 2000 project and other important projects for the city, some of which total over $500,000 in savings.

8. The next couple of pages describe my education, experience, and job performance which should not have gone unrecognized for the purpose of appropriate salary increases:

page 6 of 12

15 of 38

## UCATION, EXPERIENCE, AND JOB PERFORMANCE

I have an MBA degree in Business Administration which I obtained from UTB in September 1985. I also have a Bachelors in Computer Information Systems since August 1981.

I have been adjunct professor for the UTB computer science department for the last couple of years.

I have accomplished over 17 years working in the computer field and specializing in the HP3000 computers which is the one the City of Brownsville currently has.

I have been MIS Director since January 1994 for the city of Brownsville. Previous to that I had been a programmer/analyst for the city since October 1984 for nine years and for Cameron County for three years.

I have saved thousands of dollars managing the MIS department as efficiently as possible and working with under $500 a year for overtime.

I have stayed within the budget the last 5 years.

My current staff consists of 2 programmers, 1 PC technician, and 1 operator.

MIS department is responsible for the administrative functions of the city such as payroll, financials (A/P, P/O, G/L), receipting, permitting, Health permits, EMS receivables and receipting, Airport A/R, Human Resources functions (Sick Annual system), parking rentals, and landfill daily checking system, and many other smaller systems.

MIS current number 1 challenge is to get our software Y2K Compliant by October 1, 1999. Our 2 programmers are working Monday-Friday as many as hours as possible to get compliant. Currently, we are on target.

MIS will be saving the city over $500,000 by doing the conversion of software in-house as well as checking all city PCs for Y2K compliant.

I am monitoring closely all our software changes so that the city will meet the targeted deadline.

Page 7 of 12

MIS has been able to save the city over $1,200,000 in the past four years:

I.  saved over $700,000 replacing the old computer with a new one
    (which is one of the fastest in the market) and, saved also by not having
    to buy all different software and all different equipment

    of this, $150,000 was saved on consulting fees (did not have to pay)
            $ 70,000 was saved on continuing utilization of good HP equipment
            $200,000 was saved on not having to convert to different computer
            $ 20,000 was saved by implementing new computer in-house
                    by MIS instead of contracting out (took 1 weekend)
            $400,000 was saved by not having to purchase new financial
                    software which had already been created, customized
                    to the city's needs and operational
            $ 50,000 was saved by purchasing new computer with 25% discount
                    and returning overcharged computer equipment ($15,000)

Savings of over $7,000 by having company COBOLTEXAS Inc. conduct
a scanning of our 700 Cobol programs for free.

Savings of over $40,000 on consulting fees in program monitoring of
accurate and timely Y2K projects including:
  the inventory of all city systems, and
  identifying and scheduling all critical applications for Y2K compliant.

The city was able to obtain a better bond rating from NYC because of
MIS developing an in-house solution to the Y2K problem.
The mayor acknowledged the job performance on this matter.

*17 of 38*

Page 8 of 12

Another unrecognized savings to the city has been the efficient utilization of fund 41-241.  Certificates of Obligations were issued to update the city's computer system in the amount of $500,000.

Of this $500,000, only $230,000 was initially used for the purchase of the computer.  $250,000 was used by other city departments; consequently, saving other city funds.

Other city departments which have gotten equipment or software from 41-241:

   $6,000  - City manager's PC and laptop

   $8,000  - Finance - 2 HP fast printers; Fixed Assets software

   $2,500  - City Secretary - PC

   $5,000  - EMS - 2 PCs and printers

   $80,000 - GIS - Geographic Information systems link with PUB

   $ 4,000 - Permitting/Health - new communication link via fiber

   $150,000 - Landfill  - funds redirected to Landfill compliance

MIS currently has a balance of $21,000 in the Fund.

*18 of 38*

IV. Mismanagement by failing to adjust my salary matrix over the
    past years and neglecting to consider the fact that it is far below the
    comparable market level, far below other comparable local
    MIS directors, far below the other city directors, and far below
    comparable cities in the recent study conducted by Human Resources.

1. I have met with the city manager several times to discuss my salary
   adjustment. I have offered information and assistance and told him that
   the majority of city directors had gotten grade/step adjustments and merits or raises.

2. All the city manager has been able to do is deceivingly repeat that he's
   "working on it" and "soon, soon".

3. Mismanagement by neglecting to adjust the salary/matrix, by
   continuing the subpar pay, and by failing to remedy the incorrect pay
   has occurred for the last several years.

The salary of $42,000 is shamefully low according to the market study
and the salary survey conducted by our Human Resources department
a couple of months ago.

The current pay of $42,000 is the lowest pay of the current local entities for
MIS director positions  (PUB, UTB, Cameron, BISD) with PUB at $60,000.

This salary is the lowest paid for a city director position in the city of
Brownsville with my education, experience, seniority, and qualifications

McAllen currently pays its MIS Director $65,000.

There has been a $10,000 thru $20,000 salary gap between the MIS Director
position and the other city Directors..

95% of all city directors are earning from $48,000 to $59,000.

City directors who have been hired within the last several years have been
hired at the starting salary of more than $10,000 above my current salary
eventhough I have been with the city for over 14 years.

Page 10 of 12

19 of 38

MIS director position is so low that even within the MIS department, it is only $4,500/year more than the salary of programmer/analyst.

The average salary difference for other city directors and their immediate supervisors is over $15,000.

The city's fire marshall, police sergeant, and police lieutenant positions are paying more than the MIS director position.

UTB currently pays $46,000 for a computer programming position.

I hereby respectfully request the Honorable Mayor and City Commissioners to address these matters appropriately and to grant remedy back pay by a at least a minimum in the following reasonable amounts per year for the duration of the MIS director position I have held for the past five years.

(This is the minimum difference of what the salary should have been corrected to based on the salary chart at the respective times):

| Comparable Salary | Actual | Difference |
|---|---|---|
| 1994 - $45,814 | $36,802 | ($9,000) |
| 1995 - $49,100 | $38,647 | ($10,500) |
| 1996 - $50,600 | $39,808 | ($11,000) |
| 1997 - $55,800 | $42,232 | ($13,500) |
| 1998 - $60,000 | $42,232 | ($18,000) |

page 11 of 12

20 of 38

I can be reached at 548-6114 (work) or 546-70 (home).

Sincerely yours,

Juan Pequeno, MIS Director

Enclosures:

1. First Proposal - Analysis of in-house EMS system, misrepresentation of facts, and mismanagement of procedures

2. Second Proposal - Addition to First Proposal

3. EMS Audit findings

4. City manager's request for Second Proposal

5. Performance Evaluation form which was supposed to have been used

6. Director Salary reports from January 1994 to November 1998

page 12 of 12

2/ 8 38

Civil Action No. B-00-180

| | | |
|---|---|---|
| Juan Pequeño | § | U.S. District Court |
| | § | |
| vs. | § | Southern District |
| | § | |
| City of Brownsville, et al | § | Brownsville Division |

**City of Brownsville**
**City Commission Meeting 10/20/98**

**TRANSCRIPT**

**ITEM 12**     **Consideration and Action awarding the contract for the purchase of the Sweet Soft Ambulance 2000 Complete Accounts Receivable Program for use by the EMS Department**

1st Person (Art):     Honorable Mayor and Commissioners, pursuant to Local Government Code 252.022 "General Exemptions". Items that are available from only source because of patent, copyrights, secret processes, or natural monopolies are exempt from the competitive bidding process. Inasmuch as this software is available only from the developer and copyright holders Sweet Computer Service, Inc.  The City of Brownsville may make this purchase without soliciting additional quotations.  Management of EMS is satisfied with the performance of this software.  Various EMS facilities including several in South Texas have proven positive experience using the product.  Staff has met with Mr. Leonard Calliard, Deputy Director of Harlingen EMS to review the program and its application.  Mr. Calliard has had the system installed for eight years and is very satisfied with it.  He pointed out the very specific nature of EMS billing and the systems capability to manage the various billing and aging methods required by agencies such as Medicare, Medicaid and Private insurance.  It is significant to point out that in the findings and recommendations by the City's Internal Auditor to the audit committee, a new





Page 1



accounting system specifically designed for EMS operations should be acquired. To quote from the Long, Chilton, Payte and Hardin, L.L.P., September 17, 1998 report, "An industry's specific software would enhance the billing and collection processes and guarantee timely updates to any changes in the laws affecting Medicare and Medicaid. Summary financial information will be batched and transmitted to the Finance Department through the City's existing computer network. The vendor has stated that the software is the year 2000 compliance. The computer software proposal from the vendor is attached for commission consideration and action. We do have one very slight change the EMS Director presented to me today the request to add one additional module to the package. The cost of that module is $895.00. The purpose of that module is to deliver the information in aske format. Which is a computer code format, which will allow for smoother interface to the City's existing system. The staff recommends the following, award a contract for the purchase of the Sweet Soft Ambulance 2000 Complete Accounts Receivable software program to Sweet Computer Services, Inc., West Union, Iowa, the sole source provider at $13,600.00 plus an additional $895.00 for the module just mentioned. Total amount $14,495.00 including the multi-user base program, all required modules, manuals, telephone support, installation, training and delivery. Funding for this procurement is available from the General Fund.

| | |
|---|---|
| 2nd Person: | Can we get a report back in about six months to see if this has helped us to keep our delinquencies. |
| 1st Person (Art): | We can do that. |
| 2nd Person: | Make a note that we do that, … |
| 1st Person (Art): | Absolutely. |

2nd Person:        because I think it's real important. It will pay for it's self real quick if it works. Motion to approve.

1st Person (Art):    Yes, sir.

3rd Person:        Second.

Mayor Gonzalez:  All those in favor. Oh, oh. So is our computer expert.

4th Person (Pequeño):    I just want to point out a couple of things. I respect my colleague's opinions and you know in going with a … looking another software, like Sweet Soft. In fact we got to demo it about eight months ago in this room ourselves. And, one of the things about it was that it was DOS base, and one of the main drawbacks of it. It started back in 1981. And, what that means is that when the PCs first started, that's what they first started with. And, basically… and we asked the consultant that was selling it you know, "When are you going to look at upgrading it." And, he really didn't know. And, the company does sell this software through out the country. But one of the things… we've been …I look ah… This company has a web site on the Internet. And, I just found out about this on the Agenda. It was going to be on the Agenda this coming week from my… and ah. But anyway…. And I got together with Art. And, kind of last minute deal. But we have been collecting this year we have collected more than we ever have from Ambulance, $1.3 million. Last year it was $1.1 million. The year before .8, you know $800,000.00. So we have been going, cons… you know consecutively going up and up. The only from this that concerns me that we might be going a little bit backwards. Going with an older PC DOS base system. Also, the system that we have is working well. The bottom line you can look at the figures. Is money coming, you know, coming in? It is. And, it is attributed to two major factors, that we got a new computer three years ago. So we don't have wait on the computer any more like we use to. Plus also Art has implemented a lot of procedures. You know that

they have to ... the billings has to go out by a certain time. And, we implemented all these other processes that have helped the collection process. Plus he sent his people to get further training. And, I looked at the Internet, and the main thing to collection to increase revenue for Ambulance is education and learning how to use the program. Ah, after looking at it my recommendation is that this software just might not be the package for the City of Brownsville. But Art, you know, feels it is. But, but...

Mayor Gonzalez:    But, let me suggest something, that maybe we table this for a couple of weeks and you all get together and iron this out, and be together on it to see that we are doing the right thing for the City.

4th Person (Pequeño):       See he ...

1st Person (Art):    May I make... After we met, I met with Mr. Pequeño on two of the issues that this running under DOS base character set. But it has been optimized for Windows NT, Windows 98, and Windows95. And, the next upgrade taking it into the Microsoft NTS server is due out in 18 months. Eight months ago they would not release that information because they did not have enough facts. In talking to the reps today. They already are nearing a Beta test date to release the software for Beta. Use Beta means that they release...

Mayor Gonzalez:    But the salesman is going to tell you that to make the sale.

1st Person (Art):    But what I want to emphasize on that is ... I don't want to state that it is a DOS base program and become obsolete. It is being re... it is being optimized or recoded for the Windows NT environment.

Mayor Gonzalez:    Well, I still would like to make the same recommendation, that you table it for a couple of weeks. You all get together on it. Get with the salesman and

whatever.    And, since Mr. Pequeño is the computer expert maybe you all can come up to a solution.

4th Person (Pequeño):    We just...

2nd Person:    Art or (inaudible) can answer this.

4th Person (Pequeño):    Well also we don't want ... the issue of de-centralizing you know if, if... Say once we move more operations to like EMS, if any. It is going to rely more on their department to maintain the whole system. We won't be tied in as like we said in network. That's not... we're not there yet.    You know with the fiber we can later connect the computers together and backup each others data.    But the assurance right now, like if something happens over EMS all the data we keep it safe. It is under lock and key. And, that will be another issue that as you do that you open up the whole for security. More so than you are now.

5th Person:    Why is this the sole source?  Why do we try... we fit the software to our hardware.  What are we doing?

1st Person (Art):    We ... no sir.  This is the application that tailors to the ... if you have seen through out the few weeks. There is a lot of industry specific. That are specific to Medicare, Medicaid and the way it handles the account. The point being made about network security was brought up. And in fact the module that I added today would interface so that there would be no security breaches in the network. It can be done as safely as getting a diskette and hand carrying it. Or it can be done on a secure network.

Mayor Gonzalez:    Well lets not get into a discussion here between personnel.

1st Person(Art):    Yes, sir.

Mayor Gonzalez:    Let's just table it for a couple of weeks. Commissioner...

Page 5

2nd Person:      I will rescind my motion to make a motion to table for two weeks.

Mayor Gonzalez:  You all get together, and let's get the best thing that we can for our City. You all get together on it.

1st Person (Art):   Very well.

3rd Person (Pequeño)::    Very Good.

Mayor Gonzalez:  All those in favor.

Various Commisioners:  Aye.

Mayor Gonzalez:  Motion carries.

## TRANSCRIBER'S CERTIFICATION

I, Brenda Bustamante, do hereby affirm that I have transcribed an audiocassette containing Item 12 of the October 20, 1998, City of Brownsville, City Commission Meeting.

I transcribed the audiocassette to the best of my ability. I did not add or omit anything on this transcription.

Brenda Bustamante

SHOULD YOU HAVE ANY QUESTIONS REGARDING THE ABOVE, PLEASE CONTACT ME AT (956) 440-1007.