1  dollar to pay the creditors?

2        MR. SCHMIDT:  That's correct, Your Honor.

3        THE COURT:  Go ahead.  I'm sorry.

4        MR. SCHMIDT:  Quite all right, Your Honor.

5     So we got -- back to the dichotomy.  You've got the *Porras*

6  versus the *In re Martin.*  Unfortunately, we do not have the

7  benefit of an appeal of *In re Porras* of Judge Clark's opinion

8  because it stopped there.  I could not find any appellate

9  history on the case; so as far as I was able to see, it stopped

10 there.

11    So you have *In re Martin,* which I believe is the authority

12 in this circuit, and I think that the Court, the 5th Circuit has

13 carved out -- says in the 5th Circuit, we observe the extreme

14 circumstances exception to the right to convert to Chapter 13.

15    And, Your Honor, I think we have those extreme

16 circumstances.  Back -- if I may digress.  You have a deception

17 at work here.  Mr. Pequeno files and he places all of his

18 creditors on hold with the automatic stay, and -- but he never

19 files schedules.  And as the trustee, I sought information on

20 what his assets were, but he never would comply.

21    He ignored the subpoena that we sent to him.  He ignored the

22 judge's oral order that he file his schedules, and he ignored

23 the Court's written order based on my motion to compel the

24 filing of schedules.

25    He finally filed schedules in June.  We're six months into

1    the -- into his bankruptcy case, and he finally files schedules.

2    And when he does, he doesn't even talk about the judgment that

3    he had received or the lawsuit in the spots that the bankruptcy

4    schedules themselves have little categories where you fill in

5    the information.  It makes it fairly easy for anybody, and

6    they're pretty direct questions.  He doesn't put it in there.

7    In fact, he says "None."  And as we got further in the case, we

8    didn't know about it at that time, he had already received

9    $60,000 a short period before he filed bankruptcy.  He never

10   even put that in there.  It's only when we get down in September

11   when he's decided to file his motion to convert because we're

12   about to go mediate at the 5th Circuit, does he file for the

13   first time an adequate disclosure of his assets of that lawsuit

14   and the money.  And it's -- and we found out about the money at

15   a deposition.  And at his deposition, Your Honor, we asked him

16   to bring his bank statements.

17          THE COURT:  When did you find out about the lawsuit?

18          MR. SCHMIDT:  I found out about the lawsuit about March,

19   about three to four months into the case.

20          THE COURT:  I mean, because obviously one of

21   Mr. Schell's points was this.  Look, he filed the schedules in

22   June, but you already knew about that lawsuit.  So what?  No

23   harm, no foul.

24          MR. SCHMIDT:  That's his argument, Your Honor, but that

25   doesn't take from the fact that it's his duty to -- Your Honor,

1    he should have been telling the trustee and the Court about the

2    existence of that lawsuit in January.  He had 15 days to file

3    his schedules, and he should have been telling us earlier about

4    that lawsuit so that we could monitor that lawsuit so the Court

5    would be aware of the lawsuit.  He has an affirmative duty under

6    the code and under the case law to file and to supplement.  And

7    yes, we knew about it, but the harm is to the system in general.

8            THE COURT:  Well, but when did the case go to trial?

9            MR. SCHMIDT:  The case went to trial sometime in

10   January, I think, Your Honor.

11           THE COURT:  All right.  So in March when you found out

12   about it, the verdict was already in?

13           MR. SCHMIDT:  The verdict was already in.

14           THE COURT:  All right.  But it still -- there wasn't any

15   money?  I mean, it's not like he had any money.  It's not like

16   he won and they wrote him a check.

17           MR. SCHMIDT:  No, no.

18           THE COURT:  So I'm trying to figure out --

19           MR. SCHMIDT:  What's the harm?

20           THE COURT:  Yeah, exactly.

21           MR. SCHMIDT:  The harm is what we could have done during

22   the lawsuit, what we could have -- before it went to trial.  I

23   mean, potentially we could have settled it because it is

24   property of the estate.  And we could have maybe had the issues

25   drawn a little differently possibly, but we had no input into

1    that.   We had had no say-so whatever in that lawsuit until after

2    we learned about the verdict.

3        So those are the harms, and the harms in general are that in

4    order to have this system work properly, we have to have honest

5    reporting, and there needs to be consequences if you don't

6    honestly report.   And that's generally what I have to say about

7    that, Your Honor.

8        The other acts of deception are the fact that not only did

9    he not file schedules accurately or until way late, but he never

10   would show up at a creditors' meetings.   He always had some

11   excuse not to be at a creditors' meeting.   So we finally get a

12   creditors' meeting that he comes to in June, and he asks -- he

13   says, "I've got a lawyer.   I've got Eddie Rodriguez.   He's going

14   to be my lawyer in this bankruptcy case, so will you continue it

15   and let me meet with him?   And we'll come back the next time."

16   And he never hired Mr. Rodriguez, so -- and he doesn't come back

17   for the next creditors' meeting, and then he didn't come back

18   again in September for the next called creditors' meeting.   He

19   files motions to excuse his appearance and to appear by

20   telephone.   The judge denies it, and he files another one the

21   same day that it's denied basically.

22       So he's not coming forth.   He's not making himself

23   available.   We can't ask him questions about anything without

24   him being there.   Finally we took his deposition, and he wasn't

25   much help there either.   He never did produce and still hasn't

1    really produced his bank records.

2          THE COURT:  What was the $60,000 for?

3          MR. SCHMIDT:  The $60,000 was a retirement fund that he

4    had built up with at City of Brownsville.  And it was retirement

5    and/or vacation leave, sick leave that -- is my understanding of

6    it.  And it was paid to him in a lump sum a few months before

7    the bankruptcy was filed.

8          THE COURT:  For my edification, is that -- whose

9    property is that?

10          MR. SCHMIDT:  Well, it depends on what it was for, Your

11    Honor.  Retirement funds are generally exempt.  But vacation

12    leave and the sort, and if there's some compensation in there,

13    it would not be exempt once it was paid over.

14          THE COURT:  So if it was a big combination, you'd have

15    to sift out what it was for?

16          MR. SCHMIDT:  You'd have to sift it out.

17          THE COURT:  Although retirement, that ought to be fairly

18    definable, you would think.  If you had the records, you ought

19    to be able to figure out what part of that was retirement

20    because that all has to be reported to the IRS.

21          MR. SCHMIDT:  That's true, Your Honor.

22          THE COURT:  All right.  Go ahead.  I'm sorry.

23          MR. SCHMIDT:  No, Your Honor, that's really the essence

24    of what I had to say about that.  And when you tie all of that

25    together with one other, I think, extreme circumstances here, is

1   that Mr. Pequeno never claimed this judgment or any part of the

2   judgment as exempt until he gets aware of -- that the 5th

3   Circuit has ordered us to mediation.  And on the eve of that

4   mediation, he amends his schedules and claims that the full

5   amount of the judgment is exempt.  And we had an emergency

6   hearing.  We filed an emergency motion for direction from the

7   bankruptcy court.  And we had a hearing on it, and the judge

8   allowed us to go forward with the mediation.  And we did, and we

9   settled, as the Court knows.

10      So it's all of that conduct when you lump it together that

11   constitutes the extreme circumstances, the bad faith here that I

12   believe *In re Martin* talks about and allows the Court to deny

13   the conversion, which it did.

14      And Mr. Schell has talked about the fact that the judge

15   ruled on incorrect principles of law.  He denied the conversion

16   on equitable grounds, is what he announced from the bench.  He

17   did do that, Your Honor, but he also talked about in another

18   part -- and it's in my brief.  He talked about the extreme

19   circumstances, the bad faith; that what he was finding is that

20   Pequeno was evading the trustee and his creditors.  So I believe

21   he's got oral findings that say, "I'm finding that on equitable

22   grounds," but he also has oral findings and, in fact, his order

23   so reads that he finds bad faith.

24      THE COURT:  Yeah, I know the order.  Let me ask you

25   this.  Is there any question in your mind that bad faith equates

1    to an extreme circumstance?

2            MR. SCHMIDT:  No, there's not any -- in my research,

3    that's what it all equates back to.  In the cases that I have

4    read, bad faith is the extreme circumstances.  The 5th Circuit

5    doesn't use those words, but it does cite the *In re Calder* case

6    that talks in terms of bad faith.

7            THE COURT:  What other extreme circumstances in your

8    research have you found other than bad faith?

9            MR. SCHMIDT:  Well, I found the repetitious filings

10   where you have moving from chapter to chapter and really

11   never --

12           THE COURT:  Some kind of abuse of the system?

13           MR. SCHMIDT:  Other abuses of the system, yes, Your

14   Honor.

15           THE COURT:  All right.  Let's talk about the exempt

16   nature of the property, if it is exempt.

17           MR. SCHMIDT:  Your Honor, the -- I believe the

18   evidence -- well, let me back up.  As I understand the law, that

19   when a -- when a debtor files his schedules that claim property

20   is exempt, that puts the burden on the trustee to come forth

21   with evidence to show that it doesn't fit into that pigeonhole

22   that he says it fits into.  It's not lost wages or it's not

23   homestead or what have you.  And if I come forward with the

24   evidence to that effect, then it shifts the burden back to the

25   debtor to trump my evidence.  And in this case, he claimed it as

1  exempt.  He claimed all of it as exempt.  And the evidence that

2  I produced were his letters to me saying that he talked to the

3  several jurors and that they told him that they did not award

4  him any front pay or future lost wages because they thought he

5  was getting his job back.

6       And then in response to that and relying on that,

7  Mr. Pequeno goes and ultimately files his own pro se

8  amendment -- I mean a motion to amend the judgment with Judge

9  Tagle, which -- on the basis that the jury says I didn't get my

10  future lost wages, and I want you to amend the judgment and give

11  it to me.

12       He also wrote me a letter because I was hiring -- I had met

13  with him and I had met with Mr. Castillo and Mr. Garcia, and --

14  about this motion to amend the judgment.  And I was

15  considering -- since it belonged to me, it was property of the

16  estate, I was considering dismissing that motion.  And

17  Mr. Pequeno, in response to that, wrote me a letter and said, "I

18  talked to the jurors, and this is what they said.  And so I'm,

19  therefore, entitled to my future lost wages, so please don't

20  withdraw the motion to amend that I filed."

21       He not only did that, but he used that and incorporated that

22  same letter as an exhibit when he filed a motion when he opposed

23  the hiring of Mr. Castillo's firm as special counsel for me.

24       So -- and they raised an argument that that's really -- it's

25  hearsay and inadmissible, and I -- it is hearsay.  I guess what

1    the jurors said is hearsay, but I believe that it got admitted

2    by the trial court without objection and, in essence, became a

3    judicial admission by Mr. Pequeno because he filed it in the

4    bankruptcy case itself.

5        That, I think, Your Honor, is clear and concise evidence

6    that shows that the judgment was awarded by the -- the verdict

7    awarded by the jury did not include future lost wages and rebuts

8    his claiming of the same and shifted the burden back to him to

9    come forth with the evidence, and he did not come forth with

10   evidence, certainly not any evidence that convinced the judge.

11       And I -- and in answer to a question I think you asked

12   earlier, I don't believe you can turn that around, because that

13   is a factual finding, unless you find it to be clearly

14   erroneous.

15       THE COURT:  Okay.  What about -- let me ask you the same

16   thing I asked Mr. Schell.  Let's assume I don't find the factual

17   findings to be clearly erroneous.  Can I find -- can I still

18   find that the bankruptcy court erred on either of the two

19   points, the conversion, where he denied the conversion, or the

20   characterization of the property?

21       MR. SCHMIDT:  Well, as I understand the law, Your Honor,

22   you're not empowered to go behind his factual findings.  In

23   fact, I think that the appellate rules in the 8,000 series says

24   basically that.

25       THE COURT:  Let me ask it a different way.

1          MR. SCHMIDT:  Yes, Your Honor.

2          THE COURT:  Is the characterization of the property a

3    factual finding --

4          MR. SCHMIDT:  I believe it is, Your Honor.

5          THE COURT:  -- as opposed to a question of law?  That's

6    what I'm asking.

7          MR. SCHMIDT:  I believe it is.

8          THE COURT:  What about the right to convert?

9          MR. SCHMIDT:  Well, that -- that's the -- the issue is,

10   as I see it, Your Honor, is that what is the law in the 5th

11   Circuit?  Is it extreme circumstances, or is it absolute means

12   absolute?  That is a question of law, I believe.

13         THE COURT:  All right.  And then the subquestion that I

14   have is if I believe the law to be the extreme circumstances,

15   does this conduct fall into it?

16         MR. SCHMIDT:  That is a factual question, Your Honor,

17   and I don't believe that you can go behind the judge's findings

18   unless it's clearly erroneous.

19         THE COURT:  Okay.  Now, I asked Mr. Schell this, but I

20   think you agreed with it, but let me make sure.  How I rule on

21   these two issues, the conversion issue and the characterization

22   of the funds issue, basically controls the other issues on

23   appeal, which are basically do you have the right as a trustee

24   to settle.  And I think there's a fourth issue that was another

25   settlement type issue.

1     MR. SCHMIDT:  The right to mediate, I think, was the

2     other issue.

3         THE COURT:  Whatever it was, but it had to do with who

4     owned the property basically is the way I read it.

5         MR. SCHMIDT:  Yes, Your Honor.  That's my understanding

6     as well.

7         THE COURT:  All right.  Great.  Well, let me --

8     Mr. Schell, I'm going to give you a chance to respond to

9     Mr. Schmidt --

10        MR. SCHMIDT:  Thank you, Your Honor.

11        THE COURT:  -- briefly.

12        MR. SCHELL:  Your Honor, there's certainly a lot of side

13    issues and interesting little trails that we can follow arising

14    out of this entire bankruptcy proceeding.  And I know that my

15    client, Mr. Pequeno, a lot of times has lost sight of the forest

16    because of the trees; and that, I think, is natural for a lay

17    person.  And so a lot of the things that we see in the record --

18    and I have to apologize to the Court because the record is so

19    jumbled, and, you know, the filings are so difficult to go

20    through and decipher.  A lot of what we see is kind of

21    nitpicking on different issues.  But what I hope that we've been

22    able to do for the Court is to really boil this thing down to

23    what the legal issues are that must be decided as a matter of

24    law.  And I think that the Court's question as to whether or not

25    bad faith equals extreme circumstances is extremely perceptive,

1    and I think that is really the question of law here.  Even if

2    Judge Schmidt made a finding of fact of bad faith, is that a

3    finding of extreme circumstances?  And if the test in the 5th

4    Circuit is there must be extreme circumstances in order to

5    abrogate the absolute right to conversion, then there ought to

6    be a judgment, there ought to be a finding on the record

7    somewhere of extreme circumstances, and that's just not there.

8        So -- but it's my belief that the 5th Circuit really has not

9    adopted an extreme circumstances test; that the issue is really

10   open in the 5th Circuit as recognized by Judge Clark in the

11   *Porras* decision.  And if you look at *In re Martin,* they refer to

12   *In re Calder* in a footnote and say, "There are some cases out

13   there that hold extreme circumstances," and then refer to *In re*

14   *Calder,* but they never -- the judge writing the opinion never

15   comes in and actually says, "In the 5th Circuit, this is the

16   rule that we're going to apply."

17       And it just strikes me as extremely dangerous for the Court

18   to add an exception to a statute that's just really absolute.

19   The statute is quite clear.  The right to convert is an

20   absolute.  Carving out an exception, I think, would have to be

21   based on some compelling policy grounds, which I have simply not

22   seen articulated in any of the cases.  And I can't come up with

23   any compelling policy at this point that the judiciary has to

24   carve out an exception to a statute that says "you shall

25   convert."  And certainly in *Calder* there's no attempt to really

1    address those type of overriding compelling policy reasons.  So

2    when the judiciary is going to create law, carve out exceptions

3    to statutes where the language simply isn't in the statute nor

4    in the legislative history, seems to me like there's got to be

5    pretty good reason.  Hadn't seen that.  Hadn't heard it today at

6    all.

7        THE COURT:  Let me ask you.  And, Mr. Schmidt, you're

8    welcome to chime in on this.  As far as the actual affect of

9    this, if everything stays like the bankruptcy court orders it,

10   the lawsuit gets settled and, Mr. Schmidt, you've got 50-cents

11   on the dollar to go out and try to soothe the creditors,

12   Mr. Pequeno is discharged from those debts.  If it gets

13   reversed, the big issue here is the right to settle the lawsuit,

14   right?  I mean, that's really what we're talking about?

15       MR. SCHELL:  Yes, the right to settle and/or not settle

16   the lawsuit.

17       THE COURT:  And, of course, that -- with that goes the

18   amount which was settled, because I'm sure there's some amount

19   which Mr. Pequeno would say, sure, they're going to pay me this,

20   great.

21       MR. SCHELL:  Yes, Your Honor.

22       THE COURT:  All right.  Okay.

23       MR. SCHELL:  And --

24       THE COURT:  Go ahead.  I interrupted you.  I'm sorry.  I

25   wanted to make sure that I -- you know, I guess there's some

1  point.  If the settlement had been for $440,000, let's say

2  100-cents on the dollar, there would have been money to pay off

3  all the creditors and Mr. Pequeno would have realized some money

4  out of that, and perhaps everybody would have gone home happy.

5  Where now when you're arguing over 50-cents on the dollar or

6  whatever, I'm sure Mr. Pequeno, as well as all the creditors,

7  you know, everybody is going to be unhappy, which is maybe what

8  normally happens in bankruptcy court.

9         MR. SCHELL:  Right.  And certainly, you know, I feel

10  that at some point the parties should continue talking about

11  this with the hopes that maybe the whole matter can be resolved

12  without a final adjudication.  But that's not why we're here

13  today.

14       The -- the other big issue that Trustee Schmidt raised that

15  I think is worth commenting on is that there must be

16  consequences if there is no honesty in this reporting process;

17  that the fact that certain items were maybe omitted or not

18  admitted until a later date or submitted until a later date.

19       Well, there are consequences.  Rule 11, Rule 13, the

20  bankruptcy has -- bankruptcy court has power under Section 105

21  to protect the integrity of the bankruptcy system.  There are

22  procedures.  There's even penal code violations under 18 U.S.C.

23  for being dishonest in your bankruptcy case.  And so all of

24  those remedies, all of those options, potential sanctions are

25  available in order to protect the integrity of the system and to

```
 1    make sure the creditors are protected, that the trustee is able

 2    to carry out his duties, and that the judge can oversee things

 3    the way they're supposed to be done.

 4        That doesn't strike me as being a sufficient reason to say

 5    that you can carve out an exception to a statute that's simply

 6    absolute.  Because -- in other words, saying that the

 7    consequence is you can't convert is not a good rationale because

 8    there are other existing statutory and regulatory schemes that

 9    would allow for those consequences without having to create new

10    law.  And so that, I think, you know, if the trustee is really

11    concerned about what Mr. Pequeno did --

12             THE COURT:  There are other ways of punishing him.

13             MR. SCHELL:  Right.

14             THE COURT:  That statutes are allowed, whereas this

15    statute does not have that built into it.

16             MR. SCHELL:  It's not intended to be a punitive statute.

17    And that's essentially what I wanted to comment on.

18             THE COURT:  All right.  Let me get you to do one thing,

19    if you will, Mr. Schell.  At one point when you were commenting

20    or I was questioning you, your client indicated he might want to

21    say something.  Would you visit with him for a minute and see if

22    there's anything you want to add?

23             MR. SCHELL:  Sure.

24             MR. SCHMIDT:  Your Honor, may I answer your question?

25             THE COURT:  Yes.
```

```
 1              MR. SCHMIDT:  Mr. Pequeno has already been discharged
 2     from those debts.  Someone has to object to discharge within 60
 3     days of the very first creditors' meeting.  No one did that.  I
 4     didn't deem it expedient to do that.  So he's been discharged,
 5     which raises a whole set of new issues is that is he going to
 6     really pay?  If he converts to Chapter 13, is he really going to
 7     pay all these creditors' debts that he's discharged?
 8              THE COURT:  Are you going to really pay them if it stays
 9     in 7?
10              MR. SCHMIDT:  I'm going to pay some of them, Your Honor.
11              THE COURT:  Even if they're discharged?
12              MR. SCHMIDT:  He's discharged from them, Your Honor.
13     The estate is not.  This is the only asset the estate has.
14              THE COURT:  All right.
15              MR. SCHMIDT:  If we're reversed and the settlement goes
16     away, then there is no money in this case to pay creditors.
17              THE COURT:  So he's off the hook?
18              MR. SCHMIDT:  He's off the hook.
19              THE COURT:  All right.
20              MR. SCHMIDT:  And the creditors will not get paid
21     from -- without the settlement.
22              THE COURT:  Okay.  All right.
23              MR. SCHELL:  Your Honor, Mr. Pequeno simply wanted me to
24     comment to you that with respect to the $60,000, which was
25     talked about a little bit, that money was paid to him when he
```

```
 1    was terminated by the City of Brownsville in connection with the
 2    facts that led to the lawsuit.  And that money was paid, and the
 3    record will show this, was paid over a year before the
 4    bankruptcy was even filed.  And so most of that money, if not
 5    all that money was spent before December 31, 2001, when the case
 6    was filed.  So the trustee has no right, no claim to any of that
 7    at all.
 8            THE COURT:  Well, I'm not a bankruptcy practitioner by
 9    background, but doesn't the trustee have a right to go back a
10    certain amount of days and look how funds were spent before the
11    filing of the bankruptcy?
12            MR. SCHELL:  Yes, yes.
13            THE COURT:  And I think that his complaint was, "I
14    didn't have the records to go trace that down."
15            MR. SCHELL:  And Mr. Pequeno stated on the record during
16    the proceedings held before Judge Schmidt that he did provide
17    receipts showing how that money was expended, at least in part,
18    at some point during the case.  And again, we have -- you know,
19    we've got attempts to comply, probably inept compliance in a lot
20    of ways.  But whether or not that all rises to the level of an
21    extreme circumstance, if that's the standard, is another
22    question.
23        Also Mr. Pequeno wanted the Court to know that the reason
24    that he filed the bankruptcy was because his house was about to
25    be foreclosed upon.
```

1    THE COURT:  I read that in the record.

2    MR. SCHELL:  And that having lost a motion to lift stay

3  by the mortgage holder during the bankruptcy -- during the

4  Chapter 7 case, he feels that if he goes into Chapter 13, he

5  still may have a chance to save his home, which is a significant

6  reason and motivation for him wanting to be in Chapter 13 as

7  opposed to just letting things go.

8    THE COURT:  Okay.  All right.  Thank you, counsel.

9    MR. SCHELL:  Thank you, Your Honor.

10    THE COURT:  All right.  Let me -- you know, I have your

11  briefs and I've gone through them.  I'm going to issue a written

12  opinion on this.  I'm not going to rule from the bench.  But let

13  me -- it's -- today is Wednesday.  I will give y'all until next

14  Wednesday.  If there's anything you want to give me, you have a

15  week to do it, either side, if there's anything else you think I

16  need to look at or any thoughts that some of my questions

17  triggered to you.  You know, I don't think there's anything

18  covert.  You heard what I'm interested in, and I think I'm

19  interested in what you guys briefed.  So, I mean, I don't think

20  there's any hidden issue here.  But I wanted to give you all a

21  week to think about anything else you wanted to file.  But I

22  will issue a written opinion probably soon thereafter.

23    MR. SCHMIDT:  Your Honor, one housekeeping matter.  I

24  did file a motion for leave to file a response to his reply

25  brief.

1          THE COURT:  Okay.  That's granted.  That will be part of

2   this week.

3          MR. SCHMIDT:  And Mr. Schell was kind enough not to

4   oppose it.

5          THE COURT:  All right.  Thanks, gentlemen.  We'll stand

6   adjourned.

7      (Recess)

8                                        *  *  *

9      (End of requested transcript)

10                                       -oOo-

11   I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above matter.

13

14   Date:  July 15, 2004

15

16                        _Barbara Barnard_

17                        Signature of Court Reporter
                           Barbara Barnard

18

19

20

21

22

23

24

25