```
 1              MR. PEQUENO:  Yes, Your Honor.
 2                    CROSS-EXAMINATION
 3   BY MR. PEQUENO:
 4   Q.   Hello, Trustee.
 5   A.   Hello, Mr. Pequeno.
 6   Q.   Yes.  The issue on bad faith, when I filed the schedules,
 7   the Judge told me that I needed to file them by June the 17th.
 8   And the question is, did you read the entire schedule, the
 9   entire forms that I entered to the Court?  Did you get to see
10   them?  Because I believe --
11   A.   Yes, sir.  Yes, sir, I did.
12   Q.   Okay.  I believe, did you see, there was a specific one --
13   A.   It's the Statement of Financial Affairs?
14   Q.   Yes.
15   A.   Yeah.
16   Q.   Let me -- let me --
17   A.   You made reference to a lawsuit.
18   Q.   Yes.  Let me --
19   A.   To the City of Brownsville lawsuit.
20   Q.   I have it right here.  Statement of Financial Affairs.
21   A.   Yes, sir.
22   Q.   All right.  In there, doesn't the form there ask you if
23   you have a lawsuit pending?
24   A.   It says Suits and Administrative Proceedings, yes, sir.
25   Q.   Okay.
```

Schmidt - Cross                                    31

1    A.    List all suits.

2    Q.    Didn't I -- can you read the lawsuit that's listed there,

3    please?

4    A.    Yeah.  It's a violation of free speech, first amendment,

5    federal court.  Status:  On appeal.  And it gives a case

6    number.

7    Q.    Okay.  What is the case number, please?

8    A.    It's B-00-180, I believe is what it says.

9    Q.    Is that the case being appealed at the Fifth Circuit?

10   A.    I think it's the suit against -- your suit against the

11   City of Brownsville, yes, sir.

12   Q.    Yes.  And I believe on the following page, it says, you

13   know, that I entered that on June the 12th, you know, and --

14   A.    I'm sorry.  I don't understand your question.

15   Q.    I --

16   A.    On the next page, it says --

17   Q.    Well, where you sign that you enter that to the Court to

18   bankruptcy, you signed it, and I believe I put my name, and it

19   says June --

20   A.    Okay.  Under your signature, under your signature, there's

21   a date of June 12th, 2002.

22   Q.    Right, because I believe it's like 12 or 13 pages --

23   A.    Yes, sir.

24   Q.    -- where you list all your assets, all your liabilities,

25   not only for the, you know, like for the last two years.

```
 1   A.    No, sir.  The Statement of Financial Affairs that you're
 2   referring to has 11 pages.  The schedules have a lot --
 3   Q.    Right.
 4   A.    There's more pages.  And I can't tell you how many pages
 5   there are.
 6   Q.    That's correct.  Okay.
 7   A.    Okay.
 8   Q.    Going back, but what I'm telling you, the lawsuit was
 9   listed by me in there.
10   A.    In the Statement of Financial Affairs.
11   Q.    Yes.
12   A.    There is a --
13   Q.    Plus --
14   A.    -- reference to it, yes, sir.
15   Q.    Another one is also, one of the questions that came up
16   before the Court was my retirement, that I had -- I had to pull
17   it out, because I had to live on that.  And in there, the
18   retirement -- and this says the retirement.  And it says for
19   61,000.  Do you see -- it's on the same page where the lawsuit
20   is, where you read the lawsuit, the very first one.  Do you see
21   that?
22   A.    Income from other -- income other than from employment or
23   operation of business.  There is a listing of retirement with
24   City of Brownsville.
25   Q.    Okay.
```

Schmidt - Cross                                          33

1    A.    61,000.

2    Q.    Okay.  And this was filed on June the 12th, you know, to

3    let the Court -- but also --

4    A.    Six months after you filed bankruptcy, yes, sir.

5    Q.    When did you find out about the lawsuit, you said?  What

6    date did you find out about the lawsuit?

7    A.    Mr. Pequeno, it was sometime after the first of the year.

8    I couldn't -- it may have been in January, February, March --

9    Q.    So --

10   A.    -- April.  I don't have an exact recall.

11   Q.    So even before the lawsuit happened, even before February,

12   you already knew about it, because the opposing counsel had

13   already told you about it.  Is that correct?

14   A.    I knew about it, but from the Defendant's Counsel.

15   Mr. Pequeno, it may have been before trial, yes, sir.  It may

16   have been.

17   Q.    I believe it was.

18   A.    Yes, sir.  It may have been.

19   Q.    I believe it was.  You knew before trial.  And --

20   A.    That would make sense, yes.

21   Q.    Yes.  One of the main issues that Mr. Trustee used against

22   me, saying that I, he did not know about the lawsuit and that I

23   had not listed it in the schedules.

24   A.    I cannot agree with that question, Mr. Pequeno.

25   Q.    And, well --

Schmidt - Cross                                    34

1    A.    Because it's -- I was aware of the lawsuit, yes, sir.  But

2    I never said that I was unaware of the lawsuit, as you're

3    representing to this Court.  I was -- I've told all courts that

4    I was aware of the lawsuit.  What happened was that you never

5    fully disclosed that lawsuit until I pressed you to do so.  You

6    never scheduled it, for six months.  And when you filed your

7    schedules in June, six months after you filed bankruptcy, you

8    make a reference to it only in Statement of Financial Affairs.

9    And in reality, what you had was a judgment that you should

10   have listed on the schedules.

11   Q.    No.

12   A.    And you didn't do that.

13   Q.    Yeah, the thing is that we were -- well I was -- since I

14   was pro se, I was trying to get an attorney to handle this, and

15   my house was being sold.  And you know, the stay was lifted,

16   and I was trying to -- the attorneys told me to go to a 13.

17   And I even talked with you and told you that I needed to go to

18   a 13 to save my home, because the only reason I got into this

19   bankruptcy was to save my home.  And I still plan to do that.

20   And because it was --

21   A.    Well, I can't --

22   Q.    The honorable court --

23   A.    I can't agree with that, Mr. Pequeno, because your home is

24   gone.  It was foreclosed on and sold to an innocent third party

25   that knew nothing about the bankruptcy case.

```
1   Q.   I told the creditor --

2   A.   So your home is not -- so I can't agree with your

3   statement, or your question.

4   Q.   I understand, but --

5            MR. VARDEMAN:  Objection, Your Honor.

6            THE COURT:  What's your objection?

7            MR. VARDEMAN:  I realize that Mr. Pequeno is a pro se

8   debtor and is not totally familiar with the rules of court, but

9   I would prefer that he ask in forms of question rather than

10  make statements.

11           THE COURT:  Okay.  You need to ask questions.  This

12  is a question and answer session.

13           MR. PEQUENO:  Okay.

14           THE COURT:  And not, you know, you can't just talk

15  back and forth.  So ask him pointed questions, like

16  Mr. Vardeman did you.

17           MR. PEQUENO:  Okay.

18           THE COURT:  "Isn't it true that," in other words.

19           MR. PEQUENO:  Okay.

20  BY MR. PEQUENO:

21  Q.   Isn't it true, Trustee, that the first meeting was

22  adjourned, the first creditor's meeting back on June the 14th?

23  A.   Yes, sir.  I think all of your meetings were adjourned

24  until the last one, which was -- may have been September that

25  we finally concluded it.
```

Schmidt - Cross                                    36

1    Q.    No, it was, I believe, in November.

2    A.    It may have been in November, yes, sir.

3    Q.    No, it was November 26th.

4    A.    Okay.  But the first meeting was way back.

5    Q.    The first -- "adjourned" means that it did not take place.

6    A.    No, sir.

7    Q.    Is that true?

8    A.    That's not what it means at all.

9    Q.    What does it mean, Trustee?

10   A.    Adjourn means we held it, but because we're seeking

11   additional or further information, we have stopped the meeting

12   for that day, and we're going to take it up again on another

13   appointed day to acquire, to make further inquiry.  So the

14   meeting is still going on.

15   Q.    So I believe you -- well, is it true we had a 341 meeting

16   on November, November 26th?

17   A.    We had a number of 341 meetings, Mr. Pequeno.

18   Q.    No, that actually took place where you asked me questions,

19   and you even asked -- I remember at the meeting, isn't it true

20   you asked me to produce some documents, and -- because one of

21   your questions was what happened to this $60,000.  Isn't that

22   true, Trustee?

23   A.    Yes, sir.  That was a question that I had for you.

24   Q.    Isn't it true you got, you received these documents within

25   that --

Schmidt - Cross                                               37

```
 1   A.    I received some documents from you, yes, sir, about the
 2   $60,000 --
 3   Q.    Okay.
 4   A.    -- retirement.
 5   Q.    Isn't it true also that you let all your debtors, the
 6   creditors know that especially that you had like a settlement
 7   that you had done?  Isn't it true you had -- you issued a --
 8   isn't it normal that you --
 9   A.    Yes, sir.  I have to give notice of a settlement, proposed
10   settlement.  Yes, sir.  And I did that.
11   Q.    Okay.  Did you attend the August 7th meeting where the
12   Judge orally granted my relief to a Chapter 13?
13   A.    No, sir.
14   Q.    Do you remember --
15   A.    No, sir.  I was not present at that hearing.
16   Q.    Okay.  And do you remember when you filed objections?
17   A.    It was prior to August the 7th.  It was right after you
18   filed your motion to convert.
19   Q.    Okay.  When did you --
20   A.    Which my memory is that was in the beginning of August.
21   Q.    Yeah, I believe you filed in July.
22   A.    Well, if you'd let me see the docket, I could tell you
23   exactly when I --
24            MR. VARDEMAN:  It's Exhibit 8.
25            THE WITNESS:  They're not up here.
```

```
 1              MR. VARDEMAN:  Your Honor, I believe Mr. Pequeno
 2    accidentally removed the seven exhibits from the witness stand.
 3              THE COURT:  Okay.  Put them back.
 4              MR. PEQUENO:  Okay.
 5    BY MR. PEQUENO:
 6    Q.   So you filed objections to conversion to a 13.  Your first
 7    objection, I guess, was -- I believe it was July 22nd.
 8    A.   I think it is July 22nd, yes, sir.  That's my response to
 9    your motion --
10    Q.   And then --
11    A.   -- 40 -- no, no, I'm sorry.  Hold on.
12    Q.   Well, 2002, more than two years ago.
13    A.   I'm on the right page.  Yeah, here.  It was July 22nd,
14    2002.  It's Docket Number 51, my objection to your motion to
15    convert.
16    Q.   Right.
17    A.   Yes, sir.
18    Q.   Because I had mentioned to the Court that I needed, that I
19    needed to save my home, so I motioned to file, you know, a
20    motion to convert to a 13.  I believe Your Honor asked me to do
21    that, or if I had done that.
22    A.   Yeah.  You filed it on July the 18th, and I filed my
23    objection to that motion on July 22nd.
24    Q.   Right.  And then we had a hearing on August the 7th.
25    A.   No, sir.  You had a hearing on August the 7th on other --
```

1   on a motion to reconsider, I assume that's the lifting of the

2   stay.

3   Q.   No, no, no.  On August the 7th, it was motion to convert

4   to a 13 --

5   A.   No, sir.

6   Q.   -- which was granted.

7   A.   No, sir.  No, sir, it was not.

8   Q.   Yes, yes.

9   A.   If you look at the docket, it clearly shows it's relating

10  to Dockets Number 21 and Docket Number 46.  46 is a motion to

11  reconsider, and Docket 21 is another motion to reconsider.

12  Q.   You want to look at Page 6, 6 of 20?

13  A.   That's what I'm looking at, Mr. Pequeno.

14  Q.   Okay.  August 7th, can you read that?

15  A.   Yes, sir.

16  Q.   "Hearing held."  And it says, "Clarification stated.  Case

17  to be converted to Chapter 13."  Do you see -- is that --

18  A.   Yes, sir.  That's when the Judge orally ruled, because you

19  told him you wanted to -- you had filed a motion to convert to

20  13.

21  Q.   Right.

22  A.   And he orally ruled.

23  Q.   And I was orally granted relief to go to a 13.

24  A.   Yes, sir.

25  Q.   Right?

Schmidt - Cross                                                    40

1  A.    But the Judge, if you will look, the Judge did not realize

2  that I had objected to your conversion to 13, and he held a

3  hearing on it.  He set it for hearing on his own.  And I'll

4  find that for you.  That may be the one set for September the

5  10th.

6  Q.    I think the closest thing to that was October the 9th,

7  Trustee.  And then the Honorable Judge took it under advisement

8  and then didn't rule until August -- until November the 7th.

9          MR. VARDEMAN:  Your Honor, I would again ask that he

10  ask questions rather than make statements.

11          THE COURT:  Okay.  You need to ask questions.  But

12  again, you can do all of this in the form of a question, but

13  you can't just start making statements on the record.  You need

14  to ask him questions.

15          MR. PEQUENO:  Okay.

16  BY MR. PEQUENO:

17  Q.    Isn't it true, Trustee, that it was --

18  A.    Yeah.  November the 8th was the hearing that was held, and

19  the Judge ruled that the motion to convert was denied.

20  Q.    On November --

21  A.    After we had a hearing, November the 8th.

22  Q.    Right.

23  A.    Yes, sir.

24  Q.    So it was, what, almost three, what, it was like from

25  August, there was November -- it was three months later,

Schmidt - Cross                                    41

1   wouldn't you say?

2   A.    I would think your counting is correct.

3   Q.    Okay.  And then isn't it true that I appealed that to the

4   District Court?

5   A.    Yes, sir, Judge Hanen.

6   Q.    Okay.  And then the recent ruling by Hanen was that I

7   should not have been denied the conversion to a Chapter 13.

8   A.    Well --

9   Q.    Isn't that true?

10  A.    I have to disagree with that slightly, Mr. Pequeno.  As I

11  understood Judge Hanen's rulings, he said that there is an

12  absolute right to convert, but that he remanded it back to this

13  Court to determine whether or not you were eligible to be a

14  Chapter 13 debtor because your debt had been discharged in the

15  Chapter 7.

16  Q.    You were aware that I did have a house, a home.

17  A.    You told me you had, yes, sir.

18  Q.    Okay.

19  A.    But you weren't living in it.

20  Q.    You were aware that there was a creditor, a mortgage

21  company foreclosing and taking, trying to take property.

22  A.    I was familiar that they had filed --

23  Q.    You were familiar with it.

24  A.    -- motions to lift stay, yes, sir.

25  Q.    You were also familiar that I had a car that I had, I was

1  behind on payments, Valley Federal, and I still --

2  A.   I think, yes, sir, I think I do remember that.

3  Q.   Okay.  Those two assets were put in the plan to try to

4  save them in the plan.  And that's what my Chapter 13 plan

5  reflects.  In addition to that, my recent Chapter 13 plan

6  just -- isn't it true that in my plan, didn't I put that I will

7  pay the creditors 100 percent?

8  A.   All creditors other than me and the lawyers, yes, sir.

9  Q.   Okay.  Isn't it true you mentioned to the Court that

10 Pequeno, me, the Debtor, had not told them about the judgment,

11 nowhere had I told the Court about the judgment, it was not on

12 the schedules?  Isn't that true?

13 A.   It's not in the schedules.  That is true.

14 Q.   It is in the statement of financial conditions.  Isn't

15 that --

16 A.   Yes, sir.  There is a mention about the lawsuit in the

17 Statement of Financial Affairs.

18 Q.   Isn't that part of the schedules?

19 A.   It's part of the documents.  The schedules are a separate

20 part, where you're supposed to list the assets and the debts of

21 the debtor.

22 Q.   Is a debtor required to put that in?

23 A.   Yes, sir.

24 Q.   Okay.  And is a debtor responsible to put it as accurate

25 as possible everything in there?

```
 1    A.    In the schedules, yes, sir.

 2    Q.    Okay.  Well, wouldn't you say that the Debtor, Pequeno,

 3    disclosed that?  Isn't it true to say that I did disclose it to

 4    the Court?

 5    A.    You did not disclose it in the schedules.  You did mention

 6    it -- you have a disclosure of the lawsuit in the Statement of

 7    Financial Affairs.

 8    Q.    Isn't it true that, I believe maybe if you read --

 9    Honorable Richard Schmidt said that, he said because I hadn't

10    listed the schedule, the judgment, that was like a smack of --

11    A.    Bad faith.

12    Q.    -- violation of the law, federal law or something.

13    A.    It is.

14    Q.    But my contention was that I did.  And when Judge Hanen

15    read the information, as -- and I'm sure, have you read Hanen's

16    order?

17    A.    I have, yes.

18    Q.    Okay.  In it, I don't know exactly what page, but it says

19    there that the Court was aware that the Trustee was aware of

20    the lawsuit, from the very beginning, and that -- excuse me --

21    isn't it true that I had listed it in the schedules?

22    A.    No, sir.  You did not list it in the schedules.  You

23    listed it in the -- you mentioned it in the Statement of

24    Financial Affairs.

25    Q.    Okay.  So how did it hurt the Trustee by not knowing?
```

Schmidt - Cross                                                    44

1    A.    Because you're obligated by law to list on the schedules

2    all of your assets and all of your debts, and you didn't do

3    that.

4    Q.    Okay.   When did you settle this mediation?   What date did

5    you settle this mediation?   Was it -- is it true that it was

6    around September 16th?

7    A.    Of which year?

8    Q.    2002, September 16th -- I don't believe that's in the -- I

9    don't believe that's in the -- I think the Court gave you, on

10   September 25, I think it signed an order.

11   A.    Mr. Pequeno, I went to the Fifth Circuit, as authorized by

12   this Court, to attend the Fifth Circuit mediation of that

13   judgment.   And it was prior to the time that I filed the motion

14   seeking approval by this Court of that settlement.

15   Q.    Was it --

16   A.    Whatever date that is.

17   Q.    Isn't it true that it was after I had been converted to a

18   13?

19   A.    No, sir.   You were denied by this Court a conversion to

20   13.

21   Q.    But he reversed it.

22   A.    And Judge Hanen has reversed that.

23   Q.    Right.

24   A.    And remanded that back to this Court.

25   Q.    Isn't it -- okay.   Is it fair to say that on June the

Schmidt - Cross                                          45

1    16th, more or less, or sometime in September, you settled the

2    lawsuit at the Fifth Circuit?

3    A.    Of 2002?

4    Q.    Something like that.

5    A.    When did I file my motion seeking approval?

6    Q.    September 10th.

7    A.    September 24th, it looks like.  It was prior to that that

8    I went to the Fifth Circuit and mediated the case.

9    Q.    I believe it was September 16th, you asked the Court for

10   permission on the 10th.

11   A.    Okay.  Well, you've got a better memory than I do,

12   Mr. Pequeno.

13   Q.    Okay.

14   A.    I don't remember the exact date.  I know it was prior to

15   the filing of the motion --

16   Q.    Is it --

17   A.    -- which was September 24th.

18   Q.    Okay.  Thank you.  Isn't it true that this was after

19   August the 7th?

20   A.    Well, certainly, it's after August the 7th.

21   Q.    Okay.  All right.  One of the issues that came up before

22   Hanen was that the -- do you -- let's see if you agree with

23   this, the settlement of this particular lawsuit, isn't it

24   dependent on what chapter you're in?

25   A.    Yes, sir.

Schmidt - Cross                                    46

1    Q.    Subject --

2    A.    That's my understanding of Judge Hanen's order.

3    Q.    Okay.  As far as the -- I know you know a little bit about

4    the lawsuit, the original lawsuit that I had with the city.

5    And were you aware that it had to do with the discharge of an

6    employee?

7    A.    Yeah.

8    Q.    Like an employment --

9    A.    It had to do -- it was a wrongful termination lawsuit.

10   Q.    Wrongful termination.

11   A.    Yes, sir.

12   Q.    Right.  And the issue, the law that it was, it was a

13   federal law.  It was 42 --

14   A.    Yes, sir.

15   Q.    5242, 1983.

16   A.    Yes, sir, 1983.

17   Q.    Had to do with freedom of speech.  It was something as

18   simple as just, you know, speaking, and was very difficult to

19   me.  But were you aware that Judge Tagle, in her court, at

20   least three times, ruled that this case, this particular case,

21   rose to the level of the first amendment?  Were you aware of

22   that?

23   A.    Well, no, sir.  I wasn't there, so --

24   Q.    Okay.

25   A.    I couldn't --

Schmidt - Cross                                   47

1   Q.    Okay.

2   A.    -- say if she said that or didn't say that.

3   Q.    Yes.  She, on the other side --

4            THE COURT:  You can't talk, you can ask questions.

5            MR. PEQUENO:  Okay, Your Honor.

6   BY MR. PEQUENO:

7   Q.    And what is the status -- is it true that, have both

8   briefs been done on both sides?

9   A.    Yes, sir.  We did the -- of course, the City of

10  Brownsville had to file their brief first, and then

11  Mr. Costilla and I responded with a responsive brief, as

12  lawyers hired and approved by this Court.

13  Q.    Right.

14  A.    Yeah.

15  Q.    Is it fair to say that they've been waiting for this

16  decision for more than a year?

17  A.    No, sir, I don't think that's fair to say.  I don't think

18  the Fifth Circuit waits on an opinion.  They have their own

19  time schedule.

20  Q.    Right.  Okay.

21  A.    But it has been up there for a while, if that's your

22  question.

23  Q.    Yeah.  My question --

24  A.    Yes, sir.

25  Q.    -- is that the briefs have been completed for quite a

Schmidt - Cross                                    48

1   while, and --

2   A.   For a while, yes, sir.

3   Q.   Okay.  Let's see.  So if you stay in -- if this was to

4   stay in Chapter 7, who would basically -- would I be able to

5   have a say with the judgment, what happens, if it stays in a 7?

6   A.   No, sir, you would not.  It would -- the judgment has been

7   settled.  That has been approved by this Court.  The settlement

8   monies would get paid, and the creditors would get a

9   distribution.

10  Q.   Have you gotten to see -- I know you're not a Chapter 13

11  Trustee, but --

12  A.   No, sir, I'm not.

13  Q.   Right.  And -- but in the plan that I filed, have you seen

14  my, the latest plan?

15  A.   I have looked at it, yes, sir.

16  Q.   Okay.  Did you see where I made that if this thing, this

17  lawsuit gets resolved, I will pay my creditors 100 percent?

18  A.   Yes, sir, I've seen that.

19  Q.   Okay.

20  A.   Other than myself and Mr. Costilla's law firm.

21  Q.   Have you seen where I've been -- I've filed an adversary

22  against the creditor to see if I could get my home back?

23  A.   Well, I know you've filed a suit against Aurora, the

24  mortgage company, but you haven't sued the people that own that

25  house.

Schmidt - Cross                                    49

1   Q.    Well, Aurora is the one that did, that violated in

2   bankruptcy.  They're the ones that violated the automatic stay.

3   A.    That's your allegations.

4   Q.    So that's my allegation, and that's why --

5   A.    Which is contrary to what Judge Isgur found.  He found

6   that they had not violated the stay, that the stay had been

7   lifted.

8   Q.    Well, he found mainly contrary that you really didn't have

9   a link in there --

10  A.    Right.

11  Q.    -- and so forth, you could get out.  But it was attached

12  altogether, so the whole case was dismissed.

13  A.    I'm sorry.  I don't understand your question.

14  Q.    But -- no, I --

15  A.    Could you repeat that?  I'm sorry.  I don't understand.

16  Q.    Are you aware that I refiled an adversary against the

17  rightful party?

18  A.    Yes, sir.  Yes, sir.

19  Q.    All right.

20  A.    Solely against Aurora.

21  Q.    Right.

22  A.    Yeah, the mortgage company.  Not against the owners of the

23  real estate.

24  Q.    Right.  Okay.  As far as the wages of this lawsuit that

25  we're talking about --

1   A.   The City of Brownsville lawsuit?

2   Q.   The City of Brownsville.

3   A.   Yes, sir.

4   Q.   You're aware that in the jury -- well, you probably, it

5   might be -- in the jury instructions, were you aware that it

6   included future wages?

7   A.   Yes, sir.  It was a lump sum verdict.

8   Q.   Right.

9   A.   Yes, sir.

10   Q.   Okay.

11   A.   I've already testified about that.

12   Q.   Is it true that that particular issue, as far as the wages

13   being non-exempt, is being appealed as a separate appeal at the

14   Fifth Circuit?

15   A.   Have you given notice of appeal to the Fifth Circuit?

16   Yes, sir.  I don't know what you've appealed on, because you've

17   never designated your issues.

18   Q.   The --

19   A.   That I've seen, anyway.

20   Q.   Well, it's on the appeal.  It's on the actual --

21   A.   Okay.

22   Q.   That issue of non-exemption.

23   A.   I'll take your representation.

24   Q.   And that it was based on hearsay evidence.

25        MR. PEQUENO:  That's all, Your Honor.

1           THE WITNESS:  Well, I have to disagree with that

2    question.

3           THE COURT:  That's all the questions?  All right.  Do

4    you have any redirect?  Go ahead.

5                        REDIRECT EXAMINATION

6    BY MR. VARDEMAN:

7    Q.   Mr. Schmidt, just at a matter of clarification, the City

8    of Brownsville judgment that's on appeal to the Fifth Circuit,

9    Mr. Pequeno made a reference to how long the briefs had been on

10   file.  Is it your understanding that that matter has been

11   abated, due to the pending settlement and all of these other

12   matters before the bankruptcy court?

13   A.   That is my understanding, yes, sir.

14   Q.   Okay.  And you made a statement in response to one of

15   Mr. Pequeno's questions, you told him that his memory was

16   better than yours.  Were you making a statement of fact, or was

17   that just a figure of speech?

18   A.   That's a figure of speech.  I couldn't remember the exact

19   date of the mediation, but he's obviously looked at documents,

20   and I have not had a chance to look at those.

21   Q.   Okay.  All right.

22           MR. VARDEMAN:  No further questions, Your Honor.

23           THE COURT:  All right.  You can step down.  Next

24   witness.  Do you have any other witnesses?

25           MR. VARDEMAN:  I don't have any other witnesses, Your

```
 1   Honor.
 2           THE COURT:  All right.  Do you have any witnesses,
 3   Mr. Pequeno?
 4           MR. PEQUENO:  No, Your Honor.
 5           THE COURT:  All right.  Are we ready to argue?
 6           MR. VARDEMAN:  Your Honor, one of the cases that
 7   Judge Hanen refers to in his opinion is the Lesnit (phonetic)
 8   case.  It was a case with similar facts, where the debtors
 9   wanted to convert to 13 after they had received their discharge
10   in 7.  The difference, one difference is that they were
11   addressing the issue of whether the debtors can convert to 13,
12   and not whether the debtors should be reconverted to Chapter 7.
13           But in that case, the Court gave great significance
14   to the fact that the debtors had already received a discharge.
15   And the Court went to say that the fact that the debtors had
16   received a discharge, in a Chapter 7 case, there's supposed to
17   be a quid pro quo.  And I'm looking down at Page 6.  The
18   debtors receive a discharge, and in exchange, they make full
19   disclosure about their financial affairs, especially their
20   assets, and surrender their non-exempt assets to the Trustee
21   for liquidation and distribution among creditors.  It's one for
22   one.  It's quid pro quo.
23           And I would even add to that that in this case, one
24   significant fact is when the debtor wants to use a Chapter 7
25   for the sole reason of obtaining an automatic stay to protect a
```

```
 1   mortgage that he has no current ability to reorganize, that

 2   also has to be a quid pro quo.  If the debtor wants to go into

 3   Chapter 7 for a specific reason and use Chapter 7 and use that

 4   process, he has to be willing to do everything that's required

 5   in Chapter 7, not only disclosing non-exempt assets and all of

 6   his other assets, but playing by the rules, attending

 7   creditor's meetings, filing schedules, and not only that,

 8   surrendering his non-exempt assets, in this case, the judgment

 9   against the City of Brownsville.  And, you know, for the Debtor

10   to get -- the Debtor can't get two discharges.  He's already

11   received one discharge in this case.  And for him --

12            THE COURT:  And he has a motion to revoke that.

13            MR. VARDEMAN:  As a matter of fact, I was unaware of

14   that until this morning, Your Honor.  I guess he filed that --

15            THE COURT:  Does that have an impact?

16            MR. VARDEMAN:  Excuse me?

17            THE COURT:  Does that have an impact?  Can I revoke

18   the discharge at this date?

19            MR. VARDEMAN:  Your Honor, I haven't researched that.

20   Certainly, that was one of the items that Judge Hanen referred

21   to in his opinion.  And of course, that was not even on file

22   until today.

23            The other thing, Your Honor -- if you would let me

24   finish just a moment, Mr. Pequeno -- you know, the underlying

25   principle in Chapter 13 is that the debtor have an opportunity
```

1    to repay his debts.  And like I said, he's already received the

2    discharge.  There's no debts to repay.  The mortgage company

3    has foreclosed on his house.  There's nothing to restructure

4    there.  I would point out that Section 1322D.

5            THE COURT:  Well, if we revoke the discharge, he's

6    got all those debts that he's got to pay off, doesn't he?

7            MR. VARDEMAN:  That's correct, Your Honor.  I can't

8    argue with that.  I can't argue with that.

9            THE COURT:  In his plan -- in his plan, he proposes

10   to pay off those debts.

11           MR. VARDEMAN:  That's absolutely correct, Your Honor.

12           THE COURT:  Okay.  Now, I don't know how you confirm

13   a plan that doesn't take care of the administrative expenses

14   that have been incurred during the -- but I mean, can you

15   confirm a plan that doesn't pay the attorney's fees, for

16   instance?

17           MR. VARDEMAN:  Your Honor, our position is going to

18   be that's an administrative priority expense.

19           THE COURT:  Of course, that's not -- I mean, that's

20   not before me today, but --

21           MR. VARDEMAN:  No.  That's going to have to be paid.

22           THE COURT:  But apparently, the Debtor is attempting

23   to -- has filed a plan that doesn't pay for the administrative

24   expenses.

25           MR. VARDEMAN:  That's going to have to be paid under

1    the provisions of Chapter 13, Your Honor.  To the extent that

2    it's allowed, that's going to have to be paid.

3              THE COURT:  But that's not before me today, is it?

4              MR. VARDEMAN:  That is not.

5              THE COURT:  Before me today is the issue as to

6    whether or not the Debtor should be reconverted to Chapter 7.

7              MR. VARDEMAN:  And I've addressed the first two

8    issues, number one, the discharge, and number two, we've put on

9    the evidence about the bad faith in this case and how the

10   Debtor has proceeded.  He filed the Chapter 7 case solely to

11   obtain the benefits of an automatic stay to protect his home

12   mortgage, which he had no ability to reorganize, even in a

13   Chapter 13, and then immediately filed a --

14             THE COURT:  Well, but I mean, just because his

15   motives have changed, I mean, it may well be that he can't get

16   his house back.  He hadn't sued the right people, and you

17   pointed out the problems that he has with respect to getting

18   his house back.  He may not have even sued the right people.

19   So just because he can't get his house back doesn't mean that

20   there might not be a purpose served by a bankruptcy at this

21   point.  Isn't that --

22             MR. VARDEMAN:  Well, I would have to agree with that,

23   Your Honor.  But the fact that we have put on evidence of his

24   bad faith and his motives in this bankruptcy case is relevant.

25             The last thing, Your Honor -- if I could finish,

1    Mr. Pequeno -- is that 1322D allows a debtor five years from

2    the date of filing to complete a Chapter 13 plan.  This case

3    was filed on December 31st of 2001.  That means that this

4    Debtor has five years from that date, or until December 31st,

5    2006, to complete his payments under a Chapter 13 plan.  And if

6    you go down and you look at confirmation of a 13, in Section

7    1325B1B, the Debtors must submit three years of his disposable

8    income to the Trustee, to the Chapter 13 Trustee.  Now, the

9    Debtor testified that he had $500 a month in disposable income.

10   He's got to pay three years of that.  Now, he's got less than

11   three years left under the requirements of 1322D, which means

12   that at this point, since he's got two years and four months,

13   he's got to catch up seven or eight payments of that $500 a

14   month in order to make a plan work.

15        MR. PEQUENO:  I did that in good faith, Your Honor.

16   I knew --

17        THE COURT:  Okay.  Wait a minute.  You don't get to

18   talk until he's finished.  Go ahead.

19        MR. VARDEMAN:  The other thing is, Your Honor --

20        THE COURT:  Well, isn't that a confirmation issue?  I

21   mean, you're not suggesting --

22        MR. VARDEMAN:  It's a --

23        THE COURT:  I mean, you're not suggesting that there

24   is no way, as a matter of law, that he can confirm a plan at

25   this point.

1          MR. VARDEMAN:  Well, what I'm saying is that he's got

2   to make those payments, Your Honor.

3          THE COURT:  Okay.  But so, I mean, it may well be the

4   plan he has on file at the present time doesn't satisfy the

5   provisions of the code.  But isn't the test as to conversion to

6   Chapter 7 is that he has no confirmable plan, and that he -- I

7   mean, the Debtor has to make a good faith effort to confirm a

8   plan, or the case may be converted to 7.  Isn't that correct?

9          MR. VARDEMAN:  Well, that's exactly why we're here,

10  is to convert it to 7, Your Honor.

11         THE COURT:  Okay.  But he's just barely been

12  converted to 13.  I mean, Judge Hanen's rule came down, came

13  down, what, a month ago.

14         MR. VARDEMAN:  April the 1st, Your Honor.

15         THE COURT:  And we -- April 1st, okay.  But -- and we

16  then finally got it converted to 13 when?

17         MR. VARDEMAN:  It was on July the 20th that the Court

18  entered the order, Your Honor.

19         THE COURT:  So July the 20th, since July the 20th,

20  he's had to file a plan.  It may be that it's got problems, but

21  shouldn't he be given a reasonable amount of time to attempt to

22  confirm a plan if we're going to implement Judge Hanen's order,

23  realistically?

24         MR. VARDEMAN:  I can't argue with that, Your Honor.

25         THE COURT:  I mean, I agree with you that there are

1    lots of problems that he's got to solve in order to confirm a

2    plan.  And -- but I don't know that it would be reasonable to

3    say that because I ruled the wrong way, and then it got

4    appealed and overturned, that that time in there should be held

5    against him, in terms of whether or not -- in other words, if

6    it brought him within the three years of the date of his

7    got-to-finish-the-plan, at some point in there, there ought to

8    be a way for him to equitably figure out a way to make all

9    those payments.

10            Now, I don't know whether he can do it or not.  I

11   mean, I agree with you that if he can't confirm a plan that

12   takes care of all of the problems that he's got, then there is

13   no way that it can stay in Chapter 13.

14            MR. VARDEMAN:  Your Honor, the last thing I would

15   like to say is that 1307, which talks about conversion or

16   dismissal, states that once a debtor has been converted from

17   Chapter 7 to Chapter 13, he no longer has an automatic right to

18   dismiss his case.

19            THE COURT:  Correct.

20            MR. VARDEMAN:  In other words, the case is going to

21   have to be going back to Chapter 7 if he doesn't make his

22   payments or doesn't do what he's supposed to do --

23            THE COURT:  Correct.

24            MR. VARDEMAN:  -- in Chapter 13.  And I just want to

25   alert the Court to that, and make sure that if this Debtor is

1   allowed to stay in 13 for any period of time, that whatever

2   happens to his case, that the Court will fashion some order to

3   convert this case back to Chapter 7 and appoint Mr. Schmidt as

4   the Chapter 7 Trustee.

5          THE COURT:  I don't appoint Trustees.  I don't know

6   what the U.S. Trustee's position is with respect to what

7   happened to a case that was a 7, converted to 13, and goes back

8   to 7.  I don't -- but I think that that's not -- I suspect the

9   U.S. Trustee would take the position that they get the choice.

10          MR. VARDEMAN:  Yes, Your Honor.

11          THE COURT:  Okay.  That doesn't mean I can't remove

12   the Trustee that's appointed, but they get to appoint the

13   Trustee.

14          MR. VARDEMAN:  Yes, Your Honor.  That's all I have,

15   Your Honor.

16          THE COURT:  All right.  Go ahead, Mr. Pequeno.

17          MR. PEQUENO:  I just wanted to say, Your Honor, that

18   I believe that there has been no discharge.  Even though I know

19   Honorable Judge Hanen said that it looks like on August 14th,

20   there could have been an automatic discharge, simply that the

21   341 meeting was not held, and also it wasn't held until

22   November the 26th.  And it's on record.

23          The other point is that on August the 7th, I was, by

24   bankruptcy court, I was ruled to -- I was granted relief for

25   Chapter 13.  Then I was overruled on November the 7th.  In the

1    meantime, I was in Chapter 13.  And so that's -- so, but I

2    entered the motion to revoke, if in case there is a discharge,

3    which I don't believe so in this case.

4         This is basically a case that I declared all my

5    assets before I converted, I converted to a 13.  And it wasn't

6    something that I was, that it was done afterwards.  It was

7    done -- I declared my assets in June, and it's in record,

8    before I converted.  And I believe it's also in the order of

9    Hanen's, listed in there.

10        The other point is that, their contention is that I

11   should not go to 13 because of bad faith.  Well, the fact of

12   the matter is that I do not have bad faith.  I've tried

13   everything I've done on my part to come here, to be as truthful

14   to the Court and to, you know, to help me see if I could

15   resolve this issue and try to go into the 13 to try to save my

16   home.  But it's more complicated now because it's a third party

17   that has it.  But my contention is that it was sold, you know,

18   unlawfully, while there existed a stay.

19        And I hope to put that back into the plan.  I also

20   plan to put my car.  And then whatever is left over, I'll pay

21   the unsecured creditors.  But come the judgment, which I -- we

22   had a very difficult fight down here with Tagle's Court.  It

23   was a very difficult lawsuit, and we won.  And I believe

24   strongly that we have a 95 percent chance to win, because the

25   main issue that the opposing side is arguing, we -- this case,

1   this case does reach, does rise to the level of first

2   amendment, which Judge Tagle ruled at least three times.

3        And one other point that I want to say is that the

4   Trustee has, from the beginning, even knowing that I needed to

5   convert to a Chapter 13, he said, "I will oppose it." And I

6   didn't know exactly what he meant by that at that time, but he

7   just said, "I will oppose it." And then he said, he started

8   saying these things about bad faith, which are not true.

9        He stated to court certain things, that he didn't

10   know about the judgment, that I hadn't listed, didn't declare

11   the judgment to the Court, which were not true. And if

12   anything, you know, he's misrepresenting that information to

13   the Court to make me look -- he also said that I had not listed

14   the 61, my retirement. He -- Trustee also stated that I hadn't

15   given him documents, which in his own papers, you know, he

16   states there that he did, he did receive them. And it's just

17   been a litany of things, so many things.

18        And I've communicated some of these things to the

19   Fifth Circuit of what's going on, and because we, right now,

20   what they're trying to decide at the Fifth Circuit, who is the

21   real party of interest, and when was this mediation done. Was

22   it done while I was in a 13 or a 7? My contention is that it

23   was done when I was in a 13. And so consequently, it doesn't

24   come into play. And that's exactly what Judge Hanen ruled,

25   that the judgment, the settlement was based, subject to the

1    chapter, subject to what chapter you're in, Chapter 13 or

2    Chapter 7.

3            So I respectfully ask the Court to allow me to go and

4    continue into the Chapter 13.  I'm willing to modify it to what

5    I need to do, and the whole thing has been difficult to fight

6    just to keep my house this far.  And they've been saying that I

7    don't have a house, that I don't, which is -- that's the only

8    reason I went into this.  And I will pay the creditors through

9    my plan.

10            THE COURT:  Okay.

11            MR. SCHMIDT:  Your Honor, may I address --

12            THE COURT:  I think he maybe has one other thing to

13    say.

14            MR. PEQUENO:  Excuse me, Your Honor?

15            THE COURT:  Did you have one other thing to say?  I

16    think she wants you to say something else.

17        (Parties conferring off the record.)

18            MR. PEQUENO:  Well, I have a -- as far as dealing

19    with the discharge, Trustee Schmidt, on October 10th, issued a

20    notice of assets, sent notice to creditors that claims must be

21    filed on or before 90 days from the issue of this notice, and

22    that was on October 10th, 2002.  This is way before supposedly

23    discharges had happened.  And so -- right.  That's all, Your

24    Honor.

25            THE COURT:  All right.  Mr. Schmidt, did you have

1    something to reply?

2            MR. SCHMIDT:  Yes, briefly, Your Honor.  The

3    important issue in this case, as I see it, is the risk of the

4    loss of the value of the judgment.  While it's true that the

5    briefs have been filed, so that the Fifth Circuit at this point

6    has the judgment against the City of Brownsville appeal abated,

7    and there are --

8            THE COURT:  Okay.  Well, let me ask you this.  What

9    was appealed was the judgment.

10           MR. SCHMIDT:  Yes, by the City of Brownsville.

11           THE COURT:  Was the issue of the -- okay.  There was

12   a judgment entered which was on appeal to the Fifth Circuit.

13           MR. SCHMIDT:  Correct, by the City of Brownsville.

14           THE COURT:  At one point, this case was in 7,

15   filed 7.  Then it got converted to 13, then it got converted

16   to 7.

17           MR. SCHMIDT:  No, Your Honor.  It was originally

18   filed as a Chapter 7.  Mr. Pequeno --

19           THE COURT:  And Mr. Pequeno came in and asked to be

20   converted to 13, and I said convert it to 13.  At the time I

21   did that, you had on file an objection, and so I reconsidered

22   that.

23           MR. SCHMIDT:  But you had never really heard the

24   motion.

25           THE COURT:  Right, never really heard it, and that --

```
1            MR. SCHMIDT:  So you scheduled it and heard it.

2            THE COURT:  Vacated that conversion.

3            MR. SCHMIDT:  Yes.

4            THE COURT:  Isn't that correct?

5            MR. SCHMIDT:  That's correct.

6            MR. PEQUENO:  But that was --

7            THE COURT:  All right.  Now, was that vacation of

8   that conversion appealed?

9            MR. SCHMIDT:  Yes.  That was what was appealed to

10  Judge Hanen.

11           MR. VARDEMAN:  Your Honor --

12           THE COURT:  No, that's not what was appealed.  What

13  was appealed was we later had a hearing on whether it should be

14  converted to 13.

15           MR. SCHMIDT:  And that was appealed.

16           THE COURT:  And I denied it.

17           MR. SCHMIDT:  That was appealed to Judge Hanen.

18           THE COURT:  That's what was appealed.

19           MR. SCHMIDT:  Yes.  I'm sorry.

20           THE COURT:  But what was the date that I ruled --

21           MR. SCHMIDT:  November, I think.

22           THE COURT:  -- that the case should be -- should not

23  be converted to 13?  What date did that hearing --

24           MR. SCHMIDT:  That you filed the written order?  You

25  had an oral order converting it to 13, and that was --
```

```
1              THE COURT:  That was overturned.

2              MR. SCHMIDT:  And then you heard the motion to

3    convert and issued an order denying it.

4              THE COURT:  And denied it.  And what date did I issue

5    the order denying the motion to convert to 13?

6              MR. SCHMIDT:  I think, Your Honor, it was in November

7    of 2002, if you would give me a moment.

8              THE COURT:  So approximately November of 2002.

9              MR. SCHMIDT:  Yeah, the 11/8/2002 says that the Judge

10   ruled that the motion to convert was denied.

11             THE COURT:  All right.  When was --

12             MR. SCHMIDT:  And then the order was entered --

13             THE COURT:  When was the --

14             MR. SCHMIDT:  It's Docket Number 121, on November

15   the 12th of 2002, order denying motion to convert.

16             THE COURT:  That's the 12th.  Docket number what?

17             MR. SCHMIDT:  121, Your Honor.

18             THE COURT:  All right.  So that was done on

19   11/12/2002.

20             MR. SCHMIDT:  Yes, Your Honor.

21             THE COURT:  When did I approve the settlement of the

22   lawsuit?

23             MR. SCHMIDT:  After that.

24             THE COURT:  Docket number?

25             MR. SCHMIDT:  After that, I believe.
```

```
1           MR. VARDEMAN:  It was September 25th, Your Honor.

2           THE COURT:  September 25th, 2002?

3           MR. VARDEMAN:  Yes, Your Honor.

4           THE COURT:  No, 11/12 -- it must have been 2003 then.

5           MR. VARDEMAN:  No, it's Docket Number 75, Your Honor.

6           THE COURT:  75?

7           MR. SCHMIDT:  No, it's September 25th of 2002.

8    Agreed order approving settlement.

9           THE COURT:  So it was before the case was -- the

10   denial of the motion to convert to 13.  So it was in 7 when I

11   approved it.

12          MR. SCHMIDT:  Yes.

13          THE COURT:  Now, the order approving the settlement,

14   was that appealed?

15          MR. SCHMIDT:  Yes.

16          THE COURT:  The order approving the settlement was

17   appealed?

18          MR. SCHMIDT:  Yes.  And that's part of Judge Hanen's

19   order.  And what he said is he didn't have to decide that

20   issue, because it was determined about his, it would be

21   determined upon remand who owned it, basically, and was in

22   control of it.  If he was in 13, then he was in control of it.

23   If he was reconverted back to 7, then it was --

24          THE COURT:  When was the motion to convert to 13

25   filed?
```

```
 1            MR. SCHMIDT:  It was --

 2            MR. VARDEMAN:  It was filed on July the 18th, Your

 3    Honor.

 4            MR. PEQUENO:  July 18th.

 5            THE COURT:  2002?

 6            MR. VARDEMAN:  Yes.

 7            MR. SCHMIDT:  2002, Docket Number 50.

 8            THE COURT:  So there were two matters on appeal.  One

 9    was the --

10            MR. SCHMIDT:  Three matters, Your Honor.

11            THE COURT:  -- the actual lawsuit, Judge Tagle's

12    lawsuit, and the jury findings were on appeal.

13            MR. SCHMIDT:  To the Fifth Circuit.

14            THE COURT:  Fifth Circuit.

15            MR. SCHMIDT:  Yes, Your Honor.

16            THE COURT:  Then the bankruptcy was filed, or maybe

17    that was done during the bankruptcy, I don't know, and the

18    issue of the approval of the settlement was appealed.

19            MR. SCHMIDT:  Yes.

20            THE COURT:  And then the denial of the conversion,

21    and that was appealed.

22            MR. SCHMIDT:  Yes.

23            THE COURT:  So that's three matters on appeal.

24            MR. SCHMIDT:  And the exemptions.  And you denied his

25    claim for exemption for the judgment based on it being for
```

1  future lost wages.  That was appealed and affirmed by Judge
2  Hanen.
3          THE COURT:  Okay.  So no one has ruled on appeal
4  whether or not the September 25th, 2002, order of approval of
5  the settlement is final.  That's not a final --
6          MR. SCHMIDT:  No.  Judge Hanen said he didn't need to
7  read that -- reach that issue, because he was sending it back
8  to you to determine eligibility to be in 13.
9          MR. PEQUENO:  That it was contingent on the chapter,
10 on the conversion to the 13.
11         MR. SCHMIDT:  Judge Hanen was of the opinion that it
12 had been, the settlement was approved prior to the conversion.
13         THE COURT:  Conversion to what?
14         MR. SCHMIDT:  13.
15         THE COURT:  And it was approved prior to the
16 conversion.
17         MR. SCHMIDT:  Well, I know, Your Honor.  That was
18 Judge Hanen's findings.
19         MR. PEQUENO:  I believe, Your Honor, what Hanen said,
20 that in order for the Trustee to have authority to settle,
21 authority to --
22         THE COURT:  Let me ask you this, did anyone appeal my
23 vacation of the oral ruling that he should be in 13?
24         MR. SCHMIDT:  He appealed the -- Your Honor --
25         MR. PEQUENO:  No, Your Honor.

69

1          MR. SCHMIDT:  -- signed an order denying conversion

2     to 13.  That was appealed.  The oral --

3          THE COURT:  That's the only thing that's been

4     appealed with respect to that.  Okay.

5          MR. SCHMIDT:  On conversion.  That's correct.

6          THE COURT:  Okay.  All right.  Go ahead, Mr. Pequeno.

7     Anything further?

8          MR. PEQUENO:  That Judge Hanen has said that

9     Trustee's right to settle the lawsuit was to -- he said, I

10    believe he used the word "compromise," his right to compromise

11    the lawsuit was dependent on the conversion, whether to convert

12    to a 13 or not.

13         THE COURT:  Okay.

14         MR. PEQUENO:  That's all, Your Honor.

15         MR. SCHMIDT:  Well, Your Honor, the order of Judge

16    Hanen speaks for itself.

17         THE COURT:  Okay.  Thank you.  I'll have to -- I'm

18    going to review these cases.  I need to read Judge Hanen's

19    order one more time just to be certain of everything that's

20    done.  And I'll let you know what I decide.  Thank you.

21         (Proceedings concluded at 11:57 a.m.)

22

23

24

25